## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| CEPHALON, INC. and UNIVERSITY OF UTAH RESEARCH FOUNDATION ) ) ) ) ) | |
| Plaintiffs ) ) | Civil Action No. 05-29-JJF |
| v. ) ) | |
| BARR LABORATORIES, INC. ) ) | |
| Defendant ) ) | |

## PLAINTIFFS' OPENING BRIEF ON
## CLAIM CONSTRUCTION FOR U.S. PATENT NO. 4,863,737 ('737 PATENT)

Frederick L. Cottrell III (#2555)
Cottrell @rlf.com
Chad M. Shandler (#3796)
Shandler @rlf.com
Richards Layton & Finger, P.A.
P.O. Box 551
One Rodney Square
Wilmington, Delaware 19899-0551
(302) 651-7700

Attorneys for Plaintiffs CEPHALON, INC., and
UNIVERSITY OF UTAH RESEARCH
FOUNDATION

OF COUNSEL:

William F. Lee
David B. Bassett
Peter J. Kolovos
Gregory P. Teran
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, Massachusetts 02109
(617) 526-6000

Dated: July 8, 2005

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................. ii

INTRODUCTION .............................................................................................. 1

LAW OF CLAIM CONSTRUCTION ..................................................................... 2

CLAIM CONSTRUCTION ISSUES ....................................................................... 7

   I. The '737 Patent ........................................................................................ 7

     A. The Specification and File History ....................................................... 7

       1. Background of the Invention ............................................................ 7

       2. The Patented Solution .................................................................... 11

       3. The Prosecution History ................................................................. 12

     B. Disputed Claim Terms ....................................................................... 16

       1. "substantially powdered" ................................................................ 16

       2. "a pharmacologically effective dose of a [lipophilic] drug in a
          substantially powdered form" ........................................................ 19

       3. "mixing ... at a temperature below the melting points of the
          drug and the carbohydrate material" .............................................. 22

       4. "compressed with the carbohydrate material into a solid integral
          mass" ............................................................................................ 24

       5. "lipophilic" .................................................................................... 25

       6. "the drug" as stated in step (c) of claim 1 and step (d) of claim
          18 ................................................................................................. 26

       7. "the carbohydrate material" as stated in step (c) of claim 1 and
          step (d) for claim 18 ..................................................................... 30

       8. "the drug-containing matrix" as stated in step (d) of claim 1 ......... 31

       9. "a ... carbohydrate material" ......................................................... 32

CONCLUSION .................................................................................................. 34

# TABLE OF AUTHORITIES

Arlington Indus. v. Bridgeport Fittings Inc.,
  345 F.3d 1318 (Fed. Cir. 2003) ........................................................... 3

Bell Atlantic Network Servs., Inc. v. Covad Communications Group, Inc.,
  262 F.3d 1258 (Fed. Cir. 2001) ........................................................... 3

Boss Control, Inc. v. Bombardier Inc.,
  _ F.3d _, 2005 WL 1342908 (Fed. Cir. June 8, 2005) ..................... 2, 6

Brookhill-Wilk1, LLC v. Intuitive Surgical, Inc.,
  334 F.3d 1294 (Fed. Cir. 2003) ................................................ 4, 18, 26

C.R. Bard, Inc. v. U.S. Surgical Corp.,
  388 F.3d 858 (Fed. Cir. 2004) ........................................................ 7, 14

Carroll Touch, Inc. v. Electro Mech. Sys., Inc.,
  15 F.3d 1573 (Fed. Cir. 1993) ............................................................. 5

CCS Fitness, Inc. v. Brunswick Corp.,
  288 F.3d 1359 (Fed. Cir. 2002) ........................................................... 5

In re Crish,
  393 F.3d 1253 (Fed. Cir. 2004) ........................................................... 7

Crystal Semiconductor Corp. v. Tritech Microelecs. Int'l., Inc.,
  246 F.3d 1336 (Fed. Cir. 2001) ......................................................... 33

DeMarini Sports, Inc. v. Worth, Inc.,
  239 F.3d 1314 (Fed. Cir. 2001) ........................................................... 6

Dow Chem. Co. v. Sumitomo Chem. Co.,
  257 F.3d 1364 (Fed. Cir. 2001) ...................................................... 7, 24

Eolas Techs., Inc. v. Microsoft Corp.,
  399 F.3d 1325 (Fed. Cir. 2005) ...................................................... 4, 24

Genentech, Inc. v. Chiron Corp.,
  112 F.3d 495 (Fed. Cir. 1997) ............................................................. 7

Glaxo Wellcome, Inc. v. Andrx Pharms., Inc.,
  344 F.3d 1226 (Fed. Cir. 2003) ........................................................... 4

Goldenberg v. Cytogen, Inc.,
  373 F.3d 1158 (Fed. Cir. 2004) ........................................................... 3

- ii -

Golight, Inc. v. Wal-Mart Stores, Inc.,
　355 F.3d 1327 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . 27

Hockerson-Halberstadt, Inc. v. Converse Inc.,
　183 F.3d 1369 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . 4

Home Diagnostics, Inc. v. Lifescan, Inc.,
　381 F.3d 1352 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . 3

Irdeto Access, Inc. v. Echostar Satellite Corp.,
　383 F.3d 1295 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . 3

KCJ Corp. v. Kinetic Concepts, Inc.,
　223 F.3d 1351 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . 33

Liebel-Flarsheim Co. v. Medrad, Inc.,
　358 F.3d 898 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . 3, 4, 24

Mars, Inc. v. H.J. Heinz Co.,
　377 F.3d 1369 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . 14, 15, 21

Merck & Co. v. Teva Pharms. USA, Inc.,
　347 F.3d 1367 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . 4

Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings,
　370 F.3d 1354 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . 3

Middleton, Inc. v. Minnesota Mining & Mfg. Co.,
　311 F.3d 1384 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . 5, 21, 24

Multiform Desiccants, Inc. v. Medzam, Ltd.,
　133 F.3d 1473 (Fed. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . 3

Nellcor Puritan Bennett, Inc. v. Masimo Corp.,
　402 F.3d 1364, 1369-70 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . 6

Northern Telecom Ltd. v. Samsung Elecs. Co.,
　215 F.3d 1281, 1293-95 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . . 6

NTP, Inc. v. Research in Motion, Ltd.,
　392 F.3d 1336 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . 4, 6

Omega Eng'g, Inc. v. Raytek Corp.,
　334 F.3d 1314 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . 5, 6

PC Connector Solutions LLC v. SmartDisk Corp.,
　406 F.3d 1359 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . 3, 6

- iii -

Philips Petroleum Co. v. Huntsman Polymers Corp.,
   157 F.3d 866 (Fed. Cir. 1998) ........................................................................ 7

Playtex Prods., Inc. v. Procter & Gamble Co.,
   400 F.3d 901 (Fed. Cir. 2005) ......................................................................... 3

Regents of the University of California v. Eli Lilly and Co.,
   119 F.3d 1559 (Fed. Cir. 1997) ....................................................................... 7

Rexnord Corp. v. Laitram Corp.,
   274 F.3d 1336 (Fed. Cir. 2001) ....................................................................... 6

RF Delaware, Inc. v. Pacific Keystone Techs., Inc.,
   326 F.3d 1255 (Fed. Cir. 2003) ....................................................................... 3

Riverwood Int'l Corp. v. R.A. Jones & Co.,
   324 F.3d 1346 (Fed. Cir. 2003) ....................................................................... 3

SRI Int'l v. Matsushita Elec. Corp. of Am.,
   775 F.2d 1107 (Fed. Cir. 1985) (en banc) ..................................................... 15

Texas Digital Sys., Inc. v. Telgenix, Inc.,
   308 F.3d 1193 (Fed. Cir. 2002) ..................................................... 4, 18, 19, 26

Unitherm Food Systems, Inc. v. Swift Eckrich, Inc.,
   375 F.3d 1341 (Fed. Cir. 2004) ..................................................................... 22

Vanguard Prods. Corp. v. Parker Hannifin Corp.,
   234 F.3d 1370 (Fed. Cir. 2000) ....................................................................... 6

Vitronics Corp. v. Conceptronic, Inc.,
   90 F.3d 1576 (Fed. Cir. 1996) .................................................................. passim

Vivid Tech., Inc. v. Am. Sci. & Eng'g, Inc.,
   200 F.3d 795 (Fed. Cir. 1999) .................................................................... 7, 24

W.E. Hall Co. v. Atlanta Corrugating, LLC,
   370 F.3d 1343 (Fed. Cir. 2004) ....................................................................... 3

Federal Statutes

35 U.S.C. § 103 .............................................................................................. 12

35 U.S.C. § 112 .............................................................................................. 12

**INTRODUCTION**

On September 5, 1989, the United States Patent and Trademark Office issued U S Patent No. 4,863,737 ("the '737 Patent").[1]  The '737 Patent describes and claims certain drug-containing lollipops as well as their methods of manufacture.  These lollipops can be used to deliver drugs, such as pain-relief medication, through the mucosal tissues of the patient's mouth, pharynx, and esophagus.  This patent was originally assigned to the University of Utah, and later to the University of Utah Research Foundation.  The Foundation's exclusive licensee is Cephalon, Inc

The technology described and claimed in the '737 Patent is used in a pharmaceutical product manufactured by Cephalon, Inc. called ACTIQ®.  ACTIQ® is an oral transmucosal fentanyl citrate product – in essence, a lollipop that contains a prescription pain-relieving medicine called fentanyl.  ACTIQ® dissolves slowly in the patient's mouth.  As it dissolves, the fentanyl medicine is absorbed through the lining of the mouth and into the bloodstream, where it works to relieve breakthrough cancer pain.[2]

By letters dated December 7, 20 and 21, 2004, Barr Laboratories, Inc. ("Barr") informed Cephalon, Inc. that Barr had filed Abbreviated New Drug Application No. 77-312 ("ANDA"), and that it intends to market a generic version of ACTIQ® prior to the expiration of the '737 Patent.  The product Barr intends to market, if made or sold in the United States, would infringe the '737 Patent under the plain meaning of the patent's claims.  Cephalon, Inc. and the University of Utah Research Foundation (hereafter, collectively "Cephalon") have therefore brought suit against Barr

---

[1]      A copy of the '737 Patent is provided as Exhibit 1 to the Declaration of Gregory P. Teran ("Teran Decl."), filed herewith  In addition, the '737 Patent and all United States patents are available online at the PTO's website: http://www.uspto.gov/patft/index.html

[2]      See ACTIQ® Patient Leaflet (Teran Decl. Ex. 9.)

This brief addresses the construction of the disputed terms of the '737 Patent Consistent with controlling authority, Cephalon proposes that the disputed terms of the patent should be construed according to their plain meaning, as there is no clear evidence that the patentees adopted any different meaning in the specification or the prosecution history

In its preliminary proposed claim constructions, Barr, however, proposes constructions that are at odds with long-established canons of claim construction Barr consistently departs from the ordinary meaning of the disputed terms and seeks to add convoluted limitations to the claims that have no foundation in the text of the claims, the specification, or the prosecution history As explained below in greater detail, Barr's constructions should be rejected, and the Court should simply apply the plain meaning of the disputed terms

## LAW OF CLAIM CONSTRUCTION

Although claim construction is a subject with which the Court is certainly familiar, Cephalon sets forth below a brief summary of the law of claim construction [3]

Interpreting a patent claim is primarily a matter of reading the language of the claim itself, the specification of the patent, and the prosecution history  See Boss Control, Inc. v. Bombardier Inc., Nos 04-1437 et al , 2005 WL 1342908, at *3 (Fed Cir June 8, 2005)  "Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language " Bell Atlantic Network Servs., Inc. v.

---

[3]     As the Court may be aware, on July 21, 2004 the Federal Circuit granted review *en banc* of Phillips v. AWH Corp., No 03-1269, and requested briefing from the parties and *amici* concerning many of the canons of claim construction  Numerous *amici* filed briefs, and oral argument was heard in February 2005  No decision *en banc* has yet issued

Covad Communications Group, Inc., 262 F.3d 1258, 1267 (Fed. Cir. 2001); Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996)

First and foremost, claim construction analysis must begin with (and remain focused on) the language of the claims themselves. Playtex Prods., Inc. v. Procter & Gamble Co., 400 F.3d 901, 906 (Fed. Cir. 2005). There is a "heavy presumption" that claim terms carry the full scope of their ordinary and plain meaning. See, e.g., Irdeto Access, Inc. v. Echostar Satellite Corp., 383 F.3d 1295, 1300 (Fed. Cir. 2004) (citing Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 913 (Fed. Cir. 2004); RF Delaware, Inc. v. Pacific Keystone Techs., Inc., 326 F.3d 1255, 1263 (Fed. Cir. 2003).[4] The words of the claims are to be interpreted from the perspective of the "person of ordinary skill in the field of the invention," who "is deemed to read the words used in the patent documents with an understanding of their meaning in the field, and to have knowledge of any special meaning and usage in the field." Multiform Desiccants, Inc. v. Medzam, Ltd., 133 F.3d 1473, 1477 (Fed. Cir. 1998).[5]

The ordinary and customary meaning of a claim term may be determined by reviewing a variety of sources, including the language and context of the claims

---

[4]     "Indeed, normal rules of usage create a 'heavy presumption' that claim terms carry their accustomed meaning in the relevant community at the relevant time." Home Diagnostics, Inc. v. Lifescan, Inc., 381 F.3d 1352, 1355 (Fed. Cir. 2004) (citing CCS Fitness, Inc. v. Brunswick Corp., 288 F.3d 1359, 1366 (Fed. Cir. 2002)); see also Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings, 370 F.3d 1354, 1360 (Fed. Cir. 2004) (same); Goldenberg v. Cytogen, Inc., 373 F.3d 1158, 1164 (Fed. Cir. 2004) ("In construing patent claims, there is a heavy presumption that the terms carry their ordinary and customary meanings as would be understood by one of ordinary skill in the art"); W.E. Hall Co. v. Atlanta Corrugating, LLC, 370 F.3d 1343, 1350 (Fed. Cir. 2004) ("We indulge a 'heavy presumption' that the claim terms carry their ordinary and customary meaning"); Riverwood Int'l Corp. v. R.A. Jones & Co., 324 F.3d 1346, 1357 (Fed. Cir. 2003) ("The terms used in the claims bear a 'heavy presumption' that they mean what they say and have the ordinary meaning that would be attributed to those words by persons skilled in the relevant art").

[5]     Claims cannot take on "different meanings at different times"; rather, the literal meaning of a claim is fixed upon the issuance of the patent. PC Connector Solutions LLC v. SmartDisk Corp., 406 F.3d 1359 (Fed. Cir. 2005); Arlington Indus., Inc. v. Bridgeport Fittings, Inc., 345 F.3d 1318, 1330 (Fed. Cir. 2003).

- 3 -

themselves,[6] dictionaries and treatises, and the specification of the patent and its prosecution history (sometimes referred to as its "file history" or "file wrapper"). NTP, Inc. v. Research in Motion, Ltd., 392 F.3d 1336, 1346 (Fed. Cir. 2004) (quotations omitted). In particular, "[d]ictionaries, encyclopedias and treatises, publicly available at the time the patent is issued, are objective resources that serve as reliable sources of information on the established meanings that would have been attributed to the terms of the claims by those of skill in the art." Texas Digital Sys., Inc. v. Telgenix, Inc., 308 F.3d 1193, 1202-03 (Fed. Cir. 2002).[7]

Claims must also be construed "so as to be consistent with the specification, of which they are a part." Merck & Co. v. Teva Pharms. USA, Inc., 347 F.3d 1367, 1371 (Fed. Cir. 2003). Limitations generally may not be imported from the specification into the claims, however, and courts must be cautious to avoid this temptation. See, e.g., Texas Digital, 308 F.3d at 1204. Indeed, even when the specification describes only a single embodiment or a limited number of embodiments, "the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction.'" Liebel-Flarsheim Co., 358 F.3d at 907-08; see also Eolas Techs., Inc. v. Microsoft Corp., 399 F.3d 1325 (Fed. Cir. 2005); Glaxo Wellcome, Inc. v. Andrx Pharms., Inc., 344 F.3d 1226, 1233 (Fed. Cir. 2003) ("as a general rule claims of a patent are not limited to the

---

[6]    While certain terms may be at the center of the claim construction debate, the context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms. See Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc., 334 F.3d 1294, 1299 (Fed. Cir. 2003); Hockerson-Halberstadt, Inc. v. Converse Inc., 183 F.3d 1369, 1374 (Fed. Cir. 1999).

[7]    "Such references are unbiased reflections of common understanding not influenced by expert testimony or events subsequent to the fixing of the intrinsic record by the grant of the patent, not colored by the motives of the parties, and not inspired by litigation. Indeed, these materials may be the most meaningful sources of information to aid judges in better understanding both the technology and the terminology used by those skilled in the art to describe the technology." Tex. Digital, 308 F.3d at 1202-03.

preferred embodiment . . or to the examples listed within the patent specification ")
(citations omitted)  Conversely, however, any construction of the claims that excludes a
preferred embodiment "is rarely, if ever, correct and would require highly persuasive
evidentiary support " Vitronics, 90 F 3d at 1583

After first ascertaining the ordinary meaning of the claim terms themselves, the
specification and prosecution history should then be consulted to determine whether the
patentee did something to rebut the presumption of ordinary meaning  For example, an
inventor may "clearly set forth a definition of the disputed claim term in either the
specification or prosecution history" that is different from the term's ordinary meaning
See CCS Fitness, Inc. v. Brunswick Corp., 288 F 3d 1359, 1366 (Fed  Cir  2002)  As the
Federal Circuit has said, however, "[u]nless it appears from the specification or the file
history that they were used differently by the inventor," the words of a claim are accorded
their "ordinary and accustomed meaning "  Carroll Touch, Inc. v. Electro Mech. Sys.,
Inc., 15 F 3d 1573, 1577 (Fed  Cir  1993); see also Vitronics, 90 F 3d at 1582

In some circumstances, a patentee may disclaim the full breadth of a claim during
prosecution to obtain a patent  Any such disclaimer, however, must be "unequivocal[] "
Omega Eng'g., Inc. v. Raytek Corp., 334 F 3d 1314, 1324 (Fed  Cir  2003); see also
Middleton, Inc. v. Minnesota Mining & Mfg. Co., 311 F 3d 1384, 1387-89 (Fed  Cir
2002) (claim term given "full scope" of dictionary definition where there was no "special
meaning or definition of" term in patent, and the patentee had not "clearly and
unambiguously disclaimed or disavowed any interpretation during prosecution in order to
obtain claim allowance") (quotations omitted)

- 5 -

Unequivocal disclaimer is rare. Mere characterization of the invention in the prosecution history is not enough. See, e.g., Nellcor Puritan Bennett, Inc. v. Masimo Corp., 402 F.3d 1364, 1369-70 (Fed. Cir. 2005) (reversing district court's narrow construction that improperly "seized on the applicants' characterization of their invention" in the prosecution history), NTP, 392 F.3d at 1361-62 (in prosecution history, applicants distinguished certain prior art by calling attention to a feature of one embodiment of the invention; this statement did not limit the claims solely to embodiments practicing that feature). Furthermore, the Federal Circuit has consistently declined to apply the doctrine of prosecution disclaimer where the alleged disavowal of claim scope is, at best, ambiguous. See, e.g., Northern Telecom Ltd. v. Samsung Elecs. Co., 215 F.3d 1281, 1293-95 (Fed. Cir. 2000) (accused infringer relied on remarks made by inventors to overcome a rejection as basis for narrowing broad language of claims; because inventors' statements were amenable to multiple reasonable interpretations, they were too ambiguous to support disclaimer).[8] "Rather, we have required the alleged disavowing statements to be both so clear as to show reasonable clarity and deliberateness . . . and so unmistakable as to be unambiguous evidence of disclaimer." Omega Eng'g, 334 F.3d at 1325 (citations omitted).

---

[8]     See also PC Connector Solutions LLC v. SmartDisk Corp., 406 F.3d 1359, 1363 (Fed. Cir. 2005) ("[I]n the prosecution history, we do not read the patentability arguments that were made specifically to distinguish a test fixture as having effected the particular redefinition now advanced on appeal"); Boss Control, 2005 WL 1342908 at *5 ("[W]hile it is true that during prosecution the applicants twice used the phrase 'cut off' interchangeably with the term 'interrupt,' this usage does not operate to erase the clear definition of 'interrupt' found in the specification of the '206 patent"); Rexnord Corp. v. Laitram Corp., 274 F.3d 1336, 1347 (Fed. Cir. 2001) (refusing to limit ordinary meaning of claim because alleged disclaimer in file wrapper was, at best, "inconclusive"); DeMarini Sports, Inc. v. Worth, Inc., 239 F.3d 1314, 1326-27 (Fed. Cir. 2001) (refusing to rely on examiner's silence or patentee's lack of argument during prosecution to construe claim term); Vanguard Prods. Corp. v. Parker Hannifin Corp., 234 F.3d 1370, 1372 (Fed. Cir. 2000) (refusing to narrow the asserted claim based on prosecution disclaimer because "the prosecution history does not support [the infringer]'s argument that the Vanguard inventors 'expressly disclaimed' claim scope beyond products made by co-extrusion").

- 6 -

Several of the asserted claims of the '737 Patent in this matter include the transitional term "comprising." The use of "comprising" in a claim is open language of inclusion, and is universally understood in the context of claim interpretation to mean "including, but not limited to." See Dow Chem. Co. v. Sumitomo Chem. Co., 257 F.3d 1364, 1380-81 (Fed. Cir. 2001) (finding it "fundamental" that the use of "comprising" does not exclude additional unrecited elements or steps, and accused method or product does not avoid literal infringement merely by employing additional elements or steps); Vivid Tech. Inc. v. Am. Sci. & Eng'g, Inc., 200 F.3d 795, 811 (Fed. Cir. 1999) ("[A] claim using] the signal 'comprising' ... is generally understood to signify that the claims do not exclude the presence in the accused apparatus or method of factors in addition to those explicitly recited") [9]

## CLAIM CONSTRUCTION ISSUES

### I. The '737 Patent

#### A. The Specification and File History

##### 1. Background of the Invention[10]

The '737 Patent discloses and claims a "drug-containing lollipop" that can administer a fast-acting drug to a patient in a dose-to-effect manner. "Dose-to-effect"

---

[9]  See also In re Crish, 393 F.3d 1253 (Fed. Cir. 2004) ("[I]t is well-established that 'comprising' is a term of art used in claim language which means that the named elements are essential, but other elements may be added and still form a construct within the scope of the claim."); Philips Petroleum Co. v. Huntsman Polymers Corp., 157 F.3d 866, 874 (Fed. Cir. 1998) ("The use of 'comprising' and 'which comprises' in the composition and process claims generally would mean that the claims require [the recited limitations], but that additional elements or process steps may be present."); Genentech, Inc. v. Chiron Corp., 112 F.3d 495, 501 (Fed. Cir. 1997) ("'Comprising' is a term of art used in claim language which means that the named elements are essential but other elements may be added and still form a construct within the scope of the claim."); Regents of the Univ. of Cal. v. Eli Lilly and Co., 119 F.3d 1559, 1572 (Fed. Cir. 1997) ("The word 'comprising,' as UC argues and as is well-established, permits inclusion of other moieties.")

[10]  This information is taken from the '737 Patent specification and can properly be considered by the Court as "intrinsic" evidence. C.R. Bard, Inc. v. U.S. Surgical Corp., 388 F.3d 858, 861 (Fed. Cir. 2004) ("The intrinsic record includes the specification and the prosecution history.")

means that the drug can be administered to the patient to produce precisely the desired pharmaceutical effect, such as a decrease in the amount of pain a patient is experiencing Once the desired pharmaceutical effect is achieved, the lollipop can be removed by the patient or a medical professional. Col. 6:25 - 6:28 [11] Further, the '737 Patent teaches and claims novel methods for making the drug-containing lollipop by incorporating the drug into a compressed powder lollipop using fabrication techniques which do not require a molten mass. Col. 5:40 – 5:43; and 5:61 - 5:65

At the time of the invention, the majority of pharmaceutical compositions were administered either orally or by injection. This is still true today. As discussed in the '737 Patent specification, these methods of administration suffer from several disadvantages

*Oral administration.* Oral administration -- that is, the swallowing of tablets, capsules or liquids -- is often preferred due to its convenience. In addition, oral administration is (usually) non-threatening, painless and easy to accomplish. But there are disadvantages to this mode of administration. For example, pediatric and geriatric patients often have difficulty swallowing pills and may refuse to take liquid compositions. Col. 1:48 - 1:52. In addition, swallowing some pharmaceutical compositions increases gastric volume and thereby the likelihood of nausea and vomiting This problem is a particularly dangerous result for patients prior to anesthesia. Col. 1:52 - 1:56. Moreover, the rate of absorption of the drug into the bloodstream after swallowing varies from patient to patient. The absorption of the drug is dependent upon

---

[11]    Unless otherwise indicated, all such column and line citations are to the '737 Patent.

the movement of the drug from the stomach to the small and large intestines and the effects of secretions from these organs  Col  1:57 - 1:62

Additionally, there is normally a delay between the time of oral administration and the time that the therapeutic effect of the drug begins.  Generally, it can take forty-five minutes or longer for the drug to pass through the gastrointestinal system and enter the bloodstream  For many applications where immediate effectiveness of the drug is required, such as premedication before surgery, a serious medical condition, or immediate relief from pain, such a delay is unacceptable  Col  1:66 - 2:9

Another disadvantage of oral administration results from the fact that many drugs, particularly drugs with central nervous system ("CNS") or cardiovascular action, are almost immediately metabolized, and pass through the liver before distribution into the general blood circulation  More than sixty percent of most drugs, and about 100% of some drugs, are removed from the patient's bloodstream during this "first pass" through the liver  Col  2:14 - 2:24  Oral administration is thus impractical for many drugs, and it is particularly impractical for most CNS and cardiovascular action drugs that are used in critical care situations, for premedication prior to surgery, or for the induction of anesthesia  Col  2:25 - 2:30.

Yet another disadvantage of oral dosage forms is that they are formulated for an "average" patient  Many drugs, however, have widely varying effects on different patients  A pre-formulated oral dosage form does not allow the medical professional to control the precise dose needed to obtain the desired effect in a specific patient; instead, the dose is estimated to produce an average effect on an "average" patient  In reality,

actual patients will thus often be overdosed or underdosed, each of which can be harmful to the patient. Col. 2:39 - 2:50.

*Injection.* As an alternative to oral dosing, injection is often used. Injecting a drug results in rapid entry of the drug into the patient's bloodstream. Since the drug is delivered intravenously or intramuscularly, this mode of delivery also avoids the removal of large quantities of the drug by the patient's liver. The drug is rapidly distributed to various portions of the patient's body before exposure to the liver. Col. 2:58 - 2:66.

However, most patients, in particular children and geriatric adults, have an aversion to injections. Col. 2:67 - 2:68. Since psychological stress can exacerbate a patient's debilitated condition, it is often undesirable to use injections where the patient is seriously ill or suffers from a debilitating condition or injury. Col. 3:2 - 3:6.

Furthermore, the individual variations in effect using an "average" dose are even more profound when utilizing the injection mode of administration. To prevent overdosing, a patient is often given a lower than average dose, and then additional injections are given to supplement the dose. Repeated injections are thus necessary. Col. 3:7 - 3:15.

*Drug-containing candies and lozenges in the prior art.* In addition to tablets, capsules, liquids, and injections, the art prior to the '737 Patent also taught the incorporation of drugs into a molten candy mass, which was usually thoroughly mixed in a molten state, poured, and allowed to solidify. Col. 3:56 - 3:62. It is difficult, however, to blend solid drugs into such hard candy forms, since many drugs are insoluble or only partially soluble in the hard candy base. Such products thus often suffer from a lack of uniform distribution of the drug. Col. 4:2 - 4:8.

- 10 -

While the temperature of the candy mass may be increased to enable a more uniform distribution, considerable decomposition of the drug often takes place at higher temperatures. Such high temperatures are generally undesirable for drug products. Col. 4:9 - 4:16.

Candy lozenges also have drawbacks for delivery of a drug product. Such lozenges tend to crumble when placed in the mouth, or are chewed and swallowed. As a result, uniform release of the drug into the mucus and tissue does not occur. Instead, the drug will enter the bloodstream through the stomach and intestines as previously described. Due to those drawbacks, lozenges cannot be used to administer potent, fast-acting drugs, such as CNS and cardiovascular drugs. Col. 4:19 - 4:31.

Furthermore, pH conditions within the mouth tend to adversely affect the ability to administer certain drugs using the mucosal administration route. Administration of drugs through the mucosal tissue occurs best when the drug is in the non-ionized form. Variations in pH drastically affect the percentage of the drug that is non-ionized at any point in time. The pH conditions of the mouth thus limit the effectiveness of certain drugs that are administered through the mucosal tissues. Col. 4:40 - 4:52.

### 2. The Patented Solution

The '737 Patent solved the problem of how to administer potent, fast-acting drugs in patient-specific dosages by using a drug-containing lollipop that allows the drug to be administered through the mucosal tissue, thus avoiding many problems associated with the prior art.

In a preferred embodiment, the drug-containing lollipop is made by mixing solid powders at room temperature. Col. 7:62 - 7:65. This preferred embodiment has several advantages: it avoids the degradation of drugs that may occur at temperatures high

- 11 -

enough to produce a molten candy mass, and permits the mixture of constituents that are otherwise chemically incompatible in heated solution or suspension  Col 7:65 - 8:6  No statement in the specification or prosecution history, however, requires mixing solid powders in the complete absence of any and all liquid.

### 3. The Prosecution History

The application for the '737 Patent was filed on June 8, 1987, as a continuation-in-part of patent application 06/729,301, filed on May 1, 1985.[12]

The examiner rejected the original claims as "indefinite" under 35 U S C  § 112, second paragraph, and also as "obvious" under 35 U S C  § 103 in view of several United States patents   The examiner stated that these patents taught "the incorporation of a drug within a 'candy' matrix for ease of administration."[13]  The cited patents generally show the use of traditional candy formation techniques involving melting and heating the candy mass, such that the drug and candy were combined in a "molten" candy mass and then cooled.[14]

In response to this rejection, the applicants amended their claims to clarify that they were directed to a drug-containing lollipop incorporating a handle, and to include other limitations, such as that. (1) the drug must be in a "pharmacologically effective dose" and in "substantially powdered" form; and (2) the mixing of the drug and

---

[12]    The printed version of the '737 Patent indicates a date of "May 1, **1995**" (emphasis added), but this is an obvious printing error.  (The correct date is stated at Col 1:9.)

[13]    Office Action, April 27, 1988, Paper No. 5, at 4 (Teran Decl. Ex. 2)  The cited patents were U S. Patent No. 2,208,120 (Colemen); U.S. Patent No. 2,246,778 (Cahoon); U.S  Patent No. 3,341,414 (Cherkas); U.S. Patent No. 3,556,811 (Smith); U.S. Patent No. 4,372,942 (Cimiluca); and U S. Patent No 4,551,329 (Harris)  The examiner never rejected any pending claim as "anticipated" by any particular prior art reference  Thus, the examiner never found that any of these references taught each and every element of any claim proposed by the applicants

[14]    The examiner also suggested that two of the cited references generally teach the use of safety handles on a lollipop: US 2,246,778 (Cahoon) (confection) and US 4,551,329 (Harris) (oral medicament)

carbohydrate material (e g  the candy) must occur "at a temperature below the melting points of the drug and carbohydrate material" (although not necessarily at room temperature) [15]

In the response to the Office Action, and in support of these amendments, Applicants stated:

> Since the lollipops of the present invention are made by mixing solid powders of the drugs and the carbohydrate material, several disadvantages encountered in the prior art are overcome.  For example, relatively insoluble components can be combined without the difficulty of attempting to dissolve and mix those components, thereby resulting in a composition in which the drug is delivered to the mucosal tissues for absorption therethrough  Similarly, it is not necessary to heat the composition; hence, heat decomposition of the drug is avoided [16]

Distinguishing over the prior art references, Applicants stated the following:

> The present invention provides solid fabrication techniques which do not require a molten mass  As mentioned above, fabrication techniques which do not require a molten mass overcome several problems in the art related to solubility of the various components in a liquid and heat degradation of the drug and other components.  Both the method and article of manufacture claims include a limitation that the drug and the carbohydrate material are in powdered form when mixed to form the drug-containing lollipop **and/or** they are mixed at a temperature below the melting points of the drug and the carbohydrate materials [17]

> .   Unlike the present invention, this reference [Cimiluca] teaches heating the candy mass and does not suggest or teach the use of powder formation techniques **or** the incorporation of a drug into the carbohydrate material

---

[15]   Amendment, Oct  27, 1988, Paper No  8, at 2-10 (hereafter "Amendment") (Teran Decl  Ex  3)

[16]   Id. at 11-12

[17]   Id. at 15 (emphasis added)

- 13 -

> below the melting points of the drug and the carbohydrate material [18]
>
> .. None of the cited references teach or suggest the formation of a drug-containing carbohydrate material in the form of a lollipop by use of powder mixing and formation techniques None of the cited references teach or suggest the incorporation of a drug into a carbohydrate material in the form of a lollipop at a temperature below the melting points of the drug and the carbohydrate material [19]

The applicants made these statements in support of specific amendments to the claims that were offered to overcome the examiner's rejection The applicants never stated that the additional limitations added by amendment were to be interpreted in any way other than their ordinary meaning

A clear disclaimer or disavowal in the prosecution history may occur where, in response to a rejection by the examiner, the applicant states that the rejected (unamended) claim language should be read more narrowly to distinguish over the prior art E.g., C.R. Bard, Inc., 388 F 3d at 866-67 (prosecution history supported narrow claim interpretation requiring pleats where applicant overcame prior art rejection by arguing that prior art was distinguishable because it did not require pleats) That is not what happened here Instead, the applicants responded to the examiner's rejection by amending the claims with plain language Similarly, in Mars, Inc. v. H.J. Heinz Co., 377 F 3d 1369, 1377 (Fed Cir 2004), the applicants, who were pursuing claims to a pet food invention, responded to a rejection by amending their claims in a manner that explicitly narrowed the total moisture content of a certain ingredient (called the "inner component") from 25% to 15% by weight Id. at 1377 The accused infringer argued based on statements in

---

[18]    Id. at 17 (emphasis added).

[19]    Id. at 18

the specification and prosecution history that the applicants disclaimed the addition of water in any amount to the starting materials used to make the inner component. The Federal Circuit rejected this argument, finding "no reason" to narrow the plain meaning of the claims as amended, "which allows for the presence of water in the inner component, provided the water activity and total moisture content limitations are met." Id. at 1378-79.

Barr apparently contends that, during prosecution, the applicants disclaimed the presence of any liquid during the formation of the drug-containing lollipop. This is incorrect.[20] The applicants noted that "the lollipops of the present invention are made by mixing solid powders of the drugs and the carbohydrate material." Amendment, Oct. 27, 1988, at 11-12 (Teran Decl. Ex. 3). The applicants never stated, however, that such mixing must occur in the absence of any liquid whatsoever. Such a construction would be unnecessary to distinguish over the cited prior art, which generally taught the formation of medicated candies using a molten candy mass. See id. at 15-19.

Barr also contends, in essence, that the application of any heat during the formation of the drug-containing lollipop was also disclaimed in the prosecution history. This, too, is simply incorrect. The applicants stated that the invention made it "not necessary to heat the composition." Id. at 12. The applicants never stated, however, that the claims excluded any method or composition where any amount of heat was applied. Nor is such language found in the amended claims, which are silent as to heating (or

---

[20]    Barr makes this strained and facially incorrect argument for one simple reason: it needs this Court to find that the claims of the '737 Patent require the complete absence of liquids in order to have any noninfringement argument in this litigation. But not only is this argument by Barr contrary to the prosecution history of the '737 Patent, it violates one of the most basic canons of claim construction by asking the Court to construe the claims in light of the accused product. SRI Int'l v. Matsushita Elec. Corp. of Am., 775 F.2d 1107, 1118 (Fed. Cir. 1985) (en banc) (stating that claims may not be construed with reference to the accused device).

cooling) so long as the temperature during mixing does not exceed the melting points of either the drug or carbohydrate material

## B. Disputed Claim Terms

On May 27, 2005, Cephalon provided Barr with a chart describing Cephalon's preliminary proposed constructions for the asserted claims of the '737 Patent, all based on the plain meaning of the claim language.[21] On June 15, Barr provided Cephalon with a chart showing Barr's proposed constructions of the asserted independent claims of the '737 Patent.[22] It appears that nine claim terms are in dispute.[23] These disputed claim terms and additional issues are discussed below.

### 1. "substantially powdered"

| Claim Term | Cephalon's Proposed Construction | Barr's Proposed Construction |
|---|---|---|
| substantially powdered form<br><br>(claims 1, 6, 18, 37) | largely in the form of fine particles | dry, solid form consisting of finely dispersed particles that have been ground or pulverized to a point whereby the solid particles consist largely of finite and dust-like particles |

---

[21]    See Teran Decl. Ex. 4

[22]    See Teran Decl. Ex. 5. Barr's Preliminary Construction does not explicitly identify which terms and phrases of the claims Barr believes should be construed differently than Cephalon's original proposal. It instead addresses Cephalon's proposed constructions on a passage-by-passage basis. Many of the disputed passages, however, are substantially the same except for the proposed construction of certain terms and phrases. See id. Therefore, to conserve judicial resources and focus the briefing, Cephalon has attempted to identify the specific terms and phrases in dispute based on its interpretation of Barr's chart. In the event that Barr contends in its Opposition Brief that additional terms and phrases are disputed, Cephalon requests and hereby reserves the right to address those additional terms and phrases in its Reply Brief.

Furthermore, Barr's Preliminary Construction only addresses the independent claims of the '737 Patent. Cephalon has asserted several dependent claims, and provided constructions for several additional terms appearing in them. Barr has stated that it "does not dispute Cephalon's preliminary constructions for any additional terms within dependent claims 2-5, 8-11, 13, 14, 20, 22-25, 30, 31, 34 and 36 that were not previously construed in Barr's June 15, 2005 preliminary construction." Ltr. from Mr. Nutter to Mr. Kolovos, June 24, 2005.

[23]    In addition to the nine terms discussed in this brief, the constructions originally proposed by Cephalon and Barr for a tenth term, "buffer [being] capable of modifying the pKa of the drug such that a majority of the drug remains non-ionized," which appears in claims 18 and 37, were slightly different. Based on further review of Barr's proposed construction and the intrinsic evidence, Cephalon agrees with Barr's proposed construction: "a substance that tends to stabilize the hydrogen ion concentration by neutralizing acid or alkali and is capable of altering the pH of the saliva environment of the mouth such that a majority of the drug remains not changed or dissociated into ions."

| Claim Term | Cephalon's Proposed Construction | Barr's Proposed Construction |
|---|---|---|
| substantially powdered carbohydrate material<br><br>(claim 37) | a carbohydrate material largely in the form of fine particles | a carbohydrate material in a dry, solid form consisting of finely dispersed particles that have been ground or pulverized to a point whereby the solid particles consist largely of finite and dust-like particles |

The terms "substantially powdered form" and "substantially powdered carbohydrate material" should be construed according to their ordinary meaning. The ordinary meaning of "substantial" is "being largely but not wholly that which is specified." See Webster's Ninth New Collegiate Dictionary (9th ed. 1985) at 1176 (Teran Decl. Ex. 6). The verb "powder" means "to reduce or convert to powder," and the noun "powder" means "a preparation in the form of fine particles esp. for medicinal or cosmetic use." See id. at 922. Therefore, a substance in "substantially powdered form" would be "largely in the form of fine particles."

The ordinary meaning of "substantially powdered" is consistent with its usage in the patent specification and prosecution history. Neither the specification nor the prosecution history provides a specific definition of "powdered" that is different from the term's ordinary meaning.

Barr suggests that the phrase "substantially powdered form" means "dry, solid form consisting of finely dispersed particles that have been ground or pulverized to a point whereby the solid particles consist largely of finite and dust-like particles." Barr applies a similar construction to "substantially powdered carbohydrate material." Barr's construction of "substantially powdered" is unnecessarily convoluted and inconsistent with the ordinary meaning. It should not be adopted.

In its Preliminary Construction, Barr relies on a definition from the 1982 edition of Webster's New World Dictionary. "any dry substance in the form of very finite, dust-

- 17 -

like particles, produced by crushing, grinding, etc "[24]    Barr's cited definition is excessively limiting   Nothing in the specification or prosecution history suggests that a powder must be <u>completely</u> dry   This is consistent with the understanding of "powders" by persons of ordinary skill in the art at the time of the invention, who would have appreciated that powders can contain some degree of hydration, depending on various ambient factors, such as temperature and humidity [25]

Furthermore, Barr's own dictionary definition fails to support its construction   Barr's definition does not state that a powder must be in "solid form."  Nor does it state that particles of a powder must be "finely dispersed."  And although Barr's definition discusses "crushing" and "grinding" as <u>examples</u> of ways to produce a powder, it never states that particles <u>must</u> be "ground or pulverized" in order to be "powdered."[26]  Yet all of these limitations are incorporated in Barr's proposed construction.  Barr has failed to

---

[24]      <u>Webster's New World Dictionary of the American Language</u>, (2d ed  1982) at 1116   To the extent the Court finds these proposed definitions to be in conflict, the dictionary cited by Cephalon (published in 1985) is slightly closer in time to the filing date of the original application that led to the '737 Patent (May 1, 1985), as well as the issuance of the patent (Sept  5, 1989), than the dictionary cited by Barr (published in 1982)   Therefore, Cephalon's dictionary is more contemporaneous with the patent and should be preferred   See <u>Tex. Digital</u>, 308 F 3d at 1202-03; <u>Brookhill-Wilk 1, LLC.</u>, 334 F 3d at 1299 (counseling reliance on dictionaries, treatises, and similar references that are "contemporaneous with the patent")

[25]      For example, Remington's Pharmaceutical Sciences, a standard treatise in the pharmaceutical field, indicates that powders may contain hygroscopic and deliquescent substances, i e , substances that become moist because of affinity for moisture in the air   See <u>Remington's Pharmaceutical Sciences</u> (17th ed  1985) at 1600-1601 (Teran Decl  Ex  8)   Furthermore, Remington's also states that small amounts of liquids can be incorporated into divided powders and provides examples of substances, such as magnesium carbonate, starch, or lactose, that can be added to increase the absorbability of powders for liquids   See <u>id</u> at 1600   Thus, a person of ordinary skill would know that although "[e]xtremely deliquescent compounds cannot be satisfactorily prepared as powders," <u>id.</u> at 1601, there are numerous situations in which a powder is not entirely "dry"

[26]      It is known by persons of ordinary skill in the pharmaceutical arts that powders may be produced by processes such as precipitation, crystallization, and spray drying   While grinding and pulverization can be used to reduce the size of the resulting particles, these steps are not always necessary   See <u>Remington's Pharmaceutical Sciences</u> (17th ed  1985) at 1585 et seq  (Teran Decl  Ex  8)

support these additional limitations with either its own dictionary definition or any passage from the specification or prosecution history [27]

Finally, Barr's proposed construction ignores the claim term "substantially." In the claims, "substantially" modifies "powdered form," thus indicating that the substance in question (whether drug or carbohydrate material) is "largely" (but not wholly) in powdered form  Barr's construction, however, places "largely" in the wrong location and makes unjustified usage of the needlessly limiting term "consisting". "dry, solid form <u>consisting</u> of finely dispersed particles that have been ground or pulverized to a point whereby the solid particles <u>consist largely</u> of finite and dust-like particles" (Emphasis added.)  Barr's construction thus improperly suggests that the drug or carbohydrate material must be in <u>entirely</u> powdered form, and effectively reads "substantially" out of the claim

Because of these defects, Barr's construction should be rejected

### 2. "a pharmacologically effective dose of a [lipophilic] drug in a substantially powdered form"

| Claim Term | Cephalon's Proposed Construction | Barr's Proposed Construction |
|---|---|---|
| a pharmacologically effective dose of a drug in a substantially powdered form<br><br>(claim 6) | a quantity of a drug that is sufficient to produce a desired therapeutic effect and is largely in the form of fine particles | a drug in a dry, solid form consisting of finely dispersed particles that have been ground or pulverized to a point whereby the solid particles consist largely of finite and dust-like particles, <u>wherein the drug has not been exposed to liquids or heat during the production of the lollipop</u>, and with the drug being in a quantity sufficient to produce a desired therapeutic effect (emphasis added) |

---

[27]    Even if the Court finds that both Cephalon's and Barr's dictionary definitions are consistent with the use of the words in the intrinsic record, "the claim terms may be construed to encompass all such consistent meanings." <u>Tex. Digital</u>, 308 F 3d at 1203. In that event, the Court's construction should be broad enough to encompass both definitions, and therefore Cephalon's construction (which contains fewer limitations) should be selected

| Claim Term | Cephalon's Proposed Construction | Barr's Proposed Construction |
|---|---|---|
| a pharmacologically effective dose of a lipophilic drug in a substantially powdered form<br><br>(claim 37) | a quantity of a drug having an affinity for lipids that is sufficient to produce a desired therapeutic effect and is largely in the form of fine particles | a drug in a dry, solid form having a strong attraction to fats consisting of finely dispersed particles that have been ground or pulverized to a point whereby the solid particles consist largely of finite and dust-like particles, wherein the drug has not been exposed to liquids or heat during the production of the lollipop  (emphasis added) |

The parties' dispute concerning the construction of this term primarily revolves around (a) the proper construction of "substantially powdered form"; and (b) whether the pharmacologically effective dose of the drug as claimed can be exposed to either liquids or heat during the production of the drug-containing lollipop.[28]

In addition to the unsupported limitations Barr ascribes to "substantially powdered form," discussed supra, Barr asserts that the pharmacologically effective dose of the drug as claimed cannot "[have] been exposed to liquids or heat during the production of the lollipop" (emphasis added). Barr provides no support for this added limitation from any dictionary, from the claim language, or from the patent specification – thereby effectively conceding that its proposed limitation is inconsistent with the term's ordinary meaning and its usage in the patent.[29]

In its Preliminary Construction, Barr suggests that a portion of the prosecution history – specifically, the applicants' Amendment, Oct. 27, 1988, at pages 11-12, 15 and 18 (attached as Teran Decl. Ex. 3) – supports its contention that the claim term "drug in a

---

[28]     Barr and Cephalon apparently agree as to the construction of "pharmacologically effective dose." With respect to claim 37, Barr and Cephalon disagree also as to the construction of "lipophilic."    This dispute is discussed in Section I B 5, infra.

[29]     As noted above in footnote 20, the true reason Barr seeks to have this unsupported limitation imported into the claims is clear: it is the only way Barr can muster any credible argument to avoid infringement.

substantially powdered form" cannot possibly be construed to cover any drug that was ever exposed to any liquids or any heat during production of the drug-containing lollipop This contention can only be accepted, however, if the cited portion of the prosecution history is found to contain a clear and unambiguous disclaimer of claim scope   See Middleton, 311 F.3d at 1387-89. Yet the prosecution history contains no such disclaimer, and simply does not support Barr's argument

As the Amendment shows, and as is discussed in more detail in Section I A 3, supra, the claims were amended to add the language "<u>substantially</u> powdered form" and "at a temperature <u>below the melting points</u> of the drug and the carbohydrate material " (Emphasis added )   These amendments, however, do not constitute a clear and unambiguous disclaimer of the use of <u>any</u> liquids or <u>any</u> heat during production of the drug-containing lollipop  Indeed, the amendments suggest the opposite. "substantially" is less than all, and "below the melting point[]" suggests that heat can be used, as long as the degree of heat does not reach a certain level   See, e.g., Mars, 377 F.3d at 1378-79 ("no reason" to narrow plain meaning of claims as amended, "which allows for the presence of water in the inner component, provided the water activity and total moisture content limitations [as amended] are met").

No statement in the prosecution history indicates that these amendments should be read in a manner contrary to their ordinary meaning   Therefore, Barr's construction should be rejected

- 21 -

### 3. "mixing . . . at a temperature below the melting points of the drug and the carbohydrate material"

| Claim language | Cephalon's Proposed Construction | Barr's Proposed Construction |
|---|---|---|
| mixing . . at a temperature below the melting points of the drug and the carbohydrate material<br><br>(claims 1, 18) | combining or blending . . at a temperature below melting points of the drug and the carbohydrate material | combining or blending . . <u>without the use of liquids or heat</u>  (emphasis added) |

The parties' dispute with regard to the construction of this term focuses on the interpretation of "at a temperature below the melting points of the drug and the carbohydrate material "

The ordinary meaning of "melting points" is undisputed and does not require explicit construction.  See <u>Unitherm Food Sys., Inc. v. Swift Eckrich, Inc.</u>, 375 F.3d 1341, 1350 (Fed Cir. 2004)   Consistent with its well-understood meaning, Webster's Ninth New Collegiate Dictionary defines "melting point" as "the temperature at which a solid melts" and defines "melt" as "to become altered from a solid to a liquid state usu[ally] by heat " See <u>Webster's Ninth New Collegiate Dictionary</u> (9th ed 1985) at 740 (Teran Decl Ex 6) [30]  Therefore, should the Court decide to provide an explicit construction of "melting point[]," Cephalon would suggest a construction of the claim term "mixing    at a temperature below the melting points of the drug and the carbohydrate material" as "combining or blending     at a temperature below the temperature at which the drug and the carbohydrate material become a liquid "

---

[30]    Similarly, Webster's New World Dictionary of the American Language defines "melting point" as "the temperature at which a specified solid becomes a liquid "  <u>Webster's New World Dictionary of the American Language</u> (2d ed 1982) at 885 (Teran Decl Ex 7)

The ordinary meaning of "mixing    at a temperature below the melting points of the drug and the carbohydrate material" is consistent with its usage in the patent specification and prosecution history  Neither the specification nor the prosecution history provides a specific definition of any of these words that is different from the term's ordinary meaning

Barr's proposed construction interprets "at a temperature below the melting points of the drug and the carbohydrate material" as "without the use of liquid or heat "  Barr takes the clear language of the claim and replaces it with a distortion of the term that completely prohibits the use of liquid or heat during the mixing    Indeed, the claim language explicitly allows the use of heat as long as the temperature remains below the melting points of the drug and the carbohydrate material    Additionally, the claim language does not require (or even mention) the absence (or presence) of liquids  There is simply no justification for Barr's mischaracterization of the claims' complete silence on the presence of liquids as a total prohibition of the use of liquid or heat, as argued by Barr

Barr provides no dictionary definition to support its interpretation  Furthermore, neither the language that Barr cites in the specification nor the portions of the file history referred to in Barr's preliminary construction contain any support, explicit or otherwise, for Barr's tortured construction [31]    None of the portions of the prosecution history referred to in Barr's Preliminary Construction require mixing "without the use of liquid or heat "

---

[31]    Again, as noted above in footnote 20, Barr's strained construction can only be explained as an obvious attempt to avoid infringement.

Although one embodiment of the invention describes mixing solid powders at room temperature, neither the specification nor the file history contains statements limiting the claims to this embodiment, or clearly disclaiming the use of any liquid or heat during the mixing process  See Middleton, 311 F.3d at 1387-89 (claim term given "full scope" of ordinary meaning absent special definition or clear disclaimer); Liebel-Flarsheim, 358 F.3d 898 at 907-08 (Fed  Cir  2004) (claim terms given full scope even if broader than single embodiment described in patent); Eolas Techs., 399 F.3d at 1325 (same)

Additionally, the claims contain the word "comprising" as the transitional phrase See pp 6-7, supra (discussing meaning of "comprising" language in claim interpretation) This explicitly allows the addition of other elements or steps to the article of manufacture or process – including the presence of liquid, and/or the application of heat (so long as the temperature remains within the claims' explicit limitations on temperature)  See Dow Chemical, 257 F.3d at 1380-1381; Vivid Tech., Inc., 200 F.3d at 811.

Therefore, because the strained claim construction proposed by Barr limits the claim term beyond the ordinary meaning without support from a dictionary, the specification, or a clear and unequivocal disclaimer in the prosecution history, Barr's proposed construction of this term should be rejected

### 4.  "compressed with the carbohydrate material into a solid integral mass"

| Claim Term | Cephalon's Proposed Construction | Barr's Proposed Construction |
|---|---|---|
| compressed with the carbohydrate material into a solid integral mass<br><br>(claims 6, 37) | pressed or squeezed together with the carbohydrate material into a unitary mass that is not liquid or gaseous | pressed or squeezed together with the carbohydrate material in the absence of a liquid to form a unitary mass that is not liquid or gaseous  (emphasis added) |

The parties' main dispute with regard to the claim term "compressed with the carbohydrate material into a solid integral mass" is similar to their dispute concerning the term "mixing      at a temperature below the melting points of the drug and the carbohydrate material." Once again, Barr has inserted into this phrase an unsupported additional term – this time, the words "in the absence of a liquid."

The plain meaning of the claim term certainly does not require the additional words that Barr has inserted. These words are not present in the claim language, and they are not based on any definitions of words that <u>are</u> present in the claim language. Furthermore, the portions of the specification and file history that Barr refers to in its preliminary construction do not contain this language.

As discussed above, although one embodiment of the invention certainly describes mixing solid powders at room temperature, neither the specification nor the file history contains statements limiting the claims to this embodiment, or clearly disclaiming the use of any liquid during the mixing process. Additionally, again the claims contain the word "comprising" as the transitional phrase, which allows the addition of other elements or steps (such as the presence of liquid) to the article of manufacture or process. These arguments are discussed in detail in Section I B 3, <u>supra</u>.

### 5.  "lipophilic"

| Claim Term | Cephalon's Proposed Construction | Barr's Proposed Construction |
|---|---|---|
| lipophilic (claims 18, 37) | having an affinity for lipids | having a strong attraction to fats |

The term "lipophilic" should be construed according to its ordinary meaning to a person of ordinary skill in the art. Lipophilic is defined as "having an affinity for lipids (as fats)." <u>See</u> <u>Webster's Ninth New Collegiate Dictionary</u> (9th ed. 1985) at 696 (Teran

Decl. Ex. 6)  Barr proposes an alternative definition: "having a <u>strong</u> attraction for fats."[32]

Cephalon's definition is more appropriate. A compound possessing an affinity (or attraction) for lipids, whether or not that level of affinity is "strong," is lipophilic. The ordinary meaning of lipophilic does not contain a limitation as to degree. Some lipophilic compounds are highly lipophilic, and others are less so.[33]  Because the lipophilicity of a compound is a matter of degree, the level of degree should not be imported into the claim term when the degree is not specified in the claim language. Neither the specification nor the prosecution history contradict this construction. Accordingly, Barr's proposal to use the words "strong attraction" should be rejected.

### 6.  "the drug" as stated in step (c) of claim 1 and step (d) of claim 18

| Claim Term | Cephalon's Proposed Construction | Barr's Proposed Construction |
|---|---|---|
| the drug<br><br>(claim 1) | the drug | the drug from step (a), the drug in a dry, solid form consisting of finely dispersed particles that have been ground or pulverized to a point whereby the solid particles consist largely of finite and dust-like particles |

---

[32]    See Webster's New World Dictionary of the American Language, (2d ed. 1982) at 911. As noted above, the dictionary used by Cephalon is closer in time to the filing of the original application that led to the '737 Patent than the one used by Barr. Therefore, the dictionary used by Cephalon is more appropriate for use in construing the claims of the '737 Patent. See Tex. Digital, 308 F.3d at 1202-03; Brookhill-Wilk 1, 334 F.3d at 1299. Even if both Cephalon's and Barr's dictionary definitions are consistent with the use of the words in the intrinsic record, "the claim terms may be construed to encompass all such consistent meanings." Tex. Digital, 308 F.3d at 1203. Cephalon's proposed construction is broad enough to encompass both definitions.

[33]    See, e.g., U.S. Patent No. 4,550,109, issued October 29, 1985, Col. 8:45-8:47 ("The lipophilicity increases with the increasing chain length, which can be seen easily by the higher Rf-values for the products with the larger chains."); U.S. Patent No. 4,560,549, issued December 24, 1985, Col. 11:68-12:5 ("[T]he relative ineffectiveness of TBS is due to the decreased lipophilicity of such compound when alkyl, alkanoyl or similar $-R_1$ and $-R_2$ attachments (as already defined above) are substituted by $-Br$ thereby leading to decreased dermal penetration."); Drayer, Pharmacotherapy, 7(4):87-91, 88 (1987) ("The degree of lipophilicity of beta blockers may be of consequence in producing CNS side effects in that variations may produce great differences in brain:plasma concentration ratios.") (Teran Decl. Ex. 10); Moerlein et al., Int. J. Nucl. Med. Biol. 12(5):353-356, 356 (1985) ("[T]his work shows that increasing the lipophilicity of spiperone analogues does not have straightforward effects on the cerebral localization properties of the radiolabelled compounds.") (Teran Decl. Ex. 11)

| Claim Term | Cephalon's Proposed Construction | Barr's Proposed Construction |
|---|---|---|
| the drug<br><br>(claim 18) | the drug | the drug from step (a), the drug in a dry, solid form having a strong attraction to fats and consisting of finely dispersed particles that have been ground or pulverized to a point whereby the solid particles consist largely of finite and dust-like particles |

Claims 1 and 18 are method claims reciting several steps. In claim 1, there is a step denoted as "(a)" which recites "obtaining a pharmacologically effective dose of the drug in a substantially powdered form, the drug being capable of absorption through mucosal tissues of the mouth, pharynx, and esophagus." Claim 18 recites a similar step "(a)," adding the requirement that the drug must be in "substantially powdered lipophilic form." Each claim also contains a number of additional steps.

Barr's proposed construction imports into subsequent steps of claims 1 and 18 respectively all of the limitations of "the drug in substantially powdered form" (emphasis added) that it has proposed for its construction of step (a) of claims 1 and 18. This is inappropriate.[34]

Step (c) of claim 1 states "mixing the drug and the carbohydrate material." The claim language does not state "the drug from step (a)," nor does it state that "the drug" mixed in step (c) is in "substantially powdered form." Barr incorrectly suggests that this extreme limitation of "the drug" in step (c) of claim 1 is justified because "[s]tep (c)

---

[34]    In particular, Barr improperly seeks to import a limitation – "substantially powdered form" – from one step of the claim where it is explicit to another step that is completely silent as to that limitation. This argument is unsupported by the canons of claim construction. Cf. Golight, Inc. v. Wal-Mart Stores, Inc., 355 F.3d 1327 (Fed. Cir. 2004) (rejecting argument that there was an implicit "360 degrees" limitation to the construction of the claim term "rotating" where, inter alia, the "360 degrees" limitation was explicitly stated in connection with "rotating" in other claims).

cannot be performed without first completing steps (a) and (b) "[35] Barr provides a similar statement as its sole support for its construction of "the drug" in step (d) of claim 18 [36]

However, the preamble of claim 1 and claim 18 both state "the method comprising the steps of " (Emphasis added ) As discussed above, the word "comprising" is open language that permits the inclusion of additional claim elements   See Section I B 3, supra; see also footnote 9, cases cited, and accompanying text, supra

Consistent with the commonly understood meaning of "comprising," the specification explicitly describes embodiments that include additional steps    For example, when describing "geometric dilution"[37] as a preferred process to manufacture the product, the specification states that "[t]his procedure is repeated until all of the components are added to the mix and mixed thoroughly with all other components " Col 11:58-11:60  Thus, the specification makes clear that this step can be included within the claimed method even though it is not explicitly set forth in the claim language   In addition, several of the examples in the specification of the '737 Patent contemplate additional unclaimed steps  For instance, Example 1 states "[a]liquots of 2 grams each

---

[35]     According to Barr, the "preamble of claim 1 introduces the claims as a method for producing a drug-containing lollipop  Step (c) cannot be performed without first completing steps (a) and (b). Thus, step (c) refers to the 'drug in a substantially powdered form' obtained in step (a) " Teran Decl. Ex  5 at 2

[36]     See id. at 7

[37]     "It is presently preferred to use the method of geometric dilution in mixing the various components  Using this method, the two smallest ingredients by weight (as a proportion of the final product) are first mixed together thoroughly

When complete mixing has been obtained between those two components, the next smallest ingredient or ingredients by weight equal to the weight of the previous ingredients is added and mixed thoroughly with the existing mixture  This procedure is repeated until all of the components are added to the mix and mixed thoroughly with all other components.

Geometric dilution provides for complete and thorough mixing of all of the components  Using the method described above, there is little chance for incomplete mixing and uneven distribution of components throughout the mix  It will be recognized that this is an advancement over the art in that existing methods may result in incomplete mixing because of the insolubility of the products "

Col  11:49 - 11:68

were hydraulically compressed      " which suggests an additional step in which small portions of the mixture are prepared for compression  Col  18:47 – 18:48  Furthermore, practicing the embodiments of Examples 2, 3, and 4 (Col  18:56-20:24) by combining ingredients using geometric dilution as taught in the '737 Patent (Col  11:49-11:68) would result in the performance of additional steps prior to mixing step (c) in claim 1.

Accordingly, between obtaining "the drug" in step (a) and mixing "the drug and the carbohydrate material" in step (c) of claim 1, additional steps can be performed.  That is what the word "comprising" explicitly permits.  These additional steps may affect the characteristics of "the drug "  Therefore, it does not necessarily follow that "the drug" used in step (c) of claim 1 will still contain precisely the same characteristics of "the drug" that was obtained in step (a).[38]

The same analysis applies for claim 18 as for claim 1

Neither the specification nor the file history contradicts this analysis  Indeed, as pointed out above, the specification specifically supports the understanding that additional steps which are not explicitly discussed in the claims may nonetheless be part of the claimed process  To the extent any of those steps alter the characteristics of the drug, Barr's construction would have the effect of excluding these embodiments from the coverage of the claims  The Federal Circuit has stated that such a construction would be "rarely, if ever, correct and would require highly persuasive evidentiary support "

---

[38]    Particularly telling is the lack of any explicit claim language requiring "the drug" in step (c) to be in "substantially powdered form "  The applicants explicitly stated that the drug in step (a) must be in "substantially powdered form "  Had they meant to claim only methods where the drug remained unchanged (and hence in substantially powdered form) between steps (a) and (c), they could easily have said so  Yet they did not  That is because the claimed invention contemplates (and covers) additional steps that could change the drug's characteristics between steps (a) and (c).

- 29 -

Vitronics, 90 F 3d at 1583   Barr has provided <u>no</u> evidentiary support at all, and therefore Barr's construction of this term should be rejected

### 7. "the carbohydrate material" as stated in step (c) of claim 1 and step (d) for claim 18

| Claim Term | Cephalon's Proposed Construction | Barr's Proposed Construction |
|---|---|---|
| the carbohydrate material (claim 1) | the carbohydrate material | the carbohydrate material from step (b) |
| the carbohydrate material (claim 18) | the carbohydrate material | the carbohydrate material from step (b) |

Barr's proposed construction imports into subsequent steps of claim 1 and claim 18 the limitation that "the carbohydrate material" is the carbohydrate material from step (b) of claim 1 and claim 18 respectively, effectively requiring that the carbohydrate material in step (b) be used directly in step (c) without the possibility of there being intervening steps between steps (b) and (c)  This proposed construction is inappropriate for the same reasons that Barr's proposed construction of "the drug" in these claims is inappropriate

Step (c) of claim 1 states "mixing the drug and the carbohydrate material "  The claim language does not state "the carbohydrate material from step (b)." As discussed above, Barr's only support for this limitation of "the carbohydrate material" in step (c) of claim 1 is that the "preamble of claim 1 introduces the claims as a method for producing a drug-containing lollipop  Step (c) cannot be performed without first completing steps (a) and (b)  Thus, step (c) refers to the 'drug in a substantially powdered form' obtained in step (a) "  Barr provides a similar statement as its sole support for its construction of "the carbohydrate material" in step (d) of claim 18.

However, as discussed in Section I B 6, <u>supra</u>, the preambles of claim 1 and claim 18 both state "the method <u>comprising</u> the steps of" (emphasis added), and the specification describes embodiments involving additional steps not explicitly described in claims 1 and 18. Accordingly, between obtaining "the carbohydrate material" in step (b) and mixing "the drug and the carbohydrate material" in step (c) of claim 1, additional steps can be performed. These steps may affect the characteristics of "the carbohydrate material." Therefore, it does not follow that by the time "the carbohydrate material" is used in step (c) of claim 1, it will still contain precisely the same characteristics of "the carbohydrate material" obtained in step (b).

The same analysis applies for claim 18 as for claim 1.

Neither the specification nor the file history contradicts this construction. Indeed, as discussed in Section I B 6, <u>supra</u>, the specification specifically supports the understanding that additional steps which are not explicitly discussed in the claims may nonetheless be part of the claimed process. Barr's construction improperly ignores the possibility of additional steps and should therefore be rejected.

### 8. "the drug-containing matrix" as stated in step (d) of claim 1

| Claim Term | Cephalon's Proposed Construction | Barr's Proposed Construction |
|---|---|---|
| the drug-containing matrix (claim 1) | the drug-containing matrix | the drug-containing matrix of step (c) |

Barr's proposed construction imports the limitation that the "drug-containing matrix" of step (d) in claim 1 is "the drug-containing matrix <u>of step (c)</u>." (Emphasis added.) Such an importation is inappropriate. The claim language does not include this

limitation   Furthermore, Barr provides <u>no</u> support for including this language in the claim

As discussed above in Sections I B 6 and I B 7, <u>supra</u>, the preambles of claim 1 and claim 18 both state "the method <u>comprising</u> the steps of" (emphasis added), and the specification describes embodiments involving additional steps not explicitly described in claims 1 and 18   Between "mixing the drug and the carbohydrate material     to form a drug-containing matrix" in step (c) and "compressing the drug-containing matrix" in step (d), additional steps can be performed   These steps may affect the characteristics of "the drug-containing matrix "  Therefore, it does not follow that "the drug-containing matrix" compressed in step (d) will still contain precisely the same characteristics of "the drug-containing matrix" formed in step (c)

Neither the specification nor the file history contradict this analysis   Indeed, as discussed in Sections I B 6 and I B 7, <u>supra</u>, the specification specifically supports the understanding that additional steps which are not explicitly discussed in the claims may nonetheless be part of the claimed process   Barr's construction improperly ignores the possibility of additional steps and should be rejected

### 9. "a . . . carbohydrate material"

| Claim language | Cephalon's Proposed Construction | Barr's Proposed Construction |
|---|---|---|
| a    carbohydrate material<br><br>(claims 1, 18) | one or more    carbohydrate material(s) | a    carbohydrate material |

Cephalon proposes that "a    carbohydrate material" should be construed as "one or more    carbohydrate material(s) "  It is a well-established principle of patent law that in claims like these where open-ended transitions such as "comprising" are used, the

article "a" is construed to mean "one or more " See Crystal Semiconductor Corp. v. Tritech Microelecs. Int'l., Inc., 246 F.3d 1336, 1347 (Fed. Cir. 2001) ("This court has consistently emphasized that the indefinite articles 'a' or 'an,' when used in a patent claim, mean 'one or more' in claims containing open-ended transitional phrases such as 'comprising '"), KCJ Corp. v. Kinetic Concepts, Inc., 223 F.3d 1351, 1356 (Fed. Cir. 2000) ("This court has repeatedly emphasized that an indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising '")

For these reasons, Cephalon asserts that "a    carbohydrate material" should be construed to mean "one or more    carbohydrate material(s) "[39]

---

[39]    Although this claim construction issue has been raised only with regard to this one claim term, clearly, the same principle applies wherever the article "a" or "an" appears throughout these claims

## CONCLUSION

For the foregoing reasons, Cephalon respectfully requests that the Court construe the disputed claim terms of the '737 Patent in accordance with the plain meaning of those terms, as set forth in Cephalon's proposed constructions above   A form of order is attached hereto

_____
Frederick L  Cottrell III (#2555)
Cottrell @rlf com
Chad M  Shandler (#3796)
Shandler @rlf com
Richards Layton & Finger, P A
P O  Box 551
One Rodney Square
Wilmington, Delaware 19899-0551
(302) 651-7700

Attorneys for Plaintiffs CEPHALON, INC ,
and UNIVERSITY OF UTAH RESEARCH
FOUNDATION

OF COUNSEL:

William F  Lee
David B  Bassett
Peter J  Kolovos
Gregory P  Teran
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, Massachusetts 02109
(617) 526-6000

Dated:  July 8, 2005

- 34 -

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| CEPHALON, INC. and<br>UNIVERSITY OF UTAH<br>RESEARCH FOUNDATION, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-29-JJF |
| | ) | |
| BARR LABORATORIES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**PROPOSED ORDER**

The Court having considered the parties' claim construction briefs, affidavits, submissions and arguments regarding Patent No 4,863,737, construes the terms in dispute as follows:

**"substantially powdered form"** means largely in the form of fine particles.

**"substantially powdered carbohydrate material"** means a carbohydrate material largely in the form of fine particles.

**"a pharmacologically effective dose of a drug in a substantially powdered form"** means a quantity of a drug that is sufficient to produce a desired therapeutic effect and is largely in the form of fine particles.

**"a pharmacologically effective dose of a lipophilic drug in a substantially powdered form"** means a quantity of a drug having an affinity for lipids that is sufficient to produce a desired therapeutic effect and is largely in the form of fine particles

**"mixing . . . at a temperature below the melting points of the drug and the carbohydrate material"** means combining or blending    at a temperature below the melting points of the drug and the carbohydrate material

**"compressed with the carbohydrate material into a solid integral mass"** means pressed or squeezed together with the carbohydrate material into a unitary mass that is not liquid or gaseous

**"lipophilic"** means having an affinity for lipids

**"the drug"** as stated in step (c) of claim 1 and step (d) of claim 18 (as well as dependent claims) means the drug

**"the carbohydrate material"** as stated in step (c) of claim 1 and step (d) for claim 18 (as well as dependent claims) means the carbohydrate material

**"the drug-containing matrix"** as stated in step (d) of claim 1 (as well as dependent claims) means the drug-containing matrix

**"a . . . carbohydrate material"** means one or more    carbohydrate material(s)

**IT IS ORDERED** this ____ day of -_____, 2005

_____
The Honorable Joseph J. Farnan, Jr.
United States District Judge

2

RLF1-2896930-1

## CERTIFICATE OF SERVICE

I hereby certify that on July 8, 2005, I electronically filed the foregoing with the Clerk of

Court using CM/ECF which will send notification of such filing(s) to the following and which

has also been served as noted.

**VIA HAND DELIVERY**
Josy W. Ingersoll
Richard H. Morse
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE 19801


I hereby certify that on July 8, 2005, I have mailed via Federal Express, the documents to

the following non-registered participants:


Georege C. Lombardi, Esquire          Robert C. Millonig, Esquire
Bradley F. Graveline, Esquire          Heidi L. Kraus, Esquire
Michael K. Nutter, Esquire             Sterne, Kessler, Goldstein & Fox PLLC
Winston & Strawn, LLP                  1100 New York Avenue, N.W.
35 West Wacker Drive                   Washington, DC 20005
Chicago, IL 60601




Chad M. Shandler (#3796)
(Shandler@rlf.com)

RLF1-2856858-1