## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CEPHALON, INC. and UNIVERSITY OF UTAH RESEARCH FOUNDATION, | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No.05-29 (JJF) |
| v. | ) ) ) | |
| BARR LABORATORIES, INC., | ) ) | |
| Defendant. | ) ) ) | |

## DEFENDANT BARR LABORATORIES, INC.'S RESPONSE BRIEF ON
## CLAIM CONSTRUCTION FOR U.S. PATENT NO. 4,863,737

George C. Lombardi
Bradley C. Graveline
Michael K. Nutter
WINSTON & STRAWN, LLP
35 West Wacker Drive
Chicago, IL 60601
Tel: (312) 558-5600
glombardi@winston.com

Josy W. Ingersoll (#1088)
Richard H. Morse (#531)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE 19801
Tel: (302) 571-6600
jingersoll@ycst.com

OF COUNSEL
Robert C. Millonig
Heidi L. Kraus
STERNE KESSLER GOLDSTEIN & FOX PLLC
1100 New York Avenue, N.W.
Washington, D.C. 20005
Tel: (202) 371-3600

Attorneys for Defendant Barr Laboratories, Inc.

Dated: July 29, 2005

# TABLE OF CONTENTS

INTRODUCTION ..........................................................................................................................1

ANALYSIS...................................................................................................................................2

    I.    Law of Claim Construction...........................................................................................2

          A.    The Meaning Of The Claims To One Of Ordinary Skill In The Art ...................3

          B.    The Specification...............................................................................................4

          C.    Prosecution History Disclaimer ........................................................................5

          D.    Extrinsic Evidence.............................................................................................6

          E.    Plaintiffs' Initial Emphasis On Dictionary Definitions Is Improper ...................7

    II.    State Of The Art Known To One Of Ordinary Skill In The Art At The Time Of The Invention ......................................................................................................................8

          A.    One Of Ordinary Skill In The Art At The Time Of Invention.............................9

          B.    State Of The Art As Of June 8, 1987 ...............................................................10

               1.    Wet Methods........................................................................................10

                     a.    Molten Candy Method ...............................................................10

                      b.    Wet Granulation..........................................................................11

                2.    Dry Methods ........................................................................................12

                         a.    Dry Granulation .........................................................................12

                      b.    Direct Compression ...................................................................12

           C.    Plaintiffs' Description Of The State Of The Art Is Inaccurate...........................13

    III.    Claim Construction .....................................................................................................13

          A.    "*in a substantially powdered form*" means "largely in the form of fine particles absent the presence of free liquid".....................................................15

               1.    Intrinsic Evidence ...............................................................................16

                      a.    Specification...............................................................................16

i

           b.    Prosecution History.................................................................18

     2.    Extrinsic Evidence ...................................................................20

     3.    Plaintiffs' Proposed Construction Of "*in a substantially powdered form*"
Is Not Supported By The Intrinsic Evidence ...........................20

B.    "*substantially powdered carbohydrate material*" means "carbohydrate
material largely in the form of fine particles absent the presence of free
liquid".........................................................................................22

     1.    Intrinsic Evidence ...................................................................22

     2.    Extrinsic Evidence ...................................................................23

     3.    Plaintiffs' Proposed Construction For "*substantially powdered
carbohydrate material*" Found In Claim 37 Suffers From The Same
Shortcomings As Its Proposed Construction For "*in a substantially
powdered form*" .....................................................................23

C.    "*mixing the drug and the carbohydrate material*" means "combining or
blending the drug from step (a), the drug being largely in the form of fine
particles absent the presence of free liquid, with the carbohydrate material
from step (b), without the use of free liquids" ...................................24

     1.    Intrinsic Evidence ...................................................................24

           a.    Terms Must Be Construed Consistently In The Same Claim ............24

           b.    Specification ....................................................................26

           c.    Prosecution History.........................................................27

     2.    Extrinsic Evidence ...................................................................28

     3.    Plaintiffs Refuse To Provide A Clear Construction For "*mixing the drug
and the carbohydrate material*" Found In Claims 1 and 18 ......................28

D.    "*the drug in a substantially powdered form . . . compressed with the
carbohydrate material into a solid integral mass*" means "pressing or
squeezing the drug in the form of fine particles absent the presence of free
liquid together with one or more carbohydrate materials, without the use of
free liquids, to form a unitary mass that is not liquid or gaseous."....................33

E.    "*drug-containing matrix*" means "compressible drug-containing powder
matrix"......................................................................................34

     1.    Intrinsic Evidence ...................................................................34

ii

        a.   Claims .......................................................................................34

        b.   Specification ...........................................................................34

        c.   Prosecution History ................................................................36

    2.   Extrinsic Evidence ............................................................................36

    3.   Plaintiff's Construction Is Flawed ...........................................................37

CONCLUSION........................................................................................................38

WP3:1133053.1                                                                                              063987.1001

## TABLE OF CITATIONS

### FEDERAL CASES

*ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082 (Fed. Cir. 2003)...............................................4, 34

*Alloc v. Int'l Trade Comm'n*, 342 F.3d 1361 (Fed. Cir. 2003) .....................................5, 18, 22, 32

*Astra Aktiebolag et. al v. Andrx Pharmaceuticals, Inc.*,
    222 F.Supp.2d 243 (S.D.N.Y. 2002)........................................................................................25

*Astrazeneca v. Mutual Pharmaceutical Co.*, 384 F.3d 1333 (Fed. Cir. 2004) ...........................29

*Chimie v. PPG Industrial, Inc.*, 402 F.3d 1371 (Fed. Cir. 2005)........................................6, 20, 37

*Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335 (Fed. Cir. 1998)...................20, 22, 24, 38

*Dow Chem. Co. v. United States*, 226 F.3d 1334, 1342-42 (Fed. Cir. 2000) ...............................29

*General America Transport Corp v. Cryo-Trans*, 93 F.3d 766 (Fed. Cir. 1996) .........................22

*Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327 (Fed. Cir. 2004)......................................29

*Markman v. Westview Instruments*, 53 F.3d 967 (Fed. Cir. 1995),
    *aff'd*, 517 U.S. 317 (Fed. Cir. 1995)..........................................................................................5

*Mars, Inc. v. H.J. Heinz Co.*, 377 F.3d 1369 (Fed. Cir. 2004)......................................................31

*Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313 (Fed. Cir. 2005) .............................................4

*Modine Manufacturing Co. v. United States International Trade Commission*,
    75 F.3d 1545 (Fed. Cir. 1996)...............................................................................5, 18, 22, 32

*Moleculon Resources Corp v. CBS, Inc.*, 793 F.2d 1261 (Fed. Cir. 1986)...................................32

*Omega Engineering, Inc. v. Raytek Corp.*, 334 F.3d 1314 (Fed. Cir. 2003) ...........................6, 20

*Phonometrics, Inc. v. Northern Telecom Inc.*, 133 F.3d 1459 (Fed. Cir. 1998) ...........................23

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298 (Fed. Cir. 1999) .........................4, 10

*Process Control Corp. v. HydReclaim Corp.*, 190 F.3d 1350 (Fed. Cir. 1999) .................4, 24, 25

*Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336 (Fed. Cir. 2001).........................................22, 24

*Schreiber-Schroth Co. v. Cleveland Trust Co.*, 311 U.S. 211 (1940)..............................................6

*Seattle Box Co. v. Industrial Crating & Packaging, Inc.*, 731 F.2d 818 (Fed. Cir. 1984) ............16

*Southwall Tech., Inc. v. Cardinal IG Co.*, 54 F.3d 1570 (Fed. Cir. 1995).......................................6

*Spectrum International Inc. v. Sterilite Corp.*, 164 F.3d 1372 (Fed. Cir. 1998)................32, 33, 37

*Texas Digital System, Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002) ..............................7

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996) ............................................4

*ZMI Corp. v. Cardiac Resuscitator Corp.*, 844 F.2d 1576 (Fed. Cir. 1998) ..................................6

## DOCKETED CASES

*Phillips v. AWH Corp.*, No. 03-1269, -1286 (Fed. Cir. July 12, 2005) ............... 2-8, 13, 21, 29, 34

## FEDERAL STATUTES

35 U.S.C. § 103...............................................................................................................................19

35 U.S.C. § 112.........................................................................................................................19, 36

## TREATISES

Daniel R. Cherry et al., *Patent Practice*, 10.18(c) (Irving Kayton & Karyl S. Kayton eds.,
6th ed. 1998) ............................................................................................................................24, 25

Robert C. Faber, *Landis on Mechanics of Patent Claim Drafting*, § 19.................................26, 29

WP3:1133053.1                                                                                                                    063987.1001

## INTRODUCTION

United States Patent No. 4,863,737 ("the '737 patent")[1] discloses: (1) a compressed powder formulation of a lollipop with a drug incorporated into the candy matrix; and (2) a method of manufacturing the lollipop by incorporating the drug into the candy matrix through mixing dry ingredients and compressing the resultant mixture to form a lollipop. This compressed powder medicated lollipop can be used to administer the drug in a dose-to-effect manner[2] through the mucosal tissue of the mouth, pharynx, and esophagus. This is illustrated in the Plaintiffs' commercial embodiment of the claimed invention, ACTIQ®, which is a directly compressed powder lollipop that administers the drug fentanyl in a dose-to-effect manner for break-through pain management.

At the time of the invention, a lollipop with a drug incorporated into the candy matrix was not a new concept. Indeed, the '737 patent purports to be a continuation-in-part of an earlier patent, U.S. Patent No. 4,671,953 ("the '953 patent") (attached hereto as Ex. 2),[3] which generally discloses the incorporation of a drug into a hard-candy matrix. The '953 patent, which expired in May, 2005, teaches a process for manufacturing a lollipop that requires heating a sugar substance until it melts and then adding the drug. The new matter added to the specification of the '737 patent relates to a different way of making a medicated lollipop that overcomes a number of problems associated with pharmaceutical lollipop manufacturing techniques taught by the '953 patent. Specifically, the '737 patent simply teaches mixing dry

---

[1] A copy of the '737 patent is attached hereto as Exhibit 1.

[2] Dose-to-effect administration is the administration of a sufficient amount of drug to produce the precisely desired pharmacological effect. *See* '737 Patent, Col. 5, ll. 14-18. With respect to medicated lollipops, dose-to-effect administration is performed by introducing the lollipop into the users mouth, and when the desired pharmacological effect is reached, the lollipop is then removed from the user's mouth. *Id.* at Col. 6, ll. 40-68.

[3] The '953 patent was assigned to The University of Utah Research foundation, and prior to its expiration, it is believed that Cephalon, Inc. was the exclusive licensee of the '953 patent.

1

powdered components and compressing the mixed powder to create a solid lollipop. The '737 patent further teaches that because the drug and the remaining excipients are mixed in dry powdered form, there is no need to dissolve relatively insoluble components. The '737 patent describes this as an advantage over the prior art.

Nevertheless, Plaintiffs argue that the '737 patent covers much more than this "compressed powder matrix" manufacturing process and the resultant lollipop. Indeed, Plaintiffs' proposed claim construction suggests that the '737 patent may cover a multitude of manufacturing processes that do not use dry powders, including well-known processes in the art, such as wet granulation, that predate Plaintiffs' claimed invention. In an attempt to obtain this broad construction, Plaintiffs' opening *Markman* brief asks this Court to wholly ignore the most significant determinates of claim scope: the specification and prosecution history. Rather, contrary to the laws of claim construction, Plaintiffs define the scope of the asserted claims without regard to the context of the patent specification, the arguments made by the Applicants during prosecution, and the cited art. Plaintiffs' efforts to broaden the scope of the asserted claims of the '737 patent in this manner should be rejected.

## ANALYSIS

### I.    Law of Claim Construction

Plaintiffs' arguments concerning the "law of claim construction" are outdated and inaccurate. After Plaintiffs filed their opening *Markman* brief, on July 12, 2005, the Federal Circuit issued its much-anticipated *en banc* decision in the case of *Phillips v. AWH Corp.*, No. 03-1269, -1286 (Fed. Cir. July 12, 2005) (slip opinion attached hereto as Ex. 3). In *Phillips*, the Federal Circuit clarified the principles of claim construction and the proper roles that intrinsic and extrinsic evidence should play in claim construction analysis. Contrary to Plaintiffs' arguments, the Court held that an emphasis should be placed on intrinsic evidence, particularly

2

the patent specification and prosecution history, as opposed to extrinsic evidence—such as dictionary definitions—in determining the meaning of claim terms.[4]    The *Phillips* court explained proper claim construction analysis as follows.

### A.    The Meaning Of The Claims To One Of Ordinary Skill In The Art

It is well established Federal Circuit law that "the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.*, as of the effective filing date of the patent application." *Phillips*, slip op. at 9.    Thus, claim construction analysis must begin with an inquiry into how a person of ordinary skill in the art would understand a claim term. *Id.*    This starting point is based on the well-settled principle that inventors are typically persons skilled in the field of the invention and that patents are addressed to and intended to be read by others of skill in the pertinent art. *Id.* at 10.    Importantly, "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but *in the context of the entire patent, including the specification.*"    *Id.* (emphasis added).

Because the meaning of a claim term as understood by persons of ordinary skill in the art may not be readily apparent, the court must first look to sources that show what a person of skill in the art would have understood the term to mean, including (in order of preference) "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and

---

[4] Plaintiffs' July 20, 2005 letter to the Court tries to rectify this dilemma by addressing the Federal Circuit's *en banc* decision in the case of *Phillips v. AWH Corp.* (*infra*) and states that this decision does not affect their analyses. This letter is misleading because it fails to acknowledge that in their opening brief, Plaintiffs' placed initial and primary reliance upon dictionary definitions to construe claim limitations, an approach that *Phillips* confirmed is improper. Accordingly, Plaintiffs' claim construction analyses remain outdated.

the state of the art." *Id.* at 11; *see also Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) ("We cannot look at the ordinary meaning of a term . . . in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history."); *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308-09 (Fed. Cir. 1999) (holding that it is "entirely appropriate" for a court to consult extrinsic expert testimony to ensure that the claim construction from the specification and prosecution history is not inconsistent with understandings of those in the pertinent technical field).

The context of the surrounding words of a claim term must also be considered in determining the ordinary and customary meaning of the term. *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003). Indeed, claim terms must be construed in light of how the term is used or construed elsewhere in the *same* claim. *See Process Control Corp. v. HydReclaim Corp.*, 190 F.3d 1350, 1356 (Fed. Cir. 1999). Similarly, because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims. *Phillips*, slip op. at 12.

**B.    The Specification**

The claims do not stand alone and must be read in view of the specification. *Id.* at 13. In fact, the specification is the primary basis for construing the claims and is the single best guide to the meaning of the disputed term. *Id.*; *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). The importance of the specification in claim construction is a direct result of the statutory requirement that the specification describe the claimed invention in full, clear, concise, and exact terms. *Phillips*, slip op. at 15. Accordingly, the specification may reveal a special definition given to a claim term by the patentee, in which case that definition governs. *Id.* at 16. Alternatively, the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor. *Id.* In that case, the inventor has dictated the correct

4

claim scope, and the inventor's intention, as expressed in the specification, is dispositive. *Id.* Furthermore, because the PTO requires that application claims conform to the invention as set forth in the remainder of the specification, and the terms and phrases used in the claims find clear support or antecedent basis in the description so that the meaning of the terms in the claims may be ascertainable by reference to the description, it is appropriate for a court to rely heavily on the specification for guidance in construing the meaning of a claim term. *Id.*

Moreover, when the patent specification describes the "present invention," as opposed to an embodiment of that invention, that description limits the scope of the claims. *See Alloc v. Int'l Trade Comm'n*, 342 F.3d 1361, 1369-70 (Fed. Cir. 2003) (all claims in patent family limited where specification stated "the inventions" have panels with "play" that "would allow the locking assembly to be unlocked"); *Modine Mfg. Co. v. United States Int'l Trade Comm'n*, 75 F.3d 1545, 1551 (Fed. Cir. 1996) ("[W]hen the preferred embodiment is described in the specification as the invention itself, the claims are not necessarily entitled to a scope broader than that embodiment.").

### C.    Prosecution History Disclaimer

In *Phillips*, the Federal Circuit reaffirmed that a court should consider the patent's prosecution history in construing its claims. *Phillips*, slip op. at 17.   Indeed, as stated in *Markman v. Westview Instruments*, 53 F.3d 967, 980 (Fed. Cir. 1995), *aff'd*, 517 U.S. 317 (1996), the prosecution history is the "'undisputed public record' of proceedings in the Patent and Trademark Office" and therefore it "is of primary significance in understanding the claims." As such, the court has broad power to analyze the prosecution history "to ascertain the true meaning of language used in the patent claims." *Id.*

The prosecution history of a patent is considered "intrinsic evidence" because it provides evidence of how the PTO and the inventor understood the patent. *Phillips*, slip op. at

5

17. Thus, the prosecution history can inform the meaning of the claim language by showing how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it otherwise would be. *Id.* The Federal Circuit recently declared that "[t]he purpose of consulting the prosecution history in construing a claim is to 'exclude any interpretation that was disclaimed during prosecution.'" *Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005) (quoting *ZMI Corp. v. Cardiac Resuscitator Corp.,* 844 F.2d 1576, 1580 (Fed. Cir. 1988)).

The doctrine of prosecution history disclaimer is well established in Supreme Court and Federal Circuit precedent and precludes patentees from recapturing through claim construction the meanings of claim terms that were disclaimed during the prosecution of the patent, through either amendments or remarks. *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003). It is a rule of patent construction that "a claim in a patent as allowed must be read and interpreted with reference to claims that have been cancelled or rejected, and the claims allowed cannot by construction be read to cover what was thus eliminated from the patent." *Schreiber-Schroth Co. v. Cleveland Trust Co.*, 311 U.S. 211, 220-21 (1940). Such a use of the prosecution history ensures that claims are not construed one way in order to obtain their allowance and in a different way against accused infringers. *Southwall Tech., Inc. v. Cardinal IG Co.,* 54 F.3d 1570, 1576 (Fed. Cir. 1995).

### D.    Extrinsic Evidence

Extrinsic evidence consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises. *Phillips* at 18. The Federal Circuit confirms that courts may also rely on this evidence because it may provide some useful information about the art; however, the Federal Circuit has stressed that "it

6

is less significant than the intrinsic record in determining the legally operative meaning of the claim language." *Id.* (internal quotations omitted).

### 1. Expert Testimony

Specifically, expert testimony is useful to provide background on the technology at issue, to explain how an invention works, to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of ordinary skill in the art, and/or to establish that a particular claim term has a particular meaning in the relevant field. *Id.* at 19.

### 2. Other Extrinsic Evidence

Similarly, other extrinsic evidence, such as technical and general dictionaries and treatises, may provide the court with a better understanding of the underlying technology and may be used. *Id.* This evidence, however, is generally considered less reliable. *Id.* at 19-20. Most notably, reliance on extrinsic evidence poses the risk that it will be used to change the meaning of claims in derogation of the indisputable public records consisting of the claims, the specification and the prosecution history. *Id.* at 20.

### E. Plaintiffs' Initial Emphasis On Dictionary Definitions Is Improper

The *Phillips* court revisited the question about the order in which the sources discussed above should be considered in a claim construction analysis. The court specifically addressed how much deference should be given to dictionary definitions in determining a claim term's meaning to one skilled in the art. In particular, the court clarified a prior Federal Circuit decision, *Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002), which involved the issue of the use of dictionaries in claim construction analysis.

Plaintiffs' opening claim construction brief relies extensively on an interpretation of *Texas Digital* that the *Phillips* court has now confirmed is inaccurate: that dictionaries should

be consulted first to obtain the ordinary meaning of a claim term, and then this meaning should be analyzed with respect to the specification to determine if it comports with what is disclosed by the patent. *See*, *e.g.*, Pl. Br. at 4-5, 17-19, 26.   Rather, *Phillips* holds that a dictionary-first "methodology . . . place[s] too much reliance on extrinsic sources such as dictionaries, treatises, and encyclopedias and too little on intrinsic sources, in particular the specification and prosecution history." *Phillips*, slip op. at 23. The *Phillips* court reasoned that assigning such a limited role to the specification is inconsistent with prior Federal Circuit rulings that the specification is the single best guide to the meaning of the claim terms and that the specification acts as its own  dictionary when it expressly defines terms used in the claims or when it defines terms by implication. *Id*. at 24. The court went on to explain that the main problem with relying heavily on dictionaries is that it focuses the inquiry on the abstract meaning of words rather than on the meaning of the claim terms within the context of the patent. *Id*. at 25. That is, heavy reliance on a dictionary definition divorced from the intrinsic evidence risks transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract, out of its particular context as described in the specification. *Id*. "If the district court starts with the broad dictionary definition . . . and fails to fully appreciate how the specification implicitly limits that definition, the error will systematically cause the construction of the claim to be unduly expansive." *Id*. To combat this problem, the *Phillips* court counseled that a court construing claim terms should instead focus at the outset on how the patentee used the term in the claims, specification, and prosecution history.

## II.  State Of The Art Known To One Of Ordinary Skill In The Art At The Time Of The Invention

Based on *Phillips*' instruction that the claims be defined as one of ordinary skill in the art would have understood them at the time of the invention, the first step in the claim

8

construction analysis is to define the pertinent art and who one of ordinary skill in that art would be. It is telling that Plaintiffs' opening *Markman* brief fails to provide this very basic information.

### A.   One Of Ordinary Skill In The Art At The Time Of Invention

Barr proposes that for purposes of construing the claims of the '737 patent, the pertinent art is pharmaceutic in nature, with an emphasis on solid dosage forms and their manufacture; and a person with ordinary skill in the art as of both June 8, 1987, and May 1, 1985 (the filing dates of the '737 and '953 patents, respectively), would have, at a minimum, the following qualifications:

- A graduate degree in Pharmacy;

- a minimum of six years experience in the academic setting performing research in solid dosage forms and independent publications in peer reviewed journals; and/or

- a minimum of four to six years of work experience in an industrial pharmacy setting involving formulation and development of solid dosage forms.

Dr. Lawrence H. Block, a professor of Pharmacy at the Duquesne University School of Pharmacy, possesses these qualifications and is a preeminent scientist in the area of dosage forms. The Declaration of Dr. Lawrence H. Block has been filed concurrently herewith and is hereinafter referred to as the "Block Decl." Dr. Block was, and continues to be, one of ordinary skill in the art at the time the '737 patent and the '953 patent were filed. *See* Block Decl., ¶ 17.

Despite the importance of construing the claim terms as would one of ordinary skill in the art, Plaintiffs did not define (or even discuss) the level of skill one would need to be of ordinary skill in the art at the time the application was filed. Nor did Plaintiffs submit a

9

declaration of a person of ordinary skill in the art to support their proposed constructions. These omissions cast doubt over Plaintiffs' entire claim construction analysis.

### B.    State Of The Art As Of June 8, 1987

It is important for the Court to have a thorough understanding of the state of the art at the time of the invention, so as to properly construe the claims. *Pitney Bowes*, 182 F.3d at 1309. The '737 patent, which claims priority to the '953 patent, was filed June 8, 1987. As of the date of the claimed invention, the known solid peroral[5] and oral pharmaceutical dosage forms included tablets, capsules, pills, buccal tablets, sublingual tablets, lozenges, troches, and lollipops. Block Decl., ¶ 19. Many of these oral dosage forms could effect transmucosal delivery of a drug. *Id.* Peroral and oral dosage forms contain powdered or granular drug, alone, or in combination with pharmaceutical excipients, such as binders, lubricants, disintegrants, diluents, buffers, and colorants. *Id.* It was known that a holder could be attached to oral dosage forms, as for a lollipop, particularly when the oral dosage form was meant to be administered to a child. *Id.* at ¶ 20.

Solid peroral or oral dosage forms could be produced using one of at least the following methods or techniques: (1) wet methods, such as a molten candy method or wet granulation followed by compression; or (2) dry methods, such as direct compression or dry granulation followed by compression. *Id.* at ¶ 21.

### 1.    Wet Methods

#### a.    Molten Candy Method

As of the date of the claimed invention, it was known that a solid dosage form could be prepared by incorporating the active ingredient into a hard candy base. Block Decl., ¶

---

[5] "Peroral" refers to the ingestion of a pharmaceutical product by mouth followed by swallowing. Block Decl., ¶ 19 n.2.

22.    In this method, drug is added to, and dissolved or dispersed in, syrup or a viscous carbohydrate solution to ensure even distribution. *Id.* Heat is applied at some point during the process to create a molten mass, which is then molded into the desired shape of the final product and allowed to cool. *Id.* The '953 patent appears to disclose the manufacture of drug-containing lollipops using this method.

### b.    Wet Granulation

As of the date of the claimed invention, wet granulation was a well-known and commonly employed method of preparing solid dosage forms. Block Decl., ¶ 23. Wet granulation typically involves the following steps: (1) obtaining the drug and excipients; (2) weighing the drug and excipients; (3) mixing using a liquid (which may occur at various times in this process); (4) granulating; (5) screening the damp mass; (6) drying; (7) dry screening; (8) lubricating; and (9) compressing the dried granules. *Id.* In particular, a liquid is added (*e.g.*, by spraying or pouring) to dry materials and mixed until the materials are converted to a dough-like mass. *Id.* at ¶ 24. The added liquid may or may not include the drug and/or excipients. *Id.* Typically, the dough-like mass is then sieved and dried using heat to produce granular material. *Id.* After drying, typically, some moisture is retained in the granular material. *Id.* Additional excipient may be added to the granules to facilitate compression and/or drug release. *Id.* It should be noted that granular material is different from powder. *Id.* at ¶ 25. Whereas powders are fine particles that move independently of one another, granular material is an agglomeration of fine particles. *Id.* Compressing the dried granules results in the formation of a compact, such as a solid dosage form. *Id.* at ¶ 26.

11

## 2.    Dry Methods

### a.    Dry Granulation

At the time of the claimed invention, dry granulation was generally used when the tabletting ingredients were moisture- or thermo-labile. Block Decl., ¶ 27. Dry granulation involves the following steps: (1) obtaining the drug and excipients; (2) weighing the drug and excipients; (3) mixing (which may occur at various times in the process); (4) compacting or slugging[6]; (5) dry screening; (6) lubricating; and (7) compressing the granules into solid dosage forms. *Id.* at ¶ 28. In particular, the drug in powdered form is mixed with other powdered excipients that have cohesive properties. *Id.* at ¶ 29. Excess air contained in the powdered material is then expelled under pressure to form a dense body known as a slug. *Id.* The slug is then comminuted or milled into granules, additional excipients are added, and the resulting mixture is compressed into tablets or other solid dosage forms. *Id.*

### b.    Direct Compression

Direct compression was also a known technique as of the date of the claimed invention. Block Decl., ¶ 30. Direct compression involves directly compressing dry powdered materials into solid dosage forms without first modifying the physical nature of the material (*e.g.*, changing the material's size and/or flow properties). *Id.* It is the easiest process to automate. *Id.*

One of ordinary skill in the art would understand the claims and the specification of the '737 patent to be directed toward a dry method of forming a drug-containing lollipop. *Id.* at ¶ 31.

---

[6] "Slugging" is the use of tabletting to make compacts. It is possible that the composition may not be uniform at this point. Block Decl. ¶ 28 n.3.

12

### C.    Plaintiffs' Description Of The State Of The Art Is Inaccurate

Plaintiffs' "description" of the state of the art, on the other hand, is incomplete and without support.  First, Plaintiffs fail to support their characterization of the state of the art with any declaration by one of ordinary skill in the art at the time of the invention.  Plaintiffs also limit their discussion of the art to routes of drug administration and simple dosage forms, while wholly ignoring the various processes for manufacturing these dosage forms.  Moreover, Plaintiffs focus their discussion on the claimed invention itself rather than the state of the art in the relevant field—solid dosage forms and their manufacture.

Plaintiffs' failure to define one of ordinary skill in the art with respect to the alleged invention of the '737 patent—combined with their inadequate depiction of the state of the art known to one of ordinary skill in the art at the time of invention—is fatal.  Under Federal Circuit law, claims must be defined as one of ordinary skill in the art would understand them after reading the claims, specification, and prosecution history.  *Phillips*, slip op. at 11.  By not properly defining the level of skill required to satisfy the hypothetical "one of ordinary skill in the art," and by not providing a proper description of the state of the art, Plaintiffs' claim construction analyses, and consequently Plaintiffs' proposed constructions, are fundamentally flawed.

### III.    Claim Construction

The '737 patent contains four independent claims, claims 1, 6, 18 and 37.  Claims 1 and 18 are method claims, whereas claims 6 and 37 are article of manufacture claims.  For ease of reference, claims 1 and 6 of the '737 patent are recited below as representative samples of the claim-at-issue in this dispute.  The disputed claim limitations are italicized for the convenience of the Court.

WP3:1133053.1                                                                                            063987.1001

1.    A method for producing a drug-containing lollipop for use in transmucosal delivery of the drug to a patient, the method comprising the steps of:

(a)    obtaining a pharmacologically effective dose of the drug *in a substantially powdered form*, the drug being capable of absorption through mucosal tissues of the mouth, pharynx, and esophagus;

(b)    obtaining a soluble carbohydrate material capable of forming a compressible confectionary matrix and capable of dissolving in the mouth of the patient;

(c)    *mixing the drug and the carbohydrate material* at a temperature below the melting points of the drug and the carbohydrate material to form *a drug-containing matrix* such that the drug is dispersed substantially throughout the matrix, the *drug-containing matrix* being capable of releasing the drug for absorption through the mucosal tissues upon dissolution of the matrix in the mouth of the patient;

(d)    compressing *the drug-containing matrix* in a mold to form an integral mass such that, when the integral mass dissolves in the mouth of the patient, the drug is released for absorption through the mucosal tissues; and

(e)    incorporating a holder as part of the integral mass in order to form the drug-containing lollipop.

\* \* \* \*

6.    A drug-containing lollipop for use in transmucosal delivery of the drug to a patient comprising:

a soluble, compressible carbohydrate material;

a pharmacologically effective dose of a drug *in a substantially powdered form*, the drug being capable of absorption through mucosal tissues of the mouth, pharynx, and esophagus and being dispersed substantially uniformly throughout the carbohydrate material at a temperature below the melting points of the drug and the carbohydrate material and *compressed with the carbohydrate material into a solid integral mass* which is capable of dissolving in the mouth of the patient so that the drug is released for absorption through mucosal tissues of the mouth, pharynx, and

14

esophagus upon dissolution of the integral mass in the mouth of the patient;

holder means secured to the integral mass so as to form a drug-containing lollipop, the holder means being configured so as to permit convenient insertion and removal of the drug-containing integral mass into and out of the mouth of a patient.

Plaintiffs allege that Barr will infringe both of these claims, as well as independent claims 18 and 37 (along with a number of dependent claims). On June 15, 2005, Barr provided to Plaintiffs its Preliminary Construction of Claims 1, 6, 18, and 37 of the '737 patent. The parties exchanged preliminary claim constructions to narrow the issues to be addressed in the present *Markman* briefing. Unfortunately, in their opening brief, Plaintiffs make a number of unwarranted assumptions about arguments that they expect Barr to proffer. In reality, there are only a few constructions that remain in dispute.[7] Those claim limitations should be construed as follows.

### A.    *"in a substantially powdered form"* means "largely in the form of fine particles absent the presence of free liquid"

The limitation *"in a substantially powdered form"* is found in each of the independent claims 1, 6, 18, and 37. This limitation should be construed to mean: **largely in the form of fine particles absent the presence of free liquid[8]**." This construction comports fully with the intrinsic and extrinsic evidence.

---

[7] While Barr does not agree with how Plaintiffs have separated and parsed out specific claim terms from the remainder of the claim limitations, Barr does not dispute Plaintiffs' construction of the terms *"lipophilic"* as used in claims 18 and 37 ("having an affinity for lipids"), *"a pharmacologically effective dose"* as used in claims 1, 6, 18 and 37 ("a quantity that is sufficient to produce a desired therapeutic effect"), *"at a temperature below the melting points of the dry and the carbohydrate material"* as used in claims 1, 6, 18 and 37, and *"a . . . carbohydrate material"* as used in claims 1, 6, and 18 ("one or more carbohydrate material(s)"). For the Court's convenience, attached hereto as Exhibit 4 is a chart comparing the parties' proposed constructions of the limitations currently in dispute.

[8] Free liquid is defined as "any liquid that is not incorporated chemically into the fine particles, beyond that which may be sorbed naturally. Block Decl. ¶ 33 n.4.

15

### 1.    **Intrinsic Evidence**

First, when the claims are read in view of the specification and prosecution history as required by *Phillips*, the meaning of the claim language "*substantially powdered form*" to one of ordinary skill in the art is readily apparent.[9]

### a.    **Specification**

The specification of the '737 repeatedly teaches that "the present invention" uses "dry" ingredients in a "solid powdered" form:

- "The present invention teaches the combination of ***dry powdered*** ingredients by geometric dilution." Col. 5, ll. 43-45 (emphasis added);

- "Thus, flavorings, drugs, and other components (which may be insoluble in liquid form) are easily mixed when they exist as a ***dry powder***." Col. 6, ll. 5-7 (emphasis added);

- "Each of the components is mixed with the other components in ***dry form*** to produce the compositions of the present invention." Col. 11, ll. 47-49 (emphasis added);

- "Since the present invention teaches the use of ***solid powders***, any desired type of mold can be used for the compression formation of the lollipop." Col. 6, ll. 19-21 (emphasis added);

- "the present invention teaches the mixing of ***solid powders*** at room temperature, as opposed to liquid components at elevated temperatures." Col. 7, ll. 61-65 (emphasis added); and

- "because ***solid powders*** are combined together, constituents which may be chemically incompatible when in a heated solution or suspension can be mixed." Col. 8, ll. 3-6 (emphasis added).

---

[9] Traditionally, the term "substantially" is a ubiquitous term and is considered by courts as a "word of degree." *Seattle Box Co. v. Indus. Crating & Packaging, Inc.*, 731 F.2d 818, 826 (Fed. Cir. 1984). "When a word of degree is used, the district court must determine whether the patent's specification provides some standard for measuring that degree" to one of ordinary skill in the art. *Id.* Therefore, in the present case, a proper construction of the term "substantially" requires review of the '737 patent specification and prosecution history.