Likewise, the specification repeatedly emphasizes that this compressed powder process has advantages over prior art methods that employ free liquids to dissolve the components:

- "This procedure overcomes many of the problems of the prior art. According to the present invention, *insoluble drugs* can be added to the matrix *without the necessity of attempting to dissolve the drug*." Col. 5, ll. 58-61 (emphasis added);

- "Thus, flavorings, drugs, and other components (which may be *insoluble in liquid form*) are easily mixed when they exist as a dry powder." Col. 6, ll. 5-7 (emphasis added);

- "This provides for convenient combination of the ingredients, even if they happen *to be insoluble* or otherwise chemically incompatible." Col. 9, ll. 53-56 (emphasis added);

- "It will be recognized that this is an advancement over the art in that existing methods may result in incomplete mixing because of *the insolubility of the products*." Col. 11, ll. 65-68 (emphasis added);

- "It would be a further significant advancement in the art to provide methods and compositions for incorporating drugs (including *insoluble drugs*) into a soluble matrix without heating the mixture to the point that degradation occurs. It would be a related advancement in the art to provide such a method which provided the capability of uniformly incorporating *insoluble drugs* into the soluble matrix." Col. 4, l. 63 – Col. 5, l. 2 (emphasis added);

- "It is another object of the present invention to provide methods of manufacture for forming a drug-containing compressed powder matrix, which methods avoid degradation of the drug, overcome problems related to *insolubility of the various components* in the candy matrix, and provide a product which is not likely to crumble in the patient's mouth." Col. 7, ll. 6-12 (emphasis added); and

- "Difficulties are encountered in attempting to blend solid drugs in a uniform or otherwise carefully controlled manner. Many drugs are *insoluble, or only partially soluble*, in one or more of the ingredients of the hard candy base. Thus, the resultant product is often found to be lacking in uniform distribution of the drug." Col. 4, ll. 2-4 (emphasis added).

17

These repeated disclosures make clear that the ingredients, including the drug and the carbohydrate material, are not in contact with free liquids or solvents when the process claimed in the '737 patent is employed.[10]  Indeed, not once does the specification mention that the powders can be dissolved or suspended in liquids or solvents.  Rather, all twenty-three (23) "Examples" disclosed in the '737 patent specification describe formulations for drug-containing lollipops that are made only by the mixing of dry ingredients followed by direct compression.  Thus, the specification teaches that the invention as a whole, not merely a preferred embodiment, provides for a dry powdered form absent the presence of free liquids.  *See Alloc*, 342 F.3d 1369; *Modine*, 75 F.3d at 1551.  Accordingly, when properly read in this context, it is clear that this limitation requires the drug to be largely in the form of fine particles absent the presence of free liquids.

### b.    Prosecution History

The prosecution history of the '737 patent further supports the evidence in the specification that the Applicants understood "*in a substantially powdered form*" to mean largely in the form of fine particles absent the presence of free liquid.  In response to an Office Action mailed on April 27, 1988,[11] and consistent with statements in the specification, the Applicants sought to distinguish the invention from the prior art by explaining to the Examiner the advantages of using the compressed powder process over the prior art process that employed free liquids:[12]

---

[10] In contrast to Plaintiffs' premature assertions, Barr does not propose that the drug must be entirely free of all water or moisture ("completely dry").  Rather, as discussed herein, the Barr proposes that the drug must be absent free liquid.

[11] The Apr. 27, 1988 Office Action is found at Paper No. 5 from U.S. Patent Application 07/060,0450 ("Paper No. 5"), attached hereto as Exhibit 5.

[12] *See* Oct. 27, 1988 Amendment is found at Paper No. 8 from U.S. Patent Application 07/060,045 ("Paper No. 8"), attached hereto as Exhibit 6.

18

063987.1001

- "Since the lollipops of the present invention are made by *mixing solid powders* of the drugs and the carbohydrate material, several disadvantages encountered in the prior art are overcome. For example, relatively *insoluble components* can be combined *without the difficulty of attempting to dissolve* and mix those components, . . ." Ex. 6 at p. 11-12 (emphasis added);

- "As mentioned above, fabrication techniques which do not require a molten mass overcome several problems in the art related to *solubility of the various components in a liquid* and *heat degradation* of the drug and other components. Both the method and article of manufacture claims include a limitation that the drug and the carbohydrate material are *in powdered form* when mixed to form the drug-containing lollipop and/or they are mixed at a temperature below the melting points of the drug and the carbohydrate materials." Ex. 6 at p. 15 (emphasis added); and

- "None of the cited references teach or suggest the formation of a drug-containing carbohydrate material in the form of a lollipop by use of *powder mixing and formation techniques*. . . . These techniques of the present invention avoid degradation of the drug contained in the candy matrix and also overcome *problems with solubility*." Ex. 6 at p. 19 (emphasis added).

These arguments are consistent with statements in the specification. Thus, it is readily apparent from these arguments that the Applicants understood the invention to require the drug to be largely in the form of fine particles absent the presence of free liquid.

Moreover, to overcome the Examiner's 35 U.S.C. §§ 103 and 112 rejections, the Applicants narrowed the claims-at-issue to include the limitations "*in a substantially powdered form.*" Ex. 6 at pp. 2-10. To convince the Examiner that the amended claims were patentable, the Applicants argued to the Examiner that the "lollipops of the present invention are made by mixing solid powders of the drugs and carbohydrate material . . . ." *Id.* at pp. 11-12. They further argued that "[n]one of the cited references teach or suggest the formation of a drug-containing carbohydrate material in the form of a lollipop by use of powder mixing and formation techniques." *Id.* at p. 18. In other words, they asserted that none of the cited references teach or suggest the formation of a drug-containing carbohydrate material in the form

19

of a lollipop by direct compression. Applicants' decision to narrow the claims to a drug and carbohydrate material "*in a substantially powdered form*," coupled with their aforementioned arguments to the Examiner, are a clear and unambiguous disclaimer of the use of free liquid during the claimed method.[13] Thus, the doctrine of prosecution disclaimer prevents Plaintiffs from trying to recapture the use of free liquids surrendered by these comments. *Chimie*, 402 F.3d at 1384; *Omega*, 334 F.3d at 1323.

### 2.    Extrinsic Evidence

Barr's construction also comports with the extrinsic evidence. Dr. Block confirms at the time of the invention, one of ordinary skill in the art would have understood the ordinary and customary meaning of "powder" to mean "dry, fine particles that move independently of one another" absent the presence of free liquid. Block Decl., ¶ 32. Furthermore, Dr. Block confirms that when read in light of the claims, specification and prosecution history of the '737 patent, "*in a substantially powdered form*" means "largely in the form of fine particles absent the presence of free liquid." *Id.* at ¶ 33.

### 3.    Plaintiffs' Proposed Construction Of "*in a substantially powdered form*" Is Not Supported By The Intrinsic Evidence

Plaintiffs' proposed construction of this term is materially flawed in a number of related respects. First, as noted above, Plaintiffs fail to provide any evidence of how a person of ordinary skill in the art reading the claims, specification, and prosecution history of the '737 patent would understand the claim term "*in a substantially powdered form*." Without such an analysis, Plaintiffs' proposed claim constructions should not be adopted.

---

[13] To the extent that Plaintiffs attempt to distinguish between the method claims and the article of manufacture claims, the global arguments and/or statements made by the Applicants during the prosecution of the '737 patent in distinguishing the prior art are applicable to both types of claims. *See Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1347 (Fed. Cir. 1998).

Second, Plaintiffs' pre-*Phillips* claim construction analysis improperly relies on dictionary definitions to first obtain the ordinary and customary meaning of the terms "*substantially*" and "*powdered*," and then checks to see if the specification or prosecution history contradict these definitions.  Pl. Br. at 17.  *Phillips* holds that this analysis is improper because it undoubtedly will lead to the adoption of an abstract definition rather than a construction that fits within the particular context of the patent.  *Phillips*, slip op. at 25-27.  Such is the case here.  By first looking to a dictionary definition, Plaintiffs' opening brief divorces the claim language from the context of the patent and fails to account for the specification's repeated discussion of the mixing of dry ingredients in powdered form followed by direct compression of these ingredients.

Contrary to the directives of *Phillips*, Plaintiffs ignore the specification and argue that one of ordinary skill in the art would understand that a powder does not have to be completely dry.  Plaintiffs state that "powders can contain some degree of hydration, depending on various ambient factors, such as temperature and humidity."  Pl. Br. at 18.[14]  Plaintiffs' proposed construction of "*in a substantially powdered form*," albeit succinct, does not address the hydration issue they raise in their brief.  *Id.*  Nor does it specify how much hydration may be present.  In contrast, Barr's construction allows for the presence of hydration, but not the presence of free liquid.  Thus, contrary to Plaintiffs' assertion that Barr's proposed construction "seeks to add convoluted limitations to the claims that have no foundation in the text of the claims, the specification or the prosecution history" (Pl. Br. at 2), Barr's construction is sufficiently definite to allow one of ordinary skill in the art to understand the meaning of "*in a substantially powdered form*" and is the preferred construction.

---

[14] Given the similarities of the parties' proposed constructions, to the extent that Plaintiffs believe that this claim term requires the absence of free liquid, Barr agrees and there is no dispute on this point.

21

Moreover, it is telling that neither the specification nor the prosecution history contain even a single reference to the use of free liquids; rather, each embodiment disclosed teaches a formulation for drug-containing lollipops that are made only by the mixing dry ingredients followed by direct compression. Thus, Plaintiffs are also incorrect in suggesting that mixing dry powders is merely a "preferred embodiment." Rather, it is the only embodiment and the scope of the claims should be so limited. *See, e.g., Alloc*, 342 F.3d at 1370; *Modine*, 75 F.3d at 1551; *General Am. Transp. Corp v. Cryo-Trans*, 93 F.3d 766, 769-70 (Fed. Cir. 1996).

Accordingly, the Court should adopt Barr's proposed construction of "*in a substantially powdered form*" to mean "largely in the form of fine particles absent the presence of free liquid."

**B. "*substantially powdered carbohydrate material*" means "carbohydrate material largely in the form of fine particles absent the presence of free liquid"**

The limitation "*substantially powdered carbohydrate material*" is only found in claim 37 and should be construed to mean "**carbohydrate material largely in the form of fine particles absent the presence of free liquid.**" This interpretation is consistent with the construction of the "*in a substantially powdered form*" limitation discussed above. More importantly, this construction comports fully with the intrinsic and extrinsic evidence.

**1.    Intrinsic Evidence**

The term "*substantially powdered*" in claim 37 should be construed to have the same meaning as the limitation "*in a substantially powdered form*" found in claims 1, 6, 18 and 37. It is a fundamental principle of claim construction that identical claim terms in the same patent must be given the same meaning. *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001) ("[A] claim term should be construed consistently with its appearance in other places in the same claim or in other claims of the same patent."); *Digital Biometrics*, 149 F.3d at

1345 ("[T]he same word appearing in the same claim should be interpreted consistently."); *Phonometrics, Inc. v. Northern Telecom Inc.*, 133 F.3d 1459, 1465 (Fed. Cir. 1998) ("A word or phrase used consistently throughout a claim should be interpreted consistently."). Nothing in the claims, specification, or prosecution history of the '737 patent counsels otherwise.

To the contrary, the same excerpts from the specification and prosecution history quoted above support the construction that the carbohydrate should be dry, solid, and absent free liquid. For example, in Paper No. 8 of the '737 patent file history (*see* Ex. 6), the Applicants noted, "Since the lollipops of the present invention are made by ***mixing solid powders*** of the drugs ***and the carbohydrate material***, several disadvantages encountered in the prior art are overcome. For example, relatively ***insoluble components*** can be combined ***without the difficulty of attempting to dissolve*** and mix those components, . . ." Ex. 6 at p. 11-12 (emphasis added).

### 2. Extrinsic Evidence

Likewise, for the same reasons as explained above, the extrinsic evidence confirms this construction. *See* Block Decl., ¶ 37.

### 3. Plaintiffs' Proposed Construction For "*substantially powdered carbohydrate material*" Found In Claim 37 Suffers From The Same Shortcomings As Its Proposed Construction For "*in a substantially powdered form*"

Plaintiffs combine their arguments for "*substantially powdered carbohydrate material*" with their arguments for "*in a substantially powdered form*." Accordingly, for the same reasons as above, Plaintiffs' construction is flawed and Barr's proposed construction should prevail.

C.    "*mixing the drug and the carbohydrate material*" means "combining or blending the drug from step (a), the drug being largely in the form of fine particles absent the presence of free liquid, with the carbohydrate material from step (b), without the use of free liquids"

The limitation "*mixing the drug and the carbohydrate material*" is found in step (c) of method claims 1 and step (d) of method claim 18. This limitation should be construed to mean: "**combining or blending the drug from step (a), the drug being largely in the form of fine particles absent the presence of free liquid, with the carbohydrate material from step (b), without the use of free liquids**." This construction comports with the intrinsic and extrinsic evidence.

1.    **Intrinsic Evidence**

a.    **Terms Must Be Construed Consistently In The Same Claim**

Claim terms must be construed in light of how the term is used or construed elsewhere in the *same* claim. *Rexnord*, 274 F.3d at 1342; *Digital Biometrics*, 149 F.3d at 134; *see also Process Control Corp.*, 190 F.3d at 1356. Each element of a claim must have a proper antecedent basis. It is a fundamental rule of claim drafting that the first time that an element is identified, it should be preceded by the indefinite article "a" or "an," and when the same element is referred to a second time, it should be preceded by the definite article "the" or "said." *See* Robert C. Faber, *Landis on Mechanics of Patent Claim Drafting*, § 23 at III-24-27 (4th ed. 2001) ("*Landis*") (attached hereto as Ex. 7).; *see also* Daniel R. Cherry et al., *Patent Practice*, 10.18(c) (Irving Kayton & Karyl S. Kayton eds., 6th ed. 1998) ("*Patent Practice*") (attached hereto as Ex. 8). If the word "the" is used prior to an element that has not previously been identified, the claim is indefinite. *See* Manual of Patent Examining Procedure (MPEP) 2173.05(e) (8th ed., rev. 2, 2004) (attached hereto as Ex. 9) ("A claim is indefinite when it contains words or phrases whose meaning is unclear. The lack of clarity could arise where a claim refers to "said lever" or "the

24

lever," where the claim contains no earlier recitation or limitation of a lever and where it would be unclear as to what element the limitation was making reference.").[15]

Claims 1 and 18 both claim a method for producing a drug-containing lollipop comprising a number of steps, labeled (a), (b), (c), etc. Steps (a) and (b) of both claims 1 and 18 require obtaining a "*drug in a substantially powdered form*" and a "*carbohydrate material*," respectively. These same terms are then repeated in step (c) of claim 1 and step (d) of claim 18, which both require "mixing *the* drug and *the* carbohydrate material." (emphasis added). Principles of claim drafting dictate that the use of the word "the" instead of "a" before the words "drug" and "carbohydrate material" in steps (c) and (d) indicates that "drug" and "carbohydrate material" refer back to, or are the same drug and carbohydrate material recited in the earlier steps (a) and (b). *See, e.g., Process Controls*, 190 F.3d at 1356 ("The presence of that identical language clearly indicates that 'a discharge rate' in clause [b] is the same as 'the discharge rate' in clause [d] . . . In addition, that conclusion avoids any lack of antecedent basis problem for the occurrence of 'the discharge rate' in clause [d]."); *see also Patent Practice*, 10.18(c).

That the adjective "*substantially powdered*," which modifies "*the drug*" in step (a), does not follow the term "*the drug*" in steps (c) and (d) is of no consequence. It is a fundamental principle of patent claim drafting that adjectives once used to modify a noun do not have to be repeated each time the noun is subsequently used in the claim:

> Use the same name for the element consistently throughout every claim. Do not change the noun. Do not change any adjectives. ***An adjective once used need not be repeated upon each subsequent appearance of its noun.*** But if the adjective has a subsequent appearance, the word(s) used must remain the same.

---

[15] *See also Astra Aktiebolag et. al v. Andrx Pharmaceuticals, Inc.*, 222 F. Supp. 2d 243, 258 (S.D.N.Y 2002) ("It is a fundamental concept in patent claim drafting that each element of a claim must have an antecedent basis; otherwise, the claim would be rejected as indefinite under 35 U.S.C. § 112. Manual of Patent Examining Procedure ("MPEP") § 2173.05(e) . . . the term "micro-environment" is preceded by the word "the." The use of this definite article mandates that the term "micro-environment" was previously used in claim 1.").

063987.1001

\*\*\*

> Often, an element is described not only by the noun, e.g.,
> "member," but by adjectives which modify the noun, as
> "connecting member" or "left side connecting member." *After any
> feature is first named completely with all its adjectives in a claim,
> subsequent mentions of the feature in that claim* or in subsequent
> dependent claims in the claim chain, following the first naming of
> the element, *must use the same noun for that element, but may
> use fewer than all of the adjectives,* thereafter calling it "member"
> or "connecting member," without the other adjectives "left side."

Ex. 7, *Landis*, § 19 at III-16-18 (emphasis added).  Applying these basic claim drafting principles

to claims 1 and 18, the adjective "*substantially powdered*" continues to modify "*the drug*" in step

(c) of claim 1 and step (d) of claim 18.  Thus, "*the drug*" in steps (c) and (d) refers to "*the drug

in a substantially powdered form*" identified in step (a), which Barr proposes should be

construed to mean a drug largely in the form of fine particles absent the presence of free liquid.

### b.    Specification

The specification of the '737 patent also confirms that steps (c) of claim 1 and (d)

of claim 18 require mixing the substantially powdered drug from step (a) and the carbohydrate

material from step (b) without the use of free liquids by repeatedly describing the "present

invention" as a method that mixes dry powders and explaining that the mixing of dry powders

presents advantages over prior art methods that employ free liquids:

- "The present invention teaches *the combination of dry powdered
  ingredients* by geometric dilution." Col. 5, ll. 43-44 (emphasis added);

- "For example, the present invention teaches *the mixing of solid powders*
  at room temperature, as opposed to liquid components at elevated
  temperatures." Col. 7, ll. 61-65 (emphasis added);

- "Each of the components is *mixed with the other components in dry form*
  to produce the compositions of the present invention." Col. 11, ll. 47-49
  (emphasis added);

26

- "In addition, because *solid powders are combined together*, constituents which may be chemically incompatible when in a heated solution or suspension can be mixed." Col. 8, ll. 3-6 (emphasis added);

- "Since *the components are combined as solids* problems associated with combining flavoring components insoluble in a molten candy mass are avoided." Col. 9, ll. 27-30 (emphasis added); and

- "Thus, flavorings, drugs, and other components (which may be insoluble in liquid form) are *easily mixed when they exist as a dry powder*." Col. 6, ll. 5-7 (emphasis added).

In light of these statements, one of ordinary skill in the art reading this limitation would understand that "*mixing the drug and the carbohydrate material*" requires mixing dry powders absent the presence of free liquid.

### c.    Prosecution History

Likewise, the prosecution history shows that the Applicants understood that the mixing steps (c) of claim 1 and (d) of claim 18 require mixing the substantially powdered drug from step (a) and the carbohydrate material from step (b) without the use of free liquids. The Applicants explained repeatedly that the mixing of dry powders provides advantages over prior art methods that employ free liquids:

- "Since the lollipops of the present invention are made by *mixing solid powders of the drugs and the carbohydrate material*, several disadvantages encountered in the prior art are overcome. For example, relatively insoluble components can be combined without the difficulty of attempting to dissolve and mix those components, thereby resulting in a composition in which the drug is delivered to the mucosal tissues for absorption therethrough." Ex. 6 at p. 11-12 (emphasis added);

- "As mentioned above, fabrication techniques which do not require a molten mass overcome several problems in the art related to solubility of the various components in a liquid and heat degradation of the drug and other components. *Both the method and the article of manufacture claims include a limitation that the drug and the carbohydrate material are in powdered form when mixed* to form the drug-containing lollipop and/or they are mixed at a temperature below the melting points of the drug and the carbohydrate material." Ex. 6 at p. 15 (emphasis added).

27

Based on these arguments, one of ordinary skill in the art would understand that the Applicants limited their invention to mixing dry powders absent the presence of free liquid.

### 2.    Extrinsic Evidence

Further still, extrinsic evidence support's Barr's construction. Dr. Block agrees that one of ordinary skill in the art—in light of the specification and prosecution history—would have understood "*mixing the drug and the carbohydrate material*" to mean combining or blending the drug from step (a), the drug being largely in the form of fine particles absent the presence of free liquid, with the carbohydrate material from step (b), without the use of free liquids. Block Decl., ¶ 38. Moreover, the state of the art at the time of the invention further supports this construction. It was well known to uniformly disperse small amounts of drug via wet granulation and/or the molten candy method. *Id.* at ¶ 21. What arguably was not well known was the uniform distribution of an insoluble drug to form a lollipop via direct compression. Based on this, "*mixing the drug and the carbohydrate material*" should be construed to mean "combining or blending the drug from step (a), the drug being largely in the form of fine particles absent the presence of free liquid, with the carbohydrate material from step (b), without the use of free liquids."

### 3.    Plaintiffs Refuse To Provide A Clear Construction For "*mixing the drug and the carbohydrate material*" Found In Claims 1 and 18

Plaintiffs' analysis and resulting proposed construction of this claim limitation is fundamentally flawed in numerous respects and should not be adopted by the Court. In essence, Plaintiffs' construction ignores basic claim drafting principles and effectively divorces the claim terms from the context of the specification and prosecution history.

063987.1001

First, as noted above, Plaintiffs fail to provide any evidence of how a person of ordinary skill in the art reading the claims, specification, and prosecution history of the '737 patent would have understood the claim term "*mixing the drug and carbohydrate material.*"

Second, Plaintiffs erroneously contend that in construing "*the drug*" in step (c) of claim 1 and step (d) of claim 18, it is improper to "import" the adjective "*substantially powdered form*" from the drug limitation in step (a). *See* Pl. Br. at 27. This is simply wrong; fundamental principles of claim drafting do not require the adjective to be repeated with the noun in a later reference to maintain the modification. *Landis*, § 19. Moreover, Plaintiffs' reliance on *Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327 (Fed. Cir. 2004) to support its contention is misplaced, as it involves recited limitations "in *other* claims." *See* Pl. Br. at 27 n.34 (emphasis added). Under the doctrine of claim differentiation, a claim that is silent as to a specific limitation should not be construed to contain that specific limitation if a *separate* claim dependent therefrom explicitly contains that limitation. *See Phillips*, slip op. at 32; *see also Dow Chem. Co. v. United States*, 226 F.3d 1334, 1341-42 (Fed. Cir. 2000). This is not the situation here. Rather, we are dealing with limitations found within the *same* claim, which must be consistently construed; not limitations expressly found in *other* dependent claims. Accordingly, "*the drug*" must be construed as referring to the drug identified in step (a) of the same claim.

Third, in arguing that the specification and prosecution history do not contain statements clearly disclaiming the use of free liquid (*see* Pl. Br. at 24), Plaintiffs appear to suggest that disavowal of claim scope requires express language, such as "this invention does not include ___." This suggestion is incorrect. It is well established that disavowal may be inherent or by implication simply based on the disclosure of the specification and prosecution history. *See Astrazeneca v. Mutual Pharm. Co.*, 384 F.3d 1333, 1340 (Fed. Cir. 2004) (holding rigid,

29

express manifestation of exclusion is not required, but instead the words of the specification may work an implicit disavowal). As explained above, the '737 patent specification contains language that clearly indicates that the drug from step (a) and the carbohydrate material from step (b) should be mixed in dry powdered form, absent free liquid, in order to overcome the problems associated with the prior art, such as the relative insolubility of the components. Moreover, neither the specification nor its twenty-three (23) Examples contains a single reference to the use of free liquid.

The prosecution history of the '737 patent contains an even more demonstrative disavowal of the use of liquids in the mixing step. For example, in Paper No. 8, the Applicants explicitly noted that their claimed invention is different from any reference that was cited by the Examiner, including the U.S. Patent No. 3,493,652 ("Hartman"): "Accordingly, it is apparent that no reference (or even combination of references) cited by the Examiner teaches or suggests the features of the present invention. If anything, the references teach one skilled in the art away from the compositions an methods of the present invention." Ex. 6 at p. 19. The Hartman reference cited by the Examiner discloses a type of wet granulation. Example 1 Hartman teaches the following:

> A tablet granulation is prepared from these ingredients by admixing 30 parts of sulfanilamide with the three parts of takadiastase. The mixture is worked until it granulates and is then passed through a 24 mesh screen. The remaining 65 parts of the sulfanilamide is *admixed with the starch paste and worked until granulation occurs*. It is then passed through 24 mesh screen, thoroughly admixed with the drug-enzyme granulation and the mixture is tray dried at 130ºF for about 5 hours. The dry granulation is mixed with the previously sieved magnesium separate and the resulting granulation is then compressed into tablet each containing 0.5 gm. of sulfanilamide.

U.S. Patent No. 3,493,652, Col 6, ll. 58-70 (emphasis added) (attached hereto as Ex. 10). Examples 2-9 further disclose the wet granulation process of Example 1 with the use of various

30

free liquids (*i.e.*, solutions). *Id.* at Col. 7, ll. 1-68. By explicitly distinguishing the Hartman prior art reference from the claimed invention, the Applicants disclaimed the wet granulation process—thereby disclaiming the use of free liquids—and the doctrine of prosecution history disclaimer requires that it be excluded from the scope of the claims.[16]

Plaintiffs also appear to suggest that no clear disavowal of free liquid is present due to the "and/or" connector in the Applicants argument on page 15 of Paper No. 8. In that argument, the Applicants distinguished the present invention from the prior art by noting: "Both the method and article of manufacture claims include a limitation that the drug and the carbohydrate material are in powdered form when mixed to form the drug-containing lollipop and/or they are mixed at a temperature below the melting points of the drug and the carbohydrate materials." Ex. 6 at p. 15. However, both "*in substantially powdered form*" and "*mixing the drug and the carbohydrate material at a temperature below the melting points*" are express claim limitations in each of the independent claims. As such, the "and/or" language of this passage is misleading and cannot be relied upon by Plaintiffs to expand the claim terms. Both mixing dry powders *and* mixing at temperatures below the melting points of the drug and the carbohydrate material are expressly required by each of the claims of the '737 patent.

Fourth, Plaintiffs wrongly suggest that mixing solid powders during processing is merely one embodiment of the invention and the claims should not be limited to that embodiment. Pl. Br. at 11-12, 24. To the contrary, the specification and prosecution history only teach mixing the drug and carbohydrate material in powdered form, and neither shows or suggests any method that mixes the drug and carbohydrate material in the presence of free liquid.

---

[16] Plaintiffs' reliance on *Mars, Inc. v. H.J. Heinz Co.*, 377 F.3d 1369 (Fed. Cir. 2004) is also misplaced. The *Mars* court did not limit the scope of the claim construction at issue because it found the prosecution history was ambiguous. Thus, the court could not determine if a disclaimer had taken place. Such is not the case here. The prosecution history is clear that the Applicants disclaimed the use of free liquids.

063987.1001

Indeed, the prosecution history explicitly notes that "the claims include a limitation that the drug and carbohydrate material are in powdered form when mixed." Ex. 6 at p. 15. Thus, Plaintiffs "preferred embodiment" is the invention itself; accordingly, the claims are not entitled to a scope broader than that embodiment. *See, e.g., Alloc*, 342 F.3d at 1370; *Modine*, 75 F.3d at 1551.

Finally, Plaintiffs seek to avoid the teachings of the specification and prosecution history and try to improperly expand the scope of the claim by relying on the term "comprising." Pl. Br. at 24, 28-29. Plaintiffs assert that presence of the term "comprising" in the preamble permits additional steps that may "alter the characteristics" of the drug between steps (a) (*obtaining the drug in substantially powdered form*) and step (c) (*mixing the drug and the carbohydrate material*) of claim 1. *See Id.* at 29. This is an improper use of the "comprising" transition. While the transitional term "comprising" generally does not exclude additional unrecited steps, it cannot be used to affect the scope of the claims or restore excluded or disclaimed subject matter. *Spectrum Int'l Inc. v. Sterilite Corp.*, 164 F.3d 1372, 1380 (Fed. Cir. 1998); *see also Moleculon Res. Corp v. CBS, Inc.*, 793 F.2d 1261, 1271 (Fed. Cir. 1986). The Federal Circuit has made clear that "'[c]omprising' is not a weasel word with which to abrogate claim limitations." *Spectrum*, 164 F.3d at 1380. That is precisely how Plaintiffs are trying to use "comprising" here.

The specification and prosecution history repeatedly state that the drug and the carbohydrate material are first obtained in powdered form and then are mixed as solid powders absent the presence of free liquids. In attempting to obtain an allowance on all the claims, the Applicants argued to the Examiner that the present invention is different from the prior art because it employs the use of dry powder mixing that overcomes the problems associated with the solubility of the ingredients. Furthermore, the specification and prosecution history do not

contain a single reference to the drug in any form other than a dry powder, or mixing the ingredients in any forms other than dry powders. Thus, the use of a drug or mixing ingredients in any form other than a dry powder contradicts the explicit teachings of the specification and prosecution history and has been excluded from the present invention. Any additional steps that result in the "alteration of the characteristics" of the drug (*i.e.*, changing the drug from a substantially powdered form to some other form) prior to the mixing step has been similarly excluded. Plaintiffs cannot now, for the purposes of this litigation, attempt to recapture or insert the contradictory/excluded subject matter into the scope of the claims under the veil of allowable unrecited steps. *Spectrum*, 164 F.3d at 1379. Indeed, if "comprising" were to allow for additional steps that affected the characteristics of the drug prior to the mixing step, the scope of the claim could be expanded to include other well-known solid dosage form manufacturing processes, such as wet granulation, which predate the present invention, are in the prior art, and were disclaimed during the prosecution of the '737 patent. This, of course, should not be allowed.

In light of the foregoing, the Court should adopt Barr's proposed construction of "*mixing the drug and the carbohydrate material.*"

> **D.** **"*the drug in a substantially powdered form . . . compressed with the carbohydrate material into a solid integral mass*" means "pressing or squeezing the drug in the form of fine particles absent the presence of free liquid together with one or more carbohydrate materials, without the use of free liquids, to form a unitary mass that is not liquid or gaseous."**

The limitation "*the drug in a substantially powdered form . . . compressed with the carbohydrate material into a solid integral mass*" is found in the article of manufacture claims 6 and 37. This limitation should be construed to mean "**pressing or squeezing the drug in the form of fine particles absent the presence of free liquid together with one or more carbohydrate materials, without the use of free liquids, to form a unitary mass that is not**

33

**liquid or gaseous.**" For the same reasons discussed in detail in Section III.C. above, this construction comports with the intrinsic and extrinsic evidence.

> **E.** **"*drug-containing matrix*" means "compressible drug-containing powder matrix"**

The limitation "*drug containing matrix*" is recited in steps (c) and (d) of claim 1 and steps (d) and (e) of claim 18. This limitation should be construed to mean: "**compressible drug-containing powder matrix**." This construction is supported by both the intrinsic and extrinsic evidence.

### 1.    Intrinsic Evidence

#### a.    Claims

In determining the ordinary and customary meaning of a claim term, the Federal Circuit instructs that the context of the surrounding words of a claim term must be considered. *Phillips* at 12; *ACTV*, 346 F.3d at 1088. With respect to step (c) of claim 1 and step (d) of claim 18, the surrounding words are very instructive. Both of these steps require "*mixing the drug and the carbohydrate material . . . to form a drug-containing matrix.*" As discussed above, "*mixing the drug and the carbohydrate material*" means mixing the drug in substantially powdered form from step (a) and the carbohydrate material from step (b) absent the presence of free liquid. Thus, it is apparent that because the drug and the carbohydrate are mixed as dry powders absent the presence of free liquid, the resulting mixture, that is, "*the drug-containing matrix,*" must also be in dry powder form. Furthermore, the fact that the next step after mixing requires compression of the mixture means that the matrix must be compressible.

#### b.    Specification

Additionally, the specification explicitly describes the invention as a compressible drug-containing powder matrix:

34

- "It is another object of the present invention to provide methods of manufacture for forming a **drug-containing compressed powder matrix**, which methods avoid degradation of the drug, overcome problems related to insolubility of the various components in the candy matrix, and provide a product which is not likely to crumble in the patient's mouth. Col. 7, ll. 6-12 (emphasis added);

- "The present invention relates to compositions and methods of manufacture of **compressed powder matrixes**." Col. 1, ll. 18-20 (emphasis added);

- "In addition, because **solid powders** are combined together, constituents which may be chemically incompatible when in a heated solution or suspension can be mixed in forming medicated confections by known methods . . . Once the desired constituents are thoroughly mixed, they are compressed into a solid mass under high pressure. . . . As a result, the **compressed powder matrix** is held together by physical means rather than by chemical means." Col. 8, ll. 3-18 (emphasis added);

- "The pH and the pKa of the **powder matrix** can be modified . . ." '737 Patent Abstract (emphasis added);

- "A drug administered through the oral mucosal tissues from such a **compressed powder matrix** with the scope of the present invention will quickly enter the patient's bloodstream through the veins which serve these tissues." Col. 6, ll. 40-44 (emphasis added).

The same construction should apply to step (d) of claim 1 and step (e) of claim 18, which recite "*the drug-containing matrix*." As explained above, a limitation that uses the word "*the*" immediately before an element signifies that the limitation is referring to the same element introduced or recited in a prior step or limitation. *See* Part III.C.1.a., *supra*. Without a prior introduction or recitation of that element, the claim would be indefinite. *Id.* As seen above, step (c) of claim 1 and step (d) of claim 18 provide the antecedent for the limitation "*the drug containing matrix*" by reciting "*mixing the drug and the carbohydrate material . . . to form a drug containing matrix . . .*" Thus, applying the concepts of antecedent bases and the law that elements within the same claim must be construed consistently, the "*the drug containing matrix*"

35

of step (d) of claim 1 and step (e) of claim 18 must be the same drug containing matrix introduced in the earlier steps.

### c.    Prosecution History

The prosecution history of the '737 patent further supports this interpretation. In the Apr. 27, 1988 Office Action (Paper No. 5), the Examiner rejected the claims as indefinite under 35 U.S.C. § 112, second paragraph. The Examiner argued the following:

> "Applicants instantly presented claims have not been directed along the lines of the presented specification and are therefore incomplete. Applicants have not presented any claim which recites the required limitations as, for example, stated at page 23 including flavorings, sweeteners, flavor enhancers, releasing agents, buffers and the therapeutic drug. **Applicants present no claim directed to the formation or any product having a compressed powder surround (sic) an appliance or holder in order to allow for absorption through the oral muscosal (sic) tissues.**" *See* Ex. 5 at p. 3.

In light of these comments, it is apparent that the Examiner understood the specification of the '737 patent to be directed toward the formation of a powdered drug-containing lollipop via direct compression. Moreover, in response to this Office Action, Applicants amended the claims to include the "*in a substantially powdered form*" limitation. *See* Ex. 6 at pp. 2-10. Thus, it is evident that Applicants also understood the scope of the claimed invention to be limited to the formation of a powdered drug-containing lollipop via direct compression.

### 2.    <u>Extrinsic Evidence</u>

Extrinsic evidence also support's Barr's construction. Dr. Block confirms that at the time of the invention, one of ordinary skill in the art would have understood that, when read in light of the specification and prosecution history, "*drug-containing matrix*" means a compressible drug-containing powder matrix. Block Decl., ¶ 41.

36

### 3.     Plaintiff's Construction Is Flawed

Again, as with "*the drug*" and "*the carbohydrate material*" of step (c) of claim 1, Plaintiffs suggest that the "*drug-containing-matrix*" of step (d) should not be construed to be the same "*drug-containing matrix*" of step (c). For the reasons explained in detail above (*see* Part III.C.1.a., *supra*), "*the drug-containing matrix*" of step (d) should be construed the same as "*the drug-containing matrix*" recited in step (c), that is, "compressible drug-containing powder matrix."[17]

Similarly, for the same reasons discussed above (*see* Part III.C.3., *supra*), Plaintiffs' suggestion that the term "comprising" in the preamble allows for additional steps between step (c) and (d) that may affect the characteristics of the drug containing matrix is improper. "Comprising" cannot be used to broaden the recited elements, nor can it be used to incorporate unrecited limitations that contradict the specification. *Spectrum*, 164 F.3d at 1370. If additional, unrecited steps that would modify the characteristics of the drug-containing matrix are covered (*i.e.*, changing from a powder form), the scope of the "*drug-containing-matrix*" element recited in step (d) would improperly be broadened and would contradict the definition of this term found in the specification. *Chimie*, 402 F.3d at 1384.

In addition, as discussed above, Applicants' amendments to overcome the Examiner's objections prevent Plaintiffs from recapturing the subject matter that is disclaimed by that amendment under the doctrine of prosecution history disclaimer. Accordingly, the "*drug-containing matrix*" in step (d) of claim 1 must have the same definition and scope of "*the drug-containing matrix*" element in step (c).

---

[17] These same arguments apply to steps (d) and (e) of claim 18.

Finally, to the extent that Plaintiffs attempt to distinguish between the method claims and the article of manufacture claims, the global arguments and/or statements made by the Applicant during the prosecution of the '737 patent in distinguishing the prior art are applicable to both types of claims. *See Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1347 (Fed. Cir. 1998).

## CONCLUSION

For these reasons, Plaintiffs' proposed claim constructions should be denied and the Court should adopt Barr's construction of the relevant claim terms described above.

Respectfully submitted,

George C. Lombardi
Bradley C. Graveline
Michael K. Nutter
WINSTON & STRAWN, LLP
35 West Wacker Drive
Chicago, IL 60601
Tel: (312) 558-5600
glombardi@winston.com

Josy W. Ingersoll (#1088)
Richard H. Morse (#531)
Glenn C. Mandalas (#4432)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE 19801
Tel: (302) 571-6600
jingersoll@ycst.com

OF COUNSEL
Robert C. Millonig
Heidi L. Kraus
STERNE KESSLER GOLDSTEIN & FOX PLLC
1100 New York Avenue, N.W.
Washington, D.C. 20005
Tel: (202) 371-3600

Attorneys for Defendant Barr Laboratories, Inc.

Dated: July 29, 2005

WP3:1133053.1                                                                    063987.1001