IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CEPHALON, INC. and <br> UNIVERSITY OF UTAH <br> RESEARCH FOUNDATION, <br><br> Plaintiffs, <br><br> v. <br><br> BARR LABORATORIES, INC., <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) Civil Action No. 05-29-JJF <br> ) <br> ) <br> ) <br> ) <br> ) |

### DECLARATION OF DR. LAWRENCE H. BLOCK

I, Lawrence H. Block, hereby declare and state the following:

**I.  BACKGROUND AND QUALIFICATIONS**

1. My name is Lawrence H. Block. I reside in Pittsburgh, Pennsylvania. I am currently employed by Duquesne University in Pittsburgh, Pennsylvania, and have more than 37 years of experience in the pharmaceutical field.[1]

2. I am submitting this declaration to express my opinions regarding the meaning of the claim terms in U.S. Patent No. 4,863,737 ("the '737 patent"), which I understand relate to the claim construction issues the Court has been asked to decide by the parties.

3. I have an expertise in the field of pharmaceutics. In 1962, I received a B.S. in Pharmacy from the University of Maryland School of Pharmacy in Baltimore, Maryland. I received an M.S. in Pharmacy from the University of Maryland in 1966. In 1969, I received a Ph.D. in Pharmacy from the University of Maryland.

---

[1] My *Curriculum Vitae* is attached hereto as Exhibit 1.

4. I have taught courses in Pharmaceutics since 1968.

5. From 1968 until 1970, I was on the faculty at the University of Pittsburgh in Pittsburgh, Pennsylvania, where I taught in the School of Pharmacy.

6. In 1970, I joined the faculty at the Duquesne University School of Pharmacy, where I taught courses in Pharmaceutics.

7. From 1985 until 1999, I served as the Chairman of the Department of Medicinal Chemistry and Pharmaceutics at the Duquesne University School of Pharmacy, in addition to my teaching duties.

8. I have served as the Director of the Center for Biotechnology at Duquesne University from 2001 to the present.

9. I, along with Shobhan Sabnis, am the named inventor on two United States patents: U.S. Patent No. 5,900,408, entitled "Methods of Creating a Unique Chitosan and Employing the Same to Form Complexes with Drugs, Delivery of the Same within a Patient and a Related Dosage Form," which was issued on May 4, 1999; and U.S. Patent No. 5,830,883, entitled "Methods of Creating a Unique Chitosan and Employing the Same to Form Complexes with Drugs, Delivery of the Same within a Patient and a Related Dosage Form," which was issued on November 3, 1998.

10. I have authored or coauthored numerous articles in peer reviewed journals.

11. Aside from my faculty positions, from the 1970s to the present, I have served as a consultant to numerous entities regarding pharmaceutical matters. Also during that time period,

2

I have served as a member of various boards and committees involved in the field of pharmaceutics.

12. I am a licensed pharmacist. Since 1974, I have been licensed as a Registered Pharmacist in Pennsylvania. From 1962 until 1974, I was a Registered Pharmacist in the State of Maryland.

13. The materials I reviewed prior to preparing this declaration include:

- The specification and claims of the '737 patent;
- The prosecution history of the '737 patent;
- Plaintiffs' Opening Brief on Claim Construction for U.S. Patent No. 4,863,737;
- The Declaration of Gregory P. Teran in Support of Plaintiffs' Opening Brief on Claim Construction for U.S. Patent No. 4,863,737; and
- Various publications pertaining to the pertinent art.

## II. PERSON OF ORDINARY SKILL IN THE ART

14. The '737 patent was filed on June 8, 1987 and is a continuation in part of U.S. Patent No. 4,671,953 ("the '953 patent"), filed on May 1, 1985.

15. In my opinion, the pertinent art for interpreting the '737 patent is pharmaceutic in nature, with an emphasis on solid dosage forms and their manufacture.

16. In my opinion, as of both June 8, 1987 and May 1, 1985 (the filing dates of the '737 patent and '953 patent, respectively), a person of ordinary skill in this art would be someone with, at a minimum, a graduate degree in Pharmacy and additional experience in either the academic or industrial setting. In the academic setting, the hypothetical person of ordinary skill in the art would have a minimum of six years experience performing research in solid dosage

forms and would also have authored independent publications in peer reviewed journals. In the industrial setting, the hypothetical person of ordinary skill in the art would have at least four to six years of work experience involved in the formulation and development of solid dosage forms.

17. Based on my education and experience, I believe that I currently am, and was at the time of the claimed invention, one of at least ordinary skill in the art.

### III. STATE OF THE ART AS OF THE DATE OF THE CLAIMED INVENTION

18. As of the filing dates for both the '737 and '953 patents, one of ordinary skill in the art would have understood the state of the art to include the knowledge set forth below.

19. The known solid peroral[2] and oral pharmaceutical dosage forms included tablets, capsules, pills, buccal tablets, sublingual tablets, lozenges, troches, and lollipops. Many of these oral dosage forms could effect transmucosal delivery of a drug. Peroral and oral dosage forms contained powdered or granular drug, alone, or in combination with pharmaceutical excipients, such as binders, lubricants, disintegrants, diluents, buffers, and colorants.

20. It was known that a holder could be attached to oral dosage forms, as for a lollipop, particularly when the oral dosage form was meant to be administered to a child.

21. Solid peroral or oral dosage forms could be produced using one of at least the following methods or techniques: (1) wet methods, such as a molten candy method or wet granulation followed by compression; or (2) dry methods, such as direct compression or dry granulation followed by compression.

---

[2] "Peroral" refers to the ingestion of a pharmaceutical product by mouth followed by swallowing.

### A.    Wet Methods

#### 1.    Molten Candy Method

22. As of the date of the claimed invention, it was known that a solid dosage form could be prepared by incorporating the active ingredient into a hard candy base. In this method, drug is added to, and dissolved or dispersed in, syrup or a viscous carbohydrate solution to ensure even distribution. Heat is applied at some point during the process to create a molten mass, which is then molded into the desired shape of the final product and allowed to cool.

#### 2.    Wet Granulation

23. As of the date of the claimed invention, wet granulation was a well-known and commonly employed method of preparing solid dosage forms. Wet granulation typically involves the following steps: (1) obtaining the drug and excipients; (2) weighing the drug and excipients; (3) mixing using a liquid (which may occur at various times in this process); (4) granulating; (5) screening the damp mass; (6) drying; (7) dry screening; (8) lubricating; and (9) compressing of the dried granules.

24. In particular, a liquid is added (e.g., by spraying or pouring) to dry materials and mixed until the materials are converted to a dough-like mass. The added liquid may or may not include the drug and/or excipients. Typically, the dough-like mass is then sieved and dried using heat to produce granular material. After drying, typically, some moisture is retained in the granular material. Additional excipient may be added to the granules to facilitate compression and/or drug release.

25. Granular material is different from powder. Granular material is an agglomeration of fine particles. Powders are fine particles that move independently of one another.

26. Compressing the dried granules results in the formation of a compact, such as a solid dosage form.

### B. Dry Methods

#### 1. Dry Granulation

27. At the time of the claimed invention, dry granulation was generally used when the tabletting ingredients were moisture- or thermo-labile.

28. Dry granulation involves the following steps: (1) obtaining the drug and excipients; (2) weighing the drug and excipients; (3) mixing (which may occur at various times in this process); (4) compacting or slugging;[3] (5) dry screening; (6) lubricating; and (7) compressing of the granules into solid dosage forms.

29. In particular, the drug in powdered form is mixed with other powdered excipients that have cohesive properties. Excess air contained in the powdered material is then expelled under pressure to form a dense body known as a slug. The slug is then comminuted or milled into granules, additional excipients are added, and the resulting mixture is compressed into tablets or other solid dosage forms.

---

[3] "Slugging" is the use of tabletting to make compacts. It is possible that the composition may not be uniform at this point.

### 2. Direct Compression

30. Direct compression was also a known technique as of the date of the claimed invention. Direct compression involves directly compressing dry powdered materials into solid dosage forms without first modifying the physical nature of the material (e.g., changing the material's size and/or flow properties). Accordingly, it is the easiest process to automate.

31. For the reasons stated below, it is my opinion that the specification and claims of the '737 patent are directed toward a dry method of forming a drug-containing lollipop.

### IV. CLAIM CONSTRUCTION AS UNDERSTOOD BY ONE OF ORDINARY SKILL IN THE ART AT THE TIME OF THE CLAIMED INVENTION

#### A. *"in a substantially powdered form"*

32. It is my opinion that, at the time of the claimed invention, one of ordinary skill in the art would have understood the ordinary and customary meaning of "powder" to be "dry, fine particles that move independently of one another."

33. It is my opinion that, to one of ordinary skill in the art at the time of the invention, the limitation *"in a substantially powdered form,"* as found in each of the independent claims 1, 6, 18, and 37, when read in light of the specification and the prosecution history, means "largely in the form of fine particles absent the presence of free liquid."[4]

34. My interpretation of *"in a substantially powdered form"* is based on my education and more than 37 years of experience in the field, the '737 patent specification and claims, the '737 patent prosecution history, and treatises and other standard works in the field. For example, the '737 patent's specification states the following:

---

[4] I use the term "free liquid" to mean "any liquid that is not incorporated chemically into the fine particles, beyond that which may be sorbed naturally."

7

- "The present invention teaches the combination of **dry powdered** ingredients by geometric dilution." Col. 5, ll. 43-45 (emphasis added);

- "Thus, flavorings, drugs, and other components (which may be insoluble in liquid form) are easily mixed when they exist as a **dry powder**." Col. 6, ll. 5-7 (emphasis added);

- "Each of the components is mixed with the other components in **dry form** to produce the compositions of the present invention." Col. 11, ll. 47-49 (emphasis added);

- "Since the present invention teaches the use of **solid powders**, any desired type of mold can be used for the compression formation of the lollipop." Col. 6, ll. 19-21 (emphasis added);

- "the present invention teaches the mixing of **solid powders** at room temperature, as opposed to liquid components at elevated temperatures." Col. 7, ll. 61-65 (emphasis added);

- "because **solid powders** are combined together, constituents which may be chemically incompatible when in a heated solution or suspension can be mixed." Col. 8, ll. 3-6 (emphasis added).

35. My interpretation of "*in a substantially powdered form*" is also based on the teachings provided in the '737 patent's specification that the claimed compressed powder process has advantages over prior art methods that employ free liquids to dissolve the components:

- "This procedure overcomes many of the problems of the prior art. According to the present invention, **insoluble drugs** can be added to the matrix **without the necessity of attempting to dissolve the drug**." Col. 5, ll. 58-61 (emphasis added);

- "Thus, flavorings, drugs, and other components (which may be **insoluble in liquid form**) are easily mixed when they exist as a dry powder." Col. 6, ll. 5-7 (emphasis added);

- "This provides for convenient combination of the ingredients, even if they happen **to be insoluble** or otherwise chemically incompatible." Col. 9, ll. 53-56 (emphasis added);

- "It will be recognized that this is an advancement over the art in that existing methods may result in incomplete mixing because of **the insolubility of the products**." Col. 11, ll. 65-68 (emphasis added);

- "It would be a further significant advancement in the art to provide methods and compositions for incorporating drugs (including **insoluble drugs**) into a soluble matrix without heating the mixture to the point that degradation occurs. It would be a related advancement in the art to provide such a method which provided the capability of uniformly incorporating **insoluble drugs** into the soluble matrix." Col. 4, l. 63 – Col. 5, l. 2 (emphasis added);

- "It is another object of the present invention to provide methods of manufacture for forming a drug-containing compressed powder matrix, which methods avoid degradation of the drug, overcome problems related to **insolubility of the various components** in the candy matrix, and provide a product which is not likely to crumble in the patient's mouth." Col. 7, ll. 6-12 (emphasis added);

- Difficulties are encountered in attempting to blend solid drugs in a uniform or otherwise carefully controlled manner. Many drugs are **insoluble, or only partially soluble**, in one or more of the ingredients of the hard candy base. Thus, the resultant product is often found to be lacking in uniform distribution of the drug." Col. 4, ll. 2-4 (emphasis added).

36. In addition to the '737 patent's claim language and specification, my interpretation of *"in a substantially powdered form"* is also based on the prosecution history of the '737 patent, whereby the Applicants sought to distinguish the invention from the prior art by explaining to the Examiner the advantages of using direct compression over the prior art processes that employed free liquids:

- "Since the lollipops of the present invention are made by **mixing solid powders** of the drugs and the carbohydrate material, several disadvantages encountered in the prior art are overcome. For example, relatively **insoluble components** can be combined **without the difficulty of attempting to dissolve** and mix those components, . . ." Paper No. 8 at 11-12 (emphasis added);

- "As mentioned above, fabrication techniques which do not require a molten mass overcome several problems in the art related to **solubility of the various components in a liquid** and heat degradation of the drug and other components. Both the method and article of manufacture claims include a limitation that the drug and the carbohydrate material are **in powdered** form when mixed to form the drug-containing lollipop and/or they are mixed at a temperature below the

9

melting points of the drug and the carbohydrate materials." Paper No. 8 at 15 (emphasis added);

- "None of the cited references teach or suggest the formation of a drug-containing carbohydrate material in the form of a lollipop by use of **powder mixing and formation techniques**. . . . These techniques of the present invention avoid degradation of the drug contained in the candy matrix and also overcome **problems with solubility**." Paper No. 8 at 19 (emphasis added).

**B.    "*substantially powdered carbohydrate material*"**

37.    It is my opinion that, to one of ordinary skill in the art at the time of the claimed invention, the limitation "*substantially powdered carbohydrate material,*" as is found in claim 37, when read in light of the specification and the prosecution history, means "carbohydrate material largely in the form of fine particles absent the presence of free liquid." This interpretation is consistent with my interpretation of the "*in a substantially powdered form*" limitation discussed above.

**C.    "*mixing the drug and the carbohydrate material*"**

38.    It is my opinion that, to one of ordinary skill in the art at the time of the invention, "*mixing the drug and the carbohydrate material,*" as found in step (c) of method claim 1 and step (d) of method claim 18, when read in light of the claims, specification and prosecution history of the '737 patent, means "combining or blending the drug from step (a), the drug being largely in the form of fine particles absent the presence of free liquid, with the carbohydrate material from step (b), without the use of free liquids."

39.    My interpretation of "*mixing the drug and the carbohydrate material*" is based on my education and more than 37 years of experience in the field, the '737 patent specification and claims, prosecution history, and treatises and other standard works in the field. For example, my interpretation is based on the specification of the '737 patent:

- "For example, the present invention teaches **the mixing of solid powders** at room temperature, as opposed to liquid components at elevated temperatures." Col. 7, ll. 61-65 (emphasis added);

- "Each of the components is **mixed with the other components in dry form** to produce the compositions of the present invention." Col. 11, ll. 47-49 (emphasis added);

- "In addition, because **solid powders are combined together**, constituents which may be chemically incompatible when in a heated solution or suspension can be mixed." Col. 8, ll. 3-6 (emphasis added);

- "Since **the components are combined as solids** problems associated with combining flavoring components insoluble in a molten candy mass are avoided." Col. 9, ll. 27-30 (emphasis added);

- "Thus, flavorings, drugs, and other components (which may be insoluble in liquid form) are **easily mixed when they exist as a dry powder**." Col. 6, ll. 5-7 (emphasis added);

- "The present invention teaches **the combination of dry powdered ingredients** by geometric dilution." Col. 5, 43-44 (emphasis added).

40. My interpretation of *"mixing the drug and the carbohydrate material"* is also based on the prosecution history of the '737 patent, which shows that the Applicants understood that the mixing steps (c) of claim 1 and (d) of claim 18 require mixing the substantially powdered drug from step (a) and the carbohydrate material from step (b) without the use of free liquids. The Applicants explained repeatedly that the mixing of dry powders provides advantages over prior art methods that employ free liquids:

- "Since the lollipops of the present invention are made by **mixing solid powders of the drugs and the carbohydrate material**, several disadvantages encountered in the prior art are overcome. For example, relatively insoluble components can be combined without the difficulty of attempting to dissolve and mix those components, thereby resulting in a composition in which the drug is delivered to the mucosal tissues for absorption therethrough." Paper No. 8, at p. 11-12 (emphasis added);

- "As mentioned above, fabrication techniques which do not require a molten mass overcome several problems in the art related to solubility of the various components in a liquid and heat degradation of the drug and

other components.  **Both the method and the article of manufacture claims include a limitation that the drug and the carbohydrate material are in powdered form when mixed** to form the drug-containing lollipop and/or they are mixed at a temperature below the melting points of the drug and the carbohydrate material."  Paper No. 8 at p. 15 (emphasis added).

### D.  *"the drug-containing matrix"*

41.    It is my opinion that, to one of ordinary skill in the art at the time of the invention, *"the drug-containing matrix,"* as found in steps (c) and (d) of claim 1 and steps (d) and (e) of claim 18, when read in light of the claims, specification and prosecution history of the '737 patent, means "compressible drug-containing powder matrix."

42.    My interpretation of *"the drug-containing matrix"* is based on my education and more than 37 years of experience in the field, the '737 patent specification and claims, and the '737 patent prosecution history.  For example, my interpretation is based on the specification of the '737 patent:

- "It is another object of the present invention to provide methods of manufacture for forming a **drug-containing compressed powder matrix**, which methods avoid degradation of the drug, overcome problems related to insolubility of the various components in the candy matrix, and provide a product which is not likely to crumble in the patient's mouth.  Col. 7, ll. 6-12 (emphasis added);

- "The present invention relates to compositions and methods of manufacture of **compressed powder matrixes**."  Col. 1, ll. 18-20 (emphasis added);

- "In addition, because **solid powders** are combined together, constituents which may be chemically incompatible when in a heated solution or suspension can be mixed in forming medicated confections by known methods. . . . Once the desired constituents are thoroughly mixed, they are compressed into a solid mass under high pressure. . . . As a result, the **compressed powder matrix** is held together by physical means rather than by chemical means."  Col. 8, ll. 3-18 (emphasis added);

- The pH and the pKa of the **powder matrix** can be modified. . . ."  Abstract (emphasis added);

- "A drug administered through the oral mucosal tissues from such a **compressed powder matrix** with the scope of the present invention will quickly enter the patient's bloodstream through the veins which serve these tissues." Col. 6, ll. 40-44 (emphasis added).

43. My interpretation is also based on the prosecution history of the '737 patent. In the First Office Action, the Examiner rejected all of the claims, arguing the following:

- "Applicants instantly presented claims have not been directed along the lines of the presented specification and are therefore incomplete. Applicants have not presented any claims which recites the required limitations as, for example, stated at page 23 including flavorings, sweeteners, flavor enhancers, releasing agents, buffers and the therapeutic drug. **Applicants present no claims directed to the formation or any product having a compressed powder surround (sic) an appliance or holder in order to allow for absorption through the oral muscosal (sic) tissues**. *See* Paper No. 5 at p. 3 (emphasis added).

Based on these statements, it is my opinion the Examiner understood the specification of the '737 patent to be directed toward a dry method of forming a drug-containing lollipop.

44. In response to the Examiner's rejection, the Applicants amended the claims to include the limitation *"in a substantially powdered form."* Based on this, it is my opinion the Applicants also understood the scope of the claims to be limited to a dry method of forming a drug-containing lollipop.

V. CONCLUSION

45. I am prepared to offer additional opinions in this matter if requested.

46. To the extent any additional material is produced by either party, I reserve the right to supplement or amend this declaration as appropriate.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: _29 July 2005_    _Lawrence H. Block_
Dr. Lawrence H. Block