IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| CEPHALON, INC. and<br>UNIVERSITY OF UTAH<br>RESEARCH FOUNDATION | ) <br> ) <br> ) <br> ) <br> ) |  |
| **Plaintiffs** | ) <br> ) | **Civil Action No. 05-29-JJF** |
| v. | ) <br> ) |  |
| BARR LABORATORIES, INC. | ) <br> ) |  |
| **Defendant** | ) <br> ) |  |

PLAINTIFFS' REPLY BRIEF ON
CLAIM CONSTRUCTION FOR U.S. PATENT NO. 4,863,737 ('737 PATENT)

Frederick L. Cottrell, III (#2555)
Cottrell @rlf.com
Chad M. Shandler (#3796)
Shandler @rlf.com
Richards Layton & Finger, P.A.
P.O. Box 551
One Rodney Square
Wilmington, Delaware 19899-0551
(302) 651-7700

Attorneys for Plaintiffs CEPHALON, INC., and
UNIVERSITY OF UTAH RESEARCH
FOUNDATION

OF COUNSEL:

William F. Lee
David B. Bassett
Peter J. Kolovos
Gregory P. Teran
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, Massachusetts 02109
(617) 526-6000

Dated: August 17, 2005

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ....................................................................................................................... 1

    I. Barr Misapplies The Law Of Claim Construction........................................................ 1

        A. Barr Continues To Ignore The Presumption Of Ordinary Meaning ................... 1

        B. Barr Invites Error By Suggesting That The Scope Of The Claims
           Should Be Limited To The Disclosed Embodiments ......................................... 2

        C. Barr Incorrectly Asks The Court To Find "Disclaimer" In The
           Prosecution
           History Based On, At Most, Ambiguous Evidence ............................................ 2

        D. Barr's Proposed Expert Testimony Lacks Foundation ..................................... 3

        E. The Level Of Ordinary Skill In The Art............................................................ 4

    II. Barr Incorrectly Characterizes the "State of the Art" ................................................ 4

    III. Barr Has Conceded Several of the Previously Disputed Constructions ...................... 6

    IV. Based On Barr's Revised Construction, No Material Dispute Exists As To
        "Substantially Powdered"............................................................................................ 7

    V. Barr's Constructions of the Remaining Terms Are Incorrect ..................................... 8

        A. "mixing the drug and the carbohydrate material" means "combining or
           blending the drug and the carbohydrate material"............................................. 8

           1. The Claims Do Not Require That The Drug "Obtained" In
               "Substantially Powdered Form" In Step (A) Must *Remain* In
               "Substantially Powdered Form" Up To And Through The "Mixing"
               Step ....................................................................................................... 8

           2. The "Mixing" Step Of The Claims Need Not Be Accomplished In
                The
               Absence Of Any And All "Free Liquid." ............................................... 10

               (a) Barr's Proposed Construction is Inconsistent with Ordinary
                  Meaning ....................................................................................... 11

               (b) The Specification Does Not "Clearly and Unambiguously"
                  Disavow Methods of Mixing Involving Liquid ............................. 12

(c) The Prosecution History Does Not Contain "Unequivocal" Evidence of Disclaimer.........................................................................14

(d) Barr's Extrinsic Evidence Does Not (And Cannot) Supply "Unequivocal" Evidence of Disclaimer...............................................17

3. Barr's Construction Renders The Claim Amendment Superfluous..............18

B. "a drug in a substantially powdered form . . . compressed with the carbohydrate material into a solid integral mass" means "a drug largely in the form of fine particles . . . pressed or squeezed together with the carbohydrate material into a unitary mass that is not liquid or gaseous" ........19

C. "drug-containing matrix" means "drug-containing matrix"..............................19

CONCLUSION.....................................................................................................................20

## TABLE OF AUTHORITIES

Federal Cases

Alloc v. Int'l Trade Comm'n,
    342 F.3d 1361 (Fed. Cir. 2003)....................................................................................... 15

Dow Chem. Co. v. Sumitomo Chem. Co.,
    257 F.3d 1364 (Fed. Cir. 2004)....................................................................................... 10

Envtl. Designs, Ltd. v. Union Oil Co.,
    713 F.2d 693 (Fed. Cir. 1983)......................................................................................... 18

E-Pass Techs., Inc. v. 3Com Corp.,
    343 F.3d 1364 (Fed. Cir. 2003)....................................................................................... 14

Gillette Co. v. Energizer Holdings, Inc.,
    405 F.3d 1367 (Fed. Cir. 2005)................................................................................. 12, 14

Home Diagnostics, Inc. v. LifeScan, Inc.,
    381 F.3d 1352 (Fed. Cir. 2004)....................................................................................... 12

Housey Pharms., Inc. v. Astrazeneca UK Ltd.,
    366 F.3d 1348 (Fed. Cir. 2004)....................................................................................... 12

Intervet Am., Inc. v. Kee-Vet Labs., Inc.,
    887 F.2d 1050 (Fed. Cir. 1989)................................................................................. 10, 20

Liebel-Flarsheim v. Medrad, Inc.,
    358 F.3d 898 (Fed. Cir. 2004)................................................................................... 13, 15

Mars, Inc. v. H.J. Heinz Co.,
    377 F.3d 1369 (Fed. Cir. 2004)....................................................................................... 16

Merck & Co. v. Teva Pharms. USA, Inc.,
    395 F.3d 1364 (Fed. Cir. 2005)....................................................................................... 18

Modine Mfg. Co. v. Int'l Trade Comm'n,
    75 F.3d 1545 (Fed. Cir. 1996)......................................................................................... 15

Omega Eng'g., Inc. v. Raytek Corp.,
    334 F.3d 1314 (Fed. Cir. 2003)................................................................................... 2, 15

Phillips v. AWH Corp.,
    No. 03-1269 (Fed. Cir. July 12, 2005)......................................................................*passim*

Power Mosfet Techs., L.L.C. v. Siemens AG,
    378 F.3d 1396 (Fed. Cir. 2004)....................................................................................... 19

Princeton Biochems., Inc. v. Beckman Coulter, Inc.,
        411 F.3d 1332 (Fed. Cir. 2005)................................................................................... 18

Ruiz v. A.B. Chance Co.,
        234 F.3d 654 (Fed. Cir. 2000)...................................................................................... 4

Salazar v. Procter & Gamble Co.,
        _ F.3d _, 2005 WL 1593000 (Fed. Cir. July 8, 2005).................................................. 20

Schwing GmbH v. Putzmeister Aktiengesellschaft,
        305 F.3d 1318 (Fed. Cir. 2002).................................................................................. 20

Vitronics Corp. v. Conceptronic, Inc.,
        90 F.3d 1576 (Fed. Cir. 1996)...................................................................................... 4

Vivid Tech, Inc. v. Am. Sci. & Eng'g, Inc.,
        200 F.3d 795 (Fed. Cir. 1999).................................................................................... 10

RLF1-2912105-1

## INTRODUCTION

Plaintiffs Cephalon, Inc. and the University of Utah Research Foundation (collectively "Cephalon") hereby submit their Reply Brief in support of their constructions of the claims of U.S. Patent No. 4,863,737 (the '737 Patent").

Although Barr has conceded many of the previously disputed constructions, Barr continues to advance several constructions that cannot be reconciled with the '737 Patent specification or its prosecution history. Specifically, Barr insists that the "mixing" and "compressing" steps claimed in the '737 Patent cannot take place in the presence of "free liquid." Def. Barr Labs. Response Br. on Claim Constr. ("Barr Br.") at 24-38. The ordinary meanings of "mixing" and "compressing" certainly permit the presence of liquid. Further, no portion of the specification or prosecution history "clearly and unambiguously" disclaims "free liquid." Indeed, rather tellingly, in the claims, specification, and prosecution history, the phrase "free liquid" is *never mentioned at all.* And so Barr constructs its argument around dubious evidence, arguing that the discussion of "dry" mixing methods in the specification and prosecution history implicitly limits the claims to those methods, even though numerous Federal Circuit cases stand squarely to the contrary. As explained in detail below, Barr's arguments should be rejected.

## ARGUMENT

### I.    Barr Misapplies The Law Of Claim Construction

Barr, unlike Cephalon, had the benefit of preparing its main brief *after* the Federal Circuit issued its landmark *en banc* decision in <u>Phillips v. AWH Corp.</u>, No. 03-1269 (Fed. Cir. July 12, 2005). Yet Barr's arguments fail to take many of the holdings of <u>Phillips</u>, and other relevant cases, into account.

### A.    Barr Continues To Ignore The Presumption Of Ordinary Meaning

<u>Phillips</u> reaffirms the long-established canon that "the words of a claim are generally given their ordinary and customary meaning" in the relevant art. <u>Phillips</u>, slip op. at 9 (citation omitted). Barr pays lip service to this canon, Barr Br. at 3, and then

- 1 -

proceeds to ignore it. See § V.A.2, infra.

**B.    Barr Invites Error By Suggesting That The Scope Of The Claims Should Be Limited To The Disclosed Embodiments**

Phillips confirmed, as Barr and Cephalon both recognize, the primary role of the intrinsic evidence – the specification and prosecution history – in claim construction.[1] Phillips, however, also reaffirmed in no uncertain terms that "although the specification often describes very specific embodiments of the invention, *we have repeatedly warned against confining the claims to those embodiments*." Phillips, slip op. at 29 (emphasis added). Notwithstanding this warning, Barr urges the Court to confine the claims solely to the embodiments described in the specification. See Barr Br. at 2, 31-32. This would be error. See § V.A.2.(b), infra.

**C.    Barr Incorrectly Asks The Court To Find "Disclaimer" In The Prosecution History Based On, At Most, Ambiguous Evidence**

Nowhere to be found in Barr's two-page discussion of the doctrine of prosecution history disclaimer is the most important aspect of that doctrine: any such alleged disclaimer must be *unequivocal* – "so clear as to show reasonable clarity and deliberateness . . . and so unmistakable as to be unambiguous evidence of disclaimer." Omega Eng'g., Inc. v. Raytek Corp., 334 F.3d 1314, 1325 (Fed. Cir. 2003) (citations omitted); see also Cephalon's Opening Br. on Claim Constr. ("Opening Br.") at 5-6. The Federal Circuit said, in Phillips, that the prosecution history "often lacks the clarity of the specification *and thus is less useful for claim construction purposes*." Phillips, slip op. at 17 (emphasis added). All of this is ignored by Barr, which urges the Court to find an alleged "disclaimer" of *any* mixing or compression involving a liquid based on evidence from the prosecution history that is, at most, ambiguous. See § V.A.2.(c), infra.

---

[1]    Barr asserts that Cephalon's Opening Brief asks the Court to "wholly ignore" the specification and prosecution history. Barr Br. at 2. To the contrary, Cephalon's opening brief contained an extensive review of the intrinsic evidence, Opening Br. at 7-15, which Barr's brief largely ignores.

### D.    Barr's Proposed Expert Testimony Lacks Foundation

As noted by Cephalon in its July 20 Letter to the Court under Local Rule 7.1.2(c), <u>Phillips</u> holds that courts should avoid assigning the specification a secondary role to extrinsic evidence, such as dictionaries, treatises, or expert testimony. <u>Phillips</u>, slip op. at 23-27.[2] Notwithstanding this holding, Barr contends that Cephalon's decision not to submit expert testimony in connection with its Opening Brief "cast[s] doubt" on Cephalon's proposed constructions. Barr Br. at 10. No authority, including <u>Phillips</u>, remotely suggests that expert testimony is a prerequisite to construing patent claims.

<u>Phillips</u> states that expert testimony "may" be useful if adequately supported. <u>See</u> <u>Phillips</u>, slip op. at 19. The declaration of Dr. Block submitted by Barr provides a case study in *inadequately* supported expert testimony. Dr. Block's opinions concerning the alleged "state of the art" in the mid-1980s contain no citations to any contemporaneous treatises, scientific articles, dictionaries, or patents.[3] This certainly "cast[s] doubt" on Dr. Block's apparently unassisted recollection, prepared for the purpose of litigation, of the "state of the art" as it was twenty years ago. Block Decl. ¶¶ 18-30. Dr. Block's opinions concerning his understanding of the meaning of the claims are similarly conclusory, and therefore of little use to the Court. <u>Id.</u> ¶¶ 32-44; <u>see</u> <u>Phillips</u>, slip op. at 19.[4]

---

[2]    Barr incorrectly suggests that dictionaries and technical treatises are now "less reliable" than other evidence, including expert testimony. <u>See</u> Barr Br. at 7 (segregating discussion of allegedly "less reliable" dictionaries from discussion of expert testimony). Rather, <u>Phillips</u> says that *all* extrinsic evidence (including expert testimony) is "less reliable" than the intrinsic evidence. <u>Phillips</u>, slip op. at 19.

[3]    Within the realm of extrinsic evidence, dictionaries, technical treatises, and similar documentary materials may pose less risk of inaccuracy and unreliability than expert testimony, since they are contemporaneous with the time of the invention and, unlike proffered expert testimony, are not generated for the purpose of litigation. <u>See</u> <u>Phillips</u>, slip op. at 19-20.

[4]    Dr. Block's declaration merely recites various excerpts from the intrinsic evidence without any analysis of them. He does not explain why these excerpts show either that the ordinary meaning of terms such as "mixing" would have forbidden the presence of liquid, or why they would constitute unambiguous evidence of disclaimer. Block Decl. ¶¶ 32-44. Moreover, in its Brief, Barr argues that these excerpts supposedly provide clear and unambiguous evidence supporting the constructions that Barr urges. <u>See generally</u> Barr Br. at 16-36. Of course, if that is true, then Dr. Block's testimony on claim construction is itself unnecessary, and reliance on it may lead to error. <u>E.g.</u>, <u>Vitronics Corp. v. Conceptronic, Inc.</u>, 90 F.3d 1576, 1585 (Fed. Cir. 1996).

- 3 -

### E.    The Level Of Ordinary Skill In The Art

Barr takes issue with Cephalon for not proposing an explicit finding as to the level of ordinary skill in the art.[5]  Although such a finding is recommended when adjudicating questions of obviousness, see Ruiz v. A.B. Chance Co., 234 F.3d 654, 666-67 (Fed. Cir. 2000), Cephalon is not aware of authority suggesting that this is true in the context of claim construction (nor has Barr suggested any such authority).[6]  Moreover, until Barr submitted its Response Brief, Cephalon was unaware that there was even a dispute as to the level of ordinary skill in the art.  While Cephalon disagrees in part with Barr's proposal, Cephalon does not believe this disagreement is material to the proper construction of the claims.[7]

### II.    Barr Incorrectly Characterizes the "State of the Art"

Barr's description of the state of the art at the time of the invention is inaccurate. Although peroral and oral dosage forms are generally relevant to the invention, Cephalon suggests that the art most pertinent to the invention of the '737 Patent would be the art of making medicated lozenges for transmucosal delivery.  As the patent states, the invention concerns a drug-containing lollipop which "facilitate[s] the transmucosal delivery of a medication," Col. 7:38-46, and which overcomes certain limitations previously encountered in "forming a medicated lozenge," Col. 5:33-44, and "incorporating drugs into a confection." Col. 7:60-62.[8]

---

[5]    See Barr Br. at 9-10, 11, 13.

[6]    Phillips expressly disavows the existence of any "magic formula or catechism for conducting claim construction." Slip op. at 30.

[7]    Cephalon proposes that a person of ordinary skill in the art at the time of the invention would have possessed at least an undergraduate college education in pharmacy, pharmaceutical sciences, or other pertinent fields (such as chemistry or chemical engineering) and would likely have possessed 4 years or more of experience in an applied industrial setting concerning the formulation, development, and manufacture of solid dosage forms.  See generally Decl. of Lynn Van Campen, Aug. 12, 2005 ("Van Campen Decl.") ¶ 16.  Cephalon is not presently aware of evidence suggesting that a person with these qualifications would have understood the claims differently than a person with the qualifications Barr proposes at page 9 of its Brief. See id. ¶ 17.

[8]    All such citations, unless preceded by a different patent number, refer to the '737 Patent.

Barr asserts that the "state of the art" at the time was divided into two general techniques: "wet" methods (within which Barr includes molten candy methods and wet granulation followed by compression) and "dry" methods (within which Barr includes dry compression and dry granulation). Barr Br. at 10. Tellingly, Barr offers no documentary extrinsic evidence in support of its litigation-inspired view of the state of the art – which is apparently based only on Barr's expert's recollection of events twenty years in the past. Yet Barr's purpose in segregating these techniques in this manner is clear: Barr hopes to convince the Court that when the inventors *explicitly* excluded *molten* candy methods from claim coverage, they *implicitly* disclaimed any "wet" method as well, including wet granulation.[9]

In reality, however, ordinary practitioners of the art of making medicated lozenges did not think in this fashion. They did not segregate "wet" from "dry" methods in the manner that Barr suggests. Instead, they segregated *molten* from *non-molten* methods. Clear evidence of this fact can be found in a chapter on "Medicated Lozenges" found in the 1980 edition of the Pharmaceutical Dosage Forms treatise:

> **Two** types of lozenge bases have gained wide usage because of their ready adaptation to modern high-speed methods of product manufacture. These **two lozenge forms**, which will be discussed in detail, include **hard (or boiled) candy lozenges** and **compressed tablet lozenges**. David Peters, Medicated Lozenges, in 1 Pharm. Dosage Forms 339 (H. Lieberman & L. Lachman eds., 1980) (emphasis added) ("Pharm. Dosage Forms," Teran Decl. Ex. 12.)

In the discussion of compressed tablet lozenges, the treatise also indicates that known methods for making compressed tablet lozenges included dry *and wet* methods, such as wet granulation.    See id. at 427.[10]    Wet granulation, dry granulation, and direct

---

[9]    Characterizing a "molten" method as "wet" is incorrect. Van Campen Decl. ¶ 22.

[10]    The Pharmaceutical Dosage Forms treatise states: "This section, devoted to describing the preparation of *compressed tablet lozenges*, includes many facets covered in other chapters of this text. The general guidelines to be set forth - for *wet* and *dry* granulations, milling, and drying, as well as for tablet compression - are analogous to those for *regular compressed tablets*." 1 Pharm. Dosage Forms (1980) at 427 (emphasis added) (Teran Decl. Ex. 12).

compression were all understood at the time as ways to make compressed tablets. See Sheth et al., Compressed Tablets, in 1 Pharm. Dosage Forms 109, 112 (H. Lieberman & L. Lachman eds., 1980) (Teran Decl. Ex. 13).

This evidence, unlike Barr's evidence, was not created twenty years after the fact for the purpose of litigation. Rather, it comes from a standard reference work in the pharmaceutical sciences with a reputation for being a reliable authority. See Van Campen Decl. ¶¶ 22-23. The treatise is contemporaneous with, and in fact several years prior to, the time of the invention. It shows that practitioners in the art did not think of methods for making medicated lozenges in terms of "wet" and "dry," but instead in terms of molten methods and compressed tablet methods. Therefore, when the inventors of the '737 Patent explicitly amended their claims to exclude *molten* methods, they were not implicitly disclaiming any and all "wet" methods, including wet granulation.

## III.    Barr Has Conceded Several of the Previously Disputed Constructions

Barr strangely contends that Cephalon made "unwarranted assumptions" as to Barr's claim construction positions. Barr Br. at 15. To the contrary, Cephalon's "assumptions" were based squarely on Barr's own statements and citations in its preliminary constructions.[11]  In any event, Barr has conceded several of the previously disputed constructions.[12]

Most significantly, Barr previously contended that the claims must be construed to prohibit any exposure of the drug to liquids *or heat* during production of the lollipop.[13] Barr has now conceded that heat may be used during production of the claimed lollipop,

---

[11]    While Barr was certainly free to change its preliminary constructions, it is hard to see how Cephalon's reliance on them for purposes of framing the issues for the Court should be deemed "unwarranted."

[12]    See Barr Br. at n. 7 and Barr Ex. 4. Cephalon does not necessarily agree with Barr's framing of the claim terms and Cephalon's constructions of them in Ex. 4, but understands that Barr has conceded those constructions not expressly addressed in its Brief.

[13]    See Opening Br. at 19-23; Barr Preliminary Constructions at 2, 4, 7, 8.

but continues to press the argument that no "free liquid" may be present. Barr Br. at 24-33. That argument is discussed <u>infra</u>.

## IV. Based On Barr's Revised Construction, No Material Dispute Exists As To "Substantially Powdered"

| Claim Term | Cephalon's Proposed Construction | Barr's Revised Proposed Construction |
|---|---|---|
| substantially powdered form (claims 1, 6, 18, 37) | largely in the form of fine particles | largely in the form of fine particles absent the presence of free liquid |
| substantially powdered carbohydrate material (claim 37) | a carbohydrate material largely in the form of fine particles | carbohydrate material largely in the form of fine particles absent the presence of free liquid |

Barr no longer urges its previously proposed construction[14] and has essentially adopted Cephalon's proposed construction, with the addition of the phrase "absent the presence of free liquid." The intrinsic evidence refers on several occasions to powders as being "solid."[15] At the time of the invention it was understood by those of skill in the art that even solid powders may incorporate small amounts of liquids.[16] Such liquids would not appear to be "free liquids" as Barr has defined that phrase.[17]

The word "largely" in Cephalon's construction (and Barr's revised construction) correctly modifies the entire phrase, such that a "substantially powdered" substance is largely (but not entirely) in the form of fine particles *and* largely (but not entirely) absent the presence of any so-called "free liquid".[18]

---

[14]   "Dry, solid form consisting of finely dispersed particles that have been ground or pulverized to a point whereby the solid particles consist largely of finite and dust-like particles."

[15]   E.g., Cols. 6:19-21; 7:63-65; 8:4-7.

[16]   <u>See</u> Remington's Pharm. Sciences (17th ed. 1985) at 1600 (Teran Decl. Ex. 8)

[17]   Barr defines "free liquid" as "any liquid that is not incorporated chemically into the fine particles, beyond that which may be sorbed naturally." Barr Br. at 15 n. 8. Cephalon understands "sorbed" to include both absorption and adsorption, and "liquid" would not be limited to water. Cephalon takes no position as to whether "free liquid," to the extent a term of art, has been correctly defined by Barr.

[18]   Barr appears to argue that the output of a wet granulation process cannot be a powder. Barr Br. at 11; Block Decl. ¶ 25. While Cephalon disagrees, this dispute is not relevant to the construction of the claims.

V.    **Barr's Constructions of the Remaining Terms Are Incorrect**

    A.    **"mixing the drug and the carbohydrate material" means "combining or blending the drug and the carbohydrate material"**

| Claim Term | Cephalon's Proposed Construction | Barr's Revised Proposed Construction |
|---|---|---|
| mixing the drug and the carbohydrate material<br><br>(claims 1, 18) | combining or blending the drug and the carbohydrate material | combining or blending the drug from step (a), the drug being largely in the form of fine particles absent the presence of free liquid, with the carbohydrate material from step (b), without the use of free liquids (emphasis added) |

Barr's revised proposed construction of this term and its arguments in support raise two fundamental questions:    (1) must the drug, which was "obtained" in "substantially powdered form" in step (a), *remain* in "substantially powdered form" up to and through the "mixing" step of Claims 1 and 18; and (2) must the "mixing" step of those claims be accomplished in the absence of any and all "free liquid." Applying well-established canons of claim construction, the answer to both questions is *no*, and therefore Cephalon's proposed construction should be adopted.

    1.    **The Claims Do Not Require That The Drug "Obtained" In "Substantially Powdered Form" In Step (A) Must *Remain* In "Substantially Powdered Form" Up To And Through The "Mixing" Step**

Barr quotes from Landis, a treatise on claim drafting, which suggests that adjectives, once stated in a claim, "need not be repeated" in other parts of the claim concerning the same element. Barr Br. at 25-26. Therefore, Barr suggests, all of the adjectives attached to "the drug" in step (a) of the claims – such as "substantially powdered form" – carry through and apply to each usage of "the drug" in subsequent steps, such as the mixing step. Id.[19]

---

[19]    Landis never says that such practice is mandatory – indeed, Landis says that adjectives "*need* not" be repeated, and that drafters "*may* use fewer than all of them." Barr Br. at 25-26 (emphasis added). Although such practice may be preferred in the eyes of the treatise writers for *apparatus* claims (see *infra*), there is no indication that the inventors actually followed their suggestion, or that persons of ordinary skill in the art would assume that such practice was followed. For example, in Claim 18, the claim drafter explicitly restated the adjective "soluble" to modify "carbohydrate material" in both Steps (a) and (d), but declined to explicitly restate the other adjectives from Step (a) to Step (d). But in Claim 1, no adjectives are restated.

Although never mentioned by Barr, the portion of <u>Landis</u> cited by Barr concerns the drafting of *apparatus* claims, not *method* claims.[20] The difference is significant. Apparatus claims are directed to physical objects (such as machines), not processes. Unlike a method claim, there is generally no passage of time and no potential change in the constituent elements of an apparatus claim. A "left side connecting member" recited at the beginning of an apparatus claim will likely remain on the "left side" and "connecting" throughout the claim. Repeating adjectives in that context would likely be unnecessary.

By contrast, in method claims (such as claims 1 and 18), steps are recited that quite often change the features and characteristics of the components subjected to those steps. For example, a hypothetical method claim might state the following steps: "(a) obtaining chocolate in substantially powdered form; (b) melting the chocolate; and (c) pouring the chocolate into a mold." Applying Barr's logic, "the chocolate" in steps (b) and (c) must still be in "substantially powdered form" even though it has been liquified and poured into a mold. This makes no sense.

Because components may change as the method is performed on them, there should be no presumption that all of the features of a component present at the *beginning* of a method claim – such as features of "the drug" in step (a) – remain present and unchanged as the method is carried out – such as by the time "the drug" is "mixed" in steps (c) and (d) of Claims 1 and 18.[21]

Moreover, Barr's argument fails to account for the use of the word "comprising." Even <u>Landis</u> recognizes that "[w]hen 'comprising' is used as a transition word in a

---

[20]     The excerpted pages from the <u>Landis</u> treatise filed by Barr explicitly say, in the header, "Apparatus or Machine Claims." (Barr Br. Ex. 7.)

[21]     Barr suggests that Cephalon's proposed construction would run afoul of the "antecedent basis" requirement for claim language. Barr Br. at 25. This is incorrect. Cephalon does not contend that the "mixing" step of the claims can be satisfied using some *other* drug than "the drug" that is "obtained" in step (a). Rather, because of the use of "comprising" Cephalon submits that "the drug" of step (a) need not continue to remain in "substantially powdered form" by the time the "mixing" step is accomplished. <u>See</u> Opening Br. at 27-29.

method claim, that claim encompasses a method including *additional steps* to those expressly recited in the claim, *including a step preceding or following one of the steps expressly recited.*" Landis § 2:5 at 2-13 (5th ed. 2004) (emphasis added) (Teran Decl. Ex. 14.) Furthermore, the authority cited by Cephalon in its Opening Brief (pp. 7, 24) is clear and unchallenged by Barr – the use of "comprising" in a method claim means that intervening steps are not ruled out, even if they are not explicitly recited in the claim.[22]

Had the inventors intended to restrict the claims only to methods in which *exactly* the stated steps were performed, they would have used words such as "consisting of," not "comprising." See Landis § 2:6 at 2-15 (Teran Decl. Ex. 14) ("'Consisting' or 'consisting of' . . in method claims, means that the process has only the recited steps.").[23] The inventors never used this limitation, and the Patent Office never required them to. Barr's construction would essentially read a "consisting of" limitation into the claims, and would therefore be error. "[I]nterpreting what is meant by a word in a claim is not to be confused with adding an extraneous limitation . . . which is improper." Intervet Am., Inc. v. Kee-Vet Labs., Inc., 887 F.2d 1050, 1053 (Fed. Cir. 1989) (citation omitted).[24]

### 2. The "Mixing" Step Of The Claims Need Not Be Accomplished In The Absence Of Any And All "Free Liquid."

Notably, although Barr argues that its proposed "no liquid" construction "comports with the intrinsic and extrinsic evidence," Barr Br. at 24, Barr does not state whether its proposed construction is consistent with the ordinary meaning of "mixing."

---

[22]   See Dow Chem. Co. v. Sumitomo Chem. Co., 257 F.3d 1364, 1380-81 (Fed. Cir. 2004); Vivid Tech, Inc. v. Am. Sci. & Eng'g, Inc., 200 F.3d 795, 811 (Fed. Cir. 1999).

[23]   Similarly, if the inventors intended to foreclose the possibility of intervening steps that might alter the "basic and novel characteristics of the claimed invention," they would have used words such as "consisting essentially of." Landis § 2:6 at 2-16 (Teran Decl. Ex. 14). Once again, no such language was used. This is yet another reason to reject Barr's argument that the claims prohibit intervening steps which might "[alter] the characteristics" of the drug prior to the mixing step. Barr Br. at 33.

[24]   Barr's only response to the use of "comprising" in the claims is to point out that "comprising" cannot be used to "recapture excluded or disclaimed subject matter." Barr Br. at 32. Cephalon agrees. As argued infra, at no time did the Examiner exclude, or the inventors disclaim, the presence of "free liquid" during the mixing step. Rather, all that was disclaimed (by *explicit amendment* to the claims) was any "mixing" of drug and carbohydrate at temperatures at or above their respective melting points.

That omission is telling – in fact, Barr's construction sharply departs from the ordinary meaning of "mixing," without sufficient evidence of disclaimer.

> (a)    **Barr's Proposed Construction is Inconsistent with Ordinary Meaning**

Barr's proposed construction cannot be reconciled with the ordinary meaning of the term "mixing." Barr fails to identify any explicit definition of the term "mixing" in the intrinsic evidence, and indeed, none exists. Nor is there an implicit or contextual definition of "mixing" in the intrinsic evidence that purports to forbid any and all "free liquid." Indeed, the phrase "free liquid" *never appears at all* in the claims, the specification, or the prosecution history.

As Barr points out, the intrinsic evidence certainly describes examples of "mixtures" of dry powders. E.g., Col. 7:62-65.[25] But these excerpts are actually evidence that the term "mixing," used in isolation (as it is in the claims), is *not limited* to "dry mixing." See, e.g., Phillips, slip op. at 12 ("To take a simple example, the claim in this case refers to 'steel baffles,' which strongly implies that the term 'baffles' does not inherently mean objects made of steel.") Furthermore, Barr fails to point out that the intrinsic evidence (when discussing the state of the art) also describes "mixing" and "mixtures" involving *molten* ingredients, which, by definition, are in liquid form:

> In the manufacture of medicated candy products by existing methods, the therapeutic agent is added to a **molten candy mass**. The resultant **mixture** is then **thoroughly mixed** to ensure proper distribution of the drug within the molten candy mass. The **mixture** is then **poured while still molten** and allowed to solidify into a semi-solid mass. (Col. 3:56-62, emphasis added.)

This passage further confirms that the term "mixing" does not inherently exclude liquids. In addition, because of the use of the word "comprising," the claims permit the presence of any number of additional ingredients besides the carbohydrate and drug, with no requirement as to whether such additional ingredients need be in liquid or solid form.

---

[25]    See also Barr Br. at 26-27 (citing, inter alia, '737 Patent Col. 11:47-49; Col. 6:5-7.)

Thus, the ordinary meaning of "mixing" in the context of the intrinsic evidence permits the presence of liquid. Van Campen Decl. ¶¶ 26-29. Because Barr provides no persuasive evidence to the contrary, Barr must shoulder the heavy burden of proving that the inventors, in either the specification or the prosecution history, intentionally and unequivocally disclaimed "mixing" in the presence of any liquid. Barr fails to do so.

### (b)    The Specification Does Not "Clearly and Unambiguously" Disavow Methods of Mixing Involving Liquid

As stated in Phillips, "the specification may reveal an *intentional* disclaimer, or disavowal, of claim scope by the inventor." Phillips, slip op. at 16 (emphasis added). Any such disclaimer must be clear and unambiguous. See Home Diagnostics, Inc. v. LifeScan, Inc., 381 F.3d 1352, 1357 (Fed. Cir. 2004) (declining to limit claims to preferred embodiment because "[t]hat disclosure alone does not clearly and unambiguously disavow" other ways of performing the invention as claimed.)

Barr argues that the specification discloses a single embodiment (with several examples) of dry mixing, but no embodiment or examples of mixing in the presence of free liquid. Therefore, according to Barr, the specification implicitly disavows mixing steps involving liquid.[26]

That is not consistent with the law.   **"[W]e have expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment."** Phillips, slip op. at 29 (emphasis added). To the contrary, "'words or expressions of manifest exclusion' or 'explicit' disclaimers in the specification are necessary to disavow claim scope." Gillette Co. v. Energizer Holdings, Inc., 405 F.3d 1367, 1374 (Fed. Cir. 2005) (quoting Housey Pharms., Inc. v. Astrazeneca UK Ltd., 366 F.3d 1348, 1352 (Fed. Cir. 2004)). Disclaimer does not arise "merely because the specification did not describe a broader embodiment,

---

[26]    See Barr Br. at 31-32. The specification contains several references to combining and mixing "dry powdered ingredients," "solid powders," and "components in dry form." See, e.g., Col. 5:43-44; Col. 7:61-65; Col. 11:47-49; Col. 8:3-6; Col. 9:27-30; Col. 6:5-7.

but because the specification, claim, or prosecution history made clear that the invention was limited to a particular structure." Liebel-Flarsheim v. Medrad, Inc., 358 F.3d 898, 907-08 (Fed. Cir. 2004).[27]

Here, the specification "makes clear" only that the invention is different from prior art involving the use of a molten candy mass. Col. 7:62-67. For example, one advantage of the invention described in the patent is the ability to mix constituents "which may be chemically incompatible when in a **heated solution or suspension**." Col. 8: 3-6 (emphasis added). The invention also avoids problems with "combining flavoring components [that are] insoluble **in a molten candy mass**." Col. 9:27-30 (emphasis added).

The following passage from the patent shows that to the extent the inventors distinguished their invention from mixing methods using "liquid," they were referring exclusively to "molten" liquid methods:

> For example, the present invention teaches the mixing of solid powders at room temperature, **as opposed to liquid components at elevated temperatures**. The degradation of drugs, which often occurs at the **elevated temperatures needed to produce a molten candy mass**, is thereby avoided. (Col. 7:62-67, emphasis added.)

As noted above, practitioners in the art of making medicated lozenges at the time of the invention did not think in terms of "wet" methods on the one hand and "dry" methods on the other. Instead, they thought in terms of *molten* and *non-molten* methods. By distinguishing molten methods, therefore, the inventors were not distinguishing all methods of mixing where liquid might be involved.

---

[27]    Barr cites several passages from the specification as alleged evidence that the ingredients "are not in contact with free liquids or solvents when the process claimed in the '737 patent is employed." See Barr Br. at 16-18. Yet *none* of these passages states that no "free liquid" may be present during the claimed process. *None* of these passages *even mentions* the "free liquids," nor do they purport to exclude non-molten processes employing "free liquids." Notably as the excerpts cited by Barr show, the specification distinguishes between "dry" and "solid" powders. Barr Br. at 16. The claims simply say that the drug is obtained in "substantially powdered form," not "substantially dry form." Nor does the mixing step in the claims state that ingredients are mixed in the absence of liquid. The excerpts cited by Barr thus show that a "substantially powdered form" is not necessarily "dry," and that the process claimed in the patent does not exclude any and all free liquid.

Barr also argues that none of the 23 Examples in the patent explicitly mentions mixing in the presence of liquid. Barr Br. at 30.[28] This argument is the same argument made in the *dissenting* opinion in Phillips, which did not carry the day. See Phillips, dissenting opinion at 3 (Lourie, J.) (arguing that claim term "baffles" should not include right angles because numerous examples in specification showed baffles with oblique angles). The *en banc* Federal Circuit majority rejected this argument, holding instead that the mere fact that the examples in the specification teach a particular embodiment – such as oblique-angle baffles, or dry powder mixing – does not limit the claims to that embodiment. See Phillips, slip op. at 29, 35. Similarly, in Gillette, the patent in suit contained *thirty* examples of three-blade razors; the Federal Circuit held, however, that this did not prohibit the claims, which were directed to razors with a "plurality" of blades, from covering a four-blade razor. See Gillette, 405 F.3d at 1374 ("Despite the numerous cites to three-bladed razors plucked from the written description, no statement in the patent surrenders or excludes a four-bladed razor.")

(c)    **The Prosecution History Does Not Contain "Unequivocal" Evidence of Disclaimer**

In the prosecution history, the inventors stated:

The present invention provides solid fabrication techniques **which do not require a molten mass**. As mentioned above, **fabrication techniques**

---

[28]    Barr, in connection with "substantially powdered form," notes that one stated advantage of the preferred dry-mixing embodiment is that it permits otherwise "insoluble" substances to be combined. Barr Br. at 17. As an initial matter, the use of "insoluble" in the patent appears to describe lack of solubility in heated solutions, e.g. molten candy masses. See, e.g., Col. 4:5-6 ("Many drugs are insoluble, or only partially soluble, in one or more of the ingredients of the hard candy base"); Col. 7:6-11 ("It is another object of the present invention to provide methods of manufacture for forming a drug-containing compressed powder matrix, which methods avoid degradation of the drug, overcome problems related to insolubility of the various components in the candy matrix . . . ."). Moreover, to the extent Barr contends that the claimed mixing step *must* be dry because it *must* permit mixing of "insoluble" components, that is erroneous. As a factual matter, it was well understood at the time of the invention that components can be mixed in a liquid regardless of whether those components *dissolve* in the liquid. See Van Campen Decl. ¶ 29. Furthermore, as a legal matter, the claims are not limited to encompass the ability to combine "insoluble" components, which is merely one of many advantages of the claimed invention. See Col. 25:64-26:19 (fact that "insoluble ingredients can be used" was merely one of *nine* advantages of the invention). "An invention may possess a number of advantages or purposes, and there is no requirement that every claim directed to that invention be limited to encompass all of them." E-Pass Techs., Inc. v. 3Com Corp., 343 F.3d 1364, 1370 (Fed. Cir. 2003).

> **which do not require a molten mass** overcome several problems in the
> art related to **solubility of the various components in a liquid and heat
> degradation of the drug and other components**. Amendment, Oct. 27,
> 1988, Paper No. 8, at 15 (hereafter "Amendment") (Teran Decl. Ex. 3)
> (emphasis added).

This passage, like the passages cited by Barr from the specification, is evidence that the

inventors did not intend to limit their claims to dry powder mixing. Instead, they stated

that their invention stemmed from "**fabrication techniques which do not require a**

**molten mass.**" Amendment at 15 (emphasis added). Similarly, the inventors stated that

"the present invention does not require [a solubilizing agent] in that **the mixture takes**

**place without the necessity of forming a _molten_ _liquid_ mass.**" Amendment at 16

(emphasis added). Nothing in the excerpts from the specification and prosecution history

cited by Barr presents unequivocal and unambiguous evidence that when the inventors

_explicitly_ distinguished molten candy methods, they _implicitly_ disclaimed _any_ mixing

method involving _any_ amount of liquid.[29]

Much of Barr's disclaimer argument rests on its unfounded assumption that

phrases such as "the present invention provides solid fabrication techniques" or "the

lollipops of the present invention are made by mixing solid powders" effectively serve as

_per se_ limitations on the scope of the claims. See Barr Br. at 5. Phillips contains no

language supporting that proposition, nor do the two cases cited by Barr.[30]   To the

contrary, more recent authority indicates that descriptions in the intrinsic evidence

preceded by phrases such as "the present invention" or "principles of the invention" do

not operate as _per se_ limitations of the claims. E.g., Liebel-Flarsheim Co. v. Medrad,

Inc., 358 F.3d 898, 909 (Fed. Cir. 2004) ("Moreover, the reference to the 'principles of

---

[29]    Cephalon has never argued, contrary to Barr's suggestion, that a disavowal of claim
scope would require language such as "this invention does not include [X]." Barr Br. at 29-30.
What Cephalon contends, and Barr continuously ignores, is that the law is clear: such disclaimer
must be unequivocal and unambiguous. See Phillips, slip op. at 17; Omega Eng'g, 334 F.3d at
1325. As explained above, none of the passages cobbled together by Barr from the intrinsic
evidence meets the standard.

[30]    See Alloc v. Int'l Trade Comm'n, 342 F.3d 1361, 1369-70 (Fed. Cir. 2003); Modine Mfg.
Co. v. Int'l Trade Comm'n, 75 F.3d 1545, 1551 (Fed. Cir. 1996).

- 15 -

the present invention' as providing for 'an angiographic injector' with a syringe that can be 'loaded into and removed from the injector pressure jacket,' does not limit the invention to devices that have pressure jackets any more than it limits the invention to injectors that are used for angiography.")

Barr also argues that the inventors disclaimed wet granulation when they distinguished the Hartman reference.[31]    Barr neglects to inform the Court that this reference was never cited by the Examiner as a basis for rejection of any claim.[32]  As the inventors noted, Hartman merely teaches "the formation of a medicament which has controlled release properties by the use of *enzymes*."  Amendment at 18-19 (emphasis added).  None of the statements by the Examiner or the inventors suggests that "wet granulation" was ever discussed among the inventors and the Examiner, let alone disclaimed by the inventors.  Indeed, as Barr tacitly admits, Hartman (at best) merely discloses a "type" of wet granulation.  Barr Br. at 30.  Barr never contends that this "type" of "wet granulation" was practiced in the art of preparing medicated lozenges. More importantly, nothing in the discussion of Hartman rises to the level of unequivocal and unambiguous disclaimer of wet granulation or other wet methods for making compressed tablet lozenges.

Barr unsuccessfully attempts to distinguish <u>Mars, Inc. v. H.J. Heinz Co.</u>, 377 F.3d 1369, 1377 (Fed. Cir. 2004) (cited in Opening Br. at 14), noting that in <u>Mars</u> the prosecution history was found to be too ambiguous to support a disclaimer.  Barr Br. at 31, n. 16.  That is precisely the point – the <u>Mars</u> case, just like this one, involved a situation where there was an explicit amendment to overcome prior art, and the accused infringer insisted (much like Barr) that the explicit amendment was accompanied by an

---

[31]    U.S. Patent No. 3,493,652.

[32]    Hartman was merely cited by the Examiner as a "basic teaching of the incorporation of a pharmaceutically active ingredient into a powder compression followed by compression to form an article suitable for the controlled administration of said active ingredient including drugs." Office Action, Apr. 15, 1988, at 5.

implicit disclaimer of additional matter. The Federal Circuit disagreed in <u>Mars</u>, and this Court should similarly find that the explicit amendment to exclude molten methods, as well as the arguments accompanying that explicit amendment, are insufficient to support the *implicit* (and sweepingly broad) disclaimer Barr urges here.[33]

> **(d)     Barr's Extrinsic Evidence Does Not (And Cannot) Supply "Unequivocal" Evidence of Disclaimer**

Barr's last-ditch effort to find "unequivocal" evidence of disclaimer comes from one piece of extrinsic evidence, namely, the opinion of Dr. Block. Dr. Block's opinion does not square with either the unbiased factual record of the state of the art at the time of the invention or the law that this Court must apply in construing the claims.

As an initial matter, Dr. Block and Barr apparently contend that while wet granulation was well known at the time of the invention, direct compression "arguably" was not. Barr Br. at 28, Block Decl. ¶ 21. But years before the invention (and decades before this litigation) it was recognized that "the **compressed lozenge** can be prepared by the **historical wet granulation technique or by dry compression**." 1 Pharm. Dosage Forms (1980) at 432 (emphasis added) (Teran Decl. Ex. 12).

Barr compounds this factual error with a legal one: Barr apparently suggests that the claims must be construed to exclude any element (such as a method of mixing) that was known in the art at the time of the invention. Thus, Barr urges its "no liquid" construction of the "mixing" step because wet granulation, at the time of the invention, was a "well-known process[] in the art." Barr Br. at 2, 28.

It is true that using "wet granulation" techniques to make compressed medicated lozenges was known at the time of the invention. So, for that matter, was direct

---

[33]     Barr also cites an excerpt from the prosecution history where the inventors said that the claims "include a limitation that the drug and the carbohydrate material are in powdered form when mixed . . . **and/or** they are mixed at a temperature below the melting points of the drug and the carbohydrate." Barr Br. at 31 (emphasis added) Barr unpersuasively tries to argue that "and/or" really means "and," but not "or." <u>Id.</u> At best, the statement is ambiguous and insufficient to show disclaimer. Moreover, the limitations of the claims are quite clear: there is a temperature limitation, but no limitation requiring mixing in powdered form. Cephalon's plain meaning construction, therefore, is consistent with "and/or"; Barr's construction, however, is not.

compression of powders. See 1 Pharm. Dosage Forms (1980) at 427, 451-454 (Teran Decl. Ex. 12). This is of no consequence. None of the claims asserted by Cephalon purport to cover mere "wet granulation" (or direct compression) in the abstract. Rather, the claims asserted by Cephalon are directed to methods and products that are combinations of *numerous* features.[34] Even if certain individual features of these claims were "well-known" at the time of the invention, it was the *combination* of the claimed features that the inventors – and the Patent Office – concluded was novel and worthy of patent protection. Barr improperly attempts to exploit the fallacy that each and every aspect or feature of an invention must be novel. Common sense, experience, and settled law, however, recognize that "[i]nventions typically are new combinations of existing principles or features." Princeton Biochems., Inc. v. Beckman Coulter, Inc., 411 F.3d 1332, 1337 (Fed. Cir. 2005); see also Envtl. Designs, Ltd. v. Union Oil Co., 713 F.2d 693, 698 (Fed. Cir. 1983) ("virtually all [inventions] are combinations of old elements").

### 3. Barr's Construction Renders The Claim Amendment Superfluous

Barr's construction renders explicit claim language superfluous. If either the drug or carbohydrate is heated to its melting point, it will become a liquid. Van Campen Decl. ¶ 30. If Barr is correct that the meaning of "mixing," as understood in the context of the patent, prohibits the presence of *any* liquid, then "mixing" (as construed by Barr) inherently prohibits temperatures at or above the melting points of the drug and carbohydrate. Id. Yet the inventors explicitly amended their claims to require that the mixing occur "at a temperature below the melting points of the drug and the carbohydrate material." Amendment at 2-10. Barr's construction of "mixing" renders this explicit amendment superfluous, and should therefore be rejected. See Merck & Co. v. Teva

---

[34]    These features include, without limitation, obtaining drugs in substantially powdered form, mixing them with carbohydrates (and sometimes buffers) at temperatures below the melting points of the drug and carbohydrate, and attaching holders to produce drug-containing lollipops for transmucosal delivery of drugs with certain advantages over prior art lollipops made by molten-candy methods. See generally Col. 5:11-7:19.

Pharms. USA, Inc., 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so."); Power Mosfet Techs., L.L.C. v. Siemens AG, 378 F.3d 1396, 1410 (Fed. Cir. 2004) (interpretations of claims rendering claim terms superfluous is generally disfavored).

**B.  "a drug in a substantially powdered form . . . compressed with the carbohydrate material into a solid integral mass" means "a drug largely in the form of fine particles . . . pressed or squeezed together with the carbohydrate material into a unitary mass that is not liquid or gaseous"**

Barr's construction contains several problems,[35] the most significant of which is Barr's contention that this term should be construed to exclude the presence of free liquids. For the same reasons discussed in detail in Section V.A above, this construction is improper.

**C.  "drug-containing matrix" means "drug-containing matrix"**

There is no support in the specification or prosecution history for construing "drug-containing matrix" as "drug-containing *powder* matrix." While there are references in the specification to "powder matrixes," none of them suggest that the phrase "drug-containing matrix" always means a "drug-containing powder matrix." Indeed, the word "matrix" is used extensively in the specification in the context of compositions that are not necessarily powder, such as "soluble" matrixes, Col. 5:2, "molten candy" matrixes, Col. 5:63, and "confectionary" matrixes, Col. 11:14. This context shows that a "drug-containing matrix" is not inherently powdered. See Phillips, slip op. at 12.[36]

Had the inventors intended (or the Patent Office required) the claimed "drug-containing matrix" to be "powdered," the claims would say so explicitly. Yet they do

---

[35]    First, to be consistent with the claim, the verb tense should be "pressed" or "squeezed." Second, Barr (perhaps unintentionally) omits the word "largely" from its construction. Barr Br. at 33.

[36]    Once again, Barr argues for its construction based on its incorrect view of the use of adjectives in method claims, Barr Br. at 35-36, and its incorrect view that the use of "comprising" to permit a "drug-containing matrix" that is not necessarily powdered would somehow broaden the recited elements to include disclaimed matter. Barr Br. at 37. These flawed arguments have been addressed above. See § V.A, supra.

not.    Indeed, while both claims 1 and 18 require that the *drug* be obtained in "substantially powdered" form, they do not require that the *carbohydrate* be obtained in such form.  Also, the mixtures may include any number of additional ingredients, *none* of which need be in powdered form.  Therefore, a non-powdered carbohydrate could be used, as well as non-powdered flavors and colors.  The resulting matrix would not necessarily be powdered.  Barr's construction thus improperly reads an additional, unnecessary limitation into the claims.  See Intervet, 887 F.2d at 1053.[37]

## *CONCLUSION*

Cephalon respectfully requests that the Court construe the disputed claim terms of the '737 Patent as set forth in Cephalon's proposed constructions above.

_Chad M. Shall by At /du 4025_

Frederick L. Cottrell, III (#2555)
Cottrell @rlf.com
Chad M. Shandler (#3796)
Shandler @rlf.com
Richards Layton & Finger, P.A.
P.O. Box 551
One Rodney Square
Wilmington, Delaware 19899-0551
(302) 651-7700
Attorneys for Plaintiffs CEPHALON,
INC., and UNIVERSITY OF UTAH
RESEARCH FOUNDATION

OF COUNSEL:

William F. Lee
David B. Bassett
Peter J. Kolovos
Gregory P. Teran
Wilmer Cutler Pickering Hale and Dorr
LLP
60 State Street
Boston, Massachusetts 02109
(617) 526-6000

Dated:  August 17, 2005

---

[37]    Barr also quotes from the Examiner's Office Action to suggest that the "drug-containing matrix" must be powdered, Barr Br. at 36, but this argument has three flaws.  First, the quoted excerpt contains *no* discussion of the "drug-containing matrix" limitation *at all*.  See Barr Br. at 36; Office Action at 3.  Second, even if the Examiner's unilateral comments were on point, they could not possibly support the disclaimer Barr urges here.  See Salazar v. Procter & Gamble Co., __ F.3d __, 2005 WL 1593000 (Fed. Cir. July 8, 2005) ("[A]n applicant's silence regarding statements made by the examiner during prosecution, without more, cannot amount to a 'clear and unmistakable disavowal' of claim scope"); Schwing GmbH v. Putzmeister Aktiengesellschaft, 305 F.3d 1318, 1324-25 (Fed. Cir. 2002) ("Prosecution history ... cannot be used to limit the scope of a claim unless the applicant took a position before the PTO.")  Third, Barr's argument rests on the same unfounded assumption that the explicit amendment requiring the drug to be obtained in "substantially powdered form" also limits every subsequent element in the method, including mixing and compression.  This argument fails for the reasons explained above.  See § V.A, supra.

## CERTIFICATE OF SERVICE

I hereby certify that on August 17, 2005, I electronically filed the foregoing with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following and which has also been served as noted:

**VIA HAND DELIVERY**
Josy W. Ingersoll, Esquire
Richard H. Morse, Esquire
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE 19801

I hereby certify that on August 17, 2005, I have mailed via Federal Express, the foregoing documents to the following non-registered participants:

Georege C. Lombardi, Esquire
Bradley F. Graveline, Esquire
Michael K. Nutter, Esquire
Winston & Strawn, LLP
35 West Wacker Drive
Chicago, IL 60601

Robert C. Millonig, Esquire
Heidi L. Kraus, Esquire
Sterne, Kessler, Goldstein & Fox PLLC
1100 New York Avenue, N.W.
Washington, DC 20005

Steven J. Fineman (#4025)
(Fineman@rlf.com)