IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CEPHALON, INC. and<br>UNIVERSITY OF UTAH<br>RESEARCH FOUNDATION<br><br>    Plaintiffs<br><br>v.<br><br>BARR LABORATORIES, INC.<br><br>    Defendant | Civil Action No. 05-29-JJF |

## DECLARATION OF DR. LYNN VAN CAMPEN

I, Lynn Van Campen, hereby declare and state the following:

### I. Background and Qualifications

1. I am the Director of the Zeeh Pharmaceutical Experiment Station (the "Station") at the University of Wisconsin—Madison School of Pharmacy (the "School"). I have held my current position since 2003. In this position, I have been responsible for bringing the Station, which is situated in academia and interfaces with the pharmaceutical industry, into active operation. The mission of the Station is to serve the pharmaceutical development needs of R&D labs on- and off-campus, through a program of education and related laboratory services. Through formulation and analytical development activities taught, practiced, and contracted with our lab, the Station is poised to train and educate graduate students and industry scientists in both practical and didactic coursework, which are offered through short courses as well as an anticipated Masters curriculum in drug development.

2. I received a Bachelor of Science degree in chemistry from Mary Washington College of the University of Virginia in 1969, and a Ph.D. in pharmaceutics from the School here at the University of Wisconsin—Madison in 1981. I also received a Master of Science degree in pharmaceutics from the School in 1979. My doctoral

dissertation involved the study and quantitative theoretical description and prediction of the kinetics of moisture sorption and deliquescence by water-soluble compounds of pharmaceutical interest.

3. Since receiving my doctoral degree and prior to my present position, I have been employed in the pharmaceutical industry for over twenty years. My first postdoctoral position was as a Senior Scientist at Boehringer Ingelheim Pharmaceuticals, during which time I was responsible for a formulation lab as well as a process validation group. Eventually rising to a Group Leader, I supervised laboratories responsible for characterization and preformulation studies of new compounds, and the design and formulation of solid, aerosol and parenteral dosage forms including those of proteins. I then served as Director of a new department of pharmaceutics at Synergen, Inc. before returning to Boehringer Ingelheim Pharmaceuticals as Director of Pharmaceutics where my responsibilities expanded, beyond those listed above, to include the overall management of pharmaceutical product development, clinical manufacturing and packaging, stability testing and the technology transfer group interfacing with Production. Finally, I served as Vice President of Pharmaceutical Development at Inhale Therapeutic Systems, responsible for organizational development and leadership of inhalation product development, quality control and assurance, and regulatory affairs during which time my department grew from approximately 30 to 120 employees. Prior to joining the University of Wisconsin, I accepted a Senior Fellow position and consulting role with Inhale, now Nektar Therapeutics.

4. Since receiving my doctoral degree, I have devoted my professional career to the effective application of pharmaceutical science to the development of therapeutic products, both at the formulation and analytical lab bench, in the processing lab or GMP manufacturing setting, or in the construction and management of an effective development organization.

5. I have conceived of, co-organized, and participated as faculty for a new short course through the University of Wisconsin Extension Services in Pharmacy entitled, "An Introduction to the Drug Development Process." Successful in its first

offering, this short course will be offered on an approximately annual basis, and previews an introductory semester-based course within the planned MS curriculum. Periodically I am asked to present individual lectures or seminars relevant to my industrial drug development experience within the School's graduate studies program as well as outside the School.

6. In 1984 I was co-recipient of the Ebert Prize awarded by the American Pharmaceutical Association (APhA) Academy of Pharmaceutical Sciences for the "best research paper published in 1983" in the Journal of Pharmaceutical Science (for the first of three papers associated with my doctoral research). I was awarded a competitive American Foundation for Pharmaceutical Education (AFPE) Fellowship for 1977-1978 and an AFPE E. Mead Johnson Memorial Fellowship for 1978-1980. I have served on the University of Wisconsin Extension Services in Pharmacy Land-O'Lakes Pharmaceutical Research Conference Planning Committee (1982-1985, 2004-), the U.S.P. Subcommittee on Moisture Specifications (1986-1989), and the 1988 Wisconsin Update Conference Planning Committee (1987). I have also been a member of the Scientific Advisory Panel of IPAC (International Pharmaceutical Aerosol Consortium) (1994-1995), and served on the PhRMA (Pharmaceutical Research and Manufacturing Association) Pharmaceutical Development Steering Committee (1993-1996, 1999-2001) and PhRMA Drug Product Technical Group (2002). Prior to joining the School of Pharmacy at the University I was an invited member of the Board of Visitors, School of Pharmacy (2003-2004).

7. I am author or co-author of twelve peer-reviewed scientific papers, as well as two book chapters entitled "Inhalation, Dry Powder," in the 2nd Ed of The Encyclopedia of Pharmaceutical Technology, 2000, and "Inhalation Products in Clinical Trials," in the 2nd Ed., Drug Products for Clinical Trials, ed. by D. C. Monkhouse, C. Carney and J. Clark, in press. Members of development groups under my direct supervision in the industry have secured an estimated twenty patents describing new modes of drug delivery, and of new compositions and processes for drug formulation.

8. I have attached a current copy of my curriculum vitae as Exhibit A.

9. Data and information considered in preparing this declaration are identified in Exhibit B.

10. During the past four years, I have testified in the following matters: Cephalon, Inc. v. Mylan Pharms., Inc., et al., 03-CV-1394 (JCL) (D.N.J.) (deposition testimony on behalf of Cephalon).

## II. Person of Ordinary Skill in the Art

11. I have been informed that claims are interpreted as they would be understood to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application. I have also been informed that U.S. Patent No. 4,863,737 ("the '737 Patent") issued from an application filed on June 8, 1987, and was a continuation in part of a previous patent application filed on May 1, 1985.

12. I agree with Dr. Block that the pertinent art for interpreting the '737 Patent is pharmaceutic in nature, with an emphasis on solid dosage forms and their manufacture. In my opinion, the art of preparing medicated lozenges would be of particular interest in interpreting the '737 Patent. The patent states that the invention "overcomes certain limitations previously encountered in forming a medicated lozenge." '737 Patent, Col. 5:33-44.

13. In his declaration, Dr. Block states that "a person of ordinary skill in [the] art would be someone with, at a minimum, a graduate degree in Pharmacy and additional experience in either the academic or industrial setting." He further states that "In the academic setting, the hypothetical person of ordinary skill in the art would have a minimum of six years experience performing research in solid dosage forms and would also have authored independent publications in peer reviewed journals. In the industrial setting, the hypothetical person of ordinary skill in the art would have at least four to six years of work experience involved in the formulation and development of solid dosage forms." (Block Decl. ¶ 16.)

14. I disagree with Dr. Block regarding the "minimum" requirement of a graduate degree in Pharmacy. In my experience, both today and in the 1985-87 time frame, I have encountered individuals working in the field of solid dosage forms and their manufacture who I would consider to be of at least ordinary skill yet who did not have graduate degrees. Furthermore, there are other fields of study besides Pharmacy that provide education relevant to solid dosage forms and their manufacture.

15. I agree with Dr. Block that some level of experience in the formulation and development of solid dosage forms would be necessary to obtain ordinary skill.

16. A person of ordinary skill in the art at the time of the invention would have possessed at least an undergraduate college education in pharmacy, pharmaceutical sciences, or other pertinent fields (such as chemistry or chemical engineering) and would likely have possessed 4 years or more of experience in an applied industrial setting concerning the formulation, development, and manufacture of solid dosage forms. It would also be possible for a person in an academic research setting to obtain ordinary skill, provided that such a person possessed 6 years or more of experience in research related to formulation, development, and manufacture of solid dosage forms – for example, in a suitable graduate program or industry internship. The level of experience necessary would depend on the individual's educational background. A person with education closely related to the pharmaceutical sciences may not need as much experience. The experience could include research performed to obtain an educational degree.

17. I am not aware of evidence suggesting that a person with the level of education and experience suggested by Dr. Block would interpret the claims of the '737 Patent differently than a person with the level of education and experience that I believe would be consistent with ordinary skill in the art at the time of the invention.

18. Based on my education and experience, I believe that I currently am, and was at the time of the invention, one of at least ordinary skill in the art under both Dr. Block's criteria and my own.

### III. State of the Art at the Time of the Invention

19. I have reviewed the description of the state of the art as of June 8, 1987 provided by Dr. Block in his declaration.

20. Although peroral and oral dosage forms are generally relevant to the invention, the art of preparing medicated lozenges would be of particular interest in interpreting the '737 Patent.

21. Dr. Block asserts that the "state of the art" at the time of the invention was such that solid peroral or oral dosage forms could be produced using: (1) "wet methods" (such as molten candy methods or wet granulation followed by compression) or (2) "dry methods" (such as direct compression or dry granulation followed by compression). Block Decl. ¶¶ 22-31.

22. I agree with Dr. Block that molten candy methods, wet granulation followed by compression, direct compression, and dry granulation followed by compression were known methods at the time of the invention. I disagree, however, with his suggestion that molten candy methods would have been considered to be "wet" methods. In my experience, one of skill in the art at the time of the invention would have distinguished molten methods from wet methods, such as wet granulation. Furthermore, ordinary practitioners in the art of making medicated lozenges at the time of the invention would not have distinguished "wet methods" from "dry methods" in the manner suggested by Dr. Block. Block Decl. ¶ 21. Ordinary practitioners would have distinguished between molten methods and compressed tablet methods. The compressed tablet methods would have included wet and dry methods, such as wet granulation and dry compression.

23. My opinion is based on my experience, knowledge, and education in the field of solid dosage forms at the time of the invention, as well as a chapter on "Medicated Lozenges" in the widely used treatise, <u>Pharmaceutical Dosage Forms</u>. At the time of the invention, and today, this treatise was (and is) regarded as a standard reference work in the pharmaceutical sciences. It was (and is) considered by practitioners in the field to be a reliable authority. The 1980 edition of that treatise states:

> Two types of lozenge bases have gained wide usage because of their ready adaptation to modern high-speed methods of product manufacture. These two lozenge forms, which will be discussed in detail, include hard (or boiled) candy lozenges and compressed tablet lozenges.

David Peters, Medicated Lozenges, in 1 Pharm. Dosage Forms 339 (H. Lieberman & L. Lachman eds., 1980). In discussing compressed tablet lozenges, the treatise indicates that the known methods for making compressed tablet lozenges included both dry and wet methods, such as wet granulation:

> This section, devoted to describing the preparation of compressed tablet lozenges, includes many facets covered in other chapters of this text. The general guidelines to be set forth - for wet and dry granulations, milling, and drying, as well as for tablet compression - are analogous to those for regular compressed tablets.

Id. at 427. In addition, the chapter on "Compressed Tablets" from the 1980 edition of Pharmaceutical Dosage Forms confirms that wet granulation, dry granulation, and direct compression were all understood at the time as ways to make compressed tablets. See Sheth et al., Compressed Tablets, in 1 Pharm. Dosage Forms 109, 112 (H. Lieberman & L. Lachman eds., 1980).

## IV. The Meaning That Terms Of The '737 Patent Would Have To A Person Of Ordinary Skill In The Art At The Time Of The Invention

### A. "mixing the drug and the carbohydrate material"

24. I have reviewed Dr. Block's opinion concerning what the term "mixing the drug and the carbohydrate material," as used in claims 1 and 18 of the '737 patent, would mean to one of ordinary skill in the art at the time of the invention. Block Decl. ¶¶ 38-40.

25. I note that claims 1 and 18 say that the claimed method "compris[es]" various steps, among them that the drug is "obtain[ed]" in "substantially powdered form," and then is subsequently "mix[ed]" with the carbohydrate. I have been informed that the use of the word "comprising" in these claims means that there may be intervening steps, which are not explicitly recited in the claims, that could occur between "obtaining" the drug in "substantially powdered form" and "mixing" the drug with the carbohydrate. I

note that the claims do not explicitly require that the drug, when "mix[ed]," must still be in "substantially powdered form." To the extent there were intervening steps between "obtaining" and "mixing" the drug, one of ordinary skill would understand that such steps could change the drug from "substantially powdered form" into some other (non-powdered, yet compressible) form prior to mixing.

26. The ordinary meaning of "mixing" to one of skill in the art at the time of the invention, having read the patent and prosecution history, would simply be "combining or blending." One of ordinary skill in the art would understand that "combining or blending" components in the presence of liquid is one way of "mixing" components.

27. There are several instances in the specification and prosecution history that describe, among other things, mixing components "in dry form." These passages suggest that the word "mixing," as used in the patent, does not inherently mean "combining or blending . . . without the use of free liquids."[1] Otherwise, additional qualifiers such as "in dry form" would be unnecessary.

28. The patent also describes "mixing" and "mixtures" involving molten ingredients, which are (by definition) in liquid form.

> In the manufacture of medicated candy products by existing methods, the therapeutic agent is added to a molten candy mass. The resultant mixture is then thoroughly mixed to ensure proper distribution of the drug within the molten candy mass. The mixture is then poured while still molten and allowed to solidify into a semi-solid mass.
> (Col. 3:56-62.)

29. In my opinion, these passages collectively show that the word "mixing" as used in the claims would have meant simply "combining or blending" to one of ordinary skill in the art at the time of the invention, and not "combining or blending . . . without the use of free liquids". I note that the phrase "free liquid" does not appear anywhere in the patent. Although the patent states that one advantage of the invention is the ability to

---

[1] "Free liquid," as I understand it, is Dr. Block's phrase for "any liquid that is not incorporated chemically into the fine particles, beyond that which may be sorbed [i.e., absorbed or adsorbed] naturally."

- 8 -

mix components that are insoluble, Col. 4:5-6, it was well understood at the time of the invention that components can be mixed in the presence of a liquid regardless of whether they dissolve in it.

30.  Furthermore, if "mixing," as used in the context of the '737 Patent, prohibits the presence of liquid, then it would have been unnecessary to state in claims 1 and 18 that the "mixing" step must occur "at a temperature below the melting points of the drug and the carbohydrate material." If either the drug or carbohydrate is heated to its melting point, it will become a liquid. If "mixing" as used in these claims prohibits the presence of liquid, then it necessarily prohibits mixing at a temperature at or above the melting point of the drug and the carbohydrate. There would be no need to explicitly prohibit a type of mixing that is already prohibited. Yet mixing at a temperature at or above the melting points of the drug and carbohydrate material is explicitly prohibited. This suggests that "mixing" as used in the claims does not necessarily prohibit the presence of any liquid.

31.  Dr. Block indicates that his "interpretation" is based in part on "treatises" and "other standard works in the field." Block Decl. ¶ 39. He does not explicitly identify any treatises or "standard works" that suggest "mixing" requires "combining or blending . . . without the use of free liquids."

### B. "the drug-containing matrix"

32.  I have reviewed Dr. Block's opinion concerning what the term "the drug-containing matrix," as used in claims 1 and 18 of the '737 patent, would mean to one of ordinary skill in the art at the time of the invention. Block Decl. ¶¶ 41-43.

33.  There are a number of references in the specification to "powder matrixes," but they do not appear to suggest that a "drug-containing matrix" always means a "drug-containing powder matrix." The word "matrix" is used in the specification on several occasions in the context of compositions that are not necessarily powder, such as "soluble" matrixes, Col. 5:2, "molten candy" matrixes, Col. 5:63, and "confectionary" matrixes, Col. 11:14. Furthermore, while claims 1 and 18 require that the drug is obtained in "substantially powdered form", neither of the claims requires that

- 9 -

the carbohydrate is in "substantially powdered form." Although it may be preferred in many circumstances to have the "drug-containing matrix" in powdered form prior to compression, one of ordinary skill in the art would not conclude that a "drug-containing matrix" is inherently powdered.

34. I take no position on Dr. Block's opinion as to what he believes the Examiner or the Applicants "understood" regarding the scope of the claims. Block ¶¶ 43-44.

## V. Other Matters

35. I have not undertaken to respond to every statement made by Dr. Block in his declaration, and do not intend by silence to acquiesce or agree to such statements.

36. To the extent any additional material is produced or presented to me by either party, I reserve the right to supplement or amend this declaration as appropriate.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: August 12, 2005

Dr. Lynn Van Campen

## CERTIFICATE OF SERVICE

I hereby certify that on August 17, 2005, I electronically filed the foregoing with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following and which has also been served as noted:

**VIA HAND DELIVERY**
Josy W. Ingersoll, Esquire
Richard H. Morse, Esquire
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE 19801

I hereby certify that on August 17, 2005, I have mailed via Federal Express, the foregoing documents to the following non-registered participants:

Georege C. Lombardi, Esquire
Bradley F. Graveline, Esquire
Michael K. Nutter, Esquire
Winston & Strawn, LLP
35 West Wacker Drive
Chicago, IL 60601

Robert C. Millonig, Esquire
Heidi L. Kraus, Esquire
Sterne, Kessler, Goldstein & Fox PLLC
1100 New York Avenue, N.W.
Washington, DC 20005

Steven J. Fineman (#4025)
(Fineman@rlf.com)