# EXHIBIT 7

Westlaw.

Not Reported in F Supp 2d

Not Reported in F Supp 2d, 2001 WL 699850
**(Cite as: Not Reported in F.Supp.2d)**

Not Reported in F Supp 2d, 2001 WL 699850
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, S D Indiana,
Indianapolis Division.
CARDIAC PACEMAKERS, INC, Guidant Sales
Corporation, Eli Lilly & Company, Mirowski,
Anna, Plaintiffs,
v
ST JUDE MEDICAL, INC, Pacesetter, Inc,
Ventritex, Inc, John Does 1-10, Defendants
**No. IP96-1718-C-H/G.**

May 29, 2001

ENTRY ON DEFENDANTS' MOTION TO
COMPEL PRODUCTION OF PRIVILEGED
DOCUMENTS

HAMILTON
**\*1** Defendants in this patent infringement case have moved to compel plaintiffs to produce about 3500 pages of documents The documents have been protected by the attorney-client privilege, but plaintiffs inadvertently produced copies of them to defendants After the plaintiffs realized the privileged documents had been produced, they invoked the terms of the agreed protective order in this case and demanded return of the documents Defendants complied with the demand but then moved to compel production, claiming that the plaintiffs had waived the attorney-client privilege by the original inadvertent disclosure to defendants

Production of documents and other discovery materials in this case has been subject to a protective order that was negotiated by and agreed to by all parties The protective order specifically addresses the issue of inadvertent production and its effect on privileges:

> 23 *Inadvertent Production.* The inadvertent production of any document or information

during discovery in the Litigation shall be without prejudice to any claim that such material is privileged under the attorney-client or other privilege, or protected from discovery as work product No party or entity shall be held to have waived any rights by such inadvertent production so long as the Recipient Party is notified within 30 days of the discovery of such inadvertent production. Upon written request by the inadvertently producing party, the Recipient Party shall (even if the Recipient Party disagrees that the document is privileged) return all copies of the document and not use the information in the document for any purpose until further order of the Court

The record before the court shows that the documents in question were produced by counsel for plaintiff Cardiac Pacemakers, Inc (CPI) in a group of about 25,000 pages of documents relating to Guidant's "split-off" from plaintiff Eli Lilly and Company. These documents had been designated with production numbers GUI 730343 to GUI 755169. During a related arbitration proceeding concerning the attempted transfer of patent licenses from Telectronics to St Jude Medical Group, counsel for CPI screened the Guidant documents for privilege and produced the unprivileged documents from that set to Telectronics' attorneys in 1999 CPI's law firm retained a complete set of the documents related to the "split-off," but did not cull the privileged documents from that retained set

After the related arbitration was decided in favor of plaintiffs on the license issue, this court lifted the earlier stay imposed in this case Counsel for defendants requested production in this case of all documents that had been produced in the arbitration By that time in the fall of 2000, the attorney who had handled CPI's privilege review and production of the documents during the arbitration had left the law firm The supervising attorney and a legal assistant located the copied set of documents that the law firm had retained Both believed that the retained set had been screened for

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in F Supp 2d                                                                                   Page 2

Not Reported in F Supp 2d, 2001 WL 699850
**(Cite as: Not Reported in F.Supp.2d)**

privileged documents Both were mistaken Without further screening or review, the entire set was copied and produced to defendants' counsel in this case on December 27, 2000 There is no doubt that the production of the approximately 3500 pages of privileged materials was inadvertent, meaning there was no deliberate decision to waive the applicable privileges and to disclose privileged documents to defendants

**\*2** Counsel for plaintiffs first learned of the inadvertent production of the privileged documents on March 8, 2001, when defendants used one of the documents as a deposition exhibit Counsel for plaintiffs immediately began investigating the source of the document On March 21, 2001, well inside the 30 days allowed by the protective order, counsel for plaintiffs notified defendants that privileged documents had been produced inadvertently Defendants returned all physical copies of the documents, but there is, at last report, some dispute over how to handle electronic images of those documents in defendants' computer systems

### Discussion

If not for the terms of the protective order, plaintiffs' inadvertent production of the privileged documents to the defendants would amount to a waiver of the privilege This court addressed the issue of waiver by inadvertent production in *Simon Property Group L.P v mySimon, Inc*, 194 F R D 644, 648 (S D Ind 2000) , and *Draus v. Healthtrust, Inc.*, 172 F R D 384, 388-90 (S D Ind 1997) Without repeating the reasoning in those discussions, the court adheres to the "skeptical balancing approach" described in *Simon Property Group*, 194 F R D at 648-50 The court considers first the extent to which the neglect leading to the inadvertent disclosure was excusable or inexcusable, second whether it is possible to provide effective relief from the inadvertent disclosure, and third whether there is any serious prospect of harm to the interests of the opponent or to the interests of justice if waiver is not found *Id* at 650

Those factors would weigh in favor of a finding of

waiver here The failure to check 25,000 pages of documents to see if any privileged documents were in them, the sheer size of the oversight, amounting to 3500 pages (even in a case involving huge discovery efforts), and the lack of urgent time pressure for the production do not excuse the error In terms of providing "effective relief," the court cannot ask defendants' counsel and experts to forget the documents they have seen and have used for nearly three months As for the interests of defendants and the interests of justice, defendants have relied on those documents in developing their case Defendants have also asserted that the documents tend to contradict plaintiffs' litigation positions, and defendants have suggested *in camera* review to support those assertions The court has not undertaken such a review, however, because the terms of the protective order are controlling here, notwithstanding the "skeptical balancing approach" that the court otherwise would have applied.

The protective order provides that inadvertent production "shall be without prejudice to any claim that such material is privileged ..." The protective order further provides: "No party or entity shall be held to have waived any rights by such inadvertent production so long as the Recipient Party is notified within 30 days of the discovery of such inadvertent production." The record here shows inadvertent production followed by a timely notice

**\*3** Defendants have not shown any persuasive reason for not enforcing the clear terms of the agreed protective order. The protective order was the product of negotiations among able counsel who deliberately chose to modify the otherwise applicable law concerning inadvertent disclosure of privileged documents

As the court pointed out in *VLT Corp. v. Unitrode Corp*, 194 F R D 8, 11 (D Mass 2000), such non-waiver agreements are "not an uncommon occurrence" Courts have enforced similar non-waiver provisions of agreed protective orders in *VLT Corp*, 194 F R D at 19; *In re Southeast Banking Corp. Securities and Loan Loss Reserves Litigation*, 212 B R. 386, 394 (S D Fla 1997) ; *Prescient Partners, L.P. v. Fieldcrest Cannon, Inc.*, 1997 WL 736726, at \*4 (S.D N.Y Nov 26, 1997)

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in F Supp 2d                                                      Page 3

Not Reported in F Supp 2d, 2001 WL 699850
**(Cite as: Not Reported in F.Supp.2d)**

(adding in *dicta* that parties' confidentiality agreement applied unless the production of privileged material was "completely reckless"); and *Eutectic Corp v. Metco, Inc.,* 61 F R D 35, 42-43 (E D N Y 1973).

Defendants assert in response: "Courts have repeatedly rejected the Plaintiffs' argument that a provision of a protective order insulates a party from a finding of waiver despite that party's negligence and failure to provide comply [sic] with the Federal Rules of Civil Procedure, and despite the prejudice to the other side." Def Reply Br at 2. In direct support of this bold assertion, defendants cite only *Ciba-Geigy Corp v. Sandoz Ltd.,* 916 F Supp 404 (D N J 1995) (Defendants also invite the court to consider *Snap-On Inc. v Hunter Engineering Co.,* 29 F Supp 2d 965, 972 (E D Wis 1998), with the parenthetical comment that the "court refused to create blanket protection for inadvertent production," but that case did not involve an agreed order.)

*Ciba-Geigy* offers little if any support for defendants here. The court's opinion in the case makes clear that, during a hearing leading to issuance of a protective order, the court had rejected "the so-called 'blanket' inadvertent disclosure clause advocated by plaintiff's counsel, and insisted that any such provision would not excuse the parties from conducting a privilege review prior to the production of documents, in accordance with controlling case law." 916 F Supp at 406. Whether one agrees with that reading of the actual language of the protective order or not, see *id.* at 406 n 2, the court intended, and had apparently notified counsel that it intended, to incorporate the approach of prevailing case law adopting the balancing approach to inadvertent disclosure of privileged documents. The court then adhered to that intention when confronting a problem

In this case, however, the non-waiver terms of the protective order were plainly intended to *modify* the otherwise applicable law. Defendants' argument in this case would effectively turn into a nullity the carefully negotiated non-waiver provision, which defendants themselves originally proposed. See also *Prescient Partners,* 1997 WL 736726, at *4 ("If the

provision applied only to documents deemed inadvertently produced under governing caselaw, then the parties would have to brief that law for the court," which would nullify parties' efforts to avoid having to litigate inadvertent production issues.).

**\*4** Accordingly, defendants' motion to compel production of the approximately 3500 pages of privileged documents in question is hereby denied. No costs are awarded.

So ordered

S D Ind ,2001.
Cardiac Pacemakers, Inc v St Jude Medical, Inc
Not Reported in F Supp 2d, 2001 WL 699850

Briefs and Other Related Documents (Back to top)

• 2001 WL 34131671 (Trial Motion, Memorandum and Affidavit) Entry on Plaintiffs%7D Motion for Summary Judgment on Defendants%7D Second, Third, and Fourth Counterclaims and Sixth Affirmative Defense (May. 02, 2001)
• 2001 WL 34765543 (Trial Motion, Memorandum and Affidavit) Joint Agreed Motion for Entry of a Final Judgment with Respect to U S Patent No 4,572,191 Pursuant to Fed R Civ P 54(B) (Jan 29, 2001)
• 2001 WL 34765544 (Trial Motion, Memorandum and Affidavit) Proposed Final Judgment with Respect to U S Patent No 4,572,191 Pursuant to Fed R Civ P 54(B) (2001)

END OF DOCUMENT

© 2005 Thomson/West No Claim to Orig. U S Govt Works



Not Reported in F Supp                                        Page 1

Not Reported in F Supp , 1997 WL 736726
**(Cite as: Not Reported in F.Supp.)**

Not Reported in F Supp , 1997 WL 736726
Briefs and Other Related Documents
Only the Westlaw citation is currently available
United States District Court, S D. New York
PRESCIENT PARTNERS, L P., Plaintiff,
v
FIELDCREST CANNON, INC , Fieldcrest Cannon
Sure Fit, Inc , UTC Holdings, Inc , and Bert
Shlensky, Defendants/Third-Party Plaintiffs,
v
Paula RILEY, Third-Party Defendant
**No. 96 CIV.7590(DAB)(JCF).**

Nov 26, 1997

Ned W Branthover, Esq , Kathryn Diaz, Esq ,
Morgan & Finnegan, LLP, New York, New York
Albert P Allen, Esq , Michael D McCoy, Esq ,
Alston & Bird LLP, Charlotte, NC
Eugene Farabaugh, Esq , David Gelfand, Esq ,
Milbank, Tweed, Hadley & McCloy, New York,
New York

*MEMORANDUM AND ORDER*

FRANCIS , Magistrate J
**\*1** The plaintiff PRescient Partners ("PRescient")
and Third Party Defendant Paula Riley move for a
protective order: (1) directing the defendants,
Fieldcrest Cannon, Inc , Fieldcrest Cannon Sure Fit,
Inc , UTC Holdings, Inc , and Bert Shlensky
(collectively, the "defendants") to return certain
privileged documents PRescient claims it
inadvertently produced to the defendants; (2)
barring the defendants from using this material in
discovery or at trial; (3) requiring the destruction of
work product generated by these documents; and
(4) awarding plaintiff's costs and attorneys' fees for
making this motion In response, the defendants
maintain that PRescient waived its privilege by
producing the documents and failing to take the
reasonable steps necessary to maintain the

documents' confidentiality For the reasons that
follow, PRescient's motion is granted in part and
denied in part

*Background*

PRescient owns a patent for a device that stabilizes
covers and cushions on upholstered furniture On
October 7, 1996, PRescient commenced this action
against the defendants alleging infringement of the
patent, breach of a confidential disclosure
agreement, misappropriation of trade secrets, false
patent marking, and false advertising, among other
claims

On October 29, 1996, the defendants filed their
answer, along with counterclaims and a Third-Party
Complaint against Paula Riley, PRescient's
principal Subsequently, the parties negotiated an
agreement to preserve the confidentiality of
documents produced in the course of this litigation (
"Confidentiality Agreement"), which this Court
entered as a protective order on January 21, 1997.
*See* Stipulated Protective Order, attached as Exh A,
Subexh 5 FN1 and Exh C to Declaration of
Kathryn E Diaz in Support of Plaintiff's Motion for
a Protective Order Directing Defendants to Comply
with the 1/21/97 Protective Order and Return
Privileged Documents, and Barring Defendants
from Utilizing Such Material in Discovery or at
Trial ("Diaz Decl ") Paragraph 16 of the
Confidentiality Agreement states that when a party
claims that privileged documents were inadvertently
produced, the receiving party must "promptly return
" the material but may move thereafter for an Order
compelling production

> FN1 Exh. A to the Diaz Declaration
> includes five separate exhibits, each of
> which will be referred to as a subexhibit in
> this Memorandum and Order

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in F Supp                                                    Page 2

Not Reported in F Supp , 1997 WL 736726
**(Cite as: Not Reported in F.Supp.)**

On November 5, 1996, the defendants served their first document request PRescient served its initial response to the defendants' request on May 15, 1997 Diaz Decl ¶ 16 To comply with its ongoing duty of document production, PRescient also produced documents to the defendants on May 23, June 9, August 15, and September 3, 1997 Diaz Decl ¶ 21 The May 23 and June 9 document productions included privileged communications with counsel Diaz Decl ¶ 21 (identifying the documents produced on each date); Letter from Ned Branthover to Michael McCoy dated Sept 9, 1997, attached as Exh A, Subexh 3 to Diaz Decl (list of documents claimed to be inadvertently produced); Letter from Albert Allan to Ned Branthover dated Aug 11, 1997, attached as Exh E to Diaz Decl (stating that the plaintiff's document production contained attorney-client communications)

*2 Attorney Kathryn Diaz managed PRescient's document production *See* Diaz Decl ¶¶ 13-14, 18-20 Paralegals numbered approximately 16,000 documents retrieved from PRescient Partners' storage facility, and made three copies: the " pristine set," the "attorney set," and the "paralegal set " Diaz Decl ¶¶ 14, 18 Ms Diaz personally reviewed the "attorney set" and marked the privileged documents with a yellow sticker Diaz Decl ¶ 19 She then gave the color-coded " attorney set" to paralegal Joseph Ramirez, who was to remove the specified documents from his " paralegal set" before shipping them to the defendants Diaz Decl ¶ 20 Mr Ramirez delegated this task to another paralegal, who shipped the documents without removing all the privileged material Diaz Decl ¶ 24 Ms Diaz's later investigation revealed that this second paralegal erred due to a "chronic and serious health problem which caused her to be unable to perform her job duties," a problem unknown to Ms Diaz at the time of the document production Diaz Decl ¶ 32 Apparently, the paralegal experienced a stress-related emotional breakdown in which she " froze up" and was unable to follow the directions

PRescient learned that privileged documents had been sent to the defendants on August 11, 1997, when it received a letter from defendants' counsel

The letter stated that PRescient had "waived its privileges through voluntary disclosure of communications between PRescient and its counsel" and cited four disclosed documents Diaz Decl ¶¶ 22-23 The next day, Mr Ramirez sent a letter to one of defendants' paralegals citing paragraph 16 of the Confidentiality Agreement and requesting the return of the privileged documents Letter from Joseph Ramirez to Marcia Siuda dated Aug 12, 1997, attached as Exh A, Subexh 1 to Diaz Decl Defendants' counsel responded ten days later with a letter stating that they were conducting an investigation to determine whether they agreed that the documents were "inadvertently produced " Letter from Albert Allan to Ned Branthover dated Aug 22, 1997, attached as Exh A, Subexh 2 to Diaz Decl

PRescient's counsel then conducted a comprehensive review of the more than 12,000 pages that had been produced in order to determine if other privileged material had been disclosed Diaz Decl ¶¶ 26, 28 On September 9, 1997, they sent defendants' counsel a letter requesting the return of 117 pages of privileged material that had been included in the document production Letter from Ned Branthover to Michael McCoy dated Sept 9, 1997, attached as Exh A, Subexh 3 to Diaz Decl Responding the next day, defendants' counsel refused to return the documents, claiming that the documents were not "inadvertently produced " and that PRescient had waived its privilege by producing them Letter from Albert Allan to Ned Branthover dated Sept 10, 1997, attached as Exh A, Subexh 4 to Diaz Decl PRescient then filed the instant motion

*Discussion*

A. *General Standard for a Protective Order*

*3 Rule 26(c) of the Federal Rules of Civil Procedure provides that
[u]pon motion accompanied by a certification that the movant has in good faith conferred or attempted to confer with other affected parties in an effort to resolve the dispute without court

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in F Supp , 1997 WL 736726
**(Cite as: Not Reported in F.Supp.)**

action, and for good cause shown, the court
may make any order which justice requires to
protect a party or person from annoyance,
embarrassment, oppression or undue burden or
expense, including

(1) that the disclosure or discovery not be had;

(2) that the disclosure or discovery may be had
only on specified terms and conditions

Fed R Civ P  26(c)  The burden rests on the
movant, *In re Agent Orange Product Liability
Litigation,* 821 F 2d 139, 145-46 (2d Cir 1987),
who must establish good cause by a "particular and
specific demonstration of fact [[[ ]" *In re Akron
Beacon Journal,* No. 94 Civ 1402, 1995 WL
234710, at *10 (S D N Y April 20, 1995) (citations
omitted) PRescient has certified that it conferred
in good faith with the defendants in an effort to
resolve the issues raised in the motion without court
action *See* Diaz Decl  ¶ 4. The plaintiff argues
that good cause exists for issuing a protective order
because the defendants breached paragraph 16 of
the Confidentiality Agreement and because
PRescient did not waive any privileges through
disclosure of the documents In response, the
defendants argue that paragraph 16 does not govern
this situation because the documents were not "
inadvertently produced" as the term is defined by
caselaw

### B  *The Confidentiality Agreement*

Paragraph 16 of the Confidentiality Agreement is
entitled *"Inadvertent Production of Privileged
Information, Confidential Information or Restricted
Information,"* and provides in relevant part:

16  If information subject to a claim of
privilege    is inadvertently produced, such
production shall not  constitute a waiver of
any claim of privilege    If    a claim of
inadvertent production is made    [the party in
receipt of the documents]    shall promptly return
to the claiming party or person the material (and
all copies thereof) as to which the claim of
inadvertent production has been made. All notes
or other work product reflecting the contents of
such material  shall be destroyed and any
information in any computer database shall be
deleted.

Stipulated Protective Order, attached as Exh. A,
Subexh  5 and Exh. C to Diaz Decl

The defendants argue that because this provision
uses the language "inadvertently produced," it
incorporates caselaw on waiver of privilege through
inadvertent production of privileged documents
Defendants' Memorandum in Opposition to
Plaintiff's Motion for Protective Order at 4-13 ("
Defendants' Memo ") Under the defendants'
interpretation, paragraph 16 applies only where the
privilege was not waived under governing caselaw
because the producing party took reasonable steps
to maintain the confidentiality of the disclosed
documents Defendants' Memo at 4-13 *See
generally Liz Claiborne, Inc. v Mademoiselle
Knitwear, Inc.,* No. 96 Civ 2064, 1996 WL 668862,
at *3 (S D N Y. Nov 19, 1996) ("[C]ourts in this
district   have found waiver of the privilege [as a
result  of inadvertent production] only if the
disclosing party failed to take reasonable steps to
maintain  the confidentiality of the assertedly
privileged documents    ") (quotations and citations
omitted) The defendants argue that the protective
order does not govern these circumstances because
PRescient failed to take such reasonable steps

**\*4** In contrast, PRescient maintains that paragraph
16 controls the instant situation regardless of
whether the documents would be deemed
inadvertently produced under governing caselaw.
Taking the plain meaning of the provision's
language, PRescient argues that it applies to any
documents about which a claim of inadvertent
production is made Memorandum of Law in
Support of Plaintiff's Motion for a Protective Order
under Fed R Civ P 26(c) at 3 ("Plaintiff's Memo ")

Magistrate Judge Bernikow construed a similar
provision in *Union Carbide Corp v Montell N V.,*
No. 95 Civ 0134 (S D N Y. Aug. 15, 1997). He
held that the provision did not merely incorporate
the caselaw standards governing inadvertent waiver
because, if it did, the provision would have no
effect *Id.* at 4. Furthermore, the provision "was
designed to protect the parties, who face massive
discovery obligations, from having to litigate the
issue of inadvertence " *Id* Judge Bernikow noted
however that "[p]erhaps a completely reckless

© 2005 Thomson/West  No Claim to Orig. U S Govt Works

Not Reported in F. Supp.                                              Page 4

Not Reported in F. Supp., 1997 WL 736726
**(Cite as: Not Reported in F.Supp.)**

production of privileged documents would result in waiver." *Id.*

The same reasoning leads to the conclusion in this case that paragraph 16 does not incorporate the caselaw governing inadvertent waiver. The parties drafted this provision to provide for the out-of-court resolution of inadvertent production issues and to avoid litigating these issues. If the provision applied only to documents deemed inadvertently produced under governing caselaw, then the parties would have to brief that law for the court to determine even whether the provision applied to a particular situation. This would contravene the provision's purpose of protecting the parties from having to litigate inadvertent production issues. *See Union Carbide,* slip op. at 4.

Thus, unless the production was "completely reckless," *id.,* paragraph 16 governs any document as to which "a claim of inadvertent production is made." For a production to be "completely reckless," the producing party must have shown no regard for preserving the confidentiality of the privileged documents. Here, PRescient certainly attempted to preserve the documents' confidentiality. Attorney Diaz personally reviewed thousands of documents and color-coded the privileged documents to be pulled before shipment to the defendants. The error occurred when a paralegal experienced an emotional breakdown and failed to follow instructions. Because the production was not reckless, paragraph 16 governs the present situation.

**C.** *Inadvertent Production of Privileged Documents*

Even if the defendants were correct and paragraph 16 applied only where the privilege was not waived under governing caselaw, I would reach the same result. This is because, under the applicable legal principles, the privilege was not waived through the disclosure.

The voluntary disclosure of a document protected by the attorney-client privilege generally waives any claim of privilege as to that document. *Carter v. Rosenberg & Estis, P.C.,* No. 95 Civ. 10439, 1996

WL 695866, at *2 (S.D.N.Y. Dec. 4, 1996) (citing *In re von Bulow,* 828 F.2d 94, 101 (2d Cir. 1987) ); *Eigenheim Bank v. Halpern,* 598 F. Supp. 988, 991 (S.D.N.Y. 1984) However, if the disclosure is inadvertent, the privilege will not be waived unless the producing party's conduct was "so careless as to suggest that it was not concerned with the protection of the asserted privilege." *Aramony v. United Way of America,* 969 F. Supp. 226, 235 (S.D.N.Y. 1997) (citing *Desai v. American International Underwriters,* No. 91 Civ. 7735, 1992 WL 110731, at *1 (S.D.N.Y. May 12, 1992))

**\*5** The standard test for waiver through inadvertent disclosure was developed in *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Company,* 104 F.R.D. 103, 105 (S.D.N.Y. 1985). *See Aramony,* 969 F. Supp. at 235; *Lloyds Bank PLC v. Republic of Equador,* No. 96 Civ. 1789, 1997 WL 96591 at *3 (S.D.N.Y. Mar. 5, 1997); *Liz Claiborne,* 1996 WL 668862, at *3; *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.,* 160 F.R.D. 437, 443 (S.D.N.Y. 1995) ; *Martin v. Valley National Bank of Arizona,* No. 89 Civ 8361, 1992 WL 196798, at *2 (S.D.N.Y. Aug. 6, 1992) (all applying *Lois Sportswear* test). Under the *Lois Sportswear* analysis, a court considers four factors in determining whether the release of documents was a "knowing waiver" or "simply a mistake, immediately recognized and rectified." *Lois Sportswear,* 104 F.R.D. at 105. These are: (1) the reasonableness of the precautions taken to prevent inadvertent disclosure, (2) the time taken to rectify the error, (3) the scope of the discovery and the extent of the disclosure, and (4) overarching issues of fairness. *Id.* at 105.

1. *Reasonableness of Precautions*

The fact of disclosure does not necessarily mean that the precautions were unreasonable. *Bank Brussels Lambert,* 160 F.R.D. at 443. Generally, precautions will be reasonable if "the procedure followed in maintaining the confidentiality of the document [is] not .. 'so lax, careless, inadequate or indifferent to consequences as to constitute a waiver.' " *Martin,* 1992 WL 196798, at *2 (quotation and citation omitted).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F Supp                                                                Page 5

Not Reported in F.Supp , 1997 WL 736726
**(Cite as: Not Reported in F.Supp.)**

Here, the precautions taken by PRescient's counsel to preserve privilege were reasonable Attorney Diaz personally reviewed the documents in the " attorney set," marked privileged documents, and instructed paralegal Ramirez to remove the designated documents before shipment to the defendants Diaz Decl ¶¶ 19-20 The other paralegal to whom Mr Ramirez delegated this task had an emotional breakdown and failed to follow through Diaz Decl ¶¶ 24, 32

PRescient's counsel explains that an attorney did not check the paralegals' duplication and sorting before shipment to the defendants because of the "press to produce documents " Plaintiff's Memo at 5 However, this step was not necessary in order for the production to pass the reasonable precautions test Imposing a duty on attorneys to personally double check simple tasks performed by paralegals in a large document production would needlessly increase the costs of litigation

The defendants argue that PRescient's counsel failed to take reasonable precautions because it did not "ensure that someone was available that was capable of performing the duties involved." Defendants' Memo at 8 However, Ms Diaz did not know of the paralegal's health problem at the time of the production, Diaz Decl ¶ 32, and the record contains nothing to indicate that she was negligent in failing to be aware of it Thus, the precautions taken by PRescient were reasonable. *See Aramony,* 969 F.Supp at 235-6 (precautions reasonable where four attorneys and three paralegals reviewed 630,000 pages of documents for privilege before shipment to defendants); *Lloyds Bank PLC,* 1997 WL 96591, at *4 (precautions reasonable where attorneys conducted document review); *Martin,* 1992 WL 196798, at *3 (same); *see also Lois Sportswear,* 104 F.R D at 105 (precautions "only just adequate[]" where attorney demonstrated to paralegals which types documents were privileged and then delegated the segregation of privileged documents to the paralegals).

2 *Time to Rectify Disclosure*

**\*6** "Inordinate delay in claiming the privilege can

prejudice the adversary and may be deemed a waiver " *Bank Brussels Lambert,* 160 F.R.D at 445 (citation omitted) The delay should be measured from the time the producing party learns of the disclosure, not from the time of the disclosure itself. *Aramony,* 969 F Supp at 237; *Georgia-Pacific Corp v. GAF Roofing Manufacturing Corp.,* No. 93 Civ 5125, 1995 WL 117871, at *2 (S.D.N.Y. Mar 20, 1995).

No inordinate delay occurred in this case because PRescient's counsel wrote defendants' counsel the day after learning of the error to demand return of the documents. Diaz Decl. ¶ 25 *See Aramony,* 969 F.Supp at 237 (no waiver where counsel sent letter demanding return of documents the day after learning that privileged documents had been produced); *Georgia-Pacific,* 1995 WL 117871, at *2 (no waiver where producing party acted within two business days after discovery of inadvertent disclosure) After receiving the defendants' final refusal to return the documents on August 22, 1997, PRescient's counsel began a comprehensive review to uncover other inadvertently produced privileged material, Diaz Decl. at ¶ 28, and sent the defendants what they believed was a comprehensive list of inadvertently produced documents eighteen days later, on September 9, 1997 *See* Diaz Decl , Exh. A, Subexh 3

The defendants argue that PRescient's attempt to rectify was not timely because it did not produce the list of inadvertently produced documents until September 9th, almost a month after it became aware of the disclosure Defendants' Memo. at 8-9 In addition, recently conducted depositions have revealed six more pages of privileged attorney-client communications that were produced but were not listed in PRescient's September 9th letter Defendants' Memo. at 4 While PRescient could have begun its comprehensive review as soon as it learned of the disclosure on August 11th, the fact that it did not begin that review until August 22nd-when counsel learned that the defendants would not immediately return the documents-does not constitute an inordinate delay. *Cf Baxter Travenol Laboratories, Inc v Abbott Laboratories,* 117 F R.D. 119, 121 (N D Ill 1987) (finding waiver where party waited over three months to assert

© 2005 Thomson/West No Claim to Orig U S. Govt Works

Not Reported in F.Supp                                                                Page 6

Not Reported in F.Supp , 1997 WL 736726
**(Cite as: Not Reported in F.Supp.)**

privilege).

3  *Scope of Discovery and Extent of Disclosure*

The third *Lois Sportswear* factor focuses on the
number of privileged documents disclosed in
relation to the overall size of the document
production. *Martin*, 1992 WL 196798, at *3-4 (no
waiver where five protected documents disclosed
out of 50,000 pages produced) "Courts have
routinely found that where a large number of
documents are involved, there is more likely to be
an inadvertent disclosure rather than a knowing
waiver." *Baker's Aid v. Hussmann Foodservice Co*,
No. 87 Civ. 0937, 1988 WL 138254 at *5
(E.D.N.Y. Dec. 19, 1988) (no waiver where one
document disclosed out of approximately 5,000
documents inspected); *see also Lois Sportswear*,
104 F.R.D. at 105 (no waiver where 22 documents
disclosed out of approximately 16,000 pages
inspected).

*7 PRescient produced 117 pages of privileged
material. *See* Diaz Decl , Exh. A, Subexh. 3 (list of
documents claimed to be inadvertently produced).
However, this was less than one percent of the
overall document production of 12,612 pages.
Diaz Decl ¶ 21. More importantly, the
circumstances surrounding the disclosure do not
indicate recklessness regarding the documents'
confidentiality. Virtually the entire disclosure FN2
was caused by a single unforeseen error, the
paralegal's emotional breakdown, as opposed to
numerous errors evidencing imprudence.
Therefore, despite the large size of the disclosure,
this factor does not weigh in favor of the
defendants *See Lloyds Bank*, 1997 WL 96591, at
*2-4 (finding no waiver where producing counsel
inadvertently disclosed 227 pages of privileged
documents in production involving approximately
10,000 pages of material and where counsel "
committed only one error that resulted in the
production of all fifty allegedly privileged
documents, not fifty distinct errors")

    FN2. All of the disputed documents except
    one were disclosed in a document

production on May 23, 1997, when the
paralegal apparently had her emotional
breakdown. The other disputed document
(PP 7430-33) was disclosed in a document
production on June 9, 1997

4  *Fairness*

Absent any prejudice to the defendants caused by
restoring immunity to the documents, "[i]t would be
inappropriate for the client of producing counsel to
suffer the waiver of privilege ... due to an isolated,
inadvertent error." *Aramony*, 969 F.Supp. at 237.
Some of the disclosed documents involve
attorney-client communications about case strategy
in the instant case and could be damaging to
PRescient. The defendants claim that preserving
the documents' privileged status would prejudice
them by depriving them of evidence to challenge
PRescient's claims for damages and attorneys' fees.
Defendants' Memo at 11-13. However, "[t]he
prejudice factor focuses only on whether the act of
restoring immunity to an inadvertently disclosed
document would be unfair, not whether the
privilege itself deprives parties of pertinent
information." *Bank Brussels Lambert*, 160 F.R.D.
at 446. The defendants have not shown that
unfairness would result from restoration of the
privilege. Therefore, the fourth factor also weighs
in PRescient's favor. Based on the *Lois Sportswear*
factors, then, there has been no waiver of the
attorney-client privilege.

D  *Relief*

As discussed above, paragraph 16 of the
Confidentiality Agreement governs this situation.
Therefore, as provided in that paragraph, the
defendants shall: (1) promptly return to PRescient
the material (and all copies thereof) listed in Ned
Branthover's September 9, 1997 letter to Michael
McCoy, *see* Diaz Decl , Exh. A, Subexh. 3; (2)
destroy all notes or other work product reflecting
the contents of such material; and (3) delete any
information in any computer database reflecting the
contents of these documents. Furthermore, the
defendants are prohibited from using these
documents or references to these documents in

© 2005 Thomson/West No Claim to Orig. U.S. Govt Works

Not Reported in F Supp                                                                    Page 7

Not Reported in F Supp , 1997 WL 736726
**(Cite as: Not Reported in F.Supp.)**

discovery or at trial

In addition, PRescient asks for an award of costs
and attorneys' fees for making this motion
Plaintiff's Memo at 7 This application is governed
by Rule 37(a)(4)(A) of the Federal Rules of Civil
Procedure, which authorizes a court to:

**\*8** require the party ... whose conduct
necessitated the motion or the party or attorney
advising such conduct or both of them to pay to
the moving party the reasonable expenses
incurred in making the motion, including
attorney's fees, unless the court finds that ... the
opposing party's ... response ... was substantially
justified, or that other circumstances make an
award of expenses unjust

Fed R Civ P  37(a)(4)(A)  Under this rule, then,
attorneys' fees and expenses must be awarded unless
the defendants' conduct was "substantially justified"
or "other circumstances make an award of expenses
unjust " *Sanstrom v. Rosa,* No. 93 Civ 7146, 1996
WL 469589, at \*7 (S D N Y  Aug 16, 1996)

In this case, the defendants refused to return the
documents because they believed that paragraph 16
of the Confidentiality Agreement incorporated
general principles governing inadvertent disclosure
and that PRescient had waived its privilege under
the applicable caselaw That position was not
unreasonable  Paragraph 16 is subject to
alternative interpretations, including the one offered
by the defendants Furthermore, the defendants'
argument that PRescient waived its privilege under
the *Lois Sportswear* test was warranted considering
both the large number of privileged documents
produced and the fact that the defendants were
unaware that the disclosure was attributable to the
paralegal's emotional breakdown when they
originally refused to return the documents
Therefore, although the defendants' position was not
ultimately vindicated, it was "substantially justified,
" and I decline to award costs or attorneys' fees

### Conclusion

For the reasons set forth above, the plaintiff's
motion is granted except that the application for
sanctions, including costs and attorneys' fees, is

denied

SO ORDERED

S D N Y ,1997
Prescient Partners, L P v Fieldcrest Cannon, Inc
Not Reported in F Supp , 1997 WL 736726

Briefs and Other Related Documents (Back to top)

• 1:96cv07590 (Docket) (Oct 07, 1996)

END OF DOCUMENT

© 2005 Thomson/West No Claim to Orig U S Govt Works



Not Reported in F Supp 2d

Not Reported in F Supp 2d, 2000 WL 744369
**(Cite as: Not Reported in F.Supp.2d)**

Not Reported in F Supp 2d, 2000 WL 744369
Briefs and Other Related Documents
Only the Westlaw citation is currently available
United States District Court, S D New York
UNITED STATES FIDELITY & GUARANTY
COMPANY and American Home Assurance,
Plaintiffs,
v.
BRASPETRO OIL SERVICES CO , et al ,
Defendants
UNITED STATES FIDELITY & GUARANTY
COMPANY and American Home Assurance,
Plaintiffs,
v.
PETROLEO BRASILEIRO S A , et al , Defendants
**Nos. 97Civ.6124 (JGK)(THK), 98Civ.3099
(JGK)(THK).**

June 8, 2000

MEMORANDUM OPINION AND ORDER

KATZ , Magistrate J
**\*1** These consolidated actions were referred to me
for general pretrial supervision by the Honorable
John G Koeltl, United States District Judge
Several discovery motions are presently before this
Court Defendants Braspetro Oil Services Company
and Petroleo Brasileiro S A -Petrobras (collectively
referred to as "Petrobras/Brasoil") have moved for
an order compelling the return of privileged
documents which were produced during discovery
Defendants Bank of Tokyo-Mitsubishi, Ltd and the
Long-Term Credit Bank of Japan, Ltd (collectively
referred to as "the Banks") have moved for an order
compelling the production of materials prepared by
plaintiffs United States Fidelity & Guaranty
Company ("USF & G") and American Home
Assurance Co ("AHAC") (collectively referred to
as "the sureties"), during a pre-litigation
investigation-documents which plaintiffs claim are
protected work product Finally, the sureties have

moved for an *in camera* review of the documents on
the privilege log of Petrobras/Brasoil

BACKGROUND

The plaintiffs, USF & G and AHAC, as co-sureties,
issued two multimillion dollar performance bonds
(the "P-19 Bond" and the "P-31 Bond"), which
guaranteed the construction of two oil production
facilities (the P-19 and P-31 Projects) in Brazil by a
construction consortium, of which defendant IVI
was the principal contractor The plaintiffs issued
the Bonds in favor of Brasoil, which was named as
the owner of the Projects and the obligee under the
Bonds FN1 As part of the P-19 Bond, the sureties
issued a Dual Obligee Rider in favor of the
defendant Banks, who are lenders to the P-19
Project The plaintiffs also issued a payment bond ("
the MAC Payment Bond"), which secured financing
provided by Marubeni America Corporation ("MAC
") to the P-19 consortium for purchasing millions of
dollars of equipment To protect themselves from
liability for loss and expense on the P-19, P-31 and
MAC Payment Bonds, the plaintiffs entered into
three indemnity agreements with various principals
in the construction consortium

> FN1. Defendant Brasoil is a wholly owned
> subsidiary of Petrobras Internacional
> S A -Braspetro, which in
> turn is a fully owned subsidiary of Petroleo
> Brasileiro S A -Petrobras ("Petrobras")
> Although Petrobras was not a signatory to
> the P-19 and P-13 Bonds or contracts,
> plaintiffs allege that it acted as if it were
> the owner of the Projects and the obligee
> under the Bonds *See* Am Comp ¶ 12

The sureties allege that in late 1995, the consortium
began to experience serious financial difficulties
and was unable to perform its duties under the
contracts Plaintiffs allege that Petrobras/Brasoil

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in F Supp 2d                                                           Page 2

Not Reported in F Supp 2d, 2000 WL 744369
**(Cite as: Not Reported in F.Supp.2d)**

knew of these financial problems, but rather than terminating the contracts, they instituted drastic changes in the construction contracts, without the necessary change orders, which increased the costs of performance and resulted in delays. They also allege that Petrobras/Brasoil misdirected funds from the P-19 and P-31 Projects, and commingled those funds with funds from other projects, and that Petrobras-Brasoil made premature payments for non-job related costs or for work that had not yet been completed. Plaintiffs contend that all of these actions of Petrobras-Brasoil heightened the risk of contractor default under the contracts and materially increased the sureties' risks under the Bonds.

**\*2** In May and June 1997, respectively, Brasoil declared the construction consortium to be in default with respect to the two construction projects at issue, thus triggering the sureties' obligations under the Bonds. Under the terms of the Bonds, if there was a default on the construction contracts, the sureties had the option of completing performance, arranging for substitute contractors to complete performance, or paying damages to Brasoil. After an investigation, the sureties made a determination that Petrobras/Brasoil's declaration of default was improper, that the default was largely due to Petrobras/Brasoil's improper actions, and thus, the sureties declined to make payment under the performance Bonds. This and other litigation resulted.

In one of these consolidated cases, the sureties sued Brasoil and other entities, including the Banks, seeking a declaratory judgment with respect to their obligations and liabilities under the two performance guarantee Bonds. In the other action, the sureties sued Petrobras and other entities, seeking damages for tortious interference with contract and for breach of obligations allegedly owing to the sureties under the Bonds and indemnity agreements. In essence, plaintiffs contend that Petrobras interfered with the payment obligations of the P-19 consortium and Brasoil to MAC. FN2

FN2. The parties are involved in other litigation in other courts. Brasoil has filed

suit in Brazil, asserting liability against the sureties for loss and/or damages pursuant to the P-19 and P-31 Bonds. MAC has sued the sureties in New York State Supreme Court for liability on the MAC payment bond.

Motions to dismiss these actions have been denied, *see* 1999 WL 307642 (S D N Y May 17, 1999) and 1999 WL 307666 (S D N Y May 17, 1999), and those decisions were affirmed in December 1999. *See United States Fidelity and Guaranty Co v. Braspetro Services Co.*, 199 F 3d 94 (2d Cir 1999). Upon the Second Circuit's decision, substantive discovery began in earnest. Although there is a relatively short deadline for completion of pretrial discovery, discovery matters have been complicated by the numerous parties and their complex relationship in these actions, and by voluminous documentary and deposition discovery, much of which has taken or will take place in Brazil. The Court turns now to the immediate discovery disputes that require resolution.

## DISCUSSION

### I. Disclosure of Privileged Attorney-Client Communications

In contemplation of the exchange of documentary discovery, on January 21, 2000 the parties entered into a stipulated confidentiality agreement, which was entered as an Order by the Court. The agreement provided, at paragraph 9, that:

In the event documents which are claimed to be privileged or subject to the work product doctrine are inadvertently produced, such documents shall be returned by the receiving party within two days of any written request therefor, unless the receiving party challenges the privileged nature of the document(s), in which case the producing party shall be entitled to make an application to the Court for the return of the document(s). While such application is pending, the receiving party shall not use or divulge the contents of such document(s) except to the Court under seal. The inadvertent production of any document claimed

© 2005 Thomson/West. No Claim to Orig. U S Govt. Works

Not Reported in F Supp 2d

Not Reported in F Supp 2d, 2000 WL 744369
**(Cite as: Not Reported in F.Supp.2d)**

to be privileged or subject to the work product doctrine shall not constitute a waiver of such privilege
*\*3 See* Order, dated January 21, 2000

From January 11-28, 2000, Petrobras/Brasoil made its documents available for inspection by counsel for the sureties The documents produced, consisting of approximately 400,000 pages, mostly in Portuguese, were located primarily in Brazil On Friday, January 21, 2000, counsel for the sureties informed counsel for Petrobras/Brasoil that two letters to their clients, as well as other documents claimed as privileged, had been produced to plaintiffs *See* Letter from Ian Strogatz, Esq, dated January 21, 2000, attached as Ex. A to Letter from Michele Sherman Davenport, Esq, dated February 2, 2000 ("Davenport 2/2/00 Letter") The following Monday, January 24, 2000, counsel for Petrobras/Brasoil requested the return of these documents, asserted that they were privileged, and stated that any production of them had been inadvertent and was not intended to waive the privilege *See* Letter from Michele Sherman Davenport, Esq, dated January 24, 2000, attached as Ex B to Davenport 2/2/00 Letter Numerous letters followed, both to the Court and between the parties, in which the sureties refused either to return the documents or to identify the additional privileged documents in their possession. The sureties claimed that the production was not inadvertent and that the privilege had been waived In its correspondence, Petrobras/Brasoil demanded both the return of the documents and that the sureties identify the privileged documents which had been mistakenly produced FN3 Although it has not been made entirely clear, it appears that between 23 and 34 documents claimed as privileged have been produced to the sureties, some of which were produced more than once *See* Letter from Jacob Cohen, Esq, dated May 5, 2000

> FN3 The issue of identifying the privileged documents was complicated by the fact that, pursuant to an agreement between the parties, privilege logs were not produced until after the sureties had copied the documents in Brazil The issue

was further complicated by the fact that the Portuguese documents needed to be translated before plaintiff's attorneys could fully determine the nature of the documents

*A Inadvertence and Waiver Under the Parties' Confidentiality Agreement*

The voluntary disclosure of a document protected by the attorney-client privilege generally waives any claim of privilege as to that document *See In re Steinhardt Partners, L.P.,* 9 F 3d 230, 235 (2d Cir 1993) ; *In re von Bulow,* 828 F 2d 94, 101 (2d Cir 1987) ; *Fabelo v. Greiner,* No 97 Civ 2988(DC) , 1999 WL 637233, at *\*7 (S D N Y Aug 19, 1999); *Aramony v. United Way of America,* 969 F Supp 226, 235 (S D N Y 1997) However, if the disclosure is inadvertent, the privilege will not be waived unless the producing party's conduct was " so careless as to suggest that it was not concerned with the protection of the asserted privilege " *Aramony,* 969 F Supp at 235; *see also Laquila Construction Inc v Travelers Indemnity Co of Illinois,* No 98 Civ 5920(HB), 1999 WL 232901, at *\*1 (S D N Y Apr 21, 1999)

The sureties take the position that the term " inadvertent" in the confidentiality agreement should be construed as having the same meaning it has been given by courts where documents were not produced pursuant to a confidentiality agreement In contrast, Petrobras/Brasoil argues that the purpose of the confidentiality agreement was to allow for the expeditious production of numerous documents without undue concern that the production of privileged documents would be irreversible Thus, defendants argue that the provision in the agreement for the return of inadvertently produced documents suggests that the producing party has a far less onerous burden in demonstrating inadvertent production than it would under the caselaw in the absence of such an agreement In any event, defendants argue that their production was inadvertent, whether viewed in light of the confidentiality agreement or otherwise

*\*4* The Court finds the reasoning articulated in *Prescient Partners, L.P. v. Fieldcrest Cannon, Inc.,*

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in F Supp 2d                                                    Page 4

Not Reported in F Supp 2d, 2000 WL 744369
**(Cite as: Not Reported in F.Supp.2d)**

No 96 Civ 7590(DAB) (JCF), 1997 WL 736726 (S D N Y Nov 26, 1997), to be persuasive In that case, the court held that "the provision in the parties' confidentiality agreement regarding inadvertent production of privileged documents did not merely incorporate the caselaw standards governing inadvertent waiver, because, if it did, the provision would have no effect " *See Prescient,* 1997 WL 736726, at *4 (citing *Union Carbide Corp. v. Montell N V.,* No 95 Civ 0134 (S D N Y Aug 15, 1997)) The court held that the parties had drafted the provision in order to address their concerns related to a voluminous document production, to provide for out-of-court resolution of inadvertent production issues, and to avoid having to litigate issues of inadvertence "If the provision applied only to documents inadvertently produced under governing caselaw     this would contravene the provision's purpose of protecting the parties from having to litigate inadvertent production " *Id* Accordingly, the court found that unless the production was completely reckless and the producing party showed no regard for preserving the confidentiality of the privileged documents, the producing party would be protected under the provisions of the confidentiality agreement *See id*

This reasoning is fully applicable to the confidentiality agreement in this action The relevant provision provides for the return of privileged documents claimed to be inadvertently produced The only basis in the agreement for resisting the return of a document and seeking court resolution is where the receiving party challenges the privileged *nature* of the document. That is not the primary basis of plaintiff's challenge here FN4

> FN4 Although plaintiffs did express some doubt about the privileged nature of the first two documents which were identified as being inadvertently produced, the Court has reviewed those documents and has already determined that the attorney-client privilege was appropriately invoked

There is no basis for this Court to conclude that Petrobras/Brasoil acted completely recklessly in producing privileged documents As discussed

below, counsel for Petrobras/Brasoil established an elaborate system involving multiple layers of review of the documents by Brazilian law students, a Brazilian attorney, and American lawyers, which was designed to identify and segregate privileged documents while dealing with the practical challenges of producing 400,000 pages of documents, that were primarily in Portuguese, in Brazil. Defendants identified the documents in issue as being privileged, had placed them on their privilege log, and intended to withhold them from production Nevertheless, they were mistakenly produced along with non-privileged documents These documents were accidentally and unintentionally, i e, inadvertently produced and, under the terms of the confidentiality agreement, there has been no waiver of privilege

### B The Standard for Inadvertence Under the Caselaw

Even assuming, *arguendo,* that the parties intended the "inadvertent production" provision of their agreement to have the same meaning as that term has come to have under the governing caselaw, Petrobras/Brasoil did not waive the attorney-client privilege by producing privileged documents In this Court, the criteria consistently applied to assess the issue of waiver are: (1) the reasonableness of the precautions taken to prevent inadvertent disclosure; (2) the time taken to rectify the error; (3) the scope of the discovery and the extent of the disclosure; and (4) overarching issues of fairness. *See Lois Sportswear, U.S.A., Inc v. Levi Strauss & Company,* 104 F R D 103, 105 (S D N Y 1985); *see also SEC v. Cassano,* 189 F R D 83, 85 (S D N Y 1999) ; *Aramony,* 969 F Supp at 235; *Prescient Partners,* 1997 WL 736726; *Bank Brussels Lambert v Credit Lyonnais (Suisse) S.A.,* 160 F R D 437, 443 (S D N Y 1995); *cf Manufacturers and Traders Trust Co v. Servotronics, Inc.,* 132 A D 2d 392, 399-400, 522 N Y S 2d 999, 1004-1005 (4th Dep't 1987) (applying same criteria under New York law); *John Blair Communications v. Reliance Capital Group, L P.,* 182 A D 2d 578, 579, 582 N Y S 2d 720-21 (1st Dep't 1992) (same); *Note Funding Corp v. Bobian Investment Co., N.V,* No. 93 Civ 7427(DAB)(MHD), 1995 WL 662402, at *

© 2005 Thomson/West No Claim to Orig. U S Govt Works

Not Reported in F. Supp 2d

Not Reported in F. Supp 2d, 2000 WL 744369
**(Cite as: Not Reported in F.Supp.2d)**

6 (S.D.N.Y. Nov 9, 1995) (applying New York standard on inadvertent production).

### 1. Reasonableness of the Precautions

**\*5** Disclosure by itself does not lead to the conclusion that the precautions undertaken to protect the privilege evidence indifference. *See Prescient Partners,* 1997 WL 736726, at \*5; *Bank Brussels,* 160 F.R.D. at 443. Rather, the Court must assess whether "the procedure[s] followed in maintaining the confidentiality of the document[s] [were] ... so lax, careless, inadequate or indifferent to consequences as to constitute a waiver." *Martin v. Valley National Bank of Arizona,* No 89 Civ 8361(PKL), 1992 WL 196798, at \*2 (S.D.N.Y. Aug. 6, 1992) (internal citations and quotations omitted) Inadvertent production will not waive the privilege unless the conduct of the producing party or its counsel evinced such extreme carelessness as to suggest that it was not concerned with the protection of the privilege. *See Lloyds Bank PLC v. Republic of Ecuador,* No 96 Civ 1789(DC), 1997 WL 96591, at \*3 (S.D.N.Y. Mar. 5, 1997) (quoting *Desai v. American Int'l Underwriters,* No 91 Civ 7735(LBS) (MHD), 1992 WL 110731, at \*1 (S.D.N.Y. May 12, 1992))

Here, the Court is unable to conclude that the precautions taken by Petrobras/Brasoil to assure that privileged documents not be disclosed were unreasonable, in light of the extensive number of foreign language documents that were produced. Larry Thomas, a senior litigation partner at Cameron & Hornbostel, instructed Petrobras/Brasoil on the necessary preparations for the assembly and production of the documents. *See* Declaration of Jose Antonio Antunes Maciel (" Maciel Aff."), at ¶ 6 Maciel, a Brazilian attorney with an L.L.M. degree from New York University, who is fluent in both Portuguese and English, supervised the document production in Brazil. *See* Maciel Aff., at ¶¶ 1-4 Maciel, with the assistance of several Brazilian law students, identified and segregated potentially privileged documents based on instructions from Maciel and Thomas on United States attorney-client privilege law. Maciel then reviewed all of the documents which the group had

identified as privileged, and final determinations as to the appropriateness of the privilege were made by American attorneys at Cameron & Hornbostel. *See* Maciel Aff., at ¶¶ 9-11 Moreover, efforts were made to identify various corporate departments which had received copies of documents identified as privileged, and to remove those documents from their files. *See* Maciel Aff., at ¶ 18

There is little doubt that Petrobras/Brasoil could have taken greater precautions to protect privileged documents, and it reflects poorly on the screening process that some privileged documents were produced multiple times FN5 Nonetheless, the Court finds that, in light of the voluminous document production and the fact that the documents were in a foreign country and language, the procedures used by Petrobras/Brasoil, including multiple checks of the documents, the segregating of privileged documents, attempts to locate all copies of privileged documents, and the final determination of privilege by American attorneys, constituted reasonable precautions to protect the privilege. *Cf. Aramony,* 969 F.Supp. at 236 (reasonable procedure to protect the privilege where paralegals and junior associates in large document production reviewed all documents and identified potentially privileged ones, which were then reviewed by a senior associate for a final determination of privilege); *Lois Sportswear,* 104 F.R.D. at 105 (defendant "only just adequately protected its privilege" where two paralegals made initial identification of privileged documents and attorney then went through a sampling of them and instructed that documents of that kind be segregated from those to be produced); *Bank Brussels Lambert,* 160 F.R.D. at 445 (where paralegal mistakenly produced an entire box of privileged documents, disclosure was nonetheless viewed as inadvertent and precautions taken by counsel were reasonable)

> FN5 There is additional merit to plaintiffs' contention that defendants had been on notice that once the Court of Appeals ruled on their jurisdictional challenges, they would be required to effect the document production in a relatively short period of

© 2005 Thomson/West. No Claim to Orig. U.S Govt Works

Not Reported in F Supp 2d

Not Reported in F Supp 2d, 2000 WL 744369
**(Cite as: Not Reported in F.Supp.2d)**

time They thus should have, but failed to, commence the document collection and identification of privileged documents during the months prior to the Second Circuit's ruling Their procrastination in doing so can be viewed as contributing to the disclosure of privileged documents; however, the Court is not prepared to conclude that it evidences recklessness or indifference with respect to protecting privileged information

*2 Time to Rectify Disclosure*

*6 Although inordinate delay in claiming the privilege may result in a waiver, the length of delay in claiming the privilege should be measured from the time the producing party learns of the disclosure, not from the time of the disclosure itself *See Aramony,* 969 F Supp at 237; *Prescient Partners,* 1997 WL 736726, at *6; *Lloyds Bank,* 1997 WL 96591, at *4

On Friday, January 21, 2000, counsel for the sureties informed counsel for Petrobras/Brasoil of their receipt of several privileged documents, including two letters from Cameron & Hornbostel to Petrobras, providing legal advice The following Monday, January 24, 2000, Petrobras/Brasoil's counsel wrote to counsel for the sureties seeking the return and identification of these documents, and asserting that they had been inadvertently produced The request for the return of these documents on the business day following notification of their production constituted prompt action to rectify the disclosure *Cf Aramony,* 969 F Supp at 237 (response within one day of learning of the production was timely); *Georgia-Pacific Corp v. GAF Roofing Mfg Co,* No 93 Civ 5125(RPP) 1995 WL 117871, at *2 (S D N Y Mar 20, 1995) (response within two business days of learning of inadvertent production did not constitute a waiver)

*3 Scope of Discovery and Extent of Disclosure*

The third factor to be considered focuses on the number of privileged documents disclosed in relation to the overall size of the document

production *See Martin,* 1992 WL 196798, at **3-4 "Courts have routinely found that where a large number of documents are involved, there is more likely to be an inadvertent disclosure rather than a knowing waiver." *Baker's Aid v Hussmann Food Service Co,* No. 87 Civ 0937, 1988 WL 138254, at * 5 (E D N Y. Dec 19, 1988); *see also Lloyds,* 1997 WL 96591, at *4 FN6

> FN6. Plaintiffs argue that the relevant comparison is between the total number of privileged documents and the percentage of those documents "inadvertently" produced They claim that approximately 11% of the 206 documents listed on the original privilege log were disclosed *See* Letter of Jacob Cohn, dated May 5, 2000, at 8 This perspective, while interesting and not entirely irrelevant, is not the approach taken by the vast majority of courts, and it fails to take into account the reality that the more voluminous and complex the overall document production, the more likely it becomes that certain documents will escape notice or be mistakenly produced

In the instant case, approximately 400,000 pages of documents, the majority of which were in Portuguese, were produced Of these, the sureties claim that less than 40 documents identified as privileged were produced, some more than once (the record does not reveal how many pages in total of privileged documents were produced). In light of the voluminous document production, this disclosure, while not insignificant, is relatively small and suggests inadvertence, rather than recklessness in protection of the privilege *Cf Lloyds Bank,* 1997 WL 96591, at **2-4 (no waiver where counsel disclosed 227 pages of privileged documents in a production involving approximately 10,000 pages); *Aramony,* 969 F Supp at 237 (no waiver where 99 pages of privileged documents were produced in a 630,000-page document production); *Strategem Development Corp. v. Heron Intl N V.,* 153 F R D 535, 544 (S D N Y 1994) (no waiver where 25 copies of 6 privileged documents out of 40,000 documents

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in F Supp 2d                                                                      Page 7

Not Reported in F Supp 2d, 2000 WL 744369
**(Cite as: Not Reported in F.Supp.2d)**

were produced); *Lois Sportswear,* 104 F R D at 105 (no waiver where 22 privileged documents were disclosed out of approximately 16,000 pages).

### 4. Fairness

**\*7** Under the fourth relevant factor, the Court looks to whether plaintiffs would be prejudiced by restoring privilege to the documents, not to whether the privilege itself deprives the parties of pertinent information. *See Prescient,* 1997 WL 736726, at \*7; *Bank Brussels,* 160 F R D at 446.

The Court has already ruled at oral argument that the privileged documents which have been submitted to courts in filings in other litigation (in New York State court and in Brazil) could not practicably be returned at this point, and that it would unfairly prejudice plaintiffs to do so. *See* Hearing Transcript, dated April 11, 2000, at 53. However, there has been no showing of any other prejudice to plaintiffs resulting from preservation of the privileged status of the remaining documents; rather plaintiffs would simply be deprived of the use of privileged documents which might be helpful to their case-a not uncommon situation. Therefore, this factor also weighs in Petrobras/Brasoil's favor.

Having concluded that all of the relevant factors weigh in favor of a finding of inadvertence in the production of privileged documents by Petrobras/Brasoil, it is this Court's determination that production of these documents did not constitute a waiver of privilege. Accordingly, the documents shall be returned to defendants' counsel and be treated as privileged.

### II. Work Product

On December 27, 1996, Petrobras/Brasoil notified the sureties that it was contemplating declaring a contractor default and executing on the performance Bonds. They therefore sought a meeting with the sureties, as required under Paragraph 3 1 of the Bonds prior to a default declaration. *See* Affidavit

of Ian Strogatz, Esq., at ¶ 7, attached as Ex 1 to Letter from Lisa Cohen, Esq, dated April 10, 2000. On December 28, 1996, the sureties retained Ian Strogatz, of the firm of Wolf, Block, Schorr and Solis-Cohen LLP, as counsel. In January 1997, the Paragraph 3 1 meeting was held, at which Petrobras/Brasoil informed the sureties that it was considering a default, and Petrobras and IVI agreed to "explore together ways to resolve their differences." *See* Letter from Ian Strogatz, Esq., dated April 26, 2000; Strogatz Aff., at ¶ 9. Following this meeting, the sureties and Strogatz participated in discussions, through meetings and telephone calls, with Petrobras and other parties, during which Petrobras/Brasoil and the contractor consortium, with the assistance of the sureties, sought to reach a "global solution" in order to avoid a default. *See* Letter from Strogatz to Petrobras, dated February 21, 1997, attached as Ex 4 to Cohen 4/10/00 Letter; Letter from Strogatz to Petrobras, dated May 8, 1997, attached as Ex 6 to Cohen 4/10/00 Letter.

Ultimately, the parties' discussions were not fruitful, and on May 12, 1997 and June 16, 1997, respectively, Petrobras/Brasoil declared the consortium in default on the two Projects, and contacted the sureties to trigger their remedies under the performance Bonds. *See* Exs 3 and 4 to Strogatz 4/26/00 Letter. On May 16, 1997, Strogatz advised Petrobras that the sureties "have determined to conduct an investigation under a full reservation of rights and defenses under the bond." Letter from Strogatz to Petrobras, dated May 16, 1997, attached as Ex 8 to Cohen 4/10/00 Letter. In connection with this investigation, Strogatz and others traveled to Brazil, met with various Petrobras and IVI personnel, and reviewed extensive documents provided by IVI. *See* Exs 9-19 to Cohen 4/10/00 Letter. Strogatz also retained the services of an engineering consultant to assist in the investigation. *See* Letter from Strogatz to IVI, *et al.,* dated May 23, 1997, attached as Ex 11 to Cohen 4/10/00 Letter. On August 18, 1997, the sureties denied the claims under the Bond, and subsequently filed these declaratory judgment actions.

**\*8** The defendant Banks seek discovery with respect to the materials produced by Strogatz, his

© 2005 Thomson/West No Claim to Orig U S Govt Works

associates and the engineering consultant during the period prior to the sureties' declination of liability, including any witness statements, notes from witness interviews, documents identifying witnesses, translations, and investigative reports prepared by attorneys, investigators and engineering consultants The Banks are not seeking documents that contain the seeking or giving of legal advice, which would be protected by the attorney-client privilege *See* Letter from Lisa Cohen, Esq, dated May 4, 2000 Plaintiffs argue that Strogatz and the Wolf, Block firm were retained in contemplation of litigation and, therefore, all of the documents they created or that were created on their behalf, including those of the engineering consultant, are protected from disclosure by the work product doctrine

### *1 Applicable Law*

The work product doctrine, codified in Fed R Civ P 26(b)(3), is intended to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy "with an eye toward litigation " *Hickman v Taylor*, 329 U S 495, 510-511, 67 S Ct 385, 393-394 (1947); *see also United States v Adlman*, 134 F 3d 1194, 1196 (2d Cir 1998) ; *Bogan v Northwestern Mutual Life Insurance Co*, 163 F R D 460, 462 (S D N Y 1995) The party seeking work product protection has the burden of establishing that the documents at issue were prepared in anticipation of litigation *See A Michael's Piano, Inc v FTC*, 18 F 3d 128, 146 (2d Cir 1994) ; *Matter of Grand Jury Subpoenas*, 959 F 2d 1158, 1166 (2d Cir 1992) ; *Mount Vernon Fire Insurance Co v Try 3 Building Services, Inc*, No 96 Civ 5590(MJL)(HBP), 1998 WL 729735, at *4 (S D N Y Oct 16, 1998); *Bogan*, 163 F R D at 462 The Second Circuit has held that the relevant inquiry is whether "in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation " *Adlman*, 134 F 3d at 1203-1204; *accord National Congress for Puerto Rican Rights v City of New York*, No 99 Civ 1695(SAS), 2000 WL 557261, at *1 (S D N Y May 8, 2000); *Softview Company Products Corp v Haworth, Inc*, No 97

Civ 8815(KMW) (HBP), 2000 WL 351411, at *4 (S D N Y March 31, 2000) While documents prepared for both litigation and business purposes generally enjoy work product protection, " documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation" are not protected *Adlman*, 134 F 3d at 1202; *accord Softview*, 2000 WL 351411, at *4 This holds true even if such documents might help in preparation for litigation *See Adlman*, 134 F 3d at 1202

If the proponent succeeds in establishing work product protection, the burden shifts to the party seeking discovery to show substantial need for the material and an inability to obtain its substantial equivalent from another source without undue hardship *See Mohdeen v American Airlines, Inc*, No 99 Civ 0016(HB) (FM), 1999 WL 714089, at *1 (S D N Y July 14, 1999); *Mount Vernon v Try 3*, 1998 WL 729735, at *4; *Weinhold v White Heavy Lift, Inc*, No 90 Civ 2096(PKL), 1994 WL 132392 , at *2 (S D N Y Apr 11, 1994); *In re Bairnco Corp Securities Litigation*, 148 F R D 91, 102 (S D N Y 1993) Where attorney thought processes and mental impressions are in issue, an even higher standard to overcome work product protection is applied *See Upjohn Co v United States*, 449 U S 383, 401, 101 S Ct 677, 688 (1981) ; *Adlman*, 134 F 3d at 1204; *United States v Dessange*, Inc , No S2 99 C 1882(DLC) , 2000 WL 310345, at *2 (S D N Y Mar 27, 2000)

**9 Courts have observed that the application of the work product doctrine to documents prepared by insurance companies during claims investigations is difficult because "[t]he nature of the insurance business is such that an insurance company must investigate a claim prior to determining whether to pay its insured," and thus pre-litigation investigation is the routine business of insurance companies *Westhemeco Ltd v New Hampshire Insurance Co*, 82 F R D 702, 708 (S D N Y 1978); *see also Mount Vernon v Try 3*, 1998 WL 729735, at *5; *The American Insurance Co v Elgot Sales Corp*, No 97 Civ 1327(RLC) (NRB), 1998 WL 647206, at *1 (S D N Y Sept 21, 1998); *Insurance Co of North America v M/V Savannah*, No 94

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in F Supp 2d, 2000 WL 744369
**(Cite as: Not Reported in F.Supp.2d)**

Civ. 8846(CSH), 1995 WL 608295, at *1
(S D.N.Y Oct 17, 1995) ("were the rule otherwise,
documents prepared by or at the request of an
insurance company during the insurance company's
ordinary business of claim handling would shield
from discovery all documents falling within that
category by a ritualistic incantation of 'anticipation
of litigation' "); *Bogan*, 163 F R.D. at 464; *Fine v.
Bellefonte Underwriters Insurance Co*, 91 F R.D.
420, 433 (S.D.N.Y 1981) Although at some point,
a company's investigation may shift from the
ordinary course of business to an anticipation of
litigation, there is no hard and fast rule as to when
this occurs; rather, a fact-specific inquiry is required
to determine when this shift occurs *See Weiss v.
Mucciloo*, No 95 Civ 5686(PKL) , 1997 WL
706444, at *2 (S D.N.Y. Nov 13, 1997); *Bogan*,
163 F R.D at 464; *Westhemeco Ltd*, 82 F R.D at
708; 6 Moore's Federal Practice, § 26.70[3][c]
(case-by-case approach to insurance claim
situations appears to be the best one) FN7

> FN7. The Banks contend that the sureties'
> investigation is analogous to the routine
> business investigation of an ordinary
> insurance claim because the sureties had a
> duty to investigate the claim in order to
> determine their coverage position, and had
> a direct relationship to the parties *See*
> Cohen 5/4/00 Letter. The sureties argue
> that because their duty to investigate
> commenced only after the default
> declaration, the proper analogy is to the
> investigation of a third-party insurance
> claim. The sureties cite to a few cases from
> other jurisdictions which suggest that there
> is a greater likelihood of work product
> protection attaching to the investigation of
> a third-party insurance claim than to a
> first-party insurance claim *See* Letter from
> Ian Strogatz, Esq, dated May 11, 2000.
> The Court need not resolve this issue
> Although some first-party insurance cases
> apply a presumption against work product
> protection to documents prepared prior to
> a coverage determination, cases in both
> contexts recognize that a fact-specific
> determination of the nature of the

investigation may be necessary to
determine whether the documents were
prepared in anticipation of litigation *See,
e.g. The Goodyear Tire and Rubber Co. v.
Chiles Power Supply, Inc.*, 190 F R.D.
532, 536 (S D Ind 1999) (court should
conduct a case-by-case analysis of whether
the third party insurer has made the
required showing for work product
protection); *American Insurance*, 1998
WL 647206, at *1 (case-specific analysis
to determine work product privilege with
respect to insurance investigations
generally); *Bogan*, 163 F.R.D at 463 ("
determining whether the 'in anticipation'
requirement has been satisfied involves the
resolution of factual issues concerning the
circumstances surrounding the creation of
the documents in question") The
complexity of the nature of the sureties'
investigation requires such a fact-specific
analysis here.

The sureties assert that to the extent that they
conducted a claims review, they have produced
their entire claims file to the defendants. Plaintiffs
contend, however, that the investigation conducted
by Strogatz and an engineering consultant was
conducted in anticipation of litigation, primarily
based on the fact that USF & G retained Strogatz, a
litigator, in December 1996, following notification
by Petrobras/Brasoil that they might declare a
default under the contract and execute on the
performance Bonds Strogatz has affirmed that he
was "retained solely to represent the co-sureties as
trial counsel in expected litigation over the P-19 and
P-31 projects, as my practice is limited almost
exclusively to the areas of complex civil and
commercial litigation " Strogatz 4/26/00 Letter FN8

> FN8 Plaintiffs point to the fact that in
> January 1997, Petrobras/Brasoil also
> retained outside counsel-Cameron &
> Hornbostel-thus supporting the inference
> that all of the parties were anticipating
> litigation at the time. This is simply not the
> only reasonable inference to be drawn
> from the fact of retention of counsel As

© 2005 Thomson/West No Claim to Orig. U S. Govt. Works

Not Reported in F Supp 2d, 2000 WL 744369
**(Cite as: Not Reported in F.Supp.2d)**

discussed above, the deteriorating situation between the owners and the contractors, the complex inter-relationship of the parties to the sureties, and the various contractual options available, all presented complex issues, independent of litigation Indeed, in an internal memorandum dated April 25, 1997, that has been or will be produced by defendants in redacted form (Tab 21 of the *in camera* review documents), reference is made to Petrobras-Brasoil's hiring of United States counsel "for the purpose of evaluating the situation, studying the alternative solutions for safeguarding the interests of Petrobras, and proposing a course of action for the contracts with the IVI Group, as a result of Petrobras' lack of prior experience in collecting on this type of bond "

The retention of an attorney is one indicia of the anticipation of litigation Nevertheless, it is not dispositive "While the retention of counsel is a factor to consider, an insurance company may not insulate itself from discovery by hiring an attorney to conduct ordinary claims investigation" *Arkwright Mutual Insurance Co v National Union Fire Insurance Co.,* No. 90 Civ 7811(AGS)(JCF), 1994 WL 510043, at *5 (S D N Y Sept 16, 1994); *see also Mount Vernon v Try 3,* 1998 WL 728735, at *7 Moreover, although plaintiffs bear the burden of establishing work product protection, despite numerous submissions to the Court, plaintiffs have failed to offer any evidence from USF & G itself indicating that it hired Strogatz solely because of anticipated litigation The only statement in the record by a representative of USF & G consists of January 1997 deposition testimony of Gary Wilson (in another case), who is a Vice-President and the head of the suretyship division of USF & G Mr Wilson's testimony does not address the issue of prospective litigation Rather, he merely states that when Petrobras requested a meeting because of the possibility of a contractor default, he viewed the meeting as very important and determined that USF & G should have its own separate counsel, thus leading to the retention of Mr Strogatz and the Wolf, Block firm Mr Wilson denied that at the time he expected claims to be made on the

performance Bonds, but only knew that "there was a potential claim to be made because Petrobras referenced a potential contractor default " Wilson Deposition, attached as Ex 5 to Strogatz 4/26/00 Letter FN9

> FN9 An internal memorandum from American Home Assurance, USF & G's co-surety, indicates that it hired outside counsel in January 1997 because "we felt it prudent to monitor the situation " Internal Memorandum, dated August 20, 1997, attached as Ex 36 to Cohen 4/10/00 Letter

**\*10** The record indicates that although, in January 1997, Petrobras stated that it was considering triggering the performance Bonds and asserting claims under them, at the time, the parties were jointly exploring ways to resolve their differences This process took several months, during which Mr Strogatz traveled to Rio de Janeiro and attended a number of meetings with representatives of Petrobras and IVI *See* Strogatz Aff , ¶ 9 While, of course, the failure of the parties' efforts could ultimately result in litigation, and the Court accepts that the documentary evidence suggests a belief in the likelihood of litigation, it is also apparent from the record that there were complicated business and contractual negotiations going on, in which Mr Strogatz and his associates, as well as other attorneys, played a pivotal role For example, on January 28, 1997, Strogatz wrote a letter to a representative of Petrobras, discussing a planned trip to Rio to meet again with Petrobras and the construction consortium, in order to reach "a prompt global solution " His letter makes reference to exploring issues of corporate restructuring, resolving legal issues between the parties, and efforts to reach a solution which would avoid substantial disruption of the construction projects While alluding to the possibility of defenses by the sureties if Petrobras were to declare a default, Strogatz made clear that it was premature to draw any conclusions about future action and that cooperative efforts should be pursued He stated:
These [default and contract defenses] are subjects, of course, which can only be determined

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in F Supp 2d

Not Reported in F Supp 2d, 2000 WL 744369
(Cite as: Not Reported in F.Supp.2d)

after a full and complete investigation which, as we advised Petrobras, cannot be conducted prior to satisfaction of all bond conditions For these reasons, among others, we share the Director's view that the potential delay and disruption to the projects, as well as the potential threat to Petrobras' future construction plans and future bonding needs that might very well result from a default/termination should be avoided if at all possible by the parties' continuing good-faith efforts to reach a global solution We know .. you are all working in this direction, and we want to assure you again that, within the strictures of the three-party, principal-obligee-surety relationship, which we have discussed with you, we share your wish that such a mutually satisfactory resolution can be accomplished next week
Cohen 4/10/00 Letter, Exhibit 2 FN10

> FN10 Throughout February of 1997, Strogatz continued his involvement with Petrobras and IVI, discussing various business options to be pursued, with surety approval, in order to avoid a default. *See* Exhibits 3 and 4 to Cohen 4/10/00 Letter.

Other evidence in the record shows that Strogatz, on behalf of the sureties, repeatedly informed Petrobras that until a default declaration and subsequent investigation, the sureties could not determine what action they would take under the Bonds Although litigation was one possible option, Strogatz's letters indicated that:

[A]s the third-party in the surety relationship *with certain duties at that point to both other parties,* the sureties must independently determine their own position, if and when a default/termination is effected and all other conditions precedent are satisfied Because, unlike Petrobras and IVI/Sade Vigesa, the sureties have not actively participated in the performance and administration of the underlying construction contracts and, therefore, do not know the relevant facts and circumstances, they would have no alternative under such conditions but to conduct an investigation to determine all of the facts and circumstances concerning, *inter alia,* the satisfaction of all

conditions precedent and the availability of suretyship and other defenses. The outcome of that investigation could be an undertaking by the sureties of obligations under the bonds, or the denial of liability under the bonds, depending upon the facts and the circumstances discovered during the investigation. As we have stated on a number of occasions, at this point we cannot even hazard a guess as to the outcome of any such investigation.
**\*11** Strogatz Letter to Petrobras, dated February 21, 1997, attached as Ex 4 to Cohen 4/10/00 Letter (emphasis added)

Other letters from Strogatz to Petrobras during this period reiterated that "the sureties are not in a position either to confirm or deny the efficacy of the bonds and, therefore, without an extensive investigation of a number of issues, cannot at this point either confirm or deny that Petrobras has any such rights to reserve ." Strogatz Letter to Petrobras, dated April 9, 1997, attached as Ex 5 to Cohen 4/10/00 Letter

Strogatz's letters to IVI following the default declaration in May similarly state that "[u]ntil the completion of the investigation, the sureties cannot and will not make those determinations [of which option to exercise under the bonds] and therefore, until then cannot and will not decide whether to exercise or waive their right to complete." Strogatz Letter to IVI, dated May 29, 1997, attached as Ex 13 to Cohen 4/10/00 Letter These letters all clearly indicate that the sureties intended to, indeed were obligated to, conduct an investigation prior to determining their coverage position

Once a default was declared, the manner in which Strogatz conducted the investigation further suggests that what was done would have been done for business purposes, regardless of the possibility of litigation During the investigation, Strogatz sought the cooperation of IVI and Petrobras, including requesting that they produce extensive documentation, make personnel available, and meet with Strogatz. *See* Exs 9-19 to Cohen 4/10/00 Letter. There is no evidence that the investigation, which consisted of interviewing witnesses, reviewing documents, and retaining engineering

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 744369
(Cite as: Not Reported in F.Supp.2d)

consultants to advise on the technically complex issues involved, would not have been similarly performed in order for the sureties to fulfill their obligations to the owners and contractors, and to determine their course of action under the performance Bonds. As Strogatz acknowledged in a May 16, 1997 letter, "the sureties have (and have the right to decide to exercise or waive) certain alternative rights, including *inter alia*, the right to complete the P-19 contract themselves, through agents or through independent contractors of their choice, and Petrobras/Brasoil should take no action during the investigation period that would interfere with or breach any such rights." Exhibit 8 to Cohen 4/10/00 Letter. Obviously relevant to the sureties' business decision as to whether they should elect to complete the work on the projects themselves or through the services of another contractor, were the consulting services of the engineers-Trauner Consulting Services, Inc. FN11 Moreover, the sureties informed IVI and the construction consortium that they would keep them advised on the investigation, in view of their joint and several liability to the sureties for any losses, costs and expenses, including the expense of the investigation. *See* Exhibit 22 to Cohen 4/10/00 Letter.

> FN11 The sureties have stated that during expert discovery, they will probably designate this engineering consultant as their expert, at which time the reports and other documents prepared by the engineering consultants would, in any event, be discoverable. *See* Strogatz Aff., at ¶ 14.

**\*12** Simply because an attorney participated in and supervised this process does not transform investigative documents into work product. By all accounts, there were complex issues to be addressed, regardless of litigation, for which an attorney knowledgeable in suretyship issues, such as Strogatz, could provide invaluable assistance. FN12 Tellingly, in their many submissions to the Court on this issue, the sureties have not made any assertions about what their routine business practice is when confronted with claims of the magnitude of those in

issue here, and how the investigation that occurred in this situation differed from the type of investigation they would routinely undertake when confronted with large claims in a complex surety matter. *See Adlman,* 134 F.3d at 1202 (where notes would have been prepared in essentially similar form irrespective of the possibility of litigation, they are not protected work product); *cf. Mount Vernon Fire Insurance Co. v. Platt,* No. 98 Civ. 8074(CSH)(FM), 1999 WL 892825, at \*3 (S.D.N.Y. Oct. 19, 1999) (finding that investigator's report was not protected by work product privilege because the insurance company would plainly have had to conduct a similar investigation in evaluating the claim, even in the absence of litigation); *American Insurance,* 1998 WL 647026, at \*2 (no work product protection for documents prepared during insurance investigation where insurance company had not yet determined coverage position and where, although outside counsel was hired, outside counsel was routinely hired for large claims); *In re Kidder, Peabody Securities Litigation,* 168 F.R.D. 459, 465 (S.D.N.Y.1996) (no work product privilege attached to reports generated in internal investigation by outside counsel because court found that company would have hired outside counsel to perform the investigation even if no litigation had been threatened at the time, and the notes recounting witness statements would have been necessary to serve the business needs related to the investigation, even absent the threat of litigation); *Westhemeco,* 82 F.R.D. at 708 (denying work product protection to documents from insurance investigation where insurer had not determined coverage position, was continuing negotiations, and based on these facts, plaintiff was cooperating with insurer).

> FN12 In addition to being a member of his firm's litigation department, for a number of years Strogatz also chaired its Complex Liability/Surety/Fidelity Practice Group. *See* Strogatz Aff., ¶ 3.

This conclusion is not intended to preclude the possibility that, in conducting and supervising the investigation, Mr. Strogatz and others made notes which were specifically directed to litigation

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F Supp 2d

Not Reported in F Supp 2d, 2000 WL 744369
**(Cite as: Not Reported in F.Supp.2d)**

strategy or possible litigation defenses; under *Adlman,* these notes would fall within work product protection, because they would not have been produced in the same form irrespective of the threat of litigation Moreover, defendants are not seeking any documents that contain privileged attorney-client communications To date, there has been only the general assertion that the notes of Strogatz and the engineer, as a general matter, constitute work product, with no suggestion that on their face the notes themselves discuss or reflect litigation strategy or advice To the extent that there are such notes, they may be redacted from documents that are produced, with appropriate notation, or, if inseparable from non-privileged information, withheld and itemized on a privilege list *Cf Mount Vernon v. Platt,* 1999 WL 892825, at *3 (investigation reports ordered to be produced, except insofar as they reveal legal theories of attorneys) FN13

> FN13 Although there are occasions where the Court's *in camera* review of documents can assist in the determination of whether an attorney's notes were made in anticipation of litigation, rather than in the regular course of business, there has been no offer of the documents for *in camera* review and no assertion here that the substance of the notes would make apparent that they were litigation-oriented rather than for the purpose of the claim investigation Rather, the only assertion has been that the documents generally reflect attorney thought processes-not that specific documents, on their face, would demonstrate litigation planning or strategy.

**\*13** The sureties have not met their burden of demonstrating that all documents and notes created in the course of their discussions with the defendants and subsequent investigation, were produced in anticipation of litigation and are protected work product Evidence exists indicating that following the notification of a possibility of a contractor default and the actual notice of default, the sureties attempted to reach a business solution to avoid a default, and then were required to

undertake an investigation to determine their position with respect to their options and obligations under the Bonds, including their position on defendants' claims Of course, one possible position would be to deny the claims, which in fact occurred But until that decision was made, the investigation was undertaken, with the defendants' cooperation, in order to arrive at a business determination as to which options to exercise under the Bonds Accordingly, the documents prepared during the investigation are not protected by the work product privilege, except as noted above, and are to be produced FN14

> FN14 This conclusion obviates the need to resolve the issue of whether the Banks would be entitled to these materials even if they were work product, based on a showing of substantial need and undue hardship The Court notes that, in any event, the Banks' assertion of substantial need and undue hardship is premature It is based on speculation about their ability to locate and depose witnesses and about the witnesses' ability to recall past events At this stage of discovery, the parties are still in the process of identifying witnesses and arranging for depositions

### III In Camera Review of Defendants' Privilege Log

Plaintiffs have challenged the propriety of entries on defendants' privilege log They argue that many of the entries which are claimed to be protected by the attorney-client privilege or as work product, either do not appear to have been written by or to an attorney, or were copied to numerous individuals who are not attorneys In response to plaintiffs' concerns, the Court agreed to undertake an *in camera* review of specified documents on defendants' privilege log Eighty-eight documents were identified by plaintiffs, eighty-four of which defendants have provided to the Court, along with an index that identifies the various individuals who wrote or received the documents FN15

> FN15 Defendants have agreed to produce

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in F Supp 2d                                                        Page 14

Not Reported in F Supp 2d, 2000 WL 744369
**(Cite as: Not Reported in F.Supp.2d)**

to plaintiffs four of the challenged documents, apparently conceding that they were improperly withheld

Having reviewed the documents and the privilege log, the Court concludes that, with a few exceptions described below, privilege was properly invoked On their face, many of the entries in the privilege log induce skepticism because the documents in issue appear to have been generated and circulated within various departments of Petrobras and Brasoil, which had responsibility for different aspects of the construction projects which are at issue in this case Nevertheless, the defendant corporations are large, complex structures, which have legal departments that were intimately involved in various aspects of the construction projects and their related contracts Most of the documents involve legal opinions issued by personnel in the corporate legal department, or responses to inquiries from individuals in the corporate legal department, which were sent to corporate personnel The inquiries and responses relate to legal advice and services that were being rendered FN16

> FN16 Although the Court questions the assertion of work product protection with respect to certain documents, *see, e g ,* Tab 5, June 12, 1996 Internal Memo regarding proposed contract revisions; Tab 8, January 13, 1997 internal memo providing legal opinions about construction contract options), because they were also withheld on the basis of the attorney-client privilege, their non-production is valid

Nevertheless, the Court has determined that the following documents were improperly withheld and should be produced:

Tab 13-Cover fax dated 3/17/97-Although this fax was accompanied by a draft letter with respect to which comment from the legal division was sought, the fax itself contains no substantive information, privileged or otherwise

**\*14** Tab 21-Redacted Paragraph 4-Although one

could make an argument, however tenuous, that this paragraph reflects upon some form of legal advice, the document was withheld on the basis of work product. The Court fails to see how paragraph 4 was written because of actual or impending litigation

Tab 69-Internal memo in response to attorney letter dated April 30, 1997-The memo itself is privileged attorney-client and work product material However, the attachments to the memo are entirely factual and appear to have been provided by or to the construction consortium The attachments shall be produced

The Court assumes that the redacted documents have been produced in redacted form to the plaintiffs If that has not occurred, such production shall be completed promptly

CONCLUSION

For the reasons set forth above, Petrobras/Brasoil's motion for the return of the inadvertently produced privileged documents is granted Plaintiffs are hereby ordered to return those documents and are prohibited from using them in discovery or at trial (with the exceptions noted above) The Banks' motion for the production of documents prepared in connection with the sureties' investigation is also granted

S D N Y ,2000
U S Fidelity & Guaranty Co v Braspetro Oil Services Co
Not Reported in F Supp 2d, 2000 WL 744369

Briefs and Other Related Documents (Back to top)

• 2002 WL 32496004 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum in Opposition to Plaintiffs' Motion to Strike Hamilton Testimony (Apr 08, 2002)
• 2002 WL 32595867 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum in Opposition to Plaintiffs' Motion to Strike Hamilton Testimony (Apr 08, 2002)
• 2002 WL 32496059 (Trial Motion, Memorandum and Affidavit) Sureties' Memorandum in Support of

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in F Supp 2d, 2000 WL 744369
**(Cite as: Not Reported in F.Supp.2d)**

Motion to Strike that Portion of the Testimony of Frederick C. ""Kip" Hamilton that is Based Upon Inadmissible, Virus-Ridden and Otherwise Unreliable Computer Records of IVI and/or on a Faulty and Unreliable Method ology (Mar. 27, 2002)
• 2002 WL 32595866 (Trial Motion, Memorandum and Affidavit) Sureties' Memorandum in Support of Motion to Strike that Portion of the Testimony of Frederick C ""Kip" Hamilton that is Based Upon Inadmissible, Virus-Ridden and Otherwise Unreliable Computer Records of IVI and/or on a Faulty and Unreliable Method ology (Mar. 27, 2002)
• 2001 WL 34545573 (Trial Motion, Memorandum and Affidavit) Pretrial Memorandum of Plaintiffs United States Fidelity and Guaranty Company and American Home Assurance Company (Aug. 31, 2001)
• 2001 WL 34611798 (Trial Motion, Memorandum and Affidavit) Pretrial Memorandum of Plaintiffs United States Fidelity and Guaranty Company and American Home Assurance Company (Aug. 31, 2001)
• 2001 WL 34545567 (Trial Motion, Memorandum and Affidavit) Third Party Idbny's Opposition to Plaintiff's Objections to Magistrate Judge Katz's June 22, 2001 Order (Aug. 07, 2001)
• 2001 WL 34611797 (Trial Motion, Memorandum and Affidavit) Third Party Idbny's Opposition to Plaintiff's Objections to Magistrate Judge Katz's June 22, 2001 Order (Aug. 07, 2001)
• 2001 WL 34636117 (Trial Motion, Memorandum and Affidavit) Third Party Idbny's Opposition to Plaintiff's Objections to Magistrate Judge Katz's June 22, 2001 Order (Aug. 06, 2001)
• 2001 WL 34545571 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Plaintiffs' Objections to Magistrate Judge Katz's June 22, 2001 Order Concerning the March 23, 2001 Document Subpoena Served Upon Israel Discount Bank (Jul 16, 2001)
• 2001 WL 34611796 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Plaintiffs' Objections to Magistrate Judge Katz's June 22, 2001 Order Concerning the March 23, 2001 Document Subpoena Served Upon Israel Discount Bank (Jul 16, 2001)
• 2001 WL 34636115 (Trial Motion, Memorandum

and Affidavit) Plaintiffs' Objections to Supplemental Declaration of Hermes Marcelo Huck (Jul. 16, 2001)
• 2001 WL 34636116 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Objections to Magistrate Judge Katz's June 22, 2001 Order Concerning the March 23, 2001 Document Subpoena Served Upon Israel Discount Bank (Jul. 09, 2001)
• 2001 WL 34636114 (Trial Motion, Memorandum and Affidavit) Memorandum in Opposition to USF&G's Motion for Summary Judgment as to the Port of New Orleans Project (Jul 04, 2001)
• 2001 WL 34545577 (Trial Motion, Memorandum and Affidavit) Memorandum of Plaintiffs in Opposition to Motion for Summary Judgment Seeking Dismissal of all Claims Against IESA (Jun. 26, 2001)
• 2001 WL 34611795 (Trial Motion, Memorandum and Affidavit) Memorandum of Plaintiffs in Opposition to Motion for Summary Judgment Seeking Dismissal of all Claims Against IESA (Jun. 26, 2001)
• 2001 WL 34545572 (Trial Motion, Memorandum and Affidavit) Memorandum of Law of Defendants the Bank of Tokyo-Mitsubishi, Ltd and Shinsei Bank, Limited, in Opposition to the Sureties' Motion for Summary Judgment (Jun. 06, 2001)
• 2001 WL 34611794 (Trial Motion, Memorandum and Affidavit) Memorandum of Law of Defendants the Bank of Tokyo-Mitsubishi, Ltd and Shinsei Bank, Limited, in Opposition to the Sureties' Motion for Summary Judgment (Jun. 06, 2001)
• 2001 WL 34545568 (Trial Motion, Memorandum and Affidavit) Memorandum in Opposition to USF&G's Motion for Summary Judgment as to the Port of New Orleans Project (Jun. 04, 2001)
• 2001 WL 34611793 (Trial Motion, Memorandum and Affidavit) Memorandum in Opposition to USF&G's Motion for Summary Judgment as to the Port of New Orleans Project (Jun. 04, 2001)
• 2001 WL 34545576 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of the Co-Sureties' Motion for Summary Judgment as to the Japanese Banks (May 21, 2001)
• 2001 WL 34611792 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of the Co-Sureties' Motion for Summary Judgment as to the Japanese Banks (May 21, 2001)
• 2001 WL 34545574 (Trial Motion, Memorandum

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in F Supp 2d, 2000 WL 744369
**(Cite as: Not Reported in F.Supp.2d)**

and Affidavit) Memorandum of Law in Support of USF&G's Motion for Summary Judgment as to the Port of New Orleans Project (May 18, 2001)
• 2001 WL 34611789 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of USF&G's Motion for Summary Judgment as to the Port of New Orleans Project (May 18, 2001)
• 2001 WL 34545575 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of the IVI Group's Motion for Certification Pursuant to Rule 54(b) (May 04, 2001)
• 2001 WL 34611787 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of the IVI Group's Motion for Certification Pursuant to Rule 54(b) (May 04, 2001)
• 2001 WL 34545570 (Trial Motion, Memorandum and Affidavit) Defendants Petroleo Brasileiro S A 's and Braspetro Oil Services Company's Opposition to Plaintiffs' Fed R Civ P 72(a) Objections to Chief Magistrate Judge Katz's January 29, 2001 Opinion and Order (Mar 08, 2001)
• 2001 WL 34611786 (Trial Motion, Memorandum and Affidavit) Defendants Petroleo Brasileiro S A 's and Braspetro Oil Services Company's Opposition to Plaintiffs' Fed R Civ P 72(a) Objections to Chief Magistrate Judge Katz's January 29, 2001 Opinion and Order (Mar 08, 2001)
• 2000 WL 34326073 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Motion of the Co-Sureties for Reconsideration of Magistrate Judge Katz's Order of June 7, 2000 on the Inadvertent Production Issue (Sep 25, 2000)
• 2000 WL 34403553 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Motion of the Co-Sureties for Reconsideration of Magistrate Judge Katz's Order of June 7, 2000 on the Inadvertent Production Issue (Sep 25, 2000)
• 2000 WL 34326067 (Trial Motion, Memorandum and Affidavit) Pretrial Memorandum of Law of Defendants Braspetro Oil Services Company and Petr%21oleo Brasileiro SA - Petrobras (Aug 31, 2000)
• 2000 WL 34403554 (Trial Motion, Memorandum and Affidavit) Pretrial Memorandum of Law of Defendants Braspetro Oil Services Company and Petr%21oleo Brasileiro SA - Petrobras (Aug 31, 2000)
• 2000 WL 34326070 (Trial Motion, Memorandum and Affidavit) Defendants Petroleo Brasileiro S A 's

and Braspetro Oil Services Company's Opposition to Plaintiffs' Motion to Supplement the Record and to New Arguments in Plaintiffs' Reply Memorandum (Aug 01, 2000)
• 2000 WL 34403552 (Trial Motion, Memorandum and Affidavit) Defendants Petroleo Brasileiro S A 's and Braspetro Oil Services Company's Opposition to Plaintiffs' Motion to Supplement the Record and to New Arguments in Plaintiffs' Reply Memorandum (Aug 01, 2000)
• 2000 WL 34326068 (Trial Motion, Memorandum and Affidavit) Memorandum of Law of Defendants Petr%21oleo Brasileiro SA - Petrobras and Braspetro Oil Services Company in Support of Their Motion to Dismiss the Contractors' Amended Cross-Claims (May 19, 2000)
• 2000 WL 34403551 (Trial Motion, Memorandum and Affidavit) Memorandum of Law of Defendants Petr%21oleo Brasileiro SA - Petrobras and Braspetro Oil Services Company in Support of Their Motion to Dismiss the Contractors' Amended Cross-Claims (May 19, 2000)
• 2000 WL 34326126 (Trial Motion, Memorandum and Affidavit) Memorandum of Law of Defendants Petr%21oleo Brasileiro SA - Petrobras and Braspetro Oil Services Company in Support of Their Motion to Dismiss the Contractors' Cross-Claims (Mar 09, 2000)
• 2000 WL 34403550 (Trial Motion, Memorandum and Affidavit) Memorandum of Law of Defendants Petr%21oleo Brasileiro SA - Petrobras and Braspetro Oil Services Company in Support of Their Motion to Dismiss the Contractors' Cross-Claims (Mar 09, 2000)
• 1999 WL 33912336 (Trial Pleading) Plaintiffs' Answer and Affirmative Defenses to Counterclaim of Defendant Braspetro Oil Services Company (Jun 28, 1999)
• 1999 WL 33912334 (Trial Pleading) Plaintiffs' Answer and Affirmative Defenses to Counterclaim of Defendant Long Term Credit Bank of Japan, Ltd (Jun 23, 1999)
• 1999 WL 33912335 (Trial Pleading) Plaintiffs' Answer and Affirmative Defenses to Counterclaim of Defendant Bank of Tokyo-Mitsubishi, Ltd (Jun 23, 1999)
• 1999 WL 33912333 (Trial Pleading) Amended Answer, Affirmative Defenses, and Counterclaims of Defendant Braspetro Oil Services Company (Jun

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in F Supp 2d                                                    Page 17

Not Reported in F Supp 2d, 2000 WL 744369
**(Cite as: Not Reported in F.Supp.2d)**

07, 1999)
• 1999 WL 33832465 (Trial Pleading) Answer and
Counterclaim of Bank of Tokyo-Mitsubishi, Ltd
(Jun 02, 1999)
• 1999 WL 33832470 (Trial Pleading) Answer and
Counterclaim of the Long-Term Credit Bank of
Japan, Limited (Jun 02, 1999)
• 1999 WL 33885636 (Trial Pleading) Answer and
Counterclaim of the Long-Term Credit Bank of
Japan, Limited (Jun 02, 1999)
• 1999 WL 33885637 (Trial Pleading) Answer and
Counterclaim of Bank of Tokyo-Mitsubishi, Ltd
(Jun 02, 1999)
• 1999 WL 33912332 (Trial Pleading) Answer and
Counterclaim of Bank of Tokyo-Mitsubishi, Ltd
(Jun 02, 1999)
• 1999 WL 33832469 (Trial Pleading) Answer,
Affirmative Defenses, and Counterclaims of
Defendant Braspetro Oil Services Company (Jun
01, 1999)
• 1999 WL 33885635 (Trial Pleading) Answer,
Affirmative Defenses, and Counterclaims of
Defendant Braspetro Oil Services Company (Jun
01, 1999)
• 1999 WL 33912330 (Trial Pleading) Answer,
Affirmative Defenses, and Counterclaims of
Defendant Braspetro Oil Services Company (Jun
01, 1999)
• 1999 WL 33912331 (Trial Pleading) Answer and
Counterclaim of the Long-Term Credit Bank of
Japan, Limited (Jun 01, 1999)
• 1998 WL 34256237 (Trial Motion, Memorandum
and Affidavit) Brasoil's Memorandum in Support of
Motion to Dismiss for Lack of Subject Matter
Jurisdiction, Lack of Personal Jurisdiction, and on
the Grounds of Forum Non Conveniens (Jun 26,
1998)
• 1998 WL 34279964 (Trial Motion, Memorandum
and Affidavit) Brasoil's Memorandum in Support of
Motion to Dismiss for Lack of Subject Matter
Jurisdiction, Lack of Personal Jurisdiction, and on
the Grounds of Forum Non Conveniens (Jun 26,
1998)
• 1:98cv03099 (Docket) (May 01, 1998)
• 1997 WL 33702132 (Trial Pleading) Complaint
(Aug 18, 1997)
• 1997 WL 33757662 (Trial Pleading) Complaint
(Aug 18, 1997)
• 1:97cv06124 (Docket) (Aug 18, 1997)

• 1997 WL 33768411 (Trial Pleading) Complaint
(1997)
• 1997 WL 33768412 (Trial Pleading) Amended
Complaint (1997)

END OF DOCUMENT

© 2005 Thomson/West No Claim to Orig U S Govt Works