UNITED STATES DISTRICT COURT

DISTRICT OF DELAWARE

--------------------------------------------------------

CEPHALON, INC., and UNIVERSITY
OF UTAH RESEARCH FOUNDATION,

     Plaintiffs,

    vs.          Case No. 05-20 (JJF)

BARR LABORATORIES, INC.,

     Defendant.

--------------------------------------------------------

Deposition of DR. LYNN VAN CAMPEN

Friday, September 9th, 2005

8:54 a.m.

at

Sheraton Hotel
706 John Nolen Drive
Madison, Wisconsin

ELLEN GRAUER COURT REPORTING CO. LLC
126 East 56th Street, Fifth Floor
New York, New York 10022
212-750-6434
REF: 78559

Page 2

1              Videotape deposition of DR. LYNN VAN

2      CAMPEN, a witness in the above-entitled action,

3      taken at the instance of the Defendants, pursuant

4      to the Federal Rules of Civil Procedure, pursuant

5      to Notice, before Julie K. Lyle, RPR/RMR, Certified

6      Realtime Reporter, and Notary Public, State of

7      Wisconsin, at 706 John Nolen Drive, Madison,

8      Wisconsin, on the 9th day of September, 2005,

9      commencing at 8:54 a.m. and concluding at 1:46 p.m.

10   A P P E A R A N C E S:

11              WILMER, CUTLER, PICKERING, HALE and DORR,
                LLP, by
12                Mr. Gregory P. Teran
                  60 State Street
13                Boston, Massachusetts  02109
                  Appeared on behalf of Plaintiffs.
14
                WINSTON & STRAWN, LLP, by
15                Mr. Michael K. Nutter
                  35 West Wacker Drive
16                Chicago, Illinois  60601
                  Appeared on behalf of Defendant.
17

18

19

20

21

22

23

24

25

Page 3

1                      E X A M I N A T I O N

2

    BY MR. NUTTER:                                    5
3   BY MR. TERAN:                                   156
    BY MR. NUTTER:                                  164
4

5                        E X H I B I T S

6   EXHIBIT NO.                           PAGE IDENTIFIED

7   51  Amended notice of deposition            10
    52  Van Campen Declaration                  17
8   53  Block declaration                       22
    54  Confidentiality undertaking             62
9   55  "Medicated Lozenges" chapter            95
    56  "Compressed Tablets" chapter            99
10  57  Van Campen thesis                      152

11                (Original exhibits retained by Attorney

12          Nutter.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1    TRANSCRIPT OF PROCEEDINGS

2        VIDEO TECHNICIAN:  We are officially on

3    the record at 8:54 a.m.  The date today is

4    September 9th, 2005.

5            This is tape number 1 of the

6    deposition of Dr. Lynn Van Campen.  This is being

7    taken in the matter of Cephalon, Incorporated, et

8    al., versus Barr Laboratories, Incorporated.

9            This is pending in the United States

10   District Court, District of Delaware, Civil Action

11   Number 05-29.

12           The deposition is taking place at

13   the Sheraton Hotel, located at 706 John Nolen

14   Drive, Madison, Wisconsin.

15           My name is Dean Van Hoogan,

16   videographer with Ryker & Lyle Legal Video Service,

17   on behalf of Ellen Grauer Court Reporting.  And the

18   court reporter is Julie Lyle from Gramann

19   Reporting.

20           Will counsel please state their

21   appearances and whom they represent, beginning with

22   plaintiff's counsel, and then the reporter will

23   swear in the witness.

24           MR. NUTTER:  Michael Nutter from the law

25   firm of Winston & Strawn on behalf of the

Page 5

1    defendant, Barr Laboratories, Inc.

2                    MR. TERAN:  Greg Teran from Wilmer,

3    Cutler, Pickering, Hale, and Dorr on behalf of the

4    plaintiffs, as well as Dr. Van Campen for the

5    purposes of the deposition.

6                    DR. LYNN VAN CAMPEN, called as a witness

7    herein, having been first duly sworn on oath, was

8    examined and testified as follows:

9                           EXAMINATION

10   BY MR. NUTTER:

11   Q    Good morning, Dr. Van Campen.  I know I introduced

12        myself to you off the record, but on the record,

13        let me introduce myself again.  My name is Mike

14        Nutter, and I'm with the law firm of

15        Winston & Strawn.  We represent Barr Laboratories,

16        the named defendant, in the present lawsuit filed

17        by Cephalon, Inc., and the University of Utah

18        Research Foundation regarding infringement of the

19        Foundation's U.S. Patent Number 4,863,737.

20                    For the rest of the day, I'm going

21        to refer to that patent as the '737 patent.  Will

22        you understand that nomenclature if I use it?

23   A    Yes.

24   Q    Good.

25                    Now, I'm going to ask you a number

1    of questions today.  You're to answer the questions

2    to the best of your ability and to the best of your

3    recollection.

4              It's important for you to hear each

5    and every question I ask of you.  If for some

6    reason you do not hear a question, I'll be happy to

7    repeat it or you can ask the court reporter to read

8    the question back.

9              Will you tell me if you do not hear

10   a question I ask of you?

11   A    Yes, I will.

12   Q    It's also important that you understand each and

13   every question I ask.  If for any reason you do not

14   understand a question, please tell me and I will

15   rephrase the question into one you can understand.

16             Will you tell me if you do not

17   understand a question I ask?

18   A    Yes, I will.

19   Q    It's also important you get a chance to finish your

20   answer before I begin to ask my next question.  If

21   I inadvertently cut you off before you've had a

22   chance to finish your answer, I apologize in

23   advance, but I do want to give you a chance to

24   finish your answer.

25             Will you tell me if you've not

d9de8cd9-f36e-4787-b6b9-47dfcf1cd463

1    finished your answer at the time I ask my next

2    question?

3  A    Yes, I will.

4  Q    Will you tell me if you need to look at a document

5    in order to answer one of my questions?

6  A    Yes.

7  Q    Will you also tell me if you do not know the

8    information necessary to answer my question?

9  A    Yes.

10  Q    And will you tell me if you do not recall the

11    information necessary to answer my question?

12  A    Yes.

13  Q    Now, please recognize that there's a professional

14    court reporter here as well as a videographer,

15    recording this deposition by sound and visual

16    means.  It's important that you keep two things in

17    mind.  First, the reporter must be able to hear

18    you.  Second, she can only record one person at a

19    time.  So we must try to avoid any cross-talking or

20    more than one person talking at the same time.

21         Also, the reporter cannot take down

22    nods of the head, hand gestures, or other nonverbal

23    responses.  So on behalf of the reporter as well as

24    on my behalf, please respond loudly and clearly to

25    each question I ask.

1                      Will you do so?

2  A    Yes.

3  Q    Now, after the deposition is transcribed, you'll

4      have the opportunity to read it and correct any

5      errors.  Please remember the oath that you just

6      gave means that the testimony you are about to give

7      will be rendered with the same honesty and

8      seriousness as if you were sitting in a court in

9      front of a judge and jury.

10                Now, if you need to take a break,

11      please ask.  We've got coffee, juice, tea,

12      refreshments.  If you need a break at any time,

13      just let me know.

14                Now, are you being represented by

15      counsel today?

16  A    Yes, I am.

17  Q    Who would that be?

18  A    Mr. Greg Teran.

19  Q    Now, are you on any medication today that might

20      affect your memory or your ability to testify?

21  A    No.

22            (Exhibit 51 marked for identification.)

23  BY MR. NUTTER:

24  Q    Okay.  Dr. Van Campen, could you please state your

25      full name and spell it.

d9de8cd9-f36e-4787-b6b9-47dfcf1cd463

1   A   Lynn Van Campen.  L-Y-N-N, V-A-N C-A-M-P-E-N.

2   Q   And could you please state your Social Security

3       number for the record?

4   A   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.

5   Q   And could you state your home address?

6   A   2872 Osmonson Road, Fitchburg, Wisconsin 53711.

7   Q   And could you please identify your present

8       employer.

9   A   I am employed by the University of

10      Wisconsin-Madison, the School of Pharmacy in

11      particular.

12  Q   And what's your present position?

13  A   I'm the director of the Zeeh Pharmaceutical

14      Experiment Station.

15  Q   Are you presently involved in any business

16      activities unrelated to your present employer?

17  A   No.

18              Correction:  Inasmuch as in the

19      academic setting we are able to take on private

20      consulting responsibilities that are part of what

21      we're enabled to do outside the context of our

22      primary positions, either on the faculty or in my

23      position, I've done so.

24  Q   Okay.  Just so I understand what you mean by

25      "private," can you give me an example of a private

1           consulting opportunity that you're referring to?

2    A      Yes.  It would be where I would sign a

3           confidentiality disclosure agreement as a private

4           consultant and not on behalf of the Pharmaceutical

5           Experiment Station.

6    Q      So is it fair to say that your presence here as an

7           expert on behalf of plaintiffs, would that be one

8           of the private consulting opportunities you're

9           referring to?

10   A      Yes, I believe so.  Yes.

11   Q      And I believe you've just been handed what's been

12          marked as Defendant's Exhibit Number 51, which is a

13          document entitled "Barr Laboratories' Amended

14          Notice of Deposition of Dr. Lynn Van Campen."

15                       Do you have that document before

16          you?

17   A      I do.

18   Q      Have you seen this document before?

19   A      No, I have not.

20   Q      Do you recall seeing the original notice of

21          deposition --

22   A      Yes.

23   Q      -- for yourself?

24   A      Yes, I do.

25   Q      When were you first shown the original notice of

d9de8cd9-f36e-4787-b6b9-47dfcf1cd463

1        deposition for yourself?

2    A   Let's see.  Is a notice of deposition -- actually,

3        I'm not confident that I have seen an original

4        notice of deposition --

5    Q   Okay.

6    A   -- with my name associated with it.

7    Q   Is it your understanding that you're here today

8        pursuant to Defendant's Exhibit Number 51?

9    A   Yes.

10                   MR. TERAN:  Object to form.

11   BY MR. NUTTER:

12   Q   When did you first become aware that you've been

13       asked to have your deposition taken in this case?

14   A   I was first notified by Mr.Teran, actually perhaps

15       one of his colleagues at Wilmer Cutler, in mid-July

16       that they might be interested in securing my

17       consulting services/expert witness services here.

18       It was not clear at that time whether or not an

19       actual deposition would be taken.

20   Q   Okay.  And -- and I appreciate that, and we'll sort

21       of get that at length in a little bit.  But I just

22       want to know with respect to do you know when you

23       first became aware that you needed to have your

24       deposition taken in this case.

25   A   I believe it was only in the last several weeks.

1   Q   And how were you -- how was that information

2       communicated to you?

3   A   Mr. Teran indicated that depositions were being

4       taken on behalf of the case and that mine would

5       also be taken.

6   Q   And how was -- was that done via telephone call?

7   A   Yes.

8   Q   Did he ask you at that time what your dates of

9       availability were for a deposition?

10  A   Yes, he did.  And I believe I probed my calendar,

11      in the event that this would occur, perhaps a

12      little earlier than that.

13  Q   Now, what did you do to prepare for today's

14      deposition?

15  A   At such time as the -- excuse me, as the

16      confidentiality agreements were put in place, in

17      advance of this, of my services, excuse me, I was

18      sent some material.  I believe in the -- near the

19      end of July, early August, I was sent material

20      relevant to this case and asked to examine it,

21      including the patent, '737 patent, and some other

22      materials.

23  Q   And these were materials that you reviewed prior to

24      submitting your declaration; is that correct?

25  A   Yes.

d9de8cd9-f36e-4787-b6b9-47dfcf1cd463

Page 13

1    Q    Okay.  I'd like to just focus specifically on this

2         deposition and what you -- you reviewed or did to

3         prepare for today.

4                   Did you meet with any of your

5         attorneys?

6    A    Yes.  The -- the order I -- I could summarize the

7         order in which our interactions took place.

8    Q    That would be very helpful.

9    A    As I say, it was approximately early August, the

10        first week in August, I believe, when

11        confidentiality agreements were in place and -- and

12        Wilmer Cutler was able to send me materials that

13        they asked me then to review in advance of taking

14        my declaration.

15                  These materials included the '737

16        patent; the declaration of Dr. Lawrence Block;

17        several texts -- a text -- several chapters of a

18        text, the -- the material of which was relevant to

19        some issues that would come forward in this

20        discussion and a text with which I was familiar.

21                  And there was also some history of

22        the deposition that I received or, I'm sorry, of

23        the -- of the patent history that I received.  And

24        Mr. Teran called me on the phone to indicate some

25        level of priority because this was a considerable

Page 14

1    amount of material and he was interested in having

2    my declaration available within the coming week or

3    two.  And so I did so.  Immediately I reviewed

4    those materials which he suggested I spend more

5    time on than other -- than any other materials.

6              And the following -- within the

7    following week, we had a lengthy phone call wherein

8    he was interested in what I had learned from the

9    reading that I had -- that I had done.  And it was

10   several hours' worth of some discussion about what

11   my understanding was.  And he indicated to me in

12   advance that it would be from this discussion that

13   he offered to prepare a draft of my declaration,

14   which, under the circumstances, was important

15   inasmuch as my time to do so was limited.  But that

16   draft depended on our having a very full discussion

17   of my understanding of the patent and those

18   associated materials.

19   Q    Okay.  Are you -- are you done?

20   A    Yes.

21   Q    Okay.  Now, after you learned that you were going

22        to appear today for a deposition, did you do

23        anything specific to prepare for the questions I'm

24        going to ask you today?

25   A    Yes.  Mr. Teran and I met yesterday, yesterday

1    afternoon, and in effect discussed --

2              MR. TERAN:  Well, let me just caution

3    you, Dr. Van Campen, not to reveal the substance of

4    our discussion yesterday which was in preparation

5    for today's deposition.  It would be

6    attorney-client privileged.

7              We're not -- other communications

8    prior to yesterday, there's no assertion of

9    privilege over, but the preparations yesterday we

10   would assert privilege, though.

11             To the extent you may answer the

12   question without revealing substance of yesterday's

13   discussion, you may do so.

14             THE WITNESS:  In advance of the

15   scheduling of this, you had -- Mr. Teran had

16   indicated to me that we would probably meet briefly

17   prior to the deposition itself, and we did so

18   yesterday.

19   BY MR. NUTTER:

20   Q    What time did you meet with Mr. Teran yesterday?

21   A    1 o'clock.

22   Q    And approximately how long did you meet with him

23        for?

24   A    Two hours.

25   Q    Did you review documents?

Page 16

1    A    Yes.

2    Q    What documents did you review with Mr. Teran?

3    A    The patent, my declaration, Dr. Block's

4         declaration, and I believe that's it.

5    Q    So it was the '737 patent?

6    A    Yes.

7    Q    Your declaration, Dr. Block's declaration?

8    A    Yes.

9    Q    Anything else?

10   A    No.  We may have made brief reference to the text

11        and a chapter written by Dr. Peters.

12   Q    So just so I'm clear, when you say "the text," are

13        you referring to -- what are you referring to?

14   A    Yes.  I'm trying to recall the title of the

15        textbook.  "Pharmaceutical" -- it's by Lieberman

16        and Lachman, and I don't recall the actual title.

17        It's a rather generic title on pharmaceutical

18        development.

19   Q    Is there a document that would refresh your memory?

20   A    Yes.

21   Q    And what document would that be?

22   A    It would be the -- there were several chapters of

23        general background and interest relevant to this

24        case and -- which I had reviewed in the last month.

25   Q    Is this text cited in your declaration?

d9de8cd9-f36e-4787-b6b9-47dfcf1cd463

Page 17

1    A    Yes, it is.

2              MR. NUTTER:  If I could have you mark

3         this as Defendant's Exhibit 52.

4              (Exhibit 52 marked for identification.)

5    BY MR. NUTTER:

6    Q    Dr. Van Campen, you've just been handed what's been

7         marked as Defendant's Exhibit 52, which is a

8         document entitled "Declaration of Dr. Lynn

9         Van Campen."

10             Do you have that document before

11        you?

12   A    I do.

13   Q    Do you recognize that document to be the

14        declaration you submitted in this case?

15   A    Yes, I do.

16   Q    I'd ask that you take a moment to review the

17        document and see if you can recall the name of the

18        text you were referring to in your earlier

19        response.

20   A    "Pharmaceutical Dosage Forms" is the title of

21        the -- the text.

22   Q    Now, why did you review that particular text

23        yesterday?

24   A    As a general text discussing all dosage forms that

25        were well established and understood in the 1980s

Page 18

1    that was relevant to the period at which this

2    patent issued.  It was, in part, to ensure that I

3    was familiar with medicated lozenges, with which I

4    have had less direct experience, and tablet

5    compression, with which I've had a good deal of

6    experience, and to be -- to be aware of the

7    processing of these several dosage forms and also

8    to be reminded of the state of the art at the time

9    in the 1980s.

10   Q    Just so I'm clear, referring to your declaration,

11        paragraph 23, actually the last portion on page 7,

12        it refers to David Peters, "Medicated Lozenges" in

13        1 "Pharmaceutical Dosage Forms" 339.

14                   Do you see that --

15   A    Yes.

16   Q    -- reference?

17                   Is that the text that we're

18        discussing?

19   A    Yes.

20   Q    And this is a citation to a particular chapter; is

21        that correct?

22   A    Correct.

23   Q    And the chapter's name is "Medicated Lozenges"?

24   A    That's right.

25   Q    Is that one of the chapters that you reviewed

1    yesterday?

2    A    One of two.

3    Q    What would be the other chapter?

4    A    Actually, we did not review this yesterday.  The

5         other chapter was "Compressed Tablets," and that we

6         reviewed very briefly.

7    Q    So yesterday you reviewed the "Compressed Tablet"

8         chapter of the "Pharmaceutical Dosage Forms"

9         publication?

10   A    Really only the -- yes, but only the statement

11        that's included here.  So one could say that it was

12        in reviewing my declaration as much as anything

13        that we referred to these chapters.

14   Q    And when you say "the statement," you're referring

15        to the -- the second Block quote in paragraph 23?

16   A    Correct.

17   Q    That statement?

18   A    Yes.

19   Q    Okay.  Okay.  So yesterday when you met with

20        Mr. Teran you reviewed the '737 patent, you

21        reviewed your declaration, you reviewed Dr. Block's

22        declaration, and you briefly reviewed the

23        "Compressed Tablet" chapter of the "Pharmaceutical

24        Dosage Forms" publication; is that correct?

25   A    Yes.  Again, the latter really more as an extension

1        of brief reference in this declaration.

2    Q    Do you recall reviewing any additional material?

3    A    No.

4    Q    Why did you review Dr. Block's declaration?

5              MR. TERAN:  You may answer to the extent

6        that it would not reveal any of the communications

7        we had concerning preparing for the deposition.  To

8        the extent you can answer without revealing any

9        such communication, feel free to do so.

10             MR. NUTTER:  Just for the record, you're

11       claiming privilege to communications with an

12       expert?

13             MR. TERAN:  Well, I'm only claiming

14       privilege as to communications that we had

15       yesterday concerning the subject of preparing for

16       today's deposition.  That's a very limited set of

17       communications, and I simply want to preserve that

18       privilege.

19                  Obviously, communications with the

20       expert that concern formulating the declaration,

21       basis for her opinions are -- are fair game.  So

22       I'm -- I'm -- that's the line I'm trying to draw

23       here.

24             MR. NUTTER:  Okay.  Just for the record,

25       I'd like to note that I disagree that there is -- a

1    privilege can be asserted to communications with an

2    expert for preparation of the expert for today's

3    deposition.  That being said, if you can respond to

4    my question, I'd appreciate it.

5          THE WITNESS:  Inasmuch as three to four

6    weeks had passed since I had initially looked at

7    this material and -- and signed the declaration

8    that had been drafted on my behalf but only as the

9    result of my having spoken with Mr. Teran about my

10   understanding of these materials, it was -- it was

11   really to refresh my memory of some of the very --

12   you know, the substantive points of the declaration

13   and -- and not more.

14   BY MR. NUTTER:

15   Q    Do you recall what portions of Dr. Block's

16        declaration you reviewed?

17   A    There were definitions in his declaration which

18        Mr. Teran had brought my attention to -- again, to

19        just be comfortable with the -- the discussion of

20        my understanding of these materials today and

21        really relevant to those which have been -- you

22        know, which I've noted in my declaration.

23          MR. NUTTER:  If I can have this marked as

24   Defendant's Exhibit 53.

25          (Exhibit 53 marked for identification.)

1    BY MR. NUTTER:

2    Q    Dr. Van Campen, you've just been handed what's been

3         marked as Defendant's Exhibit Number 53, which is

4         the declaration of Dr. Lawrence Block.

5                        Is this the declaration that you

6         reviewed yesterday?

7    A    Yes.

8    Q    Now, I believe you've previously testified that you

9         reviewed definitions in his declaration yesterday.

10        Can you point to me what definitions you're

11        referring to?

12   A    Yes.  They are -- they correlate directly with

13        several key phrases that -- that I note in my

14        declaration.  Among them, and I can find where they

15        are in Dr. Block's declaration, but they include

16        the understanding that I have of mixing, of powder,

17        and of liquid and wet processing.  I think those

18        are the key.

19   Q    Okay.  Other than the -- the definitions provided

20        by Dr. Block in his declaration, did you review any

21        other portions of his declaration?

22                   MR. TERAN:  I object, that's -- as vague,

23        but you may answer.

24                        If you need to take the time to look

25        through his declaration, feel free to do so.

1              THE WITNESS:  We spoke briefly of the

2        background that one skilled -- you know, of

3        ordinary skill in the art would have.

4   BY MR. NUTTER:

5   Q    Anything else?

6   A    We discussed my understanding of what powder means.

7   Q    Anything else?

8   A    We discussed what my understanding of mixing means.

9   Q    Anything else?

10  A    We discussed what my understanding of

11       drug-containing matrix, what that means, and what

12       my understanding of granules versus powders are.

13       And, in fact, that led me to suggest my looking in

14       a text, a compendial type of text, that is

15       frequently on the shelves of people in my

16       discipline to see what they had to say about powder

17       in terms of particle size.  I was curious and

18       suggested to Mr. Teran that we take a look.  So we

19       also looked at that.

20  Q    I'm sorry, you said a "common pendium" of some

21       type?

22  A    Compendium --

23  Q    Compendium.

24  A    -- of literature and information and general

25       chapters around the pharmaceutical sciences by the

1    name of Remington's.  A very -- it's a very

2    comprehensive book on the pharmaceutical sciences,

3    which means that there are very basic definitions

4    of -- and treatises on various and sundry aspects

5    of the pharmaceutical sciences.  So no one of them

6    is covered in tremendous depth, but it's a very

7    regular reference for people in my field.

8  Q  Do you recall what chapter of Remington's you --

9    you reviewed yesterday?

10  A  Yes.  I suggested that we look at how powders are

11    treated with regard to particle size because it is

12    my understanding that it's a relatively subjective

13    term and that there is no single definition of

14    what -- how powders are defined.

15  Q  And what did you learn after reviewing Remington's

16    yesterday?

17  A  That there are several references to particle size

18    fractions, and they vary from 100 to 200 microns in

19    size to upwards of 500 to 2 millimeters in size,

20    which the later definition is not one which I would

21    suggest is a common one, but it does exist in -- in

22    Remington's as a -- a category of powder.

23  Q  Now, when you were reviewing Remington's yesterday

24    for powder, were you looking at fine powders or any

25    powders or --

d9de8cd9-f36e-4787-b6b9-47dfcf1cd463

1           MR. TERAN:  Object to form.

2           THE WITNESS:  I wanted to see in whole

3      how they referred to powders as a category.

4  BY MR. NUTTER:

5  Q    So the research you did yesterday, would that

6      include coarse powders?

7  A    I don't recall reference to coarse powders.  I do

8      recall reference to fine powders.

9  Q    Do you recall what particle size range Remington's

10     defined fine powders to be?

11          MR. TERAN:  I object.

12          THE WITNESS:  I don't recall that they

13     distinguished clearly.  There were several

14     references within a chapter entitled "Powders" that

15     referred to these several different size

16     categories.

17  BY MR. NUTTER:

18  Q    So the Remington's chapter that you're referring

19     to, it's entitled "Powders"?

20  A    Yes.

21  Q    Was this a 19- -- was this a recent Remington's

22     treatise or a 1980-range treatise?

23          MR. TERAN:  Object to form.

24          THE WITNESS:  I believe it issued in the

25     last several years, about three to four years ago.

Page 26

1   BY MR. NUTTER:

2   Q    Do you have an opinion as to whether the -- the

3        definitions of powders has changed from, say, the

4        1985 time period till present?

5             MR. TERAN:  I object.

6             THE WITNESS:  I do have an opinion, and I

7        don't think it has changed.

8   BY MR. NUTTER:

9   Q    Okay.  I think we were talking about Dr. Block's

10       declaration and you were -- you were walking

11       through it and telling me the -- the various

12       definitions that you had reviewed yesterday.  And I

13       believe we discussed that you reviewed the term

14       powder, your interpretation of the term mixing,

15       your interpretation of the term drug-containing

16       matrix, and then you got on the concept of granules

17       versus powders.

18             Just going back to that, was there

19       anything else that you recall regarding Dr. Block's

20       definition -- I mean -- strike that -- regarding

21       Dr. Block's declaration that you reviewed

22       yesterday?

23   A    As I indicated, the background of someone skilled

24       in the art.

25   Q    Ordinary skill in the art.

1    A    Ordinary skill in the art.

2    Q    Yes.

3    A    We discussed an item that I had noted in my review

4         of his materials, as -- as well -- of Dr. Block's

5         declaration, as well as the chapter on

6         compressed -- on medicated lozenges in the book

7         that we've referred to, "Pharmaceutical Dosage

8         Forms."

9              Dr. Block has categorized the

10        processing of medicated lozenges in a manner which

11        is different from that in the "Pharmaceutical

12        Dosage Forms" text.  I'm most comfortable with the

13        latter which distinguishes the processing of -- of

14        medicated lozenges as either molten -- a molten

15        candy-making-type process versus compression.  And

16        I am less familiar with molten candies.  This

17        chapter was a good refresher on what I had known

18        but not directly experienced.

19              Over the years, I have had a

20        tremendous amount of experience with compressed

21        tablets in their development from drug right

22        through to commercial product.  And I have always

23        been familiar with the compressed tablet process as

24        one including wet granulation, dry granulation,

25        et cetera.  That's a manner in which this process

d9de8cd9-f36e-4787-b6b9-47dfcf1cd463

1        is -- is distinguished.

2                        In -- in the text, lozenges are

3        distinguished in their processing by either the

4        molten candy process versus the granule -- or the

5        compressed process.  So, therefore, I see the

6        compressed process as one including any of the

7        several manners of processing material as is used

8        in tablet compression, which would be wet or dry.

9        And I note that Dr. Block distinguishes a wet

10       process or a liquid process is that characteristic

11       of the molten.  So he cuts the -- he cuts the

12       organization of the processing differently than I

13       would have, and so I reviewed that yesterday to

14       remind myself of that.

15   Q   Fair enough.  Anything else?

16   A   With regard -- anything else with regard to

17       Dr. Block's declaration?

18   Q   Correct.

19   A   Yes.  There is reference in Dr. Block's declaration

20       with regard to solubility or the insoluble nature

21       of drugs that could be handled by the patent.  And

22       my understanding of the patent is that while it

23       handles insoluble drugs, it does not preclude the

24       potential granulation and/or compression and

25       processing of materials that are soluble.  And so,

1    you know, that -- that refers back to the patent,

2    but we talked briefly about that concept, and

3    that's my understanding of that.

4                    And I think that really covers

5    what -- what reference we did make to it yesterday.

6    Q    Okay.  Dr. Van Campen, I'm going to show you what's

7    been previously marked as Defendant's Exhibit

8    Number 4, which is a copy of the '737 patent.

9                    Do you have that document before

10   you?

11   A    I do.

12   Q    Is this the patent that you reviewed yesterday with

13   Mr. Teran?

14   A    Yes.

15   Q    Can you tell me what portions of the '737 patent

16   were reviewed yesterday?

17   A    In general, the terms which I referred to in

18   Dr. Block's declaration, it was those areas of the

19   patent that related to that, with one exception,

20   and that is in the claims.

21                    In the claims, the first -- let's

22   see -- okay.  In column 26 --

23   Q    Yes.

24   A    -- where the claims begin, I was refreshed in the

25   discussion which is -- which I include in my