1    declaration of the definition of compromising.  And

2    that's an important qualification for this patent.

3    And so we discussed that in addition to references

4    to the phrases and terms that Dr. Block had used in

5    his declaration and commented on.

6  Q  Okay.  When you met with Mr. Teran yesterday, was

7     anyone else present?

8  A  No.

9  Q  Did anyone else participate in the -- in the

10    meeting by telephone or -- or otherwise?

11 A  No.

12 Q  Did you take any notes of yesterday's meeting?

13 A  No.

14 Q  Did you bring any documents with you today?

15 A  Correction on my previous answer.

16                I noted that I wanted to check my CV

17    to ensure that I was quoting accurately from --

18    from what you may have seen in my records.

19                Let's see.  I was interested in

20    pursuing the nature of -- of artificial vanilla and

21    whether or not I picked up on the possibility,

22    which I had not seen earlier in reviewing one of

23    the examples, that this may include a liquid.

24                And I can't recall; there may have

25    been a few other -- those were the only things.  I

d9de8cd9-f36e-4787-b6b9-47dfcf1cd463

1    took three or four brief notes.  More of my

2    curiosity in ensuring that I would answer you --

3    your questions accurately today.

4  Q  Do you have those -- those notes with you today?

5  A  No, I don't.  I believe I -- I may have thrown them

6    out because I looked up what I wanted to and -- and

7    completed the questions that I had in my mind.

8  Q  So you looked up whether artificial vanilla is a

9    liquid?

10  A  Yes.

11  Q  Is artificial vanilla a liquid?

12  A  I -- I believe the -- well, the extract is a

13    liquid, an ethanolic -- aqueous ethanolic liquid.

14    But on that investigation, I noted that actually

15    early in the patent, they refer to a dry powdered

16    form of it.  And so my note was irrelevant, it

17    appears, to the patent.  But it was of my own

18    curiosity that I made a note to it.

19  Q  So your conclusion was that the artificial vanilla

20    is in dry powdered form -- strike that.

21                    Your conclusion is that the

22    artificial vanilla used in the examples of the '737

23    patent is in dry powdered form?

24  A  Yes.

25  Q  That applied to all the examples that include the

1    artificial vanilla?

2  A    I don't know.

3            MR. TERAN:  Object to form.

4            THE WITNESS:  I don't know.  I don't

5        know.  There are other items for which that same

6        question might be asked, but I didn't pursue it.

7  BY MR. NUTTER:

8  Q    Well, which example are you referring to when you

9        said you were looking at the artificial vanilla

10       that was used in one of the examples?

11 A    In paragraph or in column 23, examples 16, 17, 18,

12       19, 20 all list artificial vanilla and artificial

13       vanilla cream as items that could potentially be in

14       such formulations.

15 Q    And I note that examples 21, 22, and 23 include

16       artificial vanilla as well.  Would --

17 A    Correct.

18 Q    Is it your understanding that that artificial

19       vanilla is also in a dry powdered form?

20 A    I don't recall right now where -- okay.  In column

21       10 there is reference to, at the top of the column,

22       that each of these flavorings is obtainable in a

23       concentrated powder form.  It isn't distinguished

24       in the examples as to whether or not they are used

25       in a powdered form.  One can make the assumption.

d9de8cd9-f36e-4787-b6b9-47dfcf1cd463

Page 33

1          I was following up as much as anything to

2          understand this material, is it -- it's

3          distinguished from vanilla extract and so forth.

4    Q    Okay.  Excellent.

5                    So -- so you made a note to yourself

6          to follow up on the artificial vanilla and you did

7          that, and you made a note to check your CV?

8    A    Yes.

9    Q    And what were you checking your CV for?

10   A    If you were to have asked me what years I moved

11         from a position of responsibility that took on

12         solid dosage forms versus additional dosage forms,

13         I wanted to be able to answer that accurately for

14         you.  It's been -- I've been in the business a long

15         time and thought it would be best to refresh my

16         history of dates.

17   Q    And anything else that you made a note for yourself

18         to follow up on?

19   A    I can't recall.  I think there was one other item,

20         but I don't recall.  So I presume --

21   Q    If you recall at any time throughout the day --

22   A    I --

23   Q    -- let me know.

24   A    I will.

25   Q    Is it your normal practice to throw away notes?

Page 34

1          MR. TERAN:  I object to form.

2          THE WITNESS:  It depends on if I have

3     finished exercising why I took them in the first

4     place.  And in this case, it was perhaps a dozen

5     words' worth on a piece of paper, and I had

6     finished with my questions.

7   BY MR. NUTTER:

8   Q     Okay.  Usually about now I try to learn more about

9         your education and your employment background, as I

10        think you suspected.  But I know we're all, you

11        know, eager to leave here as soon as possible and

12        there's sort of a gentlemen agreement in place that

13        we're going to try to limit these to a half a day.

14        So I'm hoping that if I can refer you to your

15        declaration, which is, I believe, Defendant's

16        Exhibit Number 52, and if I can ask you to turn to

17        your CV which I believe is attached.  Is this a

18        current -- and that's attached as Exhibit -- strike

19        that.

20               And your CV is attached as Exhibit A

21        to your declaration; is that correct?

22  A     Yes.

23  Q     Now, to the best of your knowledge, is this the

24        current copy of your CV?

25  A     Actually, referring to my CV, I found a mistake,

d9de8cd9-f36e-4787-b6b9-47dfcf1cd463

1    and so in the last 24 hours, I have updated it.

2    But otherwise, yes, it's current.

3  Q    Okay.  What mistake did you find?

4  A    The line on page 1, Inhale Therapeutic Systems,

5       Inc., my reference to the dates, I believe the

6       computer automatically changed that to 2001 to

7       2002.  I had had this problem, you know, in the

8       past year when I updated my CV.  And I changed the

9       2001 to read 1996 to 2002 to encompass the full

10       period of time I was with Inhale.

11                   And that is all.

12  Q    Okay.  Other than that typographical error, has

13       anything else changed that would impact the

14       accuracy of this CV since you submitted your

15       declaration?

16  A    No.

17  Q    Can you describe for me what Zeeh Pharmaceutical

18       Experiment Stations is?

19  A    Yes.  The Pharmaceutical Experiment Station had

20       been supported by the State of Wisconsin from the

21       19- -- from 1913 and on, and operated for 20 years

22       to -- for the purpose of providing a -- a

23       laboratory wherein pharmaceutical plants or plants

24       of pharmaceutical interest could be extracted and

25       used in research and tested for their potential

1    effectiveness as medicines.  The station went

2    dormant as of the Depression.  And in the last 12

3    years now, the several faculty members at the

4    School of Pharmacy attempted to revive it with a

5    renewed mission.

6                And as of December 2003 when I

7    joined the Pharmaceutical Experiment Station as

8    director, we revived the station as an organization

9    which would support pharmaceutical development as

10   it relates to the research of new potential

11   therapeutics from academic laboratories and their

12   early development work which was not otherwise

13   supportable by any laboratory on campus, the early

14   development work relevant to pharmaceutical dosage

15   forms and -- and understanding the physical

16   chemical behavior of a potential therapeutic.  And

17   in addition, to serve industry, should they bring a

18   protocol to the laboratory, that we could execute

19   on that protocol and bring the expertise that I

20   bring from industry, as well as the expertise of

21   the understanding of pharmaceutical systems that

22   the faculty bring to bear on -- on solving, in many

23   cases, some very difficult problems that are

24   encountered during the course of drug development.

25                We also have an educational program.

1  Q    Okay.  So if I can try to summarize that to the

2       best of my ability, and I'm sure I'm not going to

3       do this very well.

4                    Is it -- is it fair to say that it's

5       an educational environment where, at your

6       direction, students learn by -- by performing work

7       on behalf of outside companies?  Is my

8       understanding correct or -- or not?

9              MR. TERAN:  Object to form.

10             THE WITNESS:  I would state it

11      differently.  That may be a small part of it.  But

12      my intent is to provide educational opportunities

13      through perhaps bringing students in to the

14      laboratory.  But I have a full-time staff who

15      execute on protocols which we either develop on

16      behalf of our clients.  And the clients could be a

17      research team on campus or it could be a company

18      locally or a company such as Cephalon at a

19      distance.

20  BY MR. NUTTER:

21  Q    And this full-time research staff, those are not

22      students; those are full-time professionals?

23  A    Correct.

24  Q    Okay.  Perhaps now is a good time to explore your

25      prior experience as a testifying expert.

1          Have you ever had your deposition

2     taken before?

3  A   Yes.

4  Q   How many times have you had your deposition taken

5     before?

6  A   Once.

7  Q   Who was that on behalf of?

8  A   It was on behalf of Wilmer Cutler, et al.,

9     representing Cephalon.

10 Q   So you were retained by the Wilmer Cutler firm to

11    testify on behalf of Cephalon in a different

12    litigation, correct?

13          MR. TERAN:  I object to form.

14          THE WITNESS:  Yes.

15 BY MR. NUTTER:

16 Q   Do you recall whether Barr was a defendant in that

17    litigation as well?  By "Barr," I mean Barr

18    Laboratories.

19 A   Yes, I do.

20 Q   Was Barr Laboratories a defendant in that

21    litigation as well?

22 A   Yes.

23 Q   And have you ever testified at trial before?

24 A   No.

25 Q   So including this case, how many times have you

1       testified on behalf of Cephalon?

2   A   Twice.

3   Q   Now, how many times have you been retained by the

4       Wilmer Cutler firm as an expert for one of their

5       clients?

6               MR. TERAN:  Object to form.

7               THE WITNESS:  Twice.

8  BY MR. NUTTER:

9   Q   Both times on behalf of Cephalon?

10  A   Correct.

11  Q   Are you the named inventor on any U.S. patents?

12  A   No.

13  Q   Are you the named inventor on any patents?

14  A   No.

15  Q   Do you have any prior experience regarding U.S.

16      patents?

17  A   Yes.

18  Q   What type of experience with U.S. patents do you

19      have?

20  A   I would estimate that over the years scientists for

21      whom I've been responsible as their manager in

22      different settings have perhaps applied for and

23      obtained patents on the order of 20 to 30 patents.

24      I've not looked rigorously to see how many that

25      would be, but my name as a -- as a co-inventor does

1    not appear.  This was work done by people who were

2    in my department -- departments.

3  Q    So people that you've worked with or have worked

4    for you have obtained patents?

5  A    Yes.

6  Q    Now, when those people obtained their patents, did

7    you play a role in the patenting process?

8          MR. TERAN:  Object to form.

9          THE WITNESS:  As their supervisor, I

10    often was asked or was interested and asked to

11    review the patent that was drafted for application.

12  BY MR. NUTTER:

13  Q    So you -- in the past, you've reviewed draft patent

14    applications before they were filed?

15  A    Yes.

16  Q    Any other experience with -- with U.S. patents

17    besides reviewing the draft applications?

18  A    Let's see.  I can't think of specific examples, but

19    there certainly have been times when, in my

20    previous employment, potentially competing patents

21    that had already issued and how they were

22    distinguished from what our plans were in terms of

23    invention were a subject of discussion from the,

24    you know -- through the legal group in that

25    setting; and I -- you know, I took part in some of

1    those discussions.

2  Q   Now, you said a prior employer.  Do you recall

3    which employer this was?

4  A   Inhale Therapeutic Systems and potentially at

5    Boehringer Ingelheim.  I don't recall specifics

6    there.

7  Q   So during your time with Inhale Therapeutic

8    Systems, you recall times when you were made aware

9    of competing patents and then you were asked to

10    review those to determine whether or not the R & D

11    that you were working on would fall within the

12    scope of those patents; is that fair?

13            MR. TERAN:  I object to form.

14            And let me just caution you, Doctor,

15    that it's possible that some of these questions may

16    sweep in communications between lawyers and

17    individuals at your previous employers that could

18    be privileged either as attorney-client if they

19    were between attorneys and individuals at the

20    company or if they were in anticipation of

21    litigation.

22            Obviously, you're the best judge of

23    that, but I just want to caution you that that may

24    be the case and you may want to keep aware of that

25    as you answer these questions.  But you may answer.

1    BY MR. NUTTER:

2    Q    And, Dr. Van Campen, that's a fair instruction.  I

3         certainly do not want you to get into any

4         privileged communications.  I just want to have a

5         general understanding of your experience with

6         patents.  And it sounded to me from your previous

7         answer that you had mentioned that at times during

8         your employment at Inhale Therapeutic Systems you

9         were made aware of competing patents and then you

10        were asked to -- or you participated in

11        conversations regarding those competing patents and

12        how it related to, I guess, what you were doing for

13        Inhale Therapeutic Systems.

14                      So I just wanted to -- maybe you can

15        just confirm for me whether my understanding is

16        accurate and, if not, if you could clarify.

17   A    In summary, I would say I was always peripheral to

18        those discussions.  Never responsible for rendering

19        judgment, but simply peripheral in offering any

20        technical insight around them.

21   Q    Now, I believe earlier today you testified, in

22        answer to one of my questions, that you were first

23        contacted regarding this case sometime in mid-July.

24                      Does that seem about --

25   A    Yes.

Page 43

1   Q   -- right?

2   A   Yes.

3   Q   Is that when you first became aware of the present

4       litigation between Cephalon and Barr Laboratories

5       regarding the '737 patent?

6   A   Yes.

7   Q   And how did you become aware of this litigation?

8   A   I was informed that there was a case that I might

9       be brought to perform as an expert witness on that

10      involved some distinction in processing and no

11      more.  And once I received materials to review, I

12      reviewed them.  I reviewed them as -- as suggested

13      and came to some conclusions, which led to the

14      process that I've described earlier.

15  Q   Now, who asked you to do this?

16  A   I believe the first e-mail communication came from

17      Holly Baker of Wilmer Cutler, and it was she who

18      handled the confidentiality agreement.

19  Q   Okay.  We can get into the confidential agreement

20      in a little bit.

21                  At the time, if you recall, of the

22      e-mail communication, were you asked at that time

23      to render an opinion?

24  A   No, I was not provided materials until that

25      agreement was executed.

d9de8cd9-f36e-4787-b6b9-47dfcf1cd463

Page 44

1  Q    What opinions have you been asked to provide in

2       this case?

3                 MR. TERAN:  Object to form.  You may

4       answer.

5                 THE WITNESS:  We've spoken to some

6       phrases and terms in the patent and in literature

7       that is relevant to the technology at hand, and I

8       have been asked to interpret those in my own

9       understanding, and I have done so and my

10      declaration reflects that.  And with the

11      explanation of -- of the manner in which the claims

12      were set forward, again, my declaration reflects

13      that.

14 BY MR. NUTTER:

15 Q    Have you been asked to provide any opinion on

16      whether Barr's ANDA product infringes the claims?

17 A    No.

18 Q    Have you ever been asked to provide any opinion

19      regarding the validity of the '737 patent?

20 A    No.

21 Q    Have you had any conversations with Cephalon

22      employees regarding this case?

23 A    No.

24                MR. NUTTER:  Perhaps now is a good time

25      for a break.

Page 45

1              MR. TERAN:  Sure.

2              VIDEO TECHNICIAN:  We are off the record

3       at 9:58 a.m.

4              (A recess was taken.)

5              VIDEO TECHNICIAN:  We are back on the

6       record at 10:06 a.m.

7  BY MR. NUTTER:

8  Q    Dr. Van Campen, if I can have you refer back to

9       your declaration, which I believe has been marked

10       as Defendant's Exhibit Number 52.

11              Do you have that before you?

12  A    I do.

13  Q    Now, is it the declaration you submitted in support

14       of Cephalon's reply brief on claim construction?

15  A    Yes.

16  Q    If I could ask you to turn to page 10 of your

17       declaration.

18  A    (Witness complying.)

19  Q    Is that your signature?

20  A    Yes, it is.

21  Q    Is it correct that you signed this document on

22       August 12th, 2005?

23  A    Yes.

24  Q    Now, did you get a chance to fully review and

25       comprehend the declaration before you signed it?

1    A    Yes.

2    Q    Now, does Exhibit 52 truly and accurately reflect

3         your opinions about the state of the art relevant

4         to the '737 patent at the time that patent was

5         filed?

6    A    Yes, it does.

7    Q    Does Exhibit 52 truly and accurately reflect your

8         opinions about who a person of ordinary skill in

9         the art would have been at the time the '737 patent

10        was filed?

11   A    Yes, it does.

12   Q    Does Exhibit 52 truly and accurately reflect your

13        opinions about the construction of various terms in

14        the claims of the '737 patent?

15   A    Yes.

16   Q    Now, if I can have you refer to paragraph 36 of

17        your declaration.

18   A    (Witness complying.)

19   Q    In this paragraph you state, and I quote, you

20        "reserve the right to supplement or amend this

21        declaration as appropriate."

22             Do you see that?

23   A    Yes.

24   Q    Have you done so?

25   A    No.

1   Q    Do you intend to supplement or amend this

2        declaration at this point?

3   A    No.

4   Q    Does the declaration currently and accurately

5        represent all of your opinions in this case at this

6        point?

7              MR. TERAN:  I object to form.

8              THE WITNESS:  Yes.

9   BY MR. NUTTER:

10  Q    Now, who wrote your declaration?

11  A    It's my understanding that Mr. Teran drafted the

12       declaration.

13  Q    How was the draft declaration communicated to you?

14  A    I'm not sure if it was by e-mail as an attachment

15       or by fax.  Or by FedEx, rather.  I believe it was

16       by e-mail.

17  Q    Okay.  I just want to get a general understanding

18       of -- as to the process by which the draft was

19       created and then reviewed and approved and

20       eventually signed by you.

21  A    Okay.

22  Q    So my understanding is that you were sent materials

23       that we've already discussed and you reviewed those

24       materials; is that correct?

25  A    Correct.

Page 48

1   Q   And then you had -- I believe you testified that

2       you had a lengthy telephone conference with Greg

3       Teran regarding your thoughts of those -- of those

4       documents?

5   A   Yes.

6   Q   Was anyone else on the telephone call at that time?

7   A   No.

8   Q   And it was during that conference that Mr. Teran

9       offered to prepare a draft of your declaration; is

10      that correct?

11  A   Yes.

12  Q   And then that draft declaration was sent to you

13      either by e-mail or fax; is that correct?

14  A   Yes.

15  Q   What -- what did you next do with that draft

16      declaration?

17  A   I read it carefully and made annotations with

18      regard to where I wished to state something in a

19      different manner so as to reflect my understanding

20      of the terms and phrases at hand.  And our next

21      communication was within a day or two on -- by

22      phone that we went through methodically the points

23      of the declaration and -- and modified any

24      statements that I felt didn't clearly reflect my

25      understanding and -- and position on the questions.

Page 49

1   Q   When you initially -- strike that.

2               When you read the first draft that

3       was sent to you either by e-mail or by fax, did you

4       understand everything in that draft?

5   A   Yes, I did.

6   Q   And I believe you previously testified that you

7       made annotations to the draft as you read it; is

8       that correct?

9   A   That's correct.

10   Q   Now, when you say "annotations," is that another

11       way of saying "revisions" or --

12   A   Yes.

13   Q   How were these annotations made?  Did you

14       physically write them onto the -- the draft

15       document?

16   A   I believe I may have -- there were only several.

17       There were only a couple.  And I believe I used

18       Post-it notes with suggested amendments.

19   Q   Did you save those Post-it notes?

20   A   I may have.

21   Q   Did you save that first draft of your declaration?

22   A   Yes.

23   Q   Now, you said that there were a couple of

24       annotations.  Do you recall what those annotations

25       were?

d9de8cd9-f36e-4787-b6b9-47dfcf1cd463

1    A    Yes.  On page 4, the definition that Dr. Block had

2         offered with regard to a person of ordinary skill

3         in the art, I discussed with Mr. Teran why I

4         differed in some respects with Dr. Block's

5         definition; and this is rather clearly stated in

6         the -- the declaration, the manner in which I

7         deferred.

8    Q    So what was the annotation suggested by you?

9    A    The changes dealt with two issues: the educational

10        background and Dr. Block's definition that it would

11        require a background in pharmacy and a graduate

12        background, plus experience.

13                    I suggested to Mr. Teran that, in my

14        view in industry in all these years, that

15        oftentimes the person most skilled in the art, of

16        ordinary skill, is that of a pharmacist whose

17        training involved industrial pharmacy, especially

18        in the 1980s, and without any graduate education,

19        but, rather, perhaps as little as four years of

20        experience would be able to interpret the patent in

21        a manner that is consistent with, you know, my

22        interpretation, and -- and I would have confidence

23        in that interpretation.

24                    And he also defined the years

25        required with -- for those who have an academic

Page 51

1     background.

2                    If you would like, I can look

3     specifically to those paragraphs and go through

4     the -- the changes.  But they involved, again, two

5     things as I recall.  One, that one can have a

6     background other than pharmacy as long as it is

7     inclusive of some experience in the industrial

8     setting.  And secondly, the number of years of

9     experience -- which are not different, very

10    different; I think four versus six years -- I was

11    suggesting that as little as four years would

12    suffice.

13  Q  Okay.  I understand what's in your declaration as

14    it was submitted with your -- with the reply brief

15    and I understand from your testimony what it was

16    that you suggested via your annotation.  How does

17    that differ from what was included in the first

18    draft that was sent to you?

19  A  I don't recall that it differed much because -- I

20    don't recall specifically.

21                    But secondly, the discussion that

22    Mr. Teran and I had on the telephone before he

23    drafted this document was such that he knew that I

24    differed with Dr. Block in these credentials, and

25    so he captured that largely in the initial draft.

1    And so I don't recall.  It was

2    perhaps that I felt I had been more different from

3    Dr. Block in the number of years than really

4    necessary.  I could concede that -- you know, we

5    were in fair agreement, but there were some

6    distinct differences, one of which was this

7    background only in pharmacy.

8  Q  So the annotation that you provided was just a

9    further clarification of the differences between

10   you and Dr. Block?

11 A  That's right.  And, if anything, reducing the

12   differences.

13 Q  And these are differences in the -- the definition

14   of one of ordinary skill in the art at the time the

15   '737 patent was filed; is that correct?

16 A  Correct.

17 Q  Now, I believe earlier you testified that it was at

18   least a couple of annotations.  Do you recall any

19   other annotations that you provided to Mr. Teran?

20 A  I am not sure that the other annotation -- I am

21   thinking there were only two -- was much more than

22   clarification of the phraseology, and I'm not sure

23   that even resulted in a change from the draft.

24 Q  So is it -- is it fair to say that other than a --

25   it sounds to me like a few minor annotations,

Page 53

1    you -- you accepted, in whole, the draft

2    declaration that was provided to you by Greg Teran?

3                MR. TERAN:  I object to form.

4                THE WITNESS:  Yes.

5    BY MR. NUTTER:

6    Q    Now, if I can go back a bit.  And I guess I'm going

7         to have to test your memory a little bit, and I

8         apologize for that.

9                     After you had this day-long

10        telephone conversation with Mr. Teran regarding

11        your review of the documents, I believe you

12        testified that a draft of the declaration was then

13        sent to you by e-mail or fax.  Is that correct?

14                MR. TERAN:  Object to form.

15                THE WITNESS:  Right.

16   BY MR. NUTTER:

17   Q    Do you -- do you know about how much time it was

18        from the conference to when you received that first

19        draft?

20   A    He indicated that it was an urgent matter and that

21        he would try to turn the draft around within 24

22        hours, which he did -- I believe 24, perhaps 48,

23        but within the next day or two, such that I could

24        be awaiting its arrival and give it quick

25        attention.

d9de8cd9-f36e-4787-b6b9-47dfcf1cd463

1  Q   Then how long after you received that draft did you

2      have another conversation with Mr. Teran?

3  A   I reviewed it immediately, and it was within a

4      workday.

5  Q   How did you let Mr. Teran know that you had

6      completed your review?

7  A   I gave him a phone call.

8  Q   Did you discuss review at that time or did you set

9      up a conference for -- strike that.

10                 Did you have a meeting at the time

11     that you called him, or did you set up a time later

12     to discuss?

13 A   I don't recall.

14 Q   Now, this second meeting, what was discussed at

15     this second meeting after you had a chance to

16     review the draft declaration?

17 A   We reviewed his draft.  I indicated to him -- and

18     we had some discussion around the definition of a

19     person of ordinary skill in the art.  And I

20     explained to him why I was more comfortable perhaps

21     considering Dr. Block's credentials and that they

22     need not be that different.  It's a very subjective

23     thing, but in my experience, there were some

24     differences I felt were key and that those we -- we

25     retained.

1           And the other items, again of

2      punctuation and/or phraseology, and I don't recall

3      the specific differences, remained such that the

4      draft was actually changed.  But all that being

5      discussed in a phone call, I was very comfortable

6      with signing the document, and therefore, he sent a

7      final draft to me for signature, I believe by

8      FedEx, following that discussion, which I don't

9      recall was very lengthy.  Perhaps an hour.

10  Q    Okay.  So you reviewed the draft declaration, you

11      had a couple comments, you had roughly about an

12      hour phone call with Mr. Teran to discuss those

13      comments, and then it's your recollection that the

14      final form of your declaration was FedEx'd to you

15      for signature?

16  A    Yes.

17  Q    If I could have you turn to Exhibit B of your

18      declaration.

19  A    (Witness complying.)

20  Q    What is shown in Exhibit B?

21  A    These are the items that Mr. Teran had called my

22      attention to with regard to preparation of my

23      understanding of the patent.

24  Q    So these were the materials that you reviewed prior

25      to rendering your opinion; is that correct?

Page 56

1    A    Yes.

2    Q    How were these materials provided to you?

3    A    I received them by FedEx as soon as the

4         confidentiality agreement was in place.

5    Q    To the best of your recollection, were any of these

6         documents marked "confidential"?

7    A    I don't recall.  But I -- in looking at Dr. Block's

8         declaration as an item which I might consider

9         confidential, I don't see that marking on it.  So

10        my recollection is -- is probably not.

11   Q    When you received these documents via FedEx, were

12        they marked up in any way when you received them?

13                  MR. TERAN:  Object to form.  You may

14        answer.

15                  THE WITNESS:  No.

16   BY MR. NUTTER:

17   Q    So no portions were highlighted?

18   A    No.

19   Q    Were there any Post-it notes on particular

20        portions?

21   A    No.

22   Q    Was there any other communication that was provided

23        to you with these documents that were sent to you

24        via FedEx?

25   A    There were additional documents.

1    Q    What additional documents were sent to you?

2    A    I believe there was additional history around the

3         response of the patent office to the patent.  And

4         this may in fact be, in part, the office action.

5         But there was a considerable amount of material

6         which, to be honest, I did not review.

7    Q    Do you think there was additional portions of the

8         prosecution history that was provided to you?

9    A    Yes.

10   Q    Any other documents?

11   A    I don't believe so.

12   Q    At any time during your conversations with Greg

13        Teran was Barr's ANDA discussed?

14   A    No.

15   Q    As you sit here today, do you have an understanding

16        as to how Barr's ANDA product is prepared?

17   A    No.

18   Q    Now, did you ask any of the attorneys for Cephalon

19        for any additional documents beyond those listed in

20        your declaration?

21   A    No.

22   Q    And other than the additional portions of the

23        prosecution history which we just discussed, have

24        any other documents been provided to you by

25        Cephalon's attorneys that are not listed in your

Page 58

1          declaration?

2     A    No.

3     Q    Now, did you write every aspect of your

4          declaration?

5                    MR. TERAN:  Object to form.

6                    THE WITNESS:  Well, as I noted, Mr. Teran

7          drafted the declaration, but I reviewed it word by

8          word.  And I could have been comfortable having

9          drafted this myself had I known the form and so

10         forth by which that needed to be done.

11                   So, no, I did not write it directly.

12         Yes, I had comment on every word of it and am

13         comfortable with it as stated.

14    BY MR. NUTTER:

15    Q    Now, after you reviewed the initial draft and you

16         had the second telephone call with Mr. Teran, were

17         any -- were any changes suggested by him to your

18         declaration?

19    A    No.  He invited me only to comment on anything and

20         everything in the declaration draft, and I did so

21         as per our previous discussion.  And it resulted in

22         relatively few changes which I've described to you.

23    Q    Now, were you ever asked to take positions in your

24         declaration that you did not agree with?

25    A    No.

1   Q    Now, were there any opinions in the original draft

2        of your declaration that were removed because you

3        didn't agree with them?

4   A    No.

5   Q    Now, did you offer or provide any opinions that the

6        lawyers did not agree with?

7                 MR. TERAN:  I object.

8                 THE WITNESS:  No.

9   BY MR. NUTTER:

10  Q    Did you propose any changes to your draft

11       declaration that the lawyers did not agree with?

12  A    No.

13  Q    Now, as you sit here today, is there anything that

14       you would like to add to your declaration?

15  A    No.

16  Q    Is there anything that you'd like to delete from

17       your declaration?

18  A    No.

19  Q    Okay.  Now, let's just step away from your

20       declaration for a second.

21                 Approximately how much time have you

22       spent working on this case?

23  A    I would total it at 10, plus or minus a few hours.

24       On the order of 10 hours.

25  Q    10 hours?

Page 60

1   A   Yeah.

2   Q   Do you keep a log of the time that you spend on

3       this case?

4   A   Yes, I do.

5   Q   Now, does the log that you keep separate this case

6       from the other Cephalon case that you're working

7       on?

8   A   Yes.

9   Q   Now, what is your hourly rate?

10  A   I believe it -- I -- I am not sure.  I have several

11      rates, depending on the nature of the business.

12      And we recently revised them, and I would not want

13      to misquote.  I could estimate, but I wouldn't want

14      to misquote.

15  Q   Now, the compensation that you receive as an expert

16      testifying for Cephalon, is that compensation that

17      you benefit directly from or does that go to the

18      Zeeh Pharmaceutical Station?

19              MR. TERAN:  Object to form.

20              THE WITNESS:  It comes to me.  I have

21      made a habit of turning a significant proportion of

22      such proceeds to -- back to as a donation to the

23      station.

24  BY MR. NUTTER:

25  Q   Is that a tax-deductible donation?

1    A    Yes.

2    Q    Now, I know you said you weren't sure so I'm not

3         sure if you can answer this question, but do you

4         typically charge a higher rate for depositions and

5         courtroom appearances?

6    A    This year I've instituted that, yes.

7    Q    Now, is there a chance you would receive any

8         additional compensation depending on the outcome of

9         this litigation?

10   A    No.

11   Q    Do you have any ownership interest in Cephalon,

12        Inc.?

13   A    No.

14   Q    Do you have any ownership interest in any companies

15        related to Cephalon, Inc.?

16   A    I do have stock investments in the pharmaceutical

17        industry, yes.

18   Q    Are you aware of any stock investments of companies

19        that are -- that are related to Cephalon, Inc.?

20   A    Related in what -- what manner?

21   Q    I would expect related in the financial sense.

22                MR. TERAN:  To the extent you know.

23                THE WITNESS:  Yeah.  No.

24   BY MR. NUTTER:

25   Q    Okay.  Do you have any ties to the University of

1    Utah or the University of Utah Research Foundation?

2  A    No.

3              MR. NUTTER:  If I can have this marked as

4    the next exhibit.

5              (Exhibit 54 marked for identification.)

6              (A discussion was held off the record.)

7  BY MR. NUTTER:

8  Q    Dr. Van Campen, you've just been shown what's been

9    marked as Defendant's Exhibit Number 54, which is a

10    copy of the confidentiality undertaking in this

11    case that you signed; is that correct?

12  A    Yes.

13  Q    Why did you sign this document?

14  A    I understood it to be a necessary part of the

15    process towards serving Cephalon or -- or Wilmer

16    Cutler on behalf of this case.

17  Q    Did anybody explain to you the -- the purpose of --

18    of that document?

19  A    Mr. Teran discussed implications of the protective

20    order briefly.

21  Q    Now, I believe earlier you testified that this

22    document was signed before your declaration was

23    prepared in this case.  Is that correct?

24  A    Yes.

25  Q    And I believe earlier you testified this document

1    was signed before you formulated your opinions

2    described in your declaration.  Is that correct?

3  A    Yes, I believe so.

4  Q    Do you recall whether you've been shown any of

5    Barr's confidential material?

6  A    I have not received any material confidential to

7    Barr.

8  Q    Do you recall whether any of Barr's confidential

9    material has been discussed or communicated to you

10    in any way by Cephalon's attorneys?

11  A    Yes.  And, no, we have not.

12  Q    So that's yes, you recall, and no, you have not?

13  A    Yes, I recall, and no, I have not.

14  Q    Do you have any -- any intent to do further work in

15    this case?

16  A    No.

17  Q    Okay.  If I could have you -- refer you again to

18    your declaration, which is Defendant's Exhibit

19    Number 52.  And if I could have you turn to page 4

20    to the section entitled -- or Section 2 entitled

21    "Person of Ordinary Skill in the Art."

22            Do you have that before you?

23  A    I do.

24  Q    What's your understanding of the phrase "person of

25    ordinary skill in the art"?

1   A     I've thought about this question.  I have not

2         necessarily formulated a -- a strong opinion around

3         this except to say that one of exceptional skill

4         might be someone who has conducted research in the

5         area and has a very unique level of skill shared by

6         very few.

7                Ordinary skill would be, in my view,

8         the person who represents the skill associated with

9         any pharmaceutical development laboratory or

10        manufacturing area wherein various dosage forms are

11        manufactured and who brings to that setting some

12        level of experience which I have rendered an

13        opinion on here, as well as a technical

14        understanding by virtue of a pharmacy or chemistry

15        or engineering background.

16   Q     Okay.  I think I have a pretty good understanding

17         of your definition of one of ordinary skill in the

18         art as it relates to the '737 patent; that's in

19         your declaration.  I guess I'm asking more for your

20         just general understanding of the concept of a

21         person of ordinary skill in the art.

22   A     That's actually --

23              MR. TERAN:  Object to form.

24              THE WITNESS:  -- what I was -- I was

25         responding to that question, one of ordinary skill

1    in the -- in the pharmaceutical development

2    setting, if that's what you meant.

3  BY MR. NUTTER:

4  Q    Okay.  You narrowed it to the pharmaceutical

5    setting.  I was just asking just generally, not

6    limited to any particular art.  Perhaps that

7    doesn't change your response.

8            MR. TERAN:  Object to form.

9            THE WITNESS:  Ordinary skill would

10   suggest to me not unique where there are only a few

11   people but, rather, a general level of skill that

12   indicates competence and some level of

13   responsibility in that setting as opposed to a

14   technician who is not responsible for other than

15   execution but, rather, one of ordinary skill who is

16   capable of a level of -- of leadership in terms of

17   executing on -- on a particular job.

18  BY MR. NUTTER:

19  Q    And -- and you've rendered your opinion regarding

20   the definition of a person of ordinary skill in the

21   art based on that understanding; is that correct?

22  A    Yes.

23  Q    Now, what documents did you consider before

24   reaching your opinion regarding the definition of a

25   person of ordinary skill in the art as it relates

1          to the '737 patent?

2    A     I had reviewed Dr. Block's definition, but I did

3          not need that in order to render an opinion

4          inasmuch as my experience brings me to a -- a

5          modified version of the definition of those

6          credentials.

7    Q     So did you review any other documents besides

8          Mr. Block's -- I'm sorry, Dr. Block's declaration?

9    A     With regard to this issue, no.

10   Q     And if I could have you focus on paragraph 12 of

11         your declaration, and if I could have you just

12         briefly review that.

13   A     (Witness complying.)  Yes, I've done that.

14   Q     Okay.  Now, in paragraph 12 you state, and I quote,

15         "I agree with Dr. Block that the pertinent art for

16         interpreting the '737 patent is pharmaceutic in

17         nature, with an emphasis on solid dosage forms and

18         their manufacture."

19              You then also write, "In my opinion,

20         the art of preparing medicated lozenges would be of

21         particular interest in interpreting the '737

22         patent."

23              Do you see those quotes in your

24         paragraph 12?

25   A     Yes.

1  Q    Do you believe that the art of preparing medicated

2       lozenges is distinct from the art to which

3       Dr. Block refers?

4                    MR. TERAN:  Object to form.

5                    THE WITNESS:  Could you repeat the

6       question, please.

7                    MR. NUTTER:  Could you read back the

8       question.

9                    (The preceding question read by the

10      reporter.)

11                   MR. TERAN:  Same objection.  You may

12      answer.

13                   THE WITNESS:  I believe Dr. Block refers

14      to the art of preparing medicated lozenges, and I

15      understand your question to suggest that he does

16      not.

17 BY MR. NUTTER:

18  Q    It seems in paragraph 12 you're comparing your

19      opinion to -- to that of Dr. Block's as if it's --

20      they're different.  Are you saying that you agree

21      with Dr. Block's opinion?

22                   MR. TERAN:  I object.  You may want to

23      take a look at Dr. Block's declaration on this

24      point before answering.

25                   THE WITNESS:  I was questioning the

1    general reference of Dr. Block to the art of

2    medicated lozenges.  I know he does refer to it,

3    and my statement is simply that this is of

4    particular interest in interpretation -- in the

5    interpretation of the '737 patent.

6    BY MR. NUTTER:

7    Q    So as you sit here today, would you describe the --

8         the pertinent art for interpreting the '737 patent

9         to be solid dosage forms and their manufacture, or

10        would you consider it to be the preparation of

11        medicated lozenges?

12                  MR. TERAN:  I object.

13                  THE WITNESS:  I see the preparation of

14        medicated lozenges as a subset of solid dosage

15        forms.

16   BY MR. NUTTER:

17   Q    Okay.  And I appreciate that distinction.  I guess

18        I'd -- if you could respond to my original

19        question.

20                  Which one of those would you think

21        is a better description of the pertinent art: solid

22        dosage forms and their manufacture or the

23        preparation of medicated lozenges?

24                  MR. TERAN:  I object.

25                  THE WITNESS:  Inasmuch as the processing

1    overlaps both of those areas and is common to those

2    areas, I can't easily distinguish them.  I think

3    they are both important, but medicated lozenges, as

4    a subset, is clearly important to this patent.

5    BY MR. NUTTER:

6    Q    So do you believe that one of ordinary skill in the

7         art should have a background in preparing medicated

8         lozenges?

9                   MR. TERAN:  I object.

10                  THE WITNESS:  Familiarity, yes.  And

11   perhaps familiarity from an educational background

12   would be sufficient to identify with the procedures

13   relevant to this patent.

14   BY MR. NUTTER:

15   Q    What do you mean by "familiarity"?

16   A    For one who has had a pharmaceutical technology

17        background from his or her education, they would

18        have discussed, to some degree, the principles of

19        medicated lozenges as a delivery system for -- for

20        drugs.  To the degree that the processing involved

21        in preparing those overlaps with that which is a

22        larger body of -- of information in the -- in the

23        tablet compression area, for example, that would be

24        a very relevant area of -- of experience and

25        knowledge that would pertain to the -- the patent's

1      preparation methods for medicated lozenges.

2  Q    Okay.  I'm -- I guess I'm just trying to understand

3      how much of a familiarity we're talking about.  I

4      mean, if -- if I'm taking a class and there's a

5      textbook and one of the textbooks is on medicated

6      lozenges and I read that -- that chapter, would I

7      then be familiar enough with medicated lozenges to

8      be one of ordinary skill in the art?

9              MR. TERAN:  I object, incomplete hypo.

10             THE WITNESS:  Without having had

11     experience in the development of solid dosage forms

12     in general, I would say no.

13 BY MR. NUTTER:

14  Q    Okay.  If I can have you turn to page 5 of your

15     declaration.

16  A    (Witness complying.)

17  Q    Now, in paragraphs 14 through 17, it appears you

18     disagree with Dr. Block's assessment of the

19     qualifications that one must have in order to be

20     one of ordinary skill in the art.  Is that correct?

21  A    Yes.

22  Q    And, in fact, you -- you give your own assessment

23     of the minimum requirements to be one of ordinary

24     skill in the art in paragraph 16.  Is that correct?

25  A    Yes.