Page 71

1   Q    Now, would someone of ordinary skill in the art

2        under Dr. Block's standard qualify as one of

3        ordinary skill in the art under your standard?

4   A    There's a significant overlap, yes.

5   Q    But you would admit that Dr. Block's standard

6        requires more experience or more education than

7        your standard.  Is that correct?

8              MR. TERAN:  Object to form.

9              THE WITNESS:  In one sense, he has a

10       narrower -- narrower definition based on a pharmacy

11       background, but extends that to requiring graduate

12       education and relevant experience.  Whereas, my

13       definition broadens the technical background but

14       does not necessarily require a graduate education.

15  BY MR. NUTTER:

16  Q    My -- I guess my question is, if someone had the

17       qualifications to satisfy Dr. Block's standard for

18       one of ordinary skill in the art, wouldn't they

19       necessarily then also satisfy your standards?

20  A    Yes.

21  Q    And the same could not be true vice versa?

22             MR. TERAN:  I object.

23             THE WITNESS:  Yes.

24  BY MR. NUTTER:

25  Q    And why is that?

1    A    I give perhaps more credence to the education

2         gained through experience in the industrial setting

3         than does Dr. Block.

4    Q    Now, isn't it true that knowledge gained through

5         experience may allow you to solve problems but,

6         without the proper education, you wouldn't

7         appreciate everything regarding those problems?

8    A    Yes.

9                   MR. TERAN:  Object.

10   BY MR. NUTTER:

11   Q    Now, let's look at your paragraph 14.  In this

12        paragraph you state, and I quote, "I disagree with

13        Dr. Block regarding the minimum requirement of a

14        graduate degree in pharmacy.  In my experience,

15        both today and in the 1985 through '87 time frame,

16        I have encountered individuals working in the field

17        of solid dosage forms and their manufacture who I

18        would consider to be of at least ordinary skill yet

19        do not have graduate degrees.  Furthermore, there

20        are other fields of study besides pharmacy that

21        would" -- excuse me -- "that provide education

22        relevant to solid dosages" -- I'm sorry -- "solid

23        dosage forms and their manufacture."

24                   Who were the individuals that you

25        referred to in this paragraph?

1    A    In the 1980s, it was customary for pharmacists to

2         have had a considerable amount of chemistry and

3         education around the technology of manufacture

4         during the course of their pharmacy education.

5                   I think of several pharmacists at

6         Boehringer Ingelheim, at which I worked in the

7         1980s, wherein there were those with Ph.D.s and

8         some experience who were unable to solve the

9         problems that pharmacists who had experience in the

10        manufacturing setting were indeed able to

11        understand and rectify them; that the hands-on

12        experience, plus the education that they had had in

13        the ways of pharmaceutical technology and/or, in

14        some cases, engineering enabled them to handle

15        development problems that were less effectively

16        addressed by those with advanced degrees.

17   Q    Now, referring specifically to the individuals

18        that -- that you mentioned in paragraph 14, would

19        you consider the skill level of these individuals

20        to be typical of individuals that do not have

21        graduate degrees in pharmacy?

22                   MR. TERAN:  Object to form.

23                   THE WITNESS:  No, not typical of those

24        with graduate degrees in pharmacy.  And let me add

25        that at that time many who obtained their Ph.D.s in

1    pharmacy were educated as pharmacists prior to

2    going in to graduate school.  If they had had

3    industrial experience between their pharmacy

4    education and their graduate study, then, yes, they

5    might have had exactly the same expertise.

6    However, it is more often the case, and I believe

7    was then, that students moved from their bachelor's

8    or professional degree right into a graduate

9    program more often than those who returned after

10   some experience in industry.

11   BY MR. NUTTER:

12   Q    I think I followed that.  You did say -- part of

13        your response, I think you said that it was typical

14        that they were educated as pharmacists prior to

15        receiving their graduate degrees.  What did you

16        mean by "educated as pharmacists"?  Did you mean in

17        the academic setting or industrial setting?

18   A    Academic setting.  In the academic setting, yes.

19                  At that time a bachelor's degree in

20        pharmacy was the professional degree.  The Pharm.D.

21        was at that time coming into -- into -- into place

22        and could also qualify.  But I distinguished that

23        from the Ph.D. in pharmacy or pharmaceutics, which

24        is a research degree.

25   Q    Okay.  Let's look at paragraph 16 now.  In this

1    paragraph you indicate, and I quote, "It would be

2    possible for a person in an academic research

3    setting to obtain ordinary skill provided that such

4    a person possessed six years or more of experience

5    in research related to formulation, development,

6    and manufacture of solid dosage forms, for example,

7    in a suitable graduate program or industry

8    internship."

9              Do you see that quote?

10   A   I do.

11   Q   Now, it appears, based on that quote, that you

12       identify the pertinent art as solid dosage forms.

13       Do you agree with that?

14   A   No.

15   Q   So you're not limiting it to medicated lozenges?

16   A   Correct.

17   Q   Now, later on in that same paragraph you stated,

18       and I quote, "The level of experience necessary

19       would depend on the individual's education

20       background."

21              Do you see that?

22   A   I do.

23   Q   Can you be more specific as to what you mean by

24       that?

25   A   I can give you an example.

d9de8cd9-f36e-4787-b6b9-47dfcf1cd463

1    Q    That's a good start.

2    A    I'm a chemist, not a pharmacist.  The experience

3         that I gained prior to going to graduate school was

4         that which first enabled me to see the scope of --

5         of chemistry as it pertains to the area of

6         pharmaceutical technology which gave me a sense of

7         some of the issues at hand with what's involved in

8         manufacturing a dosage form.

9                   In graduate school, I gained the --

10        the theoretical basis of much of the pharmaceutical

11        sciences that are relevant but which do not, in and

12        of themselves, solve the problems on the

13        manufacturing floor, if you will, in a production

14        setting.  It -- and so often experience, be it from

15        a pharmacist or a Ph.D. who is working on the floor

16        or an engineer who's working on the floor, often

17        it's that experience, the hands-on experience, that

18        leads to the solving of the types of problems that

19        are typical in development.

20                   MR. NUTTER:  Okay.  We need to take a

21        break.  We're running out of tape.

22                   THE WITNESS:  Oh.

23                   VIDEO TECHNICIAN:  This is the end of

24        tape number 1.  We are off the record at 10:59 a.m.

25                   (A recess was taken.)

Page 77

1          VIDEO TECHNICIAN:  We are back on the

2      record at 11:06 a.m.

3   BY MR. NUTTER:

4   Q    Okay.  Dr. Van Campen, right before we took a break

5      you were explaining to me what you meant by "the

6      level of experience necessary would depend on the

7      individual's educational background."  And I

8      appreciate that response, but it seemed to me that

9      that response was -- was pretty subjective.  Would

10      you agree with that?  Is that something that needs

11      to be determined sort of on a case-by-case basis?

12          MR. TERAN:  I object.

13          THE WITNESS:  Yes.  Developed in my

14      experience, I can recall those who -- in whom we

15      invested a lot of confidence to solve problems in

16      the manufacturing setting.  And it was these people

17      who had a level of experience that I would believe

18      is very relevant to the ordinary skill that you are

19      invoking for -- for this discussion and would --

20      and I looked to hire this expert -- this type of

21      expertise.  This was the kind of background that I

22      looked for in -- in staffing both the formulation

23      development laboratories that I've been responsible

24      for, as well as the manufacturing laboratories.

25   BY MR. NUTTER:

1  Q    So under your standard, you'd have to look at each

2       individual's educational background and make a

3       determination of exactly what courses took up that

4       curriculum and then look specifically at their

5       experience and what problems they were asked to

6       solve and -- and basically what experience they had

7       obtained.  Is that correct?

8              MR. TERAN:  I object.

9              THE WITNESS:  Yes, actually a customary

10      portion of an interview for hiring a new staff

11      member.

12  BY MR. NUTTER:

13  Q    Now, if I could ask you to look at your paragraph

14       17.  In that paragraph you state, and I quote, "I'm

15       not aware of evidence suggesting that a person with

16       the level of education and experience suggested by

17       Dr. Block would interpret the claims of the '737

18       patent differently than a person with the level of

19       education and experience that I believe would be

20       consistent with ordinary skill in the art at the

21       time of the invention."

22              Do you see that?

23  A    Yes.

24  Q    And on -- in paragraph 18 you indicate that "Based

25       on my education and experience, I believe that I

1    currently am, and was at the time of the invention,

2    one of at least ordinary skill in the art under

3    both Dr. Block's criteria and my own."

4                    Do you see that?

5    A    Yes.

6    Q.   Do you agree with Dr. Block's interpretation of the

7    claims of the '737 patent?

8                    MR. TERAN:  I object.

9                    THE WITNESS:  In large part, yes, but

10   there are some differences with regard to some

11   definitions that he has used.

12   BY MR. NUTTER:

13   Q    And I believe, as you indicate in your paragraph

14   18, you indicate that both you and Dr. Block are --

15   are one of ordinary skill in the art under his

16   criteria?

17   A    Yes.

18   Q    Now, if the two of you are of one of ordinary skill

19   of the art under his heightened criteria and the

20   two of you differ with respect to the meaning of

21   certain claims, what makes you think that someone

22   with -- that satisfies a lower standard would not

23   also differ with respect to the interpretation of

24   the claims of the '737 patent?

25                    MR. TERAN:  I object.

1          THE WITNESS:  I'm uncomfortable with your

2     use of the term "lower skill"; it's a different

3     skill.  And secondly, some of the terminology is

4     somewhat subjective in terms of its definition and

5     I think can be brought to any of several

6     conclusions.

7  BY MR. NUTTER:

8  Q    One of those conclusions being Dr. Block's opinion

9     and one of those conclusions being your opinion?

10          MR. TERAN:  I object.

11          THE WITNESS:  Yes.  And my judgment is

12     rendered on the basis of my experience and what I

13     would conclude a group of ordinary skill sitting

14     around the table would, in large part, conclude.

15  BY MR. NUTTER:

16  Q    Okay.  Thank you.

17          If I can have you turn to page 6 of

18     your declaration to the section entitled -- or I

19     should say Section 3 entitled "State of the Art at

20     the Time of the Invention."

21          Do you have that section before you?

22  A    Yes.

23  Q    Did you review this section yesterday with

24     Mr. Teran in preparing for today's deposition?

25  A    I think we spoke briefly of the citations from the

1      "Pharmaceutical Dosage Forms" text and -- and

2      really discussed -- otherwise did not discuss this

3      section to any large degree or any specific -- we

4      didn't go through it point by point.

5  Q   Okay.  Fair enough.

6              If I could have you briefly review

7      your paragraph 22 --

8  A   Uhm-uhm.

9  Q   -- to refresh your memory.  And I was just going to

10     ask a couple quick questions.

11  A   (Witness complying.)  I've reviewed paragraph 22.

12  Q   Okay.  Now, in this paragraph you take issue with

13     Dr. Block's distinction between wet and dry methods

14     of producing solid peroral and oral dosage forms,

15     correct?

16  A   Yes.

17  Q   And I believe in this paragraph you state that

18     ordinary practitioners would have distinguished

19     between molten methods and compressed tablet

20     methods.  Is that correct?

21  A   Yes.  Excuse me.

22  Q   Now, would you agree with me that under the concept

23     of compressed tablet methods, those methods would

24     include wet granulation, dry granulation, and

25     direct compression?

1  A    Yes.

2  Q    Now, within the context of those three methods,

3       would the -- one of ordinary skill in the art have

4       distinguished between wet and dry methods?

5  A    Yes.

6  Q    Which one of those three would be a wet method?

7  A    A wet granulation method only.

8  Q    Okay.  And which one of those three would be a dry

9       method?

10 A    Either dry compression or direct compression.

11 Q    Now, in your opinion, would one of ordinary skill

12      in the art consider wet granulation, dry

13      granulation, and direct compression to be

14      interchangeable?

15 A    No.

16 Q    Would one of ordinary skill in the art believe that

17      each method had its own set of advantages and

18      disadvantages?

19 A    Yes, one could say that.

20 Q    What are some of the advantages of wet granulation?

21 A    Excuse me.  Wet granulation allows the manufacturer

22      to dissolve binders such that granules are formed

23      that are sufficiently strong as to be maintained

24      during processing into a granular material that

25      flows well and compresses effectively.

1    Q    Is one of the advantages of wet granulation to

2         assure content uniformity --

3                MR. TERAN:  Object to form.

4   BY MR. NUTTER:

5    Q    -- of the dosage form?

6                MR. TERAN:  I object to form.

7                THE WITNESS:  Not directly.

8   BY MR. NUTTER:

9    Q    What do you mean by "not directly"?

10   A    Perhaps indirectly it assists during the course of

11        mixing, but blending -- mixing and blending would

12        be a unit process that occurs prior to the actual

13        wet granulation.

14   Q    Okay.  I guess I didn't really follow that.  I

15        apologize.

16                You say that the mixing or blending

17        occurs before the granulation?

18   A    Mixing occurs during both, but prior to adding a

19        wet granulation fluid such as a dissolved binder in

20        an aqueous medium and most often spraying that onto

21        the dry blending -- blended material, one would not

22        have not blended that material first in the dry

23        state.

24   Q    Okay.  Now, if -- if one were to spray that

25        dissolved liquid solution onto a dry powder that

1    had not previously been blended, would that change

2    your answer?

3                    MR. TERAN:  I object to form.

4                    THE WITNESS:  My answer to which

5    question?

6    BY MR. NUTTER:

7    Q    That the -- that the granulation does not directly

8         achieve content uniformity.

9                    MR. TERAN:  I object.

10                   THE WITNESS:  I indicated that it does

11   not directly achieve content uniformity because

12   that content uniformity is, in part, achieved first

13   by a dry blending of the components.

14   BY MR. NUTTER:

15   Q    And -- and I understand that.  If there is not

16        first a dry blending, then would that change

17        your -- your response?

18                   MR. TERAN:  I object.

19                   THE WITNESS:  Response to the ability of

20   wet granulation to achieve content uniformity?

21   BY MR. NUTTER:

22   Q    Yes.

23   A    I don't believe it does, in and of itself, without

24        that prior mixing step.  So I don't believe that

25        wet granulation is a direct means of achieving

1    content uniformity.

2  Q    Okay.  I'm -- I think I'm not being clear, and I

3       apologize for that.

4                    On a -- let me just give you a

5       hypothetical.

6  A    Uhm-uhm.

7  Q    I understand that the -- the hypothetical you've

8       presented me with was there was a previous dry

9       blend and then the solution, the binder solution,

10      is sprayed onto that blend.  In my hypothetical,

11      let's assume there is no prior blending, no prior

12      mixing; there's just a dry powder and then the

13      binder solution is sprayed onto that dry powder and

14      that's how the binder -- that's how the binder is

15      mixed with the dry powder.

16                    Under that hypothetical, does the

17   wet granulation process directly result in content

18   uniformity?

19                    MR. TERAN:  I object.

20                    THE WITNESS:  No.

21  BY MR. NUTTER:

22  Q    Why not?

23  A    In all likelihood, there will be varying solubility

24      of the components in the wet granulation fluid, and

25      granules resulting from a poorly blended material

1    would likely have varying compositions of active

2    ingredient which would result in poor content

3    uniformity.

4   Q    What's the poorly blended material you're referring

5        to in that response?

6   A    Those components mixed in the dry state prior to

7        the addition of granulating fluid in which

8        generally the binder or some measure of a binding

9        component is added and dissolved.

10  Q    So in that response, you are again assuming that

11       the original dry mixture has been blended before

12       the granulation process?

13            MR. TERAN:  I object.

14            THE WITNESS:  If you pose that it's not

15       been blended, then I answer that as such, that in

16       adding materials together and beginning the wet

17       granulation process prior to a good blending of the

18       materials in the dry state, that granule to

19       granule, one is less assured of a uniform

20       composition.  It's not impossible, but it's less

21       likely.

22  BY MR. NUTTER:

23  Q    Okay.  I think I see where we're crossing wires.

24       You're assuming that my dry blend is -- is a

25       mixture of several materials.  What if it's only

1    one material?  What if my dry blend is only one

2    component and then the wet granulation is added to

3    that one component?

4              MR. TERAN:  I object.

5    BY MR. NUTTER:

6    Q    Does that change your answer?

7              MR. TERAN:  I object.

8              THE WITNESS:  If I may ask you a

9    question.  Are you asking me with regard to content

10   uniformity wet granulating a material that is of

11   one component compared to adding any second

12   component to another system that is a single

13   component at the start?

14   BY MR. NUTTER:

15   Q    Yes.

16   A    Then I don't know that the wet granulation process

17        necessarily affords a better blend uniformity than

18        good mixing.  It would depend on the physical

19        chemical nature of the materials involved.

20   Q    Now, have you authored any publications concerning

21        medicated lozenges?

22   A    No.

23   Q    Now, prior to June 1987, what training, education,

24        and experience did you have concerning medicated

25        candies or medicated lozenges?

1  A  I had no experience in that area with that specific

2     solid dosage form.

3  Q  Now, prior to June 1987, what training, education,

4     experience did you have concerning compressed

5     tablets?

6  A  I had six years of experience at Pfizer prior to my

7     graduate study.  My graduate study involved the

8     research around the impact of moisture as it

9     interacts with solids which is relevant to any

10    processing of solid dosage forms.  And by 1987, I

11    had accumulated an additional six years of

12    experience with solid dosage form development at

13    Boehringer.

14 Q  Now, generally, what's the difference between wet

15    granulation and dry granulation?

16 A  A wet granulation involves the production of

17    granules by the addition of a dissolved binder

18    material in an aqueous fluid which is then added in

19    a -- in an appropriate manner, whether by spraying

20    or other addition, to a process -- a piece of

21    processing equipment, be it a high-speed granulator

22    or a fluid bed granulator, as two primary examples

23    of those -- of that equipment.

24 Q  So as I understand your response, wet granulation

25    includes a liquid solution as part of the mixing

1          method; is that correct?

2    A     Yes.

3    Q     And -- and the dry granulation does not?

4    A     Dry granulation involves the compacting of material

5          often into slugs or some such compressed material

6          which, by physical compaction, is then rendered

7          more granular, with the ultimate purpose being to

8          create a flowing granulite or granulation or coarse

9          powder, if you will, such that you can then deliver

10         it effectively to a tablet die during compression.

11   Q     Can you generally describe for me the molten candy

12         method referred to in your declaration?

13   A     Uhm-uhm.  The molten candy method relies more on

14         the high-temperature processing of materials such

15         that they are taken above their melting points

16         and -- and then mixed in a fluid state and poured

17         into a mold as opposed to compressed.

18   Q     So -- so wet granulation includes the addition of a

19         fluid as part of the mixing method; is that

20         correct?

21   A     Correct.

22   Q     And -- and that's why it's referred to as wet.

23         Would that be true?

24   A     Well, in part because it involves an aqueous system

25         that will solubilize materials, especially the

1    binder, in a manner so as to bind powder particles

2    together to produce the granule.

3  Q    And the molten candy method, that also produces

4    fluids, does it not?

5  A    It produces fluids, yes.

6  Q    So if I -- if during the -- after the -- strike

7    that.

8              After the binders are heated beyond

9    their melting points into a fluid state, if I were

10    to accidentally spill that state onto the table,

11    the table would then be wet, would it not?

12              MR. TERAN:  I object.

13              THE WITNESS:  Could you repeat that

14    question, please.

15              MR. NUTTER:  Could you repeat that.

16              (The preceding question read by the

17    reporter.)

18              MR. TERAN:  I object.  You may answer.

19              THE WITNESS:  The melting point of a

20    binder is not well defined.  Typical binders are

21    polymeric, natural polymers, and do not melt per

22    se.  And so I would answer no, it would not be wet

23    to heat a binder above its melting point.  I think

24    you would have a -- a poorly defined mass.

25  BY MR. NUTTER:

1   Q   Okay.  Let's go back to your -- one of your earlier

2       responses.  You had described the molten candy

3       method as heating the components until they reached

4       a fluid state.  Is that correct?

5   A   Yes.

6   Q   Now, when they're in that fluid state, if it was

7       accidentally poured onto the table, wouldn't that

8       table be wet or become wet?

9               MR. TERAN:  I object.

10              THE WITNESS:  I think it would be

11      plastic.  It would not necessarily be wet.

12  BY MR. NUTTER:

13  Q   So it -- so that plastic does not flow?

14  A   The plastic might flow, but to touch it means it

15      moves easily for its plasticity, but it does not

16      make it wet.

17  Q   So would you consider the molten candy method to be

18      more of a wet method or a dry method?

19              MR. TERAN:  I object.

20              THE WITNESS:  Well, confronted with that

21      distinction, I would consider it more of a dry

22      method.

23  BY MR. NUTTER:

24  Q   And why is that?

25  A   For the reasons we just discussed.  The material

1       does not necessarily -- would not necessarily be

2       wet to the touch in terms of moisture and, rather,

3       it is plastic and deforms such that it can be put

4       into a mold.

5   Q   Okay.  If I can refer you to paragraph 30 of your

6       declaration.  In that paragraph you state, and I

7       quote, "If either the drug or carbohydrate is

8       heated to its melting point, it will become a

9       liquid."

10                  Do you see that?

11  A   Yes.

12  Q   Is that liquid different from the plastic that you

13      were describing before?

14  A   No.

15  Q   So let's just focus on what's shown on paragraph

16      30.  If I heated the drug or the carbohydrate that

17      you referred to in this paragraph to their melting

18      points and they become a liquid and I pour that

19      liquid onto a table, will the surface of that table

20      become wet?

21                  MR. TERAN:  I object.

22                  THE WITNESS:  It depends on the materials

23      whether or not one would touch it and perceive it

24      to be wet as opposed to simply fluid or liquid.

25      Which in a -- in a way one associates with being

Page 93

1    plastic, that it moves freely and/or with some --

2    you know, with some pressure, it moves and deforms

3    permanently as opposed to elastic, which does not.

4    BY MR. NUTTER:

5    Q    So just so I'm clear, when we're talking about the

6         heating beyond the melting point, that liquid state

7         is different than, let's say, the free liquid

8         referred to by Dr. Block in his declaration?

9                     MR. TERAN:  I object.

10                    THE WITNESS:  Again, his terminology --

11        Dr. Block's terminology you referred to as the free

12        liquid?

13   BY MR. NUTTER:

14   Q    Yes.

15   A    Yes.  I could see a drug substance melting and

16        looking, if not feeling, wet.  When mixed with a --

17        with a binding material or a carbohydrate, which is

18        often the nature of a binder, I would expect it to

19        behave as a much, much more viscous material which

20        one of any skill would probably not refer to as

21        wet.

22   Q    So just so I'm clear, you're now saying that if you

23        heat the drug or the carbohydrate material beyond

24        their melting point, that liquid may or may not be

25        wet?  Is that what you're saying?

1    A    Yes.

2    Q    So the molten candy method may or may not be wet?

3    A    Yes.

4    Q    Are you ever aware of any treatise that refers to

5         the molten candy method as a dry method?

6    A    No.  I'm aware of a treatise that distinguishes the

7         molten method from compression methods.

8    Q    But those same treatises distinguishes wet

9         granulation from dry granulation, do they not?

10   A    Correct, in the context of compression.

11   Q    And also in the context of the mixing step, do they

12        not?

13            MR. TERAN:  I object.

14            THE WITNESS:  I don't recall the

15        distinction they make there.

16   BY MR. NUTTER:

17   Q    Well, we can look at that a little bit later.

18   A    Okay.

19   Q    Are you aware of any scientific literature that

20        refers to the molten candy method as a dry method?

21   A    Specifically as a dry method, no, I'm not aware of

22        any literature that makes that distinction.

23   Q    Are you aware of any publication anywhere that

24        refers to the molten candy method as a dry method?

25   A    No.

1          MR. NUTTER:  If I could have you mark

2     this as the next exhibit.

3          (Exhibit 55 marked for identification.)

4  BY MR. NUTTER:

5  Q    Dr. Van Campen, you've just been handed what's been

6     marked as Defendant's Exhibit Number 55, which is a

7     chapter entitled "Medicated Lozenges."  I believe

8     this is the same chapter that's cited in your

9     declaration.  Is that correct?

10 A    Yes.

11 Q    And I believe you -- you previously testified that

12     you've reviewed this chapter.  Is that correct?

13 A    Yes.

14 Q    And reviewed this in preparing the opinions that

15     are stated in your declaration?

16 A    Yes.

17 Q    If I could ask you to turn to the page identified

18     by production number BARR009970.

19 A    (Witness complying.)  I have it.

20 Q    There you're referring to Section 7 entitled

21     "Typical Formulations (Compressed Tablet

22     Lozenges)."

23          Do you see that section?

24 A    I do.

25 Q    Now, this section continues --

1    A    Excuse me.

2    Q    -- for roughly about three additional pages, until

3         BARR009973.

4                   For my next few questions, I'd just

5         like to refer you to Section A on "Wet Granulation

6         Techniques" and ask if you could briefly review

7         that section, and then let me know when you've

8         completed that review.

9    A    Okay.  (Witness complying.)  Okay.  I've finished

10        reading it.

11   Q    Now, in your opinion, does this section accurately

12        describe the state of the art concerning wet

13        granulation at the time of the '737 patent?

14                   MR. TERAN:  Object to form.

15                   THE WITNESS:  It's consistent with the

16        state of the art, yes.

17   BY MR. NUTTER:

18   Q    Now, in your -- in your opinion, would one of

19        ordinary skill in the art, at the time of the '737

20        patent, have read that patent to include wet

21        granulation as it is consistently defined in the --

22        in the section that we just reviewed?

23                   MR. TERAN:  I object.

24                   THE WITNESS:  As a first understanding of

25        what the patent was referring to, possibly not

1          because much is referred to the dry mixtures.

2    BY MR. NUTTER:

3    Q    Now, you say "as a first understanding."  Do you

4          think that that understanding would change upon

5          subsequent reviews?

6    A    In terms of what is stated -- in terms of what is

7          written in the patent, there's primary reference to

8          dry procedures; but in terms of the actual claims,

9          there is nothing in the claims that precludes the

10         use of a granulation approach or a wet granulation

11         approach.

12   Q    You would agree that there's no teaching or

13         disclosure in the '737 patent regarding the wet

14         granulation process?

15                  MR. TERAN:  I object.

16                  THE WITNESS:  I would agree, not

17         explicitly.

18   BY MR. NUTTER:

19   Q    Looking at the -- the description provided on

20         BARR9971 of the wet granulation method, it refers

21         to a -- a drying step.  I think the sentence reads,

22         "The granulation is oven-dried to a moisture

23         content of 1 to 1.5 percent."

24                  Is there any discussion in the '737

25         patent of a drying step?

1    A    I don't believe so.

2    Q    And that's because the disclosure of the '737

3         patent was directed towards a mixing of dry powders

4         and there would be no need for an oven-drying step;

5         is that correct?

6                   MR. TERAN:  I object.

7                   THE WITNESS:  For those examples that are

8         given as dry mixing examples, correct.

9    BY MR. NUTTER:

10   Q    Were there any examples given of wet mixing?

11   A    I don't recall having seen examples of that.

12   Q    Was there any disclosure in the '737 patent, to the

13        best of your recollection, directed towards any wet

14        mixing at all?

15   A    I don't recall any.

16   Q    Okay.  If I could now refer your attention to the

17        next section in this -- in this exhibit, "Direct

18        Compression Techniques," and if I could have you

19        briefly review this section.

20                   And -- and just to -- you're welcome

21        to review the entire section.  I'm really only

22        going to ask you about the description of the

23        process, which is the brief paragraph on top of

24        9973.  But you're certainly welcome to read the

25        rest of it that talks about the various

1    ingredients.

2    A    Okay.  Excuse me.  Okay.

3    Q    Okay.  In your opinion, does this section generally

4         describe direct compression as it would have been

5         understood by one of ordinary skill in the art at

6         the time of the filing of the '737 patent?

7    A    Yes.

8              MR. NUTTER:  Okay.  That's all I have for

9         that document for now.

10             If I could ask the court reporter to

11        mark this as the next exhibit.

12             (Exhibit 56 marked for identification.)

13   BY MR. NUTTER:

14   Q    Dr. Van Campen, you've just been handed what's been

15        marked as Defendant's Exhibit Number 56, which is a

16        chapter entitled "Compressed Tablets," also

17        identified by production number BARR9748 through

18        BARR9826.

19             Do you have that document before

20        you?

21   A    Yes.

22   Q    Is this the -- the chapter that you cite in your

23        declaration, specifically paragraph 23?

24   A    Excuse me.  Yes.

25   Q    If I could have you turn to page 9751 of

Page 100

1      Defendant's Exhibit Number 56.

2   A  Okay.  (Witness complying.)  I'm sorry.

3   Q  And if I could have you briefly review this table.

4   A  (Witness complying.)  Okay.

5   Q  And this table is entitled "Steps in the Different

6      Methods of Tablet Manufacture."

7              Do you see that?

8   A  Yes.

9   Q  In your opinion, does this table accurately

10     describe the three methods of making tablets as

11     known to one of ordinary skill in the art at the

12     time that the '737 patent was filed?

13  A  Yes.  Generally speaking, yes.

14  Q  Okay.  Now, in your opinion, would one of ordinary

15     skill in the art, at the time the '737 patent was

16     filed, distinguish between these three methods?

17              MR. TERAN:  Object to form.

18              THE WITNESS:  Yes.

19  BY MR. NUTTER:

20  Q  And if one of ordinary skill in the art were asked

21     to determine which of these methods is a wet method

22     and which is dry, would they be able to do it?

23              MR. TERAN:  Object.

24              THE WITNESS:  Listed in this form, yes.

25  BY MR. NUTTER:

1  Q    And what would the answer be to that question?

2  A    I'm sorry, what question?

3  Q    Which one of these is a wet method and which of

4       these is a dry method?

5  A    Oh, I'm sorry.  The left column is a wet method and

6       the two right columns both are dry methods.

7  Q    So the left column entitled "Wet Granulation" is a

8       wet method, and the two right columns, the first

9       one entitled "Dry Granulation" and the second one

10      entitled "Direct Compression," are dry methods?

11 A    Yes.

12 Q    Now, if I can refer you specifically to the wet

13      granulation process described in the first column

14      to the left.

15               In your opinion, would one of

16      ordinary skill in the art, at the time the '737

17      patent was filed, have read that patent to include

18      the wet granulation process as it is described in

19      this column?

20               MR. TERAN:  I object.

21               THE WITNESS:  To include it, clearly;

22      perhaps not to exclude it, no.

23 BY MR. NUTTER:

24 Q    Now, hypothetically, if one of ordinary skill in

25      the art were to learn that the applicants of the

1    patent argued to the PTO that their invention

2    disclosed the mixing of dry powders, would they

3    then exclude wet granulation as one of the

4    processes?

5            MR. TERAN:  I object.

6            THE WITNESS:  I take it only that it

7    specifically refers to dry powders, but that does

8    not exclude the wet granulation method as

9    established in the claims.

10   BY MR. NUTTER:

11   Q    Now, if I can have you turn to two pages later, the

12        page identified by production number BARR9753.

13   A    Okay.

14   Q    Specifically, the -- the section entitled -- or

15        Section A entitled "Advantages of Wet Granulation."

16   A    I see it.

17   Q    And if I could refer you -- first, let me just say

18        you're welcome to review this section at length.

19        It's -- it ends at the top of 115, but I'm going to

20        ask you a question regarding paragraph 3.

21           MR. TERAN:  Paragraph 3 on 9753?

22           MR. NUTTER:  Correct.

23           MR. TERAN:  Okay.

24           THE WITNESS:  I see it.

25   BY MR. NUTTER:

1    Q    Now, paragraph 3 states that "One of the advantages

2         of wet granulation over direct compression is that

3         wet granulation obtains a more uniform distribution

4         of the drug in the dosage form."  Is that correct?

5    A    In specific cases that they note there, yes.

6    Q    And that specific case is a -- is for soluble

7         low-dosage drugs; is that correct?

8    A    That's correct.

9    Q    Now, if I can refer you again to the '737 patent --

10        and keep that page open if I -- if you could --

11   A    Yep.

12   Q    -- previously marked as Defendant's Exhibit Number

13        4.

14   A    Yes.

15   Q    And if I could ask you to refer to column 11.

16   A    Yes, I have it.

17   Q    Line 61 through 68, which is the last paragraph of

18        that column --

19   A    I see it.

20   Q    -- if I could ask you to briefly review that.

21             MR. TERAN:  Which lines again?

22             MR. NUTTER:  The last paragraph, lines 61

23        through 68 of column 11.

24             MR. TERAN:  Okay.

25             THE WITNESS:  (Witness complying.)  Okay,

1          I've read it.

2    BY MR. NUTTER:

3    Q    What does that paragraph mean to you?

4    A    Geometric dilution is one mode of effective mixing.

5         It is not the only mode, but it is a mode of

6         effective mixing and blending such that content

7         uniformity is first achieved in the dry state

8         across a homogeneous blend prior to any further

9         processing.  It also refers to incomplete mixing

10        because of an insolubility of the products.

11   Q    The incomplete mixing refers to what is known by

12        existing methods, correct, not the method --

13   A    Right.

14   Q    -- disclosed in the patent?

15   A    Correct.

16   Q    Okay.  So you say this is one known method but not

17        the only method?

18                  MR. TERAN:  Object to form.

19   BY MR. NUTTER:

20   Q    I don't want to mischaracterize your testimony.

21   A    Right.

22   Q    Are there any other methods of mixing described in

23        this patent other than geometric dilution?

24   A    I don't recall that there are.

25   Q    And geometric dilution is limited to the mixing

1    of -- of dry powders, correct?

2  A    Yes.

3  Q    Now, doesn't the use of geometric dilution suggest

4        that the '737 patent is aimed at alleviating the

5        problems with direct compression that are described

6        in paragraph 3 of Defendant's Exhibit 56, page

7        BARR9753?

8              MR. TERAN:  I object.

9              THE WITNESS:  Yes, it addresses it.  But

10       I also note in paragraph 3 that the statement is

11       content uniformity of drugs and uniform color

12       dispersion can be a problem but is not necessarily.

13              It also refers to the -- to the

14       dissolving of the drug in the actual binder

15       solution which was not what I was thinking of in

16       earlier response.  I don't know that it makes a

17       difference, but it is often that wet granulation

18       fluid will contain only the binder in an aqueous

19       solution delivered to a blend already containing

20       the drug which may or may not have been subjected

21       to geometric dilution.

22  BY MR. NUTTER:

23  Q    So if the drug was dissolved in the solution, does

24       that make a -- does that make a difference to -- I

25       guess I'm -- I'm not sure what you meant by that

1    may or may not have changed your earlier responses.

2    What responses were you referring to?

3                    MR. TERAN:  I object.

4                    THE WITNESS:  When we talked in general

5    about the wet granulation method, I was thinking of

6    a system that is, in my experience, used as or more

7    often, which is that the drug is retained in the

8    dry components which are mixed prior to the

9    spraying of a granulation fluid, that generally

10   contains part or all of the binder excipient that's

11   added to the granulation.

12                    And -- and, as I say, geometric

13   dilution is not an uncommon method by which those

14   materials are mixed dry prior to wet granulation.

15   BY MR. NUTTER:

16   Q    So geometric dilution, as disclosed by the '737

17        patent, that's a way of achieving uniform

18        distribution of dry materials?

19   A    Yes.

20                    MR. TERAN:  Object.

21   BY MR. NUTTER:

22   Q    And if -- hypothetically, if one were to dissolve

23        the drug into a solution and then spray-dry that

24        solution onto a blend, would that achieve uniform

25        distribution of the drug?

1              MR. TERAN:  I object.

2              THE WITNESS:  Well, the granulation

3       process is a very dynamic one, but for very low

4       concentrations of drug, it could improve the

5       content uniformity of the final granulated product,

6       yes.

7  BY MR. NUTTER:

8  Q    For -- you understand that the '737 patent is

9       directed towards a product with a low-dosage

10      form -- or, I'm sorry, not low-dosage form, but low

11      dosage amount of the drug?

12             MR. TERAN:  I object.

13 BY MR. NUTTER:

14 Q    Is that correct?

15 A    I have not looked recently at the specific drug

16      concentrations contained in -- covered by all of

17      the examples and -- and perhaps addressed in the

18      claims.

19 Q    So you don't -- you do not know whether the dosage

20      amounts with respect to the '737 patent are low or

21      high or --

22             MR. TERAN:  Object.

23             THE WITNESS:  I'm not sure without

24      checking -- without confirming that that's so.

25 BY MR. NUTTER:

d9de8cd9-f36e-4787-b6b9-47dfcf1cd463

1   Q   Okay.  If -- if I can now refer you to -- again, to

2        Defendant's Exhibit Number 56, which is the

3        "Compressed Tablet" chapter that you cited in your

4        declaration.  And if I can have you refer -- turn

5        to page 9787.

6   A   (Witness complying.)  Okay.

7   Q   And specifically, the Section A entitled

8        "Advantages of Direct Compression."

9            Do you see that?

10  A   I do.

11  Q   If I could have you just review the first

12       paragraph.

13  A   (Witness complying.)  Okay.

14  Q   This paragraph identifies five specific advantages

15       of direct compression; is that correct?

16  A   Yes.

17  Q   And step two talks about the elimination of heat

18       and moisture; is that correct?

19  A   Correct.

20  Q   Now, does direct compression avoid the problems

21       associated with the exposure of the ingredients to

22       the moisture and heat that arise when using wet

23       granulation?

24         MR. TERAN:  I object.

25         THE WITNESS:  That have the potential to

1     arise during wet granulation, yes.  But one would

2     not choose that approach if that were likely to be

3     a problem.

4  BY MR. NUTTER:

5  Q    One would not choose what approach?

6  A    If exposure to granulation fluid were to

7     destabilize the active ingredient, then one would

8     go to a dry mode of processing.

9  Q    And if exposure to heat would be a concern because

10    of possible drug degradation, would one also be

11    inclined to a dry method?

12             MR. TERAN:  I object.

13             THE WITNESS:  Yes, but it doesn't exclude

14    it.  During the course of processing, the exposure

15    to the granulation fluid can, in fact, be very

16    fleeting and the actual elevation in heat or in

17    temperature can be very modest.  And as long as the

18    exposure is brief and the temperature not excessive

19    for that exposure time, then even a -- a less

20    stable drug can -- can be wet granulated.

21             I'm modifying a bit what I implied a

22    moment ago because I can think of processes in

23    which that's done with some frequency.

24  BY MR. NUTTER:

25  Q    Now, you indicated that that could be true if