1       the -- if the contact with the granulating fluid is

2       brief.  What if the drug is actually dissolved

3       within the granulating fluid?  Would that change

4       your answer?

5   A   Not really, because the -- the stability of the

6       drug and the granulating fluid would have to be

7       tested; and at room temperature, it could be stable

8       for easily longer than the amount of time it takes

9       to process the material.

10  Q   So why did you qualify your first answer by saying

11      "as long as the exposure to granulating fluid is

12      brief" if it can actually be dissolved within the

13      granulating fluid?

14  A   That could happen -- brief could be defined by the

15      amount of time the product is stable.  If a

16      material is stable for five hours and one

17      dissolves -- and stable is, of course, a relative

18      term.  But if a certain amount of degradation was

19      acceptable, say perhaps 1 percent, during the

20      course of processing, and less than 1 percent

21      occurs in five hours in the process of dissolving

22      the drug in the granulating fluid and then drying

23      the ultimate granulation that comes from the wet

24      granulation process is less than five hours, then

25      the process could be successful.

d9de8cd9-f36e-4787-b6b9-47dfcf1cd463

1    Q    And the typical granulation process requires the

2         use of heat to -- for -- as a drying step at some

3         point, correct?

4    A    As a drying step, yes.

5    Q    And dry granulation and/or direct compression,

6         neither one of those methods requires the use of

7         heat, correct?

8              MR. TERAN:  Object to form.

9              THE WITNESS:  Correct, in my

10        understanding.  I cannot think of an example where

11        it requires heat.

12   BY MR. NUTTER:

13   Q    Now, hypothetically, if the applicants to the '737

14        patent argue to the patent examiner that their

15        invention did not require the use of heat, would

16        that cause one of ordinary skill in the art to

17        exclude wet granulation as a possible mixing step?

18             MR. TERAN:  I object.

19             THE WITNESS:  Let's see.  In the wet

20        granulation approach with a fluid bed processing

21        used in many wet granulation processes, temperature

22        does not necessarily need to be very elevated.  I

23        believe it's generally elevated a little beyond

24        room temperature, but -- and for many processes,

25        it's elevated more if the product can handle that

1    higher temperature.

2            But for more sensitive drugs, it's

3    very possible to operate at a very low -- a

4    relatively low temperature and I would not say at

5    greatly elevated temperature.

6  BY MR. NUTTER:

7  Q    Well, how would one of ordinary skill in the art

8    define the term "heat"?

9            MR. TERAN:  I object.

10            THE WITNESS:  I would -- I would

11    generally expect someone to say above approximately

12    30 degrees centigrade inasmuch as that's an upper

13    limit of many definitions of room temperature.

14  BY MR. NUTTER:

15  Q    So for the layperson, would it be something above

16    room temperature?  A temperature above room

17    temperature would be the addition of heat -- strike

18    that.

19            The addition of -- of something at a

20    temperature higher than room temperature would be

21    the addition of heat?

22            MR. TERAN:  Object to form.

23            THE WITNESS:  It's one logical

24    definition.

25  BY MR. NUTTER:

Page 113

1    Q    Now, if I could have you turn to the next page

2         identified by production number BARR9788.

3    A    (Witness complying.)

4    Q    Do you have that page before you?

5    A    Yes.

6    Q    And if I could have you review the first full

7         paragraph that begins with the words, "The

8         advantage which is of greatest significance," if

9         you could review that --

10   A    Okay.

11   Q    -- and I'd like to ask you a couple questions.

12   A    Okay.

13              MR. NUTTER:  While you're doing that,

14        we'll go off the record.

15              VIDEO TECHNICIAN:  We are off the record

16        at 12:06 p.m.

17              (A discussion was held off the record.)

18              VIDEO TECHNICIAN:  We are back on the

19        record at 12:08 p.m.

20              THE WITNESS:  Okay.  I've read the

21        paragraph.

22   BY MR. NUTTER:

23   Q    Okay.  This paragraph discusses how direct

24        compression avoids the problems associated with

25        exposure to moisture and heat that are required in

d9de8cd9-f36e-4787-b6b9-47dfcf1cd463

1    wet granulation; is that correct?

2    A    Yes.

3    Q    And, in fact, the -- the paragraph says that "The

4    need for moisture and heat is inherent in most wet

5    granulating" -- "granulation procedures"; is that

6    correct?

7    A    Yes.

8    Q    So one of ordinary skill in the art, when reading

9    the '737 patent, when considering the use of wet

10    granulation, would have assumed that that would

11    require the need for moisture and heat, correct?

12    A    Most often, but not only.

13    Q    This paragraph -- and this is -- this is the --

14    this was cited in your declaration, correct?

15    A    Yes.

16              MR. TERAN:  I object to form.

17              THE WITNESS:  Actually, I would need to

18    check that to confirm exactly where that came from.

19              MR. TERAN:  Do you mean the chapter?

20    BY MR. NUTTER:

21    Q    Let me restate my question because I didn't say

22    that very clearly.

23              Defendant's Exhibit Number 56, the

24    chapter entitled "Compressed Tablets," this was

25    cited in your declaration?

1    A    Yes.

2    Q    Okay.  So you consider this chapter to be an

3         authority on compressed tablets?

4    A    Yes.

5    Q    And this -- this paragraph goes on to state that

6         "The unnecessary exposure of any drug to moisture

7         and heat can never be justified.  It cannot be

8         beneficial and may certainly be detrimental."

9                   Do you see that?

10   A    I do.

11   Q    Do you recall the '737 patent discussing the

12        advantages of not needing moisture or heat in

13        their -- in the process described in that patent?

14                 MR. TERAN:  I object.

15                 THE WITNESS:  In the context of not

16        raising a compound drug to its melting point and

17        beyond, yes.

18   BY MR. NUTTER:

19   Q    Do you recall in the prosecution history the

20        applicants arguing that their -- that their mixing

21        step did not require the use of heat?

22                 MR. TERAN:  I object.

23                 THE WITNESS:  I don't recall that

24        explicitly.

25                 MR. NUTTER:  Okay.  How about if we take

Page 116

1      a brief break.

2                  VIDEO TECHNICIAN:  We are off the record

3      at 12:11 p.m.

4                  (A recess was taken.)

5                  VIDEO TECHNICIAN:  We are back on the

6      record at 12:21 p.m.

7   BY MR. NUTTER:

8   Q    Okay.  Dr. Van Campen, if I can refer you again to

9        your declaration.  And you can probably put the

10       rest of the documents to the side for now.

11       Specifically page 7.

12  A    Yes.

13  Q    Section 4 entitled "The meaning that terms of the

14       '737 patent would have to a person of ordinary

15       skill in the art at the time of the invention."

16                  Do you have that section before you?

17  A    Yes.

18  Q    Now, I'm going to refer you specifically to

19       paragraph 25.  And in that paragraph you note that

20       claims 1 and 18 of the '737 patent use the word

21       "comprising."  You also note that you "have been

22       informed that the use of the word 'comprising' in

23       these claims means that there are or may be

24       intervening steps which are not explicitly recited

25       in the claims that could occur between obtaining

1      the drug in a substantially powdered form and

2      mixing the drug with the carbohydrate."

3              Is that correct?

4   A   That's correct.

5   Q   Who informed you of -- of the meaning of the word

6       "comprising"?

7   A   Mr. Teran.

8   Q   When did he inform you of that?

9   A   Following my review of the materials sent to me and

10      I believe prior -- yes, prior to his having drafted

11      my declaration as the result of our discussion.

12  Q   Do you have any understanding as to why Mr. Teran

13      informed you of this meaning of comprising?

14  A   Yes.  But that's by inference that it allowed for a

15      broader interpretation of the claims than one might

16      otherwise assume if not otherwise informed as to

17      the meaning of comprising.

18  Q   In what way does it allow for a broader

19      interpretation of the claims?

20  A   It suggests that there's a distinction between

21      actively stating something and not stating

22      something as to what one might assume.  And on

23      first reflection, one might assume that the patent

24      is referring to only a dry process, but there is

25      nothing inconsistent in the claims that I see that

d9de8cd9-f36e-4787-b6b9-47dfcf1cd463

Page 118

1   disallows the interpretation of potentially

2   intervening steps that allow for wet granulation.

3   Q   And that opinion of yours is based on your

4       understanding of the -- of the word "comprising,"

5       as explained by Mr. Teran?

6   A   Yes.

7               MR. TERAN:  Object to form.

8               THE WITNESS:  Yes.  And I would add, as a

9       review, in that context of the claims, that I did

10      not then see any conflict with that potential

11      broadened interpretation.

12  BY MR. NUTTER:

13  Q   Prior to being informed of the meaning that -- that

14      Mr. Teran associates with the word "comprising,"

15      did you, as one of ordinary skill in the art,

16      understand the term "comprising" to include the

17      addition of unrecited steps of the claims?

18  A   I'm sorry, could you repeat the question?

19              MR. NUTTER:  Sure.  Could you repeat the

20      question, please.

21              (The preceding question read by the

22      reporter.)

23              THE WITNESS:  No.  I made the most direct

24      conclusion that it was a one-to-one correlation

25      between steps claimed and steps addressed.

1    BY MR. NUTTER:

2    Q    And before -- before you -- the meaning of the word

3         "comprising" was explained to you by your attorney,

4         was it your opinion that the mixing step could be a

5         wet method?

6                   MR. TERAN:  I object.

7                   THE WITNESS:  I assumed that it was a dry

8         step.

9    BY MR. NUTTER:

10   Q    And why did you assume it to be a dry step?

11   A    There's reference multiple times to mixing in the

12        dry state and dry powder.

13   Q    And there are no references to mixing in a wet

14        state, correct?

15   A    That's correct.

16   Q    Now, I'm -- after reading this paragraph, I guess

17        I'm curious as to what type of unrecited steps you

18        believe could be included in the claim.  Can it be

19        any unrecited steps of any nature?

20   A    No.

21                  MR. TERAN:  I object.

22   BY MR. NUTTER:

23   Q    What type of steps can -- can be -- actually be --

24        I'm sorry, strike that.  What type of unrecited

25        steps could be included that -- strike that.

Page 120

1           What type of steps that have not

2      been recited in the claim could one read into the

3      claim?

4               MR. TERAN:  I object.

5               THE WITNESS:  The addition of a wet

6      granulation fluid.

7    BY MR. NUTTER:

8    Q    Anything else?

9    A    A measure of drying, some drying step.

10   Q    Anything else?

11   A    I think as unit processes go, that's all I think

12        would be absolutely required.  I could think of

13        additional associated steps, but --

14   Q    When you say "absolutely required," absolutely

15        required for what?

16   A    That -- that would be required were a wet

17        granulation step to be intervened between mixing in

18        the dry state and compression of the resulting

19        granules.

20   Q    Okay.  I understand that distinction.  I guess I

21        was asking a more broad question.

22               You say that you've been informed

23        that there may be intervening steps which are not

24        explicitly recited in the claims.  Now, in your

25        answer you limited those intervening steps to wet

1      granulation steps.  Can there be intervening steps

2      other than wet granulation steps included in the

3      claim?

4                 MR. TERAN:  I object.

5                 THE WITNESS:  I could probably think of

6      them if -- with a full review of the patent.

7  BY MR. NUTTER:

8  Q   Why would you need to look at the patent first?

9  A   I would look for any statements that -- that

10     proactively exclude certain things that I might

11     otherwise incorporate in additional steps that

12     could intervene.

13 Q   So the patent doesn't proactively exclude freezing

14     the components, so could freezing be an intervening

15     step in this claim?

16                MR. TERAN:  I object.

17                THE WITNESS:  I suppose so, although that

18     certainly does not relate to a process by which

19     compressed dosage forms are made.

20 BY MR. NUTTER:

21 Q   So would you narrow the intervening steps that

22     could be allowed to those steps that fall within

23     processes to which solid dosage forms are made?

24 A   Yes.

25                MR. TERAN:  Object.

d9de8cd9-f36e-4787-b6b9-47dfcf1cd463

1           THE WITNESS:  Yes.

2    BY MR. NUTTER:

3    Q    So is it your opinion that -- that unless a

4         particular step for preparing solid dosage forms is

5         specifically excluded in a patent, it could be

6         included in a -- as one of the steps in the method

7         claim?

8           MR. TERAN:  I object.

9           THE WITNESS:  It's my understanding

10        that -- that that could be so.

11   BY MR. NUTTER:

12   Q    And what's your basis of that understanding?

13   A    Primarily the definition of "comprising."

14   Q    Okay.  Now, staying with paragraph 25 but turning

15        to the next page, page 8.

16            Your last sentence reads, and I

17        quote, "To the extent there were intervening steps

18        between obtaining and mixing the drug, one of

19        ordinary skill would understand that such steps

20        could change the drug from substantially powdered

21        form into some other nonpowdered yet compressible

22        form prior to mixing."

23            Do you see that statement?

24   A    Yes.

25   Q    Do you agree with that statement?

1    A    Yes.

2    Q    Does the '737 patent teach or disclose any such

3         intervening steps?

4    A    I don't recall that it does.  I could look

5         clearly -- carefully at the patent and -- and

6         confirm that.

7    Q    Well, what is the basis for -- for that statement?

8                   MR. TERAN:  I object.

9                        You mean the statement in her

10        declaration?

11                  MR. NUTTER:  Yes.

12                  MR. TERAN:  Okay.

13   BY MR. NUTTER:

14   Q    Yeah, the statement in your declaration.

15   A    Okay.  By that statement, I'm acknowledging that

16        intervening steps could, in fact -- if not

17        otherwise excluded, could, in fact, be part of any

18        of those -- or at least some of those claims and

19        could result in the preparation of a material that

20        could be better compressed than the simple blending

21        of the components.

22   Q    Is there any scientific literature that supports

23        your opinion that one of ordinary skill in the art

24        would understand that unrecited steps in the claim

25        could change the form of the drug from something

1          other than substantially powdered form?

2                    MR. TERAN:  I object.

3                    THE WITNESS:  We've reviewed three ways

4          in which to prepare compressible material, and I

5          only interpret the term "comprising" to suggest

6          that it does not rule out methods beyond that of

7          dry granulation as a means of doing so.

8    BY MR. NUTTER:

9    Q     And that's based on the definition of comprising

10         that was provided to you by Mr. Teran?

11   A     Yes.

12   Q     Can you give me some examples of nonpowdered yet

13         compressible forms that the drug could change into

14         prior to mixing?

15   A     Well, the examples would almost always include the

16         addition of materials whose compressibility is

17         ensured from the dry state whether or not that was

18         brought about by the addition of binding material

19         and -- and a subsequent granulation.

20                    I'm not sure I answered your

21         question.

22   Q     I'm not sure you did either, but maybe I can phrase

23         it a different way.

24                    Is an aqueous liquid a nonpowdered

25         yet compressible form?

d9de8cd9-f36e-4787-b6b9-47dfcf1cd463

Page 125

1    A    The impact of adding aqueous liquid, with or

2         without the binder component added to it but with a

3         binder component at least in the powdered form,

4         would, on combination and some drying step, result

5         in a compressible form.

6    Q    But if the drug was dissolved in an aqueous liquid

7         and that's all, that drug is now dissolved in

8         aqueous liquid, is that a nonpowdered yet

9         compressible form?

10   A    No.

11   Q    Now, your paragraph 25 seems to suggest that the

12        intervening steps, that one of ordinary skill in

13        the art would understand that such intervening

14        steps could change the drug from a substantially

15        powdered form into a nonpowdered yet compressible

16        form.  So the intervening steps do not suggest to

17        one of ordinary skill in the art that they could

18        change the drug into a -- they can dissolve the

19        drug into a liquid solution; is that correct?

20             MR. TERAN:  I object.

21             THE WITNESS:  I'm afraid I'm going to

22        have to ask to repeat that, please.

23             MR. NUTTER:  She can repeat that.

24             THE WITNESS:  Thank you.

25             (The previous question was read by the

1        reporter.)

2                    MR. TERAN:  I object.

3                    THE WITNESS:  The intervening steps would

4        not imply to one of ordinary skill in the art that

5        only dissolution of the drug in a granulating fluid

6        would be the only intervening step but, rather, it

7        would be one of several intervening steps that

8        could result in the blending of drug in such a way

9        as to result in a more compressible form.

10   BY MR. NUTTER:

11   Q    Okay.  Well, perhaps I'm misinterpreting your

12        paragraph 25.  It says, "To the extent that there

13        were intervening steps between the obtaining and

14        the mixing step, one of ordinary skill in the art

15        would understand those steps to change the drug

16        from a substantially powdered form into

17        something" -- "into a nonpowdered yet compressible

18        form."

19                    So it would not suggest to one of

20        ordinary skill in the art to change the drug from a

21        substantially powdered form into a liquid form.

22        Isn't that what that paragraph says?

23                    MR. TERAN:  I object.

24                    THE WITNESS:  I'm not sure I see that as

25        exclusive.  The drug need not be dissolved in the

1    granulating fluid should a wet granulation step

2    intervene.

3  BY MR. NUTTER:

4  Q    Why did you add the words "nonpowdered yet

5       compressible form"?

6  A    Nonpowdered, by way of referring to more of a

7       granulating material.

8  Q    Why did you want to make sure you covered

9       granulated?

10               MR. TERAN:  I object to form.

11               THE WITNESS:  Typically, granules will be

12     more compressible versus powders as a fine powder

13     not compressible.

14  BY MR. NUTTER:

15  Q    I'm sorry, you said, "Typically, granules will be

16     more compressible versus powders as a fine powder

17     not compressible."

18  A    Yes.

19  Q    I don't understand that.

20  A    I can give you an example.  That a powder may be

21     comprised of some granulite and very, very small

22     granules, perhaps some of them retaining the nature

23     of the pure drug or a pure excipient but less

24     granulated material.  Regardless of -- of what it's

25     comprised of, if that material, in the finer powder

1    fractions of a granule -- of a granulite, if that

2    fine powder is a large fraction and that large

3    fraction of fine powder happens to be of one of the

4    less compressible components, then in the case of

5    tablets, the compressibility and manufacture of a

6    good product is -- is not likely to be very

7    successful.  With the reduction of fine powder into

8    more of a granulite material, the compressibility

9    is -- is more assured.

10   Q    Okay.  Going back to the -- the claim limitation

11   mixing the drug and the carbohydrate material.  Is

12   it your understanding that during the mixing stage,

13   the drug can be in a liquid form?

14              MR. TERAN:  I object.

15              THE WITNESS:  I don't think you can tell

16   from those claims whether or not it is mixed as

17   a -- in solution or as a -- in the dry powdered

18   form.

19   BY MR. NUTTER:

20   Q    What would you need to review to determine what

21   form the drug could be in at the mixing step?

22              MR. TERAN:  I object.  It assumes facts.

23              THE WITNESS:  Well, looking specifically

24   at those claims and using them as examples where --

25   wherein potentially intervening steps could address

1      the use of a granulating fluid or process, I would

2      look again to see if there's anything that excludes

3      that possibility.  And at the time of this writing,

4      I didn't feel that there was.

5   BY MR. NUTTER:

6   Q   Has your opinion changed since you wrote this

7      declaration?

8   A   I would have to review the patent more carefully.

9   Q   At the time that you rendered your opinion, did you

10     give thought to whether or not the drug could be

11     the granulating fluid?

12  A   No.

13  Q   And under the theory that -- strike that.

14                  And if the drug was, in fact, the

15     granulating fluid, would you have to reconsider

16     your opinion?

17                  MR. TERAN:  I object.

18  BY MR. NUTTER:

19  Q   You know, I strike that.

20                  If the drug were, in fact, the

21     granulating fluid, would you want to have an

22     opportunity to reconsider your opinion?

23                  MR. TERAN:  I object.

24                  THE WITNESS:  Are you saying that the --

25     the drug, in its pure state, is fluid?

d9de8cd9-f36e-4787-b6b9-47dfcf1cd463

1    BY MR. NUTTER:

2    Q    I'm saying that the drug -- under the hypothetical,

3         that the drug is dissolved into an aqueous

4         solution --

5    A    Okay.

6    Q    -- to make the granulating fluid and then that is

7         then spray-dried onto a -- let's say a

8         carbohydrate.

9    A    Yes, I would want to re-evaluate.

10   Q    And why would you want to re-evaluate your opinion?

11   A    Because I would only want to render an opinion that

12        is consistent technically with what I know of this

13        type of processing.

14   Q    If I can refer you to paragraph 28 of your

15        declaration, on the same page.

16   A    Yes.

17   Q    That indicates -- well, if you can briefly review

18        it, it seems to define the molten candy method.

19   A    (Witness complying.)  Yes.

20   Q    And this is a method that was known to one of

21        ordinary skill in the art at the time the '737

22        patent was filed; is that correct?

23   A    Yes.

24   Q    And -- and on this paragraph you indicate that

25        molten ingredients, by definition, are in liquid

d9de8cd9-f36e-4787-b6b9-47dfcf1cd463

Page 131

1      form?

2   A  Yes.

3   Q  Now, since they can be in liquid form, wouldn't it

4      make sense that one would consider that to be a wet

5      method?

6   A  As I indicated earlier, when one adds these

7      components -- and molten material, when mixed with

8      anything else, including the carbohydrate, I could

9      envision it to have the consistency of anything

10     from a viscous aqueous solution to a very syrupy,

11     very highly viscous taffy of sorts, in which case I

12     would not touch taffy and say that's wet.  I might

13     touch sugar syrup, a dilute sugar syrup, and say

14     that's wet.  So I think there's room for

15     interpretation.

16  Q  What's the purpose of creating this molten mass in

17     the molten candy method?

18  A  Molding, to be able to form this mass into a

19     material which, once hardened, satisfies your

20     dosage form.

21  Q  So all the ingredients are already mixed, then it's

22     just melted and put poured into a mold.  Is that

23     the way it works?

24              MR. TERAN:  Object.

25              THE WITNESS:  Yes, I believe so.

 1  BY MR. NUTTER:

 2  Q    So there's no mixing of the components after the --

 3       the ingredients are heated and melted to a molten

 4       mass?

 5                 MR. TERAN:  I object.

 6                 THE WITNESS:  There may well be mixing

 7       in -- yes, in the state of the molten material.  In

 8       fact, it would be that melting that would enable

 9       better mixing to occur.

10  BY MR. NUTTER:

11  Q    And if it was the consistency of taffy, would that

12       still promote mixing?

13  A    It could.

14  Q    Okay.  If I can refer you to paragraph 29.  And I

15       just note that you referred to Dr. Block's

16       definition of free liquid as provided in his

17       declaration, and I believe you also define it in

18       footnote 1.

19                 Do you see that?

20                 MR. TERAN:  Object to the

21       characterization.

22                 THE WITNESS:  Yes.

23  BY MR. NUTTER:

24  Q    What does Dr. Block's definition of free liquid

25       mean to you?

1   A     Primarily that liquid that is not strongly

2         associated with a material such that it loses its

3         independent nature, such as water that has not been

4         taken up by a sponge.  Free water dripping from a

5         sponge versus that which is within the sponge.

6   Q     Do you understand Dr. Block's use of the term "free

7         liquid" to mean liquid that is not physically

8         added?

9                   MR. TERAN:  I object.

10                  THE WITNESS:  That's one interpretation

11        of it, yes.

12  BY MR. NUTTER:

13  Q     Now, I know you object to -- well, strike that.

14                  In paragraph 29 you seem to take

15        exception to Dr. Block's use or definition of dry

16        powder to mean fine particles absent the presence

17        of free liquid.  Is that correct?

18                  MR. TERAN:  I object.

19                  THE WITNESS:  Okay.  If you could repeat

20        the question, please.

21                  MR. NUTTER:  If you could repeat the

22        question.

23                  (The preceding question read by the

24        reporter.)

25                  MR. TERAN:  I object.

Page 134

1    BY MR. NUTTER:

2    Q    You know what, I'm going to strike that question

3         because I don't think it's a fair question to you.

4                   In Dr. Block's declaration, he

5         defines "in a substantially powdered form" to mean

6         "largely in the form of fine particles absent the

7         presence of free liquid."

8                   Do you recall that?

9    A    Yes.

10   Q    You did not object to that definition in your

11        declaration; is that correct?

12                  MR. TERAN:  I object.

13                  THE WITNESS:  I think that's true.

14   BY MR. NUTTER:

15   Q    So you accept that the definition of "in a

16        substantially powdered form" to mean "largely in

17        the form of fine particles absent the presence of

18        free liquid"?

19                  MR. TERAN:  I object.

20                  THE WITNESS:  Yes.

21   BY MR. NUTTER:

22   Q    Now, isn't the term "absent the presence of free

23        liquid" just another way of -- of -- strike that.

24                  Isn't the term "absent the presence

25        of free liquid" a more specific way of defining the

1     word "dry"?

2               MR. TERAN:  I object.

3               THE WITNESS:  Yes.

4    BY MR. NUTTER:

5    Q    Now, you note in paragraph 29 that the term "free

6        liquid" does not appear anywhere in the '737

7        patent.  Why is that important to you?

8    A    Well, it neither includes or excludes explicitly

9        the use of "free liquid" as in the addition of a

10       granulation medium.

11   Q    But don't you think if the applicants intended to

12       include it, they would have actually put it

13       somewhere in their patent?

14              MR. TERAN:  I object.  Calls for

15       speculation.

16              THE WITNESS:  More likely than not.  But

17       if they were intending to exclude it, then they

18       might not have specified dry in some cases and not

19       in others.

20    BY MR. NUTTER:

21   Q    I mean, would one of ordinary skill in the art base

22       their interpretation of the claims on what is

23       included in the patent, or should they be required

24       to consider everything that may possibly have been

25       excluded from the patent?

Page 136

1                MR. TERAN:   I object.   Legal conclusion.

2                THE WITNESS:   I can only allow what I'm

3        advised is a potential alternative interpretation

4        given this word "comprising."   As long as I see

5        nothing technically inconsistent in the patent that

6        precludes that interpretation, I'm -- I understand

7        that that -- it is correct to allow for it.

8    BY MR. NUTTER:

9    Q    Now, I understand that the term "absent the

10       presence of free liquid" is not used anywhere in

11       the patent.   I think I'm willing to concede that.

12       But the term "dry" does appear in the '737 patent,

13       does it not?

14   A    It does.

15   Q    And I think you acknowledge that the term "absent

16       the presence of free liquid" is a more specific way

17       of defining the word "dry," correct?

18   A    Yes.

19   Q    So you would admit that the -- the concept of

20       absent the presence of free liquid is disclosed in

21       the '737 patent?

22                MR. TERAN:   I object.

23   BY MR. NUTTER:

24   Q    Is that correct?

25   A    In spirit, yes.

1    Q    Okay.  Since we seem to be counting phrases, does

2         the term "wet" appear anywhere in the '737 patent?

3    A    I don't know that it does.  I -- I don't know.

4    Q    How about "wet methods"; are they disclosed

5         anywhere in the '737 patent?

6    A    I don't believe so.

7    Q    And so then wet granulation wouldn't be disclosed

8         anywhere in the '737 patent?

9    A    No.  However, to the degree that one understands

10        mixing to, you know, potentially include a

11        granulating fluid, it is not excluded.  Therefore,

12        I understand that it could conceivably be present.

13   Q    And that's based on your understanding of the term

14        "comprising"?

15   A    Yes.

16   Q    Okay.  If we can look at now your paragraph 30,

17        page 9 of your declaration.

18   A    Yes.

19   Q    Now, in this paragraph you state, "If mixing in the

20        context of the '737 patent prohibits the presence

21        of liquid, then it would have been unnecessary to

22        state in claims 1 and 18 that the mixing step must

23        occur at a temperature below the melting points of

24        the drug and the carbohydrate material."

25                    Do you see that?

Page 138

1    A    Yes.

2    Q    What -- what do you mean by that statement?

3    A    It -- it's an unnecessary qualification to indicate

4         that -- that it must occur below the temperature of

5         the melting point as to preclude liquid being

6         present.  One wouldn't have to mention that if

7         mixing, by definition, was absolutely a -- a dry

8         process.

9    Q    Now, did Dr. Block exclude the -- the presence of

10        all liquid or just free liquid?

11                  MR. TERAN:  I object.

12                  THE WITNESS:  I don't recall.

13   BY MR. NUTTER:

14   Q    Well, if you refer to paragraph 29, you state that

15        the word "mixing," as used in the claims, would

16        have meant simply combining or blending to one of

17        ordinary skill in the art at the time of invention

18        and not "combining or blending without the use of

19        free liquids."

20                  Does that refresh your memory as to

21        how Dr. Block defined the mixing step?

22   A    Yes.

23   Q    Now, if you were to revise your paragraph 30 to

24        prohibit the presence of free liquid rather than a

25        liquid, would your opinion still be the same?

d9de8cd9-f36e-4787-b6b9-47dfcf1cd463

Page 139

1              MR. TERAN:  Object to form.

2              THE WITNESS:  I believe so.

3    BY MR. NUTTER:

4    Q    Okay.  Now, if -- if -- in the molten candy method,

5         when you heat the components until they form a

6         liquid, as you indicate in your declaration, is

7         that liquid free liquid?

8    A    No.

9    Q    So you can have a liquid that is not a free liquid

10        or you can have a liquid -- strike that.

11             You can have a liquid in the mixing

12        step without physically adding the liquid, correct?

13   A    Yes.

14   Q    But to prevent that possibility, you'd have to add

15        a limitation that the temperature could not go

16        above the melting point, correct?

17   A    Correct.

18   Q    And if you wanted to exclude all liquid, you then

19        would also have to add or you would also have to be

20        construed to consider to be absent the presence of

21        free liquid, correct?

22             MR. TERAN:  I object.

23   BY MR. NUTTER:

24   Q    Strike that.

25             You would want to -- you would want

d9de8cd9-f36e-4787-b6b9-47dfcf1cd463

1          to prevent liquid being formed by heating and you

2          would want to prevent liquid being formed by the

3          addition of liquid, correct?

4                    MR. TERAN:  I object.

5                    THE WITNESS:  Yes.

6     BY MR. NUTTER:

7     Q    Okay.  If I can refer you to your paragraph 29.

8          And it's actually the same page because I'm -- you

9          can -- feel free to review the entire paragraph,

10         but I'm just -- your last statement indicates, "It

11         was well understood at the time of the invention

12         that components can be mixed in the presence of a

13         liquid regardless of whether they dissolve it in."

14                    Do you see that portion?

15    A    Yes.

16    Q    If that's true, then how could the ability to mix

17         components that are insoluble be considered an

18         advantage of the invention of the '737 patent?

19                    MR. TERAN:  I object.

20                    THE WITNESS:  It might not be for those

21         materials which do dissolve.

22    BY MR. NUTTER:

23    Q    So if the patent says that one of the advantages of

24         the invention is the ability to mix insoluble

25         drugs, what would you -- what would that mean to

d9de8cd9-f36e-4787-b6b9-47dfcf1cd463

1        you?

2                    MR. TERAN:  I object.

3                    THE WITNESS:  For those -- for those

4        drugs taking advantage of this patent, they may or

5        may not be insoluble.  If they are insoluble, they

6        may benefit from this patent in a -- in a different

7        way than those drugs which are soluble.

8   BY MR. NUTTER:

9   Q    And how would an insoluble drug benefit from this

10       patent in a different way?

11  A    In the examples given wherein it's mixed dry, they

12       don't have to be heated above their melting point.

13  Q    Okay.  Thank you.  We're getting close to the end,

14       I think.

15                   Okay.  If I can have you turn to --

16       or actually, I take that back.  Page 9, Section B,

17       entitled "The Drug-Containing Matrix."

18  A    Okay.

19  Q    And if I can refer you to paragraph 33.  And take

20       the time to review it if you'd like, but you state

21       in this paragraph that "The drug-containing matrix

22       does not need to be a drug-containing powder

23       matrix."

24                   Do you see that?

25  A    Yes.

d9de8cd9-f36e-4787-b6b9-47dfcf1cd463

1   Q   Now, as part of the support for that opinion, you

2       cite examples of other matrices that are not

3       powdered, such as the molten candy matrices in

4       column 5, line 63, of the '737 patent.

5               Do you see that?

6   A   Yes.

7   Q   Now, could the drug-containing matrix in claims 1

8       and 18 of the '737 patent be a molten candy matrix?

9   A   I'd like to refer to that.

10  Q   Absolutely.

11  A   Okay.  Well, inasmuch as at least claim 1, and I

12      believe it reads similarly in claim 18, is

13      specified at a temperature below that of the

14      melting point, I think the matrix would not be

15      considered molten, if that was your question.

16              Could it be a molten candy matrix,

17      no.

18  Q   Okay.  Thank you.

19              So one of ordinary skill in the art,

20      at the time of the '737 patent, at the time the

21      '737 patent was filed, would read the

22      drug-containing matrix in claims 1 and 18 to be a

23      different type of matrix other than a molten candy

24      matrix?

25  A   Yes.

d9de8cd9-f36e-4787-b6b9-47dfcf1cd463

1  Q    Now, you also rely upon the -- the use of the term

2       "soluble matrix" in column 5, line 2.

3                   Do you see that?

4  A    Yes.

5  Q    Can a -- can a powdered matrix be soluble?

6  A    Yes.

7  Q    Is anything other than a powdered matrix described

8       in the '737 patent?

9  A    Well, there certainly is reference to insoluble

10      drug.

11 Q    And why do you make that distinction?

12 A    I offer it as an example of a reference to -- in

13      the patent to other than a soluble matrix.

14 Q    Can an insoluble matrix be powdered?

15 A    Yes.

16 Q    Can a confectionary matrix be powdered?

17 A    Yes.

18 Q    Now, if the '737 patent describes the drug and the

19      carbohydrate material to be in powdered form --

20      and -- and you've admitted that a soluble matrix

21      can be powdered and a confectionary matrix can be

22      powdered and an insoluble matrix can be powdered --

23      how would one of ordinary skill of the art, at the

24      time of the invention, interpret the term "the

25      drug-containing matrix" as it appears in claims 1

1    and 18?

2              MR. TERAN:  Object to form.

3              THE WITNESS:  I think the difference is

4    can these matrix -- matrices be powdered versus

5    must they be powdered, and I don't see reference to

6    suggest that they must be powdered.

7    BY MR. NUTTER:

8    Q    But it doesn't teach anything but a powdered

9         matrix, correct?

10   A    It doesn't teach other than that.

11   Q    Okay.

12   A    I would agree.

13   Q    And if I could refer you to the front of the '737

14        patent, the abstract.

15   A    Yes.

16   Q    The second-to-last sentence reads, "The present

17        invention achieves these advantages by

18        incorporating the drug into a compressed powder

19        candy matrix."

20              Do you see that?

21   A    Yes.

22   Q    Why is it that you believe the drug-containing

23        matrix in claims 1 and 18 is something other than a

24        compressed powder candy matrix?

25              MR. TERAN:  I object to form.

1          THE WITNESS:  I don't know that I did in

2     the sense that even a granulation can contain

3     powder by the fairly broad definition of a powder.

4  BY MR. NUTTER:

5  Q    Okay.  Well, in paragraph 33 you state that "One of

6     ordinary skill in the art would not conclude that a

7     drug-containing matrix is inherently powdered."

8  A    I agree with that.

9  Q    Okay.  Can you explain that statement to me in

10     light of your previous answer?

11          MR. TERAN:  Object to form.

12          THE WITNESS:  Yes.  The definition of

13     "powder" is sufficiently broad, in my experience,

14     that one might consider a drug-containing matrix to

15     be a heterogenous collection of particles bound

16     together in a granule; and those heterogenous

17     particles may, in fact, be loose enough to comprise

18     some powder proportion of what otherwise is bound

19     into more distinct granules.  It's a matter of

20     degree.

21  BY MR. NUTTER:

22  Q    Okay.  Accepting what you say as true for purposes

23     of my next question, if that's the case, then why

24     do you not conclude that a drug-containing matrix

25     is inherently powdered if you believe powdered

1       could include powder or granules?

2  A    For a given composition, the matrix can be

3       sufficiently strong in terms of granules that one

4       only sees really more discrete granules.  This is

5       especially true for more free-flowing granulation

6       that is generally the target for the manufacturing

7       technician.

8  Q    And would you consider those granules of strong

9       bonds to still be a powder?

10  A    I would refer to them as granules in that state.

11  Q    In this statement that I've been referring to in

12       your declaration, what do you mean by "inherently

13       powdered"?

14  A    Inherently, meaning necessarily containing powders

15       that -- powder representative of, perhaps more

16       often than not, pure materials in discrete

17       particles.  Primary particles of potentially pure

18       drug or pure excipient.

19  Q    Okay.  I note that the '737 patent also lists 23

20       examples of the invention.  Do you recall those

21       examples?

22  A    Yes.

23  Q    To the best of your knowledge, do any of those

24       examples include components that are in something

25       other than a powdered form?

1   A   I was curious as to whether the artificial

2       vanilla -- vanilla, for example, might include free

3       or solution liquid.  Potentially the microcaps,

4       although they would likely behave as a dry

5       particle.

6                   So those are the two areas that I

7       thought could potentially involve liquid as listed

8       explicitly in the component lists.

9   Q   Did you follow up on that question and -- and reach

10      a conclusion?

11  A   To the degree that the artificial vanilla is a

12      flavor and the flavors were referred to as -- as

13      used in the powder state, I concluded that those --

14      that the artificial vanilla is likely dry.

15                  To the degree that microcaps could

16      behave in a powdered state and yet contain

17      encapsulated liquid, that could be viewed as dry.

18  Q   Would those -- were those the only two components

19      listed in the examples that you questioned whether

20      they were dry or not?

21  A   I believe so.  I can confirm that with quick

22      reference.

23                  MR. NUTTER:  I'll tell you, while you

24      confirm that, we'll take a break because he needs

25      to change the tape.

d9de8cd9-f36e-4787-b6b9-47dfcf1cd463

1          THE WITNESS:  Good.

2          VIDEO TECHNICIAN:  This is the end of

3     tape number 2.  We are off the record at 1:16 p.m.

4          (A recess was taken.)

5          VIDEO TECHNICIAN:  We are back on the

6     record at 1:19 p.m.

7     BY MR. NUTTER:

8     Q    Dr. Van Campen, did you get a chance to confirm

9          whether the microcaps and the artificial vanilla

10         were the only two components where you questioned

11         whether they were in dry form or not?

12    A    Yes, and I see nothing that is obviously other than

13         dry.

14    Q    Thank you.

15              Now, if I can ask you to turn to

16         paragraph 35 of your declaration.

17    A    (Witness complying.)

18    Q    You indicate that you "have not undertaken to

19         respond to every statement made by Dr. Block in his

20         declaration and do not intend, by silence, to

21         acquiesce or agree to such statements."

22              Do you see that?

23    A    Yes.

24    Q    What do you mean by that statement?

25    A    To the degree that I've addressed those

1    characteristics, those phrases, those terms used in

2    the patent that appear to address what is possible

3    under the patent in terms of processing, I've

4    addressed.  On more intense review of Dr. Block's

5    declaration, it could be that there are some items

6    that could be further addressed, and more

7    explicitly, in my declaration.

8              I'm comfortable with a qualifier

9    here saying that I could more exhaustively review

10   Dr. Block's declaration and perhaps come up with

11   additional comments, but I had not felt it

12   necessary at this point.

13  Q   Well, obviously it's important for me to know at

14      this time all of your opinions regarding

15      Dr. Block's declaration.  So I guess I just want to

16      know, as you sit here today, do you have any

17      further disagreements with Dr. Block's declaration

18      that are not described in your -- in your

19      declaration?

20              MR. TERAN:  I object.

21              THE WITNESS:  On reflection of our -- of

22      our discussion during the course of these

23      questions, I don't see anything additionally that I

24      would care to add at this point.

25  BY MR. NUTTER: