1  Q   And at this time you don't -- I think earlier you
2      testified that you don't intend to supplement your
3      declaration at this time. Is that correct?
4  A   Unless I'm advised, I have no such intentions.
5  Q   Now, if it was explained to you that, as we
6      discussed earlier -- no, strike that.
7          Do you know Dr. Lawrence Block?
8  A   I have met him once.
9  Q   I think he told me he thought he met you, too.
10 A   Yes.
11 Q   So prior to reviewing his declaration, you'd heard
12     of him before?
13 A   Yes.
14 Q   In what context did the two of you meet?
15 A   We were both attending -- I believe it was the
16     annual AAPS meeting, I believe. And I had met him
17     or I was sitting next to him having a quick lunch
18     on my own when I saw his name tag and took the
19     opportunity to introduce myself and speak with him
20     since I had certainly heard of him.
21 Q   Okay. Now, you said an AAPS meeting. What does
22     that stand for?
23 A   American Association of Pharmaceutical Scientists.
24 Q   And I believe earlier you indicated that you had
25     heard of Dr. Block.

1  A  Yes.
2  Q  How had you -- how had you previously heard of him?
3  A  I have a couple of colleagues who attended
4     Duquesne. I have seen articles by Dr. Block over
5     the years.
6  Q  Do you have an opinion regarding Dr. Block's
7     reputation?
8  A  Yes. In my understanding, he's -- he's highly
9     respected.
10 Q  Now, are you aware that there's a Markman hearing
11    scheduled in this case for next Wednesday,
12    September 14th?
13 A  I -- what did you cite?
14 Q  A Markman hearing, a court hearing to discuss the
15    meaning of the claims of -- of the '737 patent.
16    Have you been notified that there's a hearing next
17    Wednesday regarding that?
18 A  I don't recall how Mr. Teran identified the court
19    date other than to say that there was reason to
20    have this deposition today because of a court date
21    next week. I know no more detail than that.
22 Q  So have you been asked to attend that hearing?
23 A  No. No.
24 Q  Do you plan to attend?
25 A  I had not.

1  Q   Are you available next Wednesday to attend if
2      asked?
3  A   I think so.
4  Q   Okay. Now, I'm going to ask maybe some
5      disconcerting questions, but I need to just get
6      some answers on the record.
7      Have you ever been the subject of
8      academic discipline?
9  A   No.
10 Q   Have you ever been convicted of a crime?
11 A   No.
12 Q   Have you ever been accused of saying or writing
13     anything that was false or untrue?
14 A   No.
15 Q   Have you ever been accused of plagiarism?
16 A   No.
17 Q   Have you ever been involuntarily separated from
18     employment?
19 A   No.
20     MR. NUTTER: Okay. If I could have you
21     mark this as an exhibit.
22     (Exhibit 57 marked for identification.)
23 BY MR. NUTTER:
24 Q   Dr. Van Campen, you've been handed what's been
25     marked as Defendant's Exhibit Number 57 which I

1   hope you recognize as your thesis.
2 A  Yes.
3 Q  Which I'm sure you were hoping you would never see
4   again. I actually have some very brief questions
5   to ask you about your thesis, and then I think that
6   will be it from me.
7          Now, this document is entitled "An
8   Approach to the Evaluation of Hygroscopicity" --
9 A  Yes.
10 Q  -- "for Pharmaceutical Solids" by Lynn Van Campen.
11          And this was submitted in 1979; is
12   that correct?
13 A  That's correct.
14 Q  Are you the author of this document?
15 A  Yes.
16 Q  If I could have you turn to page 19. Near the top
17   of this page, on the second line -- I'm sorry, do
18   you have that page before you?
19 A  I do.
20 Q  -- you refer to a paper by Shotton, S-H-O-T-T-O-N,
21   et al., which contrasts free moisture and bound
22   moisture.
23          Do you see that?
24 A  Yes.
25 Q  Now, after the word "free," you wrote in

1  parentheses "physically adsorbed," A-D-S-O-R-B-E-D;
2  and after the word "bound," you wrote in
3  parentheses, "chemisorbed," C-H-E-M-I-S-O-R-B-E-D.
4              Do you see that?
5  A  Yes.
6  Q  What do you mean by free moisture, i.e., physically
7     adsorbed moisture?
8  A  That which is adherent by very weak physical
9     forces, as opposed to chemisorbed which has a
10    stronger binding energy.
11 Q  So is your use of "free moisture" in your thesis
12    the same as Dr. Block's use of "free liquid" in his
13    declaration?
14              MR. TERAN:  I object.  Take the time you
15    need to review Dr. Block's definition.
16              THE WITNESS:  Yeah, I think I will do
17    that.
18 BY MR. NUTTER:
19 Q  Absolutely.
20 A  Yeah.  It would be easier if you were to refer me
21    to where he refers to this.
22              MR. TERAN:  Page 7, footnote 4 of his
23    declaration.
24              THE WITNESS:  Thank you.
25              The manner in which I use the term

1  "free" versus "bound" would not be included by his
2  definition of "free liquid."
3  BY MR. NUTTER:
4  Q   Which would not be included?
5      I believe it's page 19.
6  A   Right.  Physically adsorbed moisture would qualify,
7      in my view, to that liquid which may be sorbed
8      naturally.
9  Q   And how about "bound moisture"?
10 A   "Bound moisture" I would identify with his phrase
11     "incorporated chemically."
12 Q   Okay.  I -- that's kind of what I thought, but I
13     wanted you to clarify that for me.
14 A   Yeah.  Yeah.
15          MR. NUTTER:  How about if you give me two
16     minutes to look at my notes, and then hopefully I
17     think we're done.
18          VIDEO TECHNICIAN:  We are off the record
19     at 1:30 p.m.
20          (A discussion was held off the record.)
21          VIDEO TECHNICIAN:  We are back on the
22     record at 1:31 p.m.
23          MR. NUTTER:  Dr. Van Campen, I have no
24     further questions other than to add that I
25     appreciate your coming down this morning and

1   spending the morning with us.
2           MR. TERAN:  I have just a couple of
3   questions, I hate to tell you.
4                    EXAMINATION
5   BY MR. TERAN:
6   Q   But if you could pull out Exhibit 55, which is the
7       Peters --
8   A   Yeah.
9   Q   -- chapter.
10          You recall being asked some
11      questions about this document over the course of
12      the morning?
13  A   Yes.
14  Q   If you could turn to page 9971.
15  A   (Witness complying.)
16  Q   And just let me know when you have that in front of
17      you.
18  A   I do.
19  Q   And you recall being asked some questions about wet
20      granulation in the 1980s?
21  A   Yes.
22  Q   Let me ask you to turn your attention to the
23      sentence, it begins -- the second sentence of the
24      paragraph below the table, it says, "Any lumpy
25      materials are milled in order to prepare powders

1  with a uniform particle size."
2              Do you see that?
3  A   Yes.
4  Q   Was it consistent with the understanding in the art
5      that wet granulation could produce lumpy materials?
6              MR. NUTTER:  Object to form.
7              THE WITNESS:  Yes.
8  BY MR. TERAN:
9  Q   And was it understood in the art in the 1980s that
10     those materials could then be milled?
11 A   Yes.
12 Q   Was it also understood that in milling those
13     materials, one could prepare a powder?
14             MR. NUTTER:  Object to form.
15             THE WITNESS:  Yes.
16 BY MR. TERAN:
17 Q   All right.  Let me ask you to put that exhibit
18     aside for a second.
19             You were also asked some questions
20     regarding Dr. Block's declaration and opinions and
21     whether you disagreed with certain opinions of his.
22             You recall that?
23 A   Yes.
24 Q   And you were asked some questions regarding whether
25     you agreed or disagreed with his interpretation of

1    powder.
2              Do you recall that?
3  A   Yes.
4  Q   Did you have Dr. Block's declaration in front of
5      you at the time you were asking -- answering those
6      questions?
7  A   I think not in every case, no.
8  Q   Well, let me ask you to turn to his declaration,
9      which is Exhibit 53 to your deposition, and
10     specifically to paragraph 25 on page 6.
11           MR. NUTTER:  I'm just going to object to
12     the question to the extent that all documents
13     remained available to Dr. Van Campen and they were
14     in front of her at the time I asked all the
15     questions.
16           MR. TERAN:  I -- fair enough.  And to
17     clarify, what I meant by my question was not were
18     they in the pile of exhibits but did you actually
19     have the declaration in front of you as you were
20     answering the questions.
21           MR. NUTTER:  Again, I -- same objection.
22     They were in front of her.
23           MR. TERAN:  Okay.
24  BY MR. TERAN:
25  Q   In any event, did -- were you reading Dr. Block's

1           declaration at the time that you answered those
2           questions?
3    A      No.
4    Q      Now, let me ask you to read paragraph 25 of his
5           declaration on page 6. And I will state it for the
6           record. It states, "Granular material is different
7           from powder. Granular material is an agglomeration
8           of fine particles. Powders are fine particles that
9           move independently of one another."
10                     Do you see that?
11   A      I do.
12   Q      Do you agree with those statements?
13   A      I understand what he is attempting to say, but I
14          cannot agree with the statements as written.
15   Q      Why not?
16   A      It's a matter of degree. Granules can, in smaller
17          particle size, comprise powder and, in fact, fine
18          powder. The degree to which powders are of a pure
19          material or agglomerated with multiple components
20          does not distinguish between granules versus
21          powder. His statement is that it's different from
22          powder. I think powder can be very fine granules,
23          and one might need to look under the microscope
24          and/or evaluate them analytically in order to
25          determine the difference.

1  Q    All right.  Let me ask you now to turn back to
2       Dr. Block's declaration at footnote 4.  I guess you
3       have the declaration in front of you, and footnote
4       4 is on the next page, page 7.
5  A    Yes.
6  Q    And you see where he says, "I use the term free
7       liquid to mean any liquid that is not incorporated
8       chemically into the fine particles beyond that
9       which may be sorbed naturally"?
10                  Do you see that?
11 A    Yes.
12 Q    And do you recall you were asked some questions
13      about situations where a drug and carbohydrate
14      being mixed might be mixed at temperatures above
15      the melting point of either of those components?
16      You recall those questions?
17 A    Yes.
18              MR. NUTTER:  Object to the form.
19 BY MR. TERAN:
20 Q    Is -- can you think of a situation where a mixture
21      of drug and carbohydrate where one or the other or
22      both have been heated beyond their melting
23      temperatures would not result in a free liquid as
24      defined in footnote 4?
25 A    If heated -- if drug and carbohydrate are mixed and

1   heated beyond either or both of their melting
2   points, the liquid would only be chemically part of
3   the particles -- would only be chemically
4   associated with no particles remaining if they are
5   both above their melting points.
6 Q   What do you mean by "chemically associated with no
7   particles remaining"?
8         MR. NUTTER:  Object to the extent it
9   mischaracterizes her prior testimony.
10        MR. TERAN:  And if I did, please correct
11  me.  That's what I thought I heard, but --
12        THE WITNESS:  If melted, then they are a
13  homogeneous liquid form of the same chemical.
14 BY MR. TERAN:
15 Q   Are there particles remaining?
16        MR. NUTTER:  Object to form.
17        THE WITNESS:  Not if melted.
18 BY MR. TERAN:
19 Q   All right.  And finally, let me ask you to turn to
20  Exhibit 57, your thesis.
21 A   (Witness complying.)
22 Q   And you recall you were asked some questions about
23  some portions of the thesis.  As I briefly glanced
24  through it, and this is the first time I've seen
25  it, I noticed on page 14 a reference at the bottom

1    of the paragraph to free liquid.  And I'm referring
2    to the top paragraph of that page 14.
3              Do you have that in front of you?
4  A  Yes.
5  Q  Do you recall how you were using the phrase "free
6    liquid" in this thesis?
7  A  I'm going to read the entire paragraph.
8              Okay.  Distinguishing free liquid I
9    think could be consistent with Dr. Block's
10   definition in that case, although I can't recall
11   Johnson's examples of what types of pharmaceutical
12   materials he is speaking -- he's speaking about.
13 Q  And you're referring to the citation to Johnson,
14   Note 228, that occurs in the prior sentence?
15 A  Right.
16             MR. NUTTER:  Object to the form.
17 BY MR. TERAN:
18 Q  And for the record, turning to page 118 of this
19   exhibit, Exhibit 57, your thesis, there's a
20   citation to Johnson, C.A.: Water determination and
21   its significance in pharmaceutical practice.
22             Do you see that?
23 A  Yes.
24 Q  Is it your memory that the use of free liquid in
25   your thesis was consistent with the way Johnson

1    used free liquid?
2             MR. NUTTER:  Objection, asked and
3    answered.
4             THE WITNESS:  The difference between free
5    liquid and bound water is somewhat of a continuum.
6    And the approach that we were using to evaluate the
7    association of water in particular to that of
8    pharmaceutical materials has had, and still has
9    really, a sense of continuum associating beyond a
10   monolayer of water that sorbs chemically to water
11   that then associates with that monolayer of water
12   and becomes less and less chemically bonded, if you
13   will, to the material at hand.
14   BY MR. TERAN:
15   Q   Was free liquid a term of art in the pharmaceutical
16       arts in 1979?
17   A   I don't recall if Johnson used it.  It may have
18       been my own terminology to relate to that one
19       extreme of that continuum of liquid that is not
20       chemically bound, nor is even physically bound, by
21       weaker forces.
22   Q   Okay.  And just a few final questions.
23              Have you ever studied law?
24   A   No.
25   Q   Have you ever studied patent law?

1  A    No.
2  Q    Have you ever studied principles of claim
3       construction in patents?
4  A    No.
5  Q    Have you ever read any opinions of the federal
6       circuit regarding claim construction?
7  A    No.
8           MR. TERAN:  I have nothing further.
9           MR. NUTTER:  I just have one quick
10      follow-up question.
11                      EXAMINATION
12 BY MR. NUTTER:
13 Q    Dr. Van Campen, I believe you just testified that a
14      powder can be very fine granules.  Is that correct?
15 A    Yes.
16 Q    What do you mean by "very fine"?
17 A    Of the broad particle size ranges that we've found
18      as recently as yesterday in a very frequently --
19      frequent -- frequently used reference, Remington's,
20      I would say it's in the lower particle size range
21      of 100 to perhaps 4- or 500 microns.
22 Q    So it's your opinion that 100 to perhaps
23      500 microns is -- is the definition of very fine?
24          MR. TERAN:  I object.
25          THE WITNESS:  It -- in solid dosage

1      forms, that might be construed as to include fine
2      particles.
3  BY MR. NUTTER:
4  Q    If you were to find a granule that was smaller
5      than, let's say, 100 microns, what description
6      would you give that granule?
7  A    Fine particle.
8  Q    So a very fine particle is larger than a fine
9      particle?
10 A    It's a continuum depending on the context. A very
11     fine particle, I would accept that.
12 Q    Okay. So a very fine granule is somewhere between
13     100 microns and 450 microns, but something less
14     than 100 microns would be a fine particle?
15 A    No. That too would be a very fine particle or very
16     fine granule that exhibits fine powder behavior.
17 Q    Okay. So I guess I'm confused. So did you just
18     expand your range to less than 100 for a very fine
19     granule?
20          MR. TERAN: I object.
21          THE WITNESS: Potentially.
22 BY MR. NUTTER:
23 Q    Okay. I guess my question is how low does the
24     range go, and what's the next description for
25     something smaller than that range?

1  A   In a different context, fine particles are on the
2      orders of 1 or 2 microns in size. Fine particles.
3      Not very fine particles, but fine particles.
4  Q   What do you mean by "in a different context"?
5  A   In the aerosol world, for example, the
6      administration of dry powders are considered fine
7      particles if they are on the order of 1 or
8      2 microns in diameter.
9  Q   Okay. Now, I guess just to relate it to what we're
10     talking about today, in the context of the -- the
11     art described in the '737 patent, what would you
12     consider to be a fine particle?
13 A   A fine particle, 100 to 500 microns.
14 Q   And a very fine particle?
15 A   100 to 200 microns. Perhaps less than 100 microns.
16     It -- you know, very qualitative term.
17              MR. NUTTER:  I have no more questions.
18              MR. TERAN:  Me neither.
19              VIDEO TECHNICIAN:  This is the conclusion
20     of the deposition. We are off the record at
21     1:46 p.m.
22              (Deposition concluded at 1:46 p.m.)
23
24
25

d9de8cd9-f36e-4787-b6b9-47dfcf1cd463

```
1    STATE OF _____ )
                             ) SS.
2    _____ COUNTY   )

3

4            I, DR. LYNN VAN CAMPEN, do hereby certify
5    that I have read the foregoing transcript of
6    proceedings, taken on the 9th day of September, 2005, at
7    706 John Nolen Drive, Madison, Wisconsin, and the same
8    is true and correct except for the list of corrections,
9    if any, noted on the annexed errata sheet.

10

11           Dated at _____, _____,
12   this _____ day of _____, 2005.

13

14                              _____
15                              DR. LYNN VAN CAMPEN
```

d9de8cd9-f36e-4787-b6b9-47dfcf1cd463

```
1      STATE OF WISCONSIN )
                          ) SS:
2      MILWAUKEE COUNTY   )

3

4                I, Julie K. Lyle, RPR/RMR, Certified
5      Realtime Reporter, and Notary Public in and for the
6      State of Wisconsin, do hereby certify that the
7      preceding deposition was recorded by me and reduced
8      to writing under my personal direction.
9                I further certify that said
10     deposition was taken at 706 John Nolen Drive,
11     Madison, Wisconsin, on the 9th day of September,
12     2005, commencing at 8:54 a.m.
13               I further certify that I am not a
14     relative or employee or attorney or counsel of any
15     of the parties, or a relative or employee of such
16     attorney or counsel, or financially interested,
17     directly or indirectly, in this action.
18               In witness whereof, I have hereunto
19     set my hand and affixed my seal of office on this
20     11th day of September, 2005.
21
22
                               _____
                               JULIE K. LYLE, RPR/RMR
23                             Certified Realtime Reporter
                               Notary Public
24
       My commission expires February 18th, 2007.
25
```

*** ERRATA SHEET ***

Page 169

1
      ELLEN GRAUER COURT REPORTING CO. LLC
        126 East 56th Street, Fifth Floor
2
           New York, New York 10022
              212-750-6434
3

4 NAME OF CASE: CEPHALON VS. BARR LABORATORIES
   DATE OF DEPOSITION: September 9th, 2005
5 NAME OF WITNESS: DR. LYNN VAN CAMPEN

6 PAGE  LINE   FROM     TO        REASON

7   \_\_\_|\_\_|_____|_____|_____

8   \_\_\_|\_\_|_____|_____|_____

9   \_\_\_|\_\_|_____|_____|_____

10  \_\_\_|\_\_|_____|_____|_____

11  \_\_\_|\_\_|_____|_____|_____

12  \_\_\_|\_\_|_____|_____|_____

13  \_\_\_|\_\_|_____|_____|_____

14  \_\_\_|\_\_|_____|_____|_____

15  \_\_\_|\_\_|_____|_____|_____

16  \_\_\_|\_\_|_____|_____|_____

17  \_\_\_|\_\_|_____|_____|_____

18  \_\_\_|\_\_|_____|_____|_____

19  \_\_\_|\_\_|_____|_____|_____

20  \_\_\_|\_\_|_____|_____|_____

21

22                            _____

23 Subscribed and sworn before me
   this\_\_\_\_\_day of _____, 2005.
24

25 _____      _____
    (Notary Public)      My Commission Expires: